JS 44 (Rev. 12/07) (cand rev 1-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

David James Duncan

**(b)** County of Residence of First Listed Plaintiff Missoula, Montana
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Annette L. Hurst
Elisabeth R. Brown
Heller Ehrman LLP
333 Bush Street, San Francisco, CA 94104

## DEFENDANTS

Thomas A. Cohen d/b/a Hammermark Productions, Kristi Denton Cohen d/b/a Peloton Productions, and Sierra Club Books

County of Residence of First Listed Defendant Marin
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State. | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Liability | ☐ 640 R.R. & Truck | ☒ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
17 U.S.C. 501; 15 U.S.C. 1125

Brief description of cause:
Copyright infringement, declaratory relief, breach of fiduciary duty, fraud, false advertising

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE

DATE  4-30-08

SIGNATURE OF ATTORNEY OF RECORD

American LegalNet, Inc.
www.FormsWorkflow.com

ORIGINAL
FILED

APR 3 0 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  ANNETTE L. HURST (Bar No. 148738)
2  ELISABETH R. BROWN (Bar No. 234879)
   HELLER EHRMAN LLP
3  333 Bush Street
   San Francisco, CA 94104-2878
4  Telephone: +1.415.772.6000
5  Facsimile:  +1.415.772.6268
   E-mail:     Annette.Hurst@HellerEhrman.com
6              Elisabeth.Brown@HellerEhrman.com

7                                                    E-filing

8  Attorneys for Plaintiff
   DAVID JAMES DUNCAN
9
                                                                         BZ

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12  DAVID JAMES DUNCAN,                    Case No.:
13                                                                2243
                               Plaintiff,
14                                          **COMPLAINT FOR COPYRIGHT
15       v.                                 INFRINGEMENT, DECLARATORY
                                            RELIEF, BREACH OF FIDUCIARY
16  THOMAS A. COHEN d/b/a HAMMERMARK        DUTY, FRAUD, CONSTRUCTIVE
    PRODUCTIONS, KRISTI DENTON COHEN        FRAUD, CONSPIRACY TO
17  d/b/a PELOTON PRODUCTIONS, and          DEFRAUD, FALSE ADVERTISING,
18  SIERRA CLUB BOOKS                       AND INVASION OF THE RIGHT
                                            OF PUBLICITY**
19                             Defendants.
                                            **DEMAND FOR JURY TRIAL**
20

21       Plaintiff David James Duncan ("Duncan" or "Plaintiff") complains in this action

22  against Defendants Thomas A. Cohen ("Cohen") d/b/a Hammermark Productions (a sole

23  proprietorship), Kristi Denton Cohen d/b/a Peloton Productions ("Peloton" or "Denton

24  Cohen"), and Sierra Club Books ("SCB") (collectively, "Defendants") as follows:

25                              **INTRODUCTION**

26       1.    Duncan is an author of award winning books, short stories, and essays,

27  including two best-selling novels, *The River Why* and *The Brothers K*. *The River Why*, a

28  fictional environmental activism and coming-of-age story, was SCB's first fictional

Heller
Ehrman LLP

COMPLAINT

1  publication, and its critical and commercial success strongly contributed to the launch of

2  SCB as a publisher of fiction. Among Duncan's many distinctions as an author, *The River*

3  *Why* ranks thirty-fifth on the *San Francisco Chronicle* list of The 20th Century's 100 Best

4  Books of the American West and *The Brothers K* is an American Library Association Best

5  Books Award-winner and a *New York Times* Notable Book. Both novels won the Pacific

6  Northwest Booksellers Award. The staying power of *The River Why* and its importance to

7  SCB is obvious—in 2002, Duncan, through SCB, released the 20th Anniversary Edition of

8  *The River Why*.

9      2.      Defendant Denton Cohen (producer of corporate training films and wife of

10  Defendant Cohen) has engaged in, and continues to engage in, conduct infringing Duncan's

11  literary work copyright in *The River Why*. Denton Cohen wrongly contends that she

12  acquired the right to prepare a film derivative work of the novel from her husband (a Marin

13  County attorney), and she has taken recent steps to begin production. This right, however,

14  was not Cohen's to give.

15      3.      Recently, Duncan discovered a fraudulent scheme between SCB and Cohen,

16  which renders unenforceable any rights Cohen may have had. Specifically, SCB, acting as

17  Duncan's agent, sold Hammermark Productions, Inc. ("Hammermark") an option to prepare

18  the film derivative work of *The River Why*. By the terms of that agreement, Hammermark

19  never timely exercised the option. SCB, in violation of its fiduciary duty owed to Duncan,

20  revived Hammermark's expired option without *any* consideration *after* Hammermark

21  purportedly assigned the rights to Cohen and Cohen offered SCB an opportunity to invest

22  on its own account in the film production. Even in the absence of this fraudulent conduct,

23  Duncan terminated Hammermark's right to prepare a film derivative work in 1993 because

24  Hammermark failed to fulfill its obligations within a reasonable time.

25      4.      Duncan first negotiated with SCB, and then tried for some time to negotiate

26  with Denton Cohen since learning of this scheme. Duncan has gone to great lengths in an

27  effort to resolve the impasse created by Denton Cohen's insistence that she owns the film

28  rights to the book and SCB's faithless conduct. Denton Cohen is not qualified to produce

Heller
Ehrman LLP

2

1 the film, and Duncan never would have agreed to grant her the rights. All else seemingly

2 has failed, and Duncan now seeks herein by way of a lawsuit to finally put a stop to Denton

3 Cohen's infringement of the right to prepare derivative works of his book *The River Why*.

## PARTIES

5.    Duncan is a citizen of Montana residing in Missoula County, Montana.

6.    Defendant Cohen is a citizen of California residing in Marin County, California.

7.    Defendant Denton Cohen is a citizen of California residing in Marin County, California. Denton Cohen also transacts business under the fictitious business name of Peloton Productions.

8.    Upon information and belief, Defendant SCB is a division of the Sierra Club with its principal place of business at 85 Second Street, San Francisco, California 94105.

## NATURE OF THE CASE

9.    This action is for the infringement of a United States copyright, pursuant to the laws of the United States, 17 U.S.C. Section 501 *et seq*., for false advertising, pursuant to Section 43(a) of the Lanham Act, for declaratory relief, breach of fiduciary duty, fraud, constructive fraud, conspiracy to defraud, and invasion of the right of publicity.

## JURISDICTION AND VENUE

10.    Subject matter jurisdiction for copyright infringement and false advertising claims are proper in this Court pursuant to 28 U.S.C. Sections 1331 and 1338. Supplemental jurisdiction over the declaratory relief, breach of fiduciary duty, fraud, constructive fraud, conspiracy to defraud, and invasion of the right of publicity claims are proper in this Court under 28 U.S.C. Section 1367.

11.    Venue is proper in this State and this District pursuant to 28 U.S.C. Section 1400(a).

## INTRADISTRICT ASSIGNMENT

12.    Because this action is an Intellectual Property Action within the meaning of Civil Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

Heller
Ehrman LLP

## BACKGROUND FACTS COMMON TO ALL CLAIMS

13.    Duncan owns United States Copyright Registration No. TX-1-078-799 dated March 7, 1983, titled THE RIVER WHY.

14.    On or about November 20, 1981, Duncan and Sierra Club Books ("SCB") entered a Publishing Agreement that granted SCB the right to publish *The River Why* and to act as Duncan's agent for ancillary rights, including the derivative film rights, until such time as Duncan appointed a different agent. The Publishing Agreement did not convey the copyright in *The River Why* to SCB nor did it convey ownership of any rights to prepare derivative works.

15.    In or about the spring of 1983, SCB published *The River Why*. *The River Why* was SCB's first fictional publication and strongly contributed to the launch of SCB as a publisher.

16.    Beginning in 1983, Cohen communicated directly to Duncan his interest in acquiring the right to prepare a film derivative work of *The River Why*. At some point thereafter, Cohen began communicating with Duncan's agent, SCB, regarding the film rights. On or about October 2, 1984, Cohen, acting on behalf of Hammermark, sent an unexecuted proposed letter agreement ("Letter Agreement") to Ms. Andrea Nachtigall, who apparently acted as SCB's agent. The Letter Agreement proposed that SCB would option the right to prepare a film derivative work of *The River Why* to Hammermark. Upon information and belief, Cohen was aware at all relevant times that Duncan owned the copyright to *The River Why* and that SCB acted as his agent only. Upon information and belief, Cohen drafted the Letter Agreement. Attached hereto as Exhibit 1 is a true and correct copy of the Letter Agreement.

17.    Nachtigall forwarded the agreement to Jon Beckmann of SCB asking him to sign it and to confirm SCB had "the right to sell the film and television rights." In response, Beckmann sent Nachtigall the Publishing Agreement, which *does not* confer ownership of *The River Why* copyright to SCB or the right to sell the film and television rights. In addition, Beckmann sent executed copies of the Letter Agreement, despite SCB's lack of

1 ownership and despite questions for Nachtigall about the meaning of the terms contained in
2 the Letter Agreement. Beckmann's response to Nachtigall acknowledged that SCB was a
3 novice with this type of contract and that the Letter Agreement "is a first for us." Attached
4 hereto as Exhibits 2 and 3 are true and correct copies of the correspondence exchanged
5 between Ms. Nachtigall and Mr. Beckmann. Cohen countersigned the Letter Agreement on
6 behalf of Hammermark.

7     18.    The Letter Agreement offered Hammermark an option to prepare a film
8 version of *The River Why* upon specified terms. To exercise the option, the terms required
9 Hammermark to pay a negotiated price in two installments, one-third on exercise of the
10 option, and two-thirds on "commencement of photography," in addition to a promise of a
11 future running royalty.

12     19.    The Letter Agreement was inconsistent with industry standards for the
13 protection of authors and drafted to Hammermark's advantage. It contained no express
14 deadline for the commencement of photography and provided no express reversion of rights
15 to Duncan. In addition, the Letter Agreement misrepresented SCB's status, purporting that
16 SCB *owned* and had the right to convey the copyright in *The River Why*, when in fact SCB
17 was only authorized to serve as Duncan's agent.

18     20.    Under the terms of the Letter Agreement, Hammermark's option expired
19 twelve months after SCB's execution—on October 17, 1985. Hammermark could extend
20 this deadline by an additional six (6) months (to April 17, 1986) should it complete a
21 screenplay prior to the deadline. If a screenplay were written, Hammermark could then
22 further extend the option period an additional eighteen months upon payment of a $2,500.

23     21.    Cohen purported to have written a "first draft" of the screenplay himself by on
24 or about April 12, 1985. Hammermark did not actually tender any screenplay to Duncan,
25 however, until October 31, 1985, two weeks after the option deadline. Under the terms of
26 the Letter Agreement, Hammermark's failure to tender the screenplay by October 17, 1985
27 was grounds for the option to expire. SCB apparently ignored this breach of the Letter
28 Agreement and purported nonetheless to extend the option deadline until April 17, 1986.

Heller
Ehrman LLP

1  Moreover, Duncan is informed and believes and thereupon states that in the meantime the
2  optionee, Hammermark Productions, had dissolved and no longer existed.  Cohen did not
3  disclose this change in status to SCB and Duncan.

4  22.  By spring of 1987, SCB and Cohen were acting as if Hammermark had both
5  delivered the screenplay in a timely fashion and had timely made the required $2,500 option
6  payment by April 17, 1986, which would have extended the option for the additional
7  eighteen months until October 17, 1987.  Duncan is informed and believes and thereupon
8  states, however, that neither Hammermark nor a proper assignee ever made the full $2,500
9  payment by that deadline, and consequently, the improperly extended option again expired
10  on April 17, 1986.

11  23.  Approximately one year *after* the option again expired on April 17, 1986, and
12  in an apparent attempt to revive the expired option, Cohen offered Duncan's agent, SCB, an
13  opportunity to invest in the film on its own behalf, *without Duncan's knowledge*.  Cohen
14  made his offer to SCB in a phone call and two letters to Beckmann in early April 1987.
15  Beckmann responded to Cohen on April 16, indicating SCB was "tempted by the
16  investment."  Attached hereto as Exhibits 4, 5 and 6 are true and correct copies of the
17  correspondence exchanged between Cohen and Beckmann.

18  24.  On or about May 7, 1987, Cohen and SCB improperly agreed to deprive
19  Duncan of the film rights in *The River Why*, by executing a new letter agreement purporting
20  to grant a *further* twelve-month "extension" in exchange for $2000.  This new 12-month
21  option was not set to begin for another five months (October 17, 1987).  The $2000
22  payment was not a substitute for the $2500 payment provided for in the Letter Agreement.
23  It was a *new* option, that was to be tacked on to the end of the *unexercised* eighteen-month
24  extension.  In essence, SCB allowed Cohen, now apparently acting on behalf of his sole
25  proprietorship Hammermark Productions, to resurrect the expired option and finagle an
26  additional thirty months—all without Duncan's authorization—for the nominal fee of
27  $2,000.  SCB's conduct directly followed Cohen's investment offer to SCB.  SCB never
28  made a full disclosure to Duncan of the facts and circumstances of this new option.  Even if

Heller
Ehrman LLP

6

Hammermark had made the original $2,500 payment necessary for the eighteen month extension, this entirely new option was not provided for under the original Letter Agreement and it was agreed to by SCB while it was entertaining an investment opportunity put forth by Cohen. Attached hereto as Exhibit 7 is a true and correct copy of the May 7, 1987 option agreement.

25.    This revival of the option, which gave Cohen d/b/a Hammermark Productions until October 17, 1988 to exercise it, was negotiated and signed without Duncan's knowledge. Indeed, SCB and Cohen had every reason to believe that Duncan would strongly oppose reviving the option. Duncan detested the screenplay Cohen had tendered in 1985 and he unequivocally expressed his dissatisfaction to Cohen and SCB. Despite SCB's awareness of Duncan's disapproval, and with an investment opportunity in hand, SCB purported to grant the new option.

26.    In the meantime, the negotiations concerning SCB's investment opportunity continued. On or about August 29, 1987, Cohen sent an offering memorandum and subscription agreement to SCB relating to the investment opportunity. On or about September 10, 1987, SCB's Beckmann wrote to Cohen, thanking him for the investment prospectus and stating that "because of the unusual nature of the deal, I'll have to talk to other folks here before asking accounting to draw up a check." On or about September 25, 1987, Beckmann communicated SCB's decision to invest $10,000 in the project, contingent on Cohen's raising the additional needed funds for a $1.5 million production. Attached hereto as Exhibits 8, 9 and 10 are true and correct copies of the correspondence exchanged between Beckmann and Cohen.

27.    On or about October 14, 1987, Cohen sent a letter to Beckmann reciting that a check for $2,500 was enclosed "to extend the option on *The River Why* for an additional year as per our prior agreement." This payment was at least eighteen months too late to be considered the $2,500 payment required under the terms of the original Letter Agreement. Attached hereto as Exhibit 11 is a true and correct copy of Cohen's October 14, 1987 letter.

Heller
Ehrman LLP

1  28.  When Duncan learned of the "extension," he objected to SCB. SCB told
2  Duncan he had no choice but to go along with the extension. Duncan, completely unaware
3  that SCB was entertaining an investment opportunity in the film on its own account and also
4  unaware that SCB was wrong that he had no legal right to refuse, trusted and followed his
5  agent's advice. Duncan only learned of Cohen's investment offer to SCB in or about late
6  2005 or early 2006, after he requested and received a copy of SCB's *The River Why* file
7  from a retiring SCB employee. Prior to receiving the file, Duncan had no knowledge that
8  SCB had extended the option while entertaining an investment opportunity on its own
9  account, nor did he have any reason to suspect his agent had purported to act on his behalf
10  while laboring under a material conflict of interest.

11  29.  Under the Letter Agreement, in order to exercise the option, Hammermark
12  was obliged to develop a budget, because the payment due upon exercise was calculated off
13  the film's budget, i.e. 1/3 of 5% of the film's budget. In or about October 1988, a new
14  entity—"River Why Partners"—purported to exercise the option and assessed a $1,234,093
15  budget for the film. Cohen, acting on behalf of River Why Partners, tendered the first 1/3 of
16  the required payment on or about October 12, 1988. Cohen stated the remaining 2/3 would
17  be paid upon "commencement of photography, which I hope will be next summer."
18  Attached hereto as Exhibit 12 is a true and correct copy of Cohen's October 12 letter.

19  30.  Upon information and belief, there was no written assignment from
20  Hammermark Productions, Inc. to Cohen. Upon information and belief, there was no
21  further written assignment agreement from Cohen to River Why Partners. Given the lack of
22  written assignments, River Why Partners lacked authority to exercise the option and it again
23  lapsed. Moreover, every subsequent purported assignment deriving from Hammermark was
24  and is invalid under 17 U.S.C. Section 204.

25  31.  Additionally, the proposed budget was nothing more than a sham designed to
26  fraudulently retain the right to prepare a film derivative work of *The River Why*. There is no
27  evidence that Hammermark, Cohen, River Why Partners or anyone else then claiming
28  through any of them made any concrete steps to support the proposed budget that would be

Heller
Ehrman LLP

8

1    expected by industry standards—i.e., there were no commitments in the budget amount and
2    no director or actors involved in the project. Nor did Cohen have any basis for warranting
3    that he would make the remaining 2/3 payment upon commencement of photography within
4    a reasonable time, and certainly not by the following summer.

5        32.    Despite the failure to comply with the terms of the Letter Agreement, and in
6    furtherance of its breach of fiduciary duty, SCB accepted River Why Partners' option
7    exercise payment, while expressly acknowledging Duncan's disapproval for the agreement,
8    noting "the author's apprehensions." Attached hereto as Exhibit 13 is a true and correct
9    copy of SCB's acceptance of the option exercise payment.

10        33.    Hammermark, Cohen and River Why Partners all failed to perform. "Next
11    summer" came and went, but photography did not commence. In fact, *five years* came and
12    went without commencement of photography. By 1993, photography still had not
13    commenced. In the interceding years, Duncan forewent various other opportunities to make
14    the film, because of the cloud over title to the rights to prepare motion picture derivative
15    works.

16        34.    In or about 1993, Duncan became aware that Cohen was attempting to sell the
17    film rights to a third party. In light of Cohen's complete failure to perform, in October
18    1993, Duncan, through his new literary agent Michael Snell, sent a letter in writing
19    expressly terminating the option and notifying Cohen that the film rights had reverted to
20    Duncan. Attached hereto as Exhibit 14 is a true and correct copy of Mr. Snell's letter to
21    Cohen.

22        35.    Following the termination, Duncan and his agent made some efforts to
23    cooperate with Cohen, but these attempts at an amicable resolution went nowhere.

24        36.    In the years subsequent to 1993, Cohen made no genuine or concrete efforts to
25    exercise his alleged right to prepare a film derivative work of *The River Why*, except
26    dilettantish attempts to "scope out" potential filming sites in Oregon and New Zealand
27    vacation destinations, trips which Cohen took with his wife and conceded that he wrote off
28    on his taxes as business expenses. Nonetheless, it appears Cohen continued to claim he had

Heller
Ehrman LLP

9

1 the right to prepare the film (although it is unclear in exactly whose name), because in or
2 about 2004, Cohen purportedly conveyed the Letter Agreement to his wife, Kristi Denton
3 Cohen.

4      37.   In or about 2004, Duncan learned of Denton Cohen's renewed efforts to
5 produce the film. Duncan promptly sent the Cohens a letter reiterating his termination of
6 the Letter Agreement. In spite of this and every other defect in the chain of title outlined
7 above, Denton Cohen continues to claim the right to prepare the derivative film work of *The*
8 *River Why*.

9      38.   Denton Cohen's company, Peloton Productions, maintains a website
10 advertising *The River Why* production. On a page entitled "who's who" in the production,
11 the website lists David James Duncan first, as the author of the novel, followed by the
12 names of an actor and director allegedly connected to the project. Attached hereto as
13 Exhibit 15 is a true and correct copy of the webpage.

14      39.   Duncan has not authorized Peloton to use his name or otherwise to suggest he
15 is affiliated with or endorses the Peloton production in any way. Denton Cohen has used
16 Duncan's name, without his authorization and in a manner that implies his endorsement to
17 solicit investments from people with an affinity for fly fishing, Duncan and his novel. She
18 targets audiences where she knows Duncan's goodwill is at its highest, including the Salt
19 Lake City Outdoor Retailer Trade Show, where Duncan has been a featured speaker.

20      40.   Throughout 2006 and 2007, Duncan and his attorneys attempted to resolve
21 this dispute with Defendants.

22      41.   While the mediation efforts were ongoing, in July 2007 Peloton filed a lawsuit
23 against the Sierra Club in California state court, seeking a declaration that the Letter
24 Agreement is valid and binding. Despite the pendency of settlement discussions, the
25 Cohens did not disclose the lawsuit to Duncan and Duncan only learned of it from SCB
26 shortly before SCB was required to respond to the complaint in that action. In the
27 complaint, Peloton alleges that SCB acted as Duncan's exclusive agent in 1984—thus
28 implicitly conceding both that Cohen was aware of the terms of the Publishing Agreement

Heller
Ehrman LLP

10

1 and that SCB did not itself own the rights in *The River Why*, but rather had acted as
2 Duncan's agent. At the time of the filing of the lawsuit, SCB was fully aware that Duncan
3 believed the Letter Agreement to be either unenforceable by Peloton or to have terminated.
4 Nonetheless, in November 2007, Sierra Club and Peloton entered a stipulated judgment that
5 provided "(1) The October 1984 Agreement between Hammermark Productions, Inc. and
6 Sierra Club is valid and binding on all parties and their assignees and successors in interest;
7 [and] (2) Subject only to further contingent payments as set forth in the October 1984
8 Agreement, Peloton is the owner of the motion picture rights to the novel The River Why
9 written by David James Duncan." The court in that lawsuit separately found that no
10 judgment would bind David James Duncan.

11 42.    Duncan has recently put together a highly reputable team who can bring *The*
12 *River Why* to the screen. Matt Salinger, an actor and producer of more than a dozen small
13 independent films, and Patrick Markey, producer of the acclaimed fly-fishing film *A River*
14 *Runs Through It*, intend to produce the motion picture version of *The River Why* once
15 Duncan has successfully cleared title to the rights. Denton Cohen's continuing assertion of
16 title is causing Duncan ongoing harm and loss of opportunity to option the rights to Salinger
17 and Markey.

18
## FIRST CLAIM FOR RELIEF

19
### (Copyright Infringement Against Defendant Denton Cohen)

20 43.    Paragraphs 1 through 42 are hereby incorporated by reference.

21 44.    Defendant Denton Cohen is violating 17 U.S.C. Section 106 by engaging in
22 conduct that infringes Duncan's registered copyright in *The River Why* through her efforts
23 to produce a film version of his novel.

24 45.    Denton Cohen's infringement of Duncan's registered copyright is willful.
25 Knowledge of Cohen's fraudulent conduct, including the investment opportunity to SCB
26 and the sham film budget, as well as Duncan's 1993 termination of the Letter Agreement is
27 imputed to Denton Cohen by reason of the Cohens' fiduciary relationship. Consequently,
28 Denton Cohen knew the Letter Agreement had long since terminated, or was otherwise

Heller
Ehrman LLP

11

1 invalid and unenforceable. Denton Cohen's persistence in her claim to the right to prepare a
2 film derivative work of *The River Why* gives rise to a strong inference of willful
3 infringement.

4     46.     Duncan has been damaged by Denton Cohen's willful infringement in a sum
5 to be determined at trial.

6     47.     As a direct result of Denton Cohen's infringement, Duncan has suffered and
7 will continue to suffer irreparable harm, including but not limited to harm to his reputation
8 and goodwill.

9     48.     Duncan is informed and believes and on that basis alleges that Denton Cohen
10 threatens to continue her infringing activities, and unless restrained and enjoined, will
11 continue to do so. Duncan's remedy at law is not by itself adequate to compensate him for
12 the harm inflicted and threatened by Denton Cohen.

13 ## SECOND CLAIM FOR RELIEF

14 ### (Declaratory Relief Against All Defendants)

15     49.     Paragraphs 1 through 48 are hereby incorporated by reference.

16     50.     An actual controversy now exists between Duncan and Defendants in that
17 Duncan contends, and Defendants deny, that (a) the option in the original Letter Agreement
18 is invalid; (b) the extensions and/or renewals of the option agreement between SCB,
19 Hammermark, and Cohen were invalid; (c) the assignments of the Letter Agreement are
20 invalid; and (d) even if all of the foregoing were not true, the agreement has since
21 terminated due to material breach and all film rights to *The River Why* have reverted to
22 Duncan subject to whatever obligations he may have to SCB under the Publishing
23 Agreement.

24     51.     The Letter Agreement is unenforceable because Cohen knew that SCB did not
25 own the rights and drafted an agreement that nonetheless purported to convey them. The
26 Letter Agreement is unenforceable by reason of Cohen's and SCB's fraudulent conduct,
27 which was designed to allow Cohen to hang on to the right to prepare a film derivative work
28 of *The River Why* and thereby allow SCB to potentially benefit from an investment

Heller
Ehrman LLP

1  opportunity. In the face of the option deadline, and with knowledge that Duncan
2  disapproved of Cohen's screenplay for *The River Why*, Cohen offered SCB an investment
3  opportunity in the project, while requesting a new option. Cohen was aware of SCB's
4  fiduciary duties owed to Duncan and had reason to know the investment opportunity created
5  a real conflict of interest between SCB and Duncan. SCB concealed this opportunity from
6  Duncan and, despite its knowledge that Duncan would have preferred to allow the option to
7  expire, SCB purported to create a new option.

8      52.     Upon the expiration of the fraudulently created option, Cohen perpetuated the
9  fraud by creating a sham film budget he could not warrant. A film budget was a
10 prerequisite to exercising the option, because the payment due was keyed off of the film
11 budget. Cohen, however, had taken no concrete steps to plan the production or develop a
12 good faith budget. Nor had he raised the necessary money to support the budget. Without
13 the money, not even pre-production, let alone photography, could begin. Cohen's
14 fabricated budget and false promise to commence photography by the next summer were
15 intended to induce Duncan to accept the option payment.

16     53.     Even if the Letter Agreement were enforceable despite these frauds, the River
17 Why Partners was never authorized to exercise the option, because Hammermark
18 Productions did not properly assign the rights, in writing, to Cohen as an individual or to
19 River Why Partners. The conveyance of exclusive rights under the Copyright Act can only
20 be effected in writing. 17 U.S.C. § 204(a); *see also Davis v. Blige*, 505 F.3d 90 (2d Cir.
21 2007).

22     54.     Alternatively, even if the Letter Agreement were enforceable by River Why
23 Partners, by 2004 the Letter Agreement had long since terminated. Under California Law,
24 the Letter Agreement carried with it a variety of unexpressed legal obligations and
25 restrictions. Those include, without limitation, the covenant of good faith and fair dealing
26 implied in every agreement under California law, the obligation of an exclusive licensee to
27 exercise best efforts in exploiting the licensed subject matter, and the requirement of good
28 and valid consideration to support a contract. In addition, the absence of an express

Heller
Ehrman LLP

1 deadline for performance in the Letter Agreement brings to bear California Civil Code
2 Section 1657, which provides "[i]f no time is specified for the performance of an act to be
3 performed, a reasonable time is allowed."

4     55.   Hammermark violated its obligation and failed to perform under the Letter
5 Agreement within a reasonable time or undertake meaningful efforts commensurate with
6 industry norms to produce the film.

7     56.   Cohen violated his obligation to deal in good faith. He knowingly and
8 intentionally solicited SCB's investment in the project, knowing that SCB acted as
9 Duncan's agent, and with reason to know that Duncan would not authorize a further
10 extension of the option. He misrepresented the status of the film and the budget in
11 obtaining the purported extension of the option. Despite an express termination of the
12 rights in 1993, Cohen secretly purported to assign them to his wife in 2004.

13     57.   Knowledge of Cohen's fraud and the termination of the Letter Agreement is
14 imputed to Denton Cohen, who allegedly obtained the film rights from Cohen, her husband
15 and agent.

16     58.   Duncan is entitled to a declaration that the Letter Agreement is invalid or
17 otherwise terminated and he owns the film rights to *The River Why* free and clear of any
18 obligation to Hammermark, the River Why Partners, Cohen or Denton Cohen. The
19 requested judicial declaration is appropriate and necessary at this time so that the parties
20 may know how to proceed regarding future ownership of the motion picture rights to *The*
21 *River Why*.

22                     **THIRD CLAIM FOR RELIEF**

23        **(Breach of Fiduciary Duty Against Defendant SCB)**

24     59.   Paragraphs 1 through 58 are incorporated by reference.

25     60.   Defendant SCB breached its fiduciary duty to Duncan by failing to disclose its
26 investment opportunity prior to granting a further extension of the option to Cohen in May
27 1987. The information concerning SCB's business opportunity was material to SCB's
28 duties owed to Duncan and created a genuine conflict of interest. In light of Duncan's

Heller
Ehrman LLP

14

1 opposition to Cohen's script, SCB knew or had reason to know that Duncan would oppose a
2 renewal and would want any information concerning SCB's business opportunity in *The*
3 *River Why*.

4     61.    SCB's contemplation of an investment opportunity in Cohen's anticipated
5 production of *The River Why* created a real conflict of interest between SCB and Duncan.
6 SCB agreed to extend the option beyond the terms of the original Letter Agreement without
7 consulting Duncan, while at the same time entertaining the investment opportunity on its
8 own behalf. SCB knew or had reason to know Duncan would oppose such an extension,
9 because Duncan expressed his dissatisfaction with Cohen's screenplay to SCB.

10     62.    Defendant SCB also breached its fiduciary duty to Duncan by signing the
11 Letter Agreement when it acknowledged it did not understand the terms and holding out
12 Duncan's property, the copyright in *The River Why*, in a manner that made it appear as if
13 SCB owned the property. Specifically, SCB knowingly signed an agreement that falsely
14 described SCB as the owner of the property, even after Nachtigall directly asked SCB to
15 confirm it owned the rights.

16     63.    Defendant SCB again breached its fiduciary duty to Duncan by entering a
17 stipulated judgment with Denton Cohen that provided "(1) The October 1984 Agreement
18 between Hammermark Productions, Inc. and Sierra Club is valid and binding on all parties
19 and their assignees and successors in interest; [and] (2) Subject only to further contingent
20 payments as set forth in the October 1984 Agreement, Peloton is the owner of the motion
21 picture rights to the novel The River Why written by David James Duncan." SCB owed a
22 continued obligation to protect Duncan's property rights, even after the termination of its
23 agency relationship. SCB was aware Duncan deemed the Letter Agreement terminated
24 and/or invalid. Nonetheless, SCB potentially impaired Duncan's property rights by entering
25 the stipulated judgment, despite its fiduciary obligations to him as an agent.

26     64.    Duncan is entitled to an award of compensatory damages, restitution,
27 disgorgement of profits, punitive damages, and any other relief that the court deems just and
28 proper.

Heller
Ehrman LLP

1

## FOURTH CLAIM FOR RELIEF

2

### (Actual Fraud as to Defendant Cohen; Cal. C. Code § 1572)

3

65.    Paragraphs 1 through 64 are incorporated by reference.

4    66.    Cohen is liable for fraud. In the face of the option deadline, and with
5    knowledge that Duncan disapproved of his screenplay for *The River Why*, Cohen offered
6    SCB an investment opportunity in the project, while requesting a new option. Cohen was
7    aware of SCB's fiduciary duties owed to Duncan and had reason to know the investment
8    opportunity created a real conflict of interest between SCB and Duncan. Cohen and SCB
9    agreed to the new option agreement *without Duncan's approval.*

10    67.    A year later, upon expiration of the new option created between SCB and
11    Cohen in May 1987, Cohen created a sham film budget in an effort to hang on to the film
12    rights. A film budget was a prerequisite to exercising the option, because the payment due
13    was keyed off the film budget. Cohen, however, had taken no concrete steps to plan the
14    production or develop a good faith budget. Cohen's fabricated budget and promise to
15    commence photography by the next summer were intended to induce SCB and Duncan to
16    accept the option payment.

17    68.    Cohen was in no position to warrant the proposed film budget, because he had
18    made none of the concrete steps in accordance with industry practice to develop the budget.
19    For the same reasons, he was in no position to warrant his promise to commence
20    photography within a reasonable time and certainly not by the summer of 1989. Cohen had
21    no reasonable basis for making the representations and warranties that he made in seeking
22    the purported extension of the option.

23    69.    Knowledge of Cohen's fraud is imputed to Denton Cohen, who allegedly
24    obtained the right to prepare a film derivative work from Cohen, her husband and agent.

25    70.    As a result of Cohen's fraud, Duncan is entitled to a declaration from the
26    court that the Letter Agreement and exercise of the option is unenforceable.

27

Heller    28
Ehrman LLP

16

1

## FIFTH CLAIM

2

### (Constructive Fraud as to SCB; Cal. C. Code § 1573)

3

71.     Paragraphs 1 through 70 are incorporated by reference.

4     72.     Prior to granting Cohen a new option in or about May 1987, SCB concealed

5    from Duncan its investment opportunity in Cohen's production.  As Duncan's agent for the

6    ancillary rights in *The River Why*, SCB had a duty to disclose this investment opportunity

7    because it created a genuine conflict of interest between SCB and Duncan.  SCB knew that

8    Duncan would have preferred to allow the option to expire, yet SCB benefited from

9    granting Cohen a new option in order to buy more time to consider the investment

10    opportunity.

11     73.     When Duncan learned of the new option and objected, SCB assured Duncan

12    there was nothing he could do.  Had Duncan been aware of SCB's investment opportunity,

13    however, he would not have relied on his agent's assurances nor would he have accepted

14    the option payment from Cohen.  Instead, he would have endeavored to rescind the new

15    option.

16     74.     Duncan is entitled to a declaration that the Letter Agreement and Cohen's

17    purported exercise of the option are unenforceable.

18

## SIXTH CLAIM FOR RELIEF

19

### (Conspiracy to Defraud Against All Defendants)

20

75.     Paragraphs 1 through 74 are incorporated by reference.

21     76.     The Cohens and SCB agreed to deprive Duncan of the film rights in *The River*

22    *Why* and shared a common intent to defraud Duncan of those rights.  Cohen engaged in

23    fraudulent conduct by inducing SCB to violate its fiduciary duties, developing a fraudulent

24    budget, and making unwarranted promises to perform, all in an effort to hang on to the film

25    rights in *The River Why*.  SCB engaged in constructive fraud by creating a new option and

26    concealing material information from Duncan relating to the investment—an investment

27    from which SCB could only benefit if it gave Cohen a new option and allowed him to retain

Heller
Ehrman LLP

28    the rights.  The Cohens and SCB continued to perpetrate this fraud by entering the

1 November 2007 stipulated judgment that provided "(1) The October 1984 Agreement
2 between Hammermark Productions, Inc. and Sierra Club is valid and binding on all parties
3 and their assignees and successors in interest; [and] (2) Subject only to further contingent
4 payments as set forth in the October 1984 Agreement, Peloton is the owner of the motion
5 picture rights to the novel The River Why written by David James Duncan."

6     77.   Knowledge of the conspiracy is imputed to Denton Cohen, who allegedly
7 obtained the right to prepare a film derivative work from Cohen, her husband and agent.
8 Denton Cohen joined the conspiracy to defraud Duncan through her declaratory relief action
9 against SCB that ended with the stipulated judgment.

10     78.   The last overt act of the conspiracy occurred in or about November 2007
11 when Cohen, Denton Cohen and SCB entered the stipulated judgment.

12     79.   Duncan is entitled to a declaration that the Letter Agreement is unenforceable
13 by reason of the Cohens' and SCB's conspiracy to defraud him of the film rights in *The*
14 *River Why.*

15 ## SEVENTH CLAIM FOR RELIEF

16 ### (False Advertising Against Denton Cohen; 15 U.S.C. § 1125)

17     80.   Paragraphs 1 through 79 are incorporated by reference.

18     81.   In violation of 15 U.S.C. Section 1125, Denton Cohen through Peloton
19 Productions has falsely and misleadingly represented that Duncan endorses Denton Cohen's
20 efforts to produce *The River Why*. Peloton Productions prominently lists David James
21 Duncan's name on its webpage for "who's who" in *The River Why* production. Duncan's
22 name is listed along with two other names—an actor and a director who are allegedly
23 interested, or otherwise involved, in the project. Listing Duncan's name in this manner is
24 likely to confuse the public into believing Duncan endorses this project.

25     82.   Denton Cohen has solicited investments in the film project by exploiting
26 Duncan's name and creating the false impression that Duncan endorses their efforts. Upon
27 information and belief, Denton Cohen targets potential investors who have an affinity for

28

Heller
Ehrman LLP

1  Duncan and his novels and she implies that Duncan supports her efforts to bring the novel
2  to the movie screen.

3      83.    The Peloton Productions website is accessible in interstate commerce and is
4  used to solicit support for *The River Why* project.

5      84.    As an author of highly acclaimed novels, memoirs, short stories, essays and
6  documentaries, Duncan's name is protected by the Lanham Act.

7      85.    Duncan is informed and believes and on that basis alleges that Denton Cohen
8  threatens to continue exploiting Duncan's name, and unless restrained and enjoined, will do
9  so. Duncan's remedy at law is not by itself adequate to compensate him for the harm
10  inflicted and threatened by Denton Cohen.

11                        **EIGHTH CLAIM FOR RELIEF**

12            **(Violation of the Right of Publicity; Cal. Civ. Code § 3344)**

13      86.    Paragraphs 1 through 85 are incorporated by reference.

14      87.    Denton Cohen through Peloton Productions has knowingly used Duncan's
15  name in her efforts to solicit funds for the production of *The River Why*. Peloton
16  Productions prominently lists David James Duncan's name on its webpage for "who's who"
17  in *The River Why* production. Duncan's name is listed along with two other names—an
18  actor and a director who are allegedly interested, or otherwise involved, in the project.

19      88.    Duncan did not give Denton Cohen permission or authorization to use his
20  name for purposes of soliciting funds from the public or advertising Denton Cohen's
21  production efforts.

22      89.    Duncan's reputation has been injured as a result of Denton Cohen's actions in
23  an amount to be determined at trial. Duncan is entitled to an award of the greater of
24  statutory or actual damages, in addition to the any profits Denton Cohen has gained through
25  her invasion of Duncan's right of publicity.

26      90.    Duncan is informed and believes and on that basis alleges that Denton Cohen
27  threatens to continue exploiting Duncan's name, and unless restrained and enjoined, will do

Heller
Ehrman LLP    28

1   so. Duncan's remedy at law is not by itself adequate to compensate him for the harm
2   inflicted and threatened by Denton Cohen.

3                                    **PRAYER**

4       WHEREAS, Duncan prays for relief as follows:

5       A.      For a judgment that Denton Cohen has infringed United States Copyright
6   Registration No. TX-1-078-799, pursuant to 17 U.S.C. § 501;

7       B.      For an entry of preliminary and permanent injunctive relief enjoining and
8   restraining Denton Cohen, Peloton Productions, and their officers, directors, agents,
9   servants, employees and all other persons in privity or acting in concert with them from
10   further infringement of Copyright Registration No. TX-1-078-799, pursuant to 17 U.S.C.
11   § 502;

12      C.      For an entry of permanent injunctive relief enjoining and restraining Denton
13   Cohen, Peloton Productions, and their officers, directors, agents, servants, employees and
14   all other persons in privity or acting in concert with them from using David James Duncan's
15   name for solicitation of funding or in advertising;

16      D.      For an award to Duncan of his actual damages and any additional profits of
17   the infringer, or statutory damages, whichever is the greatest, pursuant to 17 U.S.C. § 504;

18      E.      For a finding that Denton Cohen's infringement was willful, and for an
19   additional award for her willful infringement, pursuant to 17 U.S.C. § 504;

20      F.      For a finding that the Letter Agreement has been terminated, pursuant to 28
21   U.S.C. § 2201 and California law;

22      G.      For a finding that SCB has breached its fiduciary duties to Duncan and an
23   award of any compensatory damages, restitution, disgorgement of profits, and punitive
24   damages;

25      H.      For a finding that the Letter Agreement is unenforceable by virtue of Cohen's,
26   Denton Cohen's and SCB's conspiracy to defraud Duncan of the right to prepare a film
27   derivative work of *The River Why* and Defendants' fraud and constructive fraud perpetrated
28   against Duncan with the intent to allow Cohen and ,subsequently, Denton Cohen to retain

Heller
Ehrman LLP

                                         20
                                   COMPLAINT

the right to prepare a film derivative work of *The River Why*;

I.       For an award to Duncan of the greater of statutory damages or his actual damages, in addition to profits realized by Denton Cohen for her invasion of Duncan's right to publicity, pursuant to Cal. Civ. Code § 3344;

J.       For an award of Duncan's attorneys' fees, expenses and costs, pursuant to 17 U.S.C. § 505;

K.       For an award to Duncan of such other and further relief as this Court deems just and proper.

Dated: April 30, 2008                    Respectfully submitted,

                                         HELLER EHRMAN LLP

                                         By _Annette L. Hurst_
                                                    ANNETTE L. HURST
                                         Attorney for Plaintiff
                                         DAVID JAMES DUNCAN

Heller
Ehrman LLP

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff David James Duncan demands a trial by jury on all issues triable by a jury.

Dated: April 30, 2008                    Respectfully submitted,

HELLER EHRMAN LLP

By _____
                    ANNETTE L. HURST
Attorney for Plaintiff
DAVID JAMES DUNCAN

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Dated: April 30, 2008                    Respectfully submitted,

HELLER EHRMAN LLP

By _____
                    ANNETTE L. HURST
Attorneys for Plaintiff
DAVID JAMES DUNCAN

Heller
Ehrman LLP

October 2, 1984

Ms. Andrea Nachtigall
1885 Lombard St.
San Francisco, CA. 94123

Dear Andrea:

This letter, when signed by your client Sierra Club
Books,("Seller") comprises our agreement with regard to the
motion picture rights  in the original literary work entitled
"The River Why" by David James Duncan (the "Work").

1. Seller warrants to Hammermark Productions, Inc. ("Hammermark"),
that Seller has the sole, exclusive, and unencumbered ownership of
all rights of every kind and character throughout the world in
the Work.

2. Seller hereby grants to Hammermark the exclusive and
irrevocable right and option, for the period specified below, to
purchase and acquire the motion picture, television, and allied
rights in the work (collectively, the "Rights") for the purchase
price and upon the terms and conditions specified herein. These
rights are more fully described by Exhibit A to this agreement
and incorporated by this reference.

3. The option shall be effective during the period commencing on
the date Seller executes this agreement and ending at midnight
twelve (12) months thereafter. If a screenplay based on the Work
is written before the option period expires then the option
period will be extended, for no additional consideration, for six
(6) months for a total option period of eighteen (18) months.

4. In consideration of the grant by Seller of the within option,
Hammermark shall pay $1,250 on execution of this agreement, and
$1,250 in six months.

5. If a screenplay is written, the option period may be extended
for an additional eighteen months upon payment of an
additional $2,500. Any consideration paid for option rights (per
paragraphs 4 or 5) shall be credited against the final purchase
price.

6. In consideration of the sale and conveyance from Seller to
Hammermark of the Motion Picture, Television, and Allied Rights
in the event such option is excercised, Hammermark shall pay to
Seller (one third on excercise and two thirds on commencement of
photography) the amounts listed below.

   A. If the budget for the motion picture exceeds $500,000 in
direct cash costs, then the purchase price shall be five percent
(5%) of the budget with a minimum price of $25,000 and a maximum
of $200,000. Additionally, Seller shall receive two and one half
percent (2 1/2%) of one hundred percent of the net profits of the
motion picture.

1



8. If the budget for the motion picture is below $500,000 ~~in direct cash costs~~, then the purchase price shall be $12,500. Additionally, Seller shall receive five percent (5%) of one hundred percent of the net profits of the motion picture.

7. The definition of net profits will be no less favorable to the Seller than to other profit participants.

8. The Sierra Club name may not be used in connection with advertising or promotion of the motion picture or with related merchandise without the express consent of the Seller, which consent will not be unreasonably withheld.

9. Hammermark and Seller may transfer or assign their rights under this agreement without the prior consent of the other party.

If the foregoing is acceptable to you, kindly indicate your approval by signing and returning the enclosed duplicate original of this letter for my file.

HAMMERMARK PRODUCTIONS, INC.,
a California corporation

By_____

Thomas A. Cohen
Its President

Accepted and Agreed this **17**
day of____**October**____, 198**4**

Enclosure: Exhibit A

Addendum: See Exhibit A page 4

## Exhibit A

### Motion Picture, Television, and Allied Rights

Exhibit to that certain Letter Agreement, dated Oct 2, 1987, by and between Hammermark Productions, Inc. ("Hammermark"), a California corporation, and Sierra Club Books.

1.    All motion picture rights including, but not limited to, the rights to produce, project, exhibit, broadcast, and transmit an unlimited number of motion pictures (including without limitation "remake" and "sequel" motion pictures, as said terms are commonly understood in the United States motion picture industry), theatrically, non-theatrically, on television, by means of cassettes and cartridges, and in all other media, now or hereafter known, and in all gauges and sizes. The term "motion picture," or words of similar import, as used in this Exhibit, shall be deemed to mean and include any present or future kind of motion picture in any gauge, without or with sound recorded synchronously therewith, whether the same is produced on film or magnetic or video tape or wire or any other substance or by any other method or means now or hereafter used for the production, exhibition, or transmission of any kind of motion picture, and whether the same is produced initially for theatrical, non-theatrical, or television exhibition or transmission or otherwise. The first motion picture produced hereunder is sometimes hereinafter referred to as "the Motion Picture."

2.    All television rights including, but not limited to, the rights to produce, project, exhibit, broadcast, and transmit an unlimited number of television productions (including without limitation "series" and "specials," as such terms are commonly understood in the United States television industry), on television and in all other media now or hereafter known and in all gauges. The term "television production," or words of similar import, as used in this Exhibit, shall be deemed to mean and include any present or future kind of television production without or with sound recorded synchronously therewith, whether the same is produced on film or magnetic or video tape or wire or any other substance or by any other method or means now or hereafter used for the production, exhibition, or transmission of any kind of television production, and whether the same is produced initially for television exhibition or transmission or otherwise.

3.    The Rights shall include, without limitation, the rights to:

a.    use, adapt, translate, subtract from, add to, and change the Work and the title thereof, or any other title by which it (or any part thereof) has been or may at any time be known, in the making of motion pictures and television productions as a part of or in conjunction with any such motion picture and television production or both;

b.    combine the Work in any manner with any other work or works in the making of motion pictures and television productions;

c.    use the Work and any part thereof, including without limitation the characters contained therein, and said titles and any similar titles, in conjunction with motion pictures and television productions based upon all or any part or parts of the Work or other literary, dramatic, or dramatico-musical works, or a combination thereof, or in conjunction with musical compositions used for or in connection with such motion pictures and television productions, whether or not written for, or used in, or in connection with, or in any manner whatsoever apart from, any such motion pictures and television productions;

d.    project, transmit, exhibit, broadcast, and otherwise reproduce the Work and any part or parts thereof pictorially and audibly by the art of cinematography or any process analogous thereto in any manner, including the right to project, transmit, reproduce, and exhibit motion pictures and television productions and any part or parts thereof (including without limitation, by so-called "pay," "free," "free home," "closed circuit," "theatre," "toll," "CATV," or "subscription" television), and by the use of cartridges, cassettes, or other devices similar or dissimilar, and by so-called "EVR," "Cartrivision" or other similar systems and by any other process of transmission now known or hereafter to be devised;

e.    publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, and license others to publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, such motion pictures and television productions and the scripts of the same and such musical compositions and any part thereof;

f.    record, reproduce, and transmit sound, including spoken words, dialogue, music, and songs, by any manner or means (including mechanical and electrical means

and any other means now known or hereafter developed), whether extracted from or based upon the Work or otherwise, and to interpolate other spoken words, dialogue, music, and songs, in or in connection with or as part of the production, reproduction, transmission, exhibition, performance, or presentation of such motion pictures and television productions;

g. make, copyright, use, vend, license and otherwise exploit, and license others to make, copyright, use, vend, license and otherwise exploit, in any manner, records, tapes and other sound-reproducing devices based in whole or in part on such motion pictures and television productions or such musical compositions, or any part or parts thereof, including the right to use the title of the Work and any similar titles in connection therewith;

h. make, copyright, use, vend, license, and otherwise exploit, and license others to make, copyright, use, vend, license, and otherwise exploit, in any manner, records, tapes, and other sound-reproducing devised based in whole or in part on the Work, or any part or parts thereof;

i. arrange for any and all merchandising and commercial tie-ups of any sort and nature arising out of or connected with the Work and/or the title thereof, the characters contained therein, or said motion pictures and television productions, or any combination thereof; and

j. generally to produce, reproduce, remake, reissue, transmit, exhibit, and perform motion pictures and television productions of any and all kinds.

4. The right, but only for purposes of advertising and exploiting motion pictures and television productions, to make, publish and copyright, or cause to be made, published, and copyrighted, in the name of Hammermark or its nominees, in any and all languages, excerpts from the Work and synopses, scenarios and other versions of the Work and of any motion pictures or television productions made pursuant to this Exhibit (each not exceeding 7,500 words in length), with or without illustrations of any type or kind whatsoever, on condition that then existing copyrights in the Work shall not thereby become invalidated. No use by Hammermark of the name of the author of the Work shall be made in connection with any of the foregoing in such manner as would indicate that he is the author of any such synopses, scenarios, or other versions. The author of the Work shall be appropriately indicated, however, to be the author of the Work.



5.    The right to broadcast and transmit by radio and television excerpts from and condensations of the Work or any motion pictures and television productions produced pursuant hereto, or both; but, with respect to such broadcasts on radio, then only for advertising and exploitation purposes, each not to exceed 10 minutes in length.

6.    Solely for the purposes of advertising and exploiting the rights granted to Hammermark hereunder, the right to use, and to license, cause, or permit others to use, the Work's author's name, portrait, picture or likeness, and biographical data.

\*    \*    \*    \*    \*

## ADDENDUM

A. Credit:

If the title of the film is the same as the title of the book: "Based on the book by David James Duncan".

If the title of the film is different from the title of the book: "Based on <u>The River Why</u> by David James Duncan."

B. Anything not specifically referred to herein shall be negotiated in good faith.

THE NACHTIGALL AGENCY

1885 Lombard Street

San Francisco, CA 94123

415 - 346-1115

talent agency

October 12, 1984

Mr. Jon Beckmann
Sierra Club Books
2034 Fillmore
San Francisco, CA
94115

RE:  The River Why  by David James Duncan

Dear Jon,

Welcome home!

At long last, the agreement between Hammermark Prod-
uctions  and  Sierra  Club  Books.  Please  review  it
and call me if you have any questions. If not, please
sign and date both copies of the contract and initial
each page of Exhibit A. Please return both originals
to me and I will send you a copy for your files. In
addition, could you please send me for my files
some document showing that Sierra Club has the right
to sell the film and television rights.

Now  that  you  are  back  I'm  eager  to  discuss  The
Turquoise Dragon by David Wallace.

Best regards,

*Andrea*

H. Andrea Nachtigall

HAN/cn
enclosure

P.S. Please initial the deletions in 6 A and B.

October 17, 1984


Andrea Nachtigall
1885 Lombard St.
San Francisco, CA 94123

Dear Andrea:

Enclosed are two signed copies of The River Why by agreement with Hammermark.
One question: Is it clear in paragraph six that the sales price includes
a television production?  Six lists "Motion Picture and Television" in the
opening clause but then only specifies "Motion Picture".  Excuse the question
if foolish--this is a first for us.

I'm enclosing a copy of our author's contract with David Duncan.

I'll give you a call when I surface from post-Frankfurt paper pile and talk
about The Turquoise Dragon.  (I'm enclosing a bound galley.)

Best regards,


Jon Beckmann
Publisher

JB/lf



# HAMMERMARK

April 8, 1987

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Per our discussion yesterday, this letter is to clarify the
procedure for investing in RIVER WHY-KIWI PARTNERS. It is my
understanding that you wish to purchase 1 Class B Unit for
$50,000. This would make the Sierra Club a direct equity investor
(as opposed to those leveraging their investment through Bank of
New Zealand securities) in the motion picture, THE RIVER WHY. In
order to complete the transaction you will need to fill out the
enclosed Subscription Booklet where I have indicated, sign and
date it, and return it to me with a check made out to "River
Why-Kiwi Partners."

At your preference, the check may be held by me or Alan Freeland
un-cashed until the balance of the financing is in place; or it
can be deposited in the Bank of New Zealand in Los Angeles where
it will earn interest at the rate of 6%. Your subscription plus
accrued interest will be returned to you if the offering is not
fully subscribed to by October 17, 1987 unless extended to
December 31, 1987. As a subscriber to one $50,000 Class B Unit,
you will receive 3.33% of all partnership receipts from the motion
picture until you have recouped your $50,000. Thereafter you will
receive 1.66% of those receipts. As a Class B Partner you will not
be required to make further capital contributions.

No matter what happens to the movie, you would receive the
following amounts as the seller of the rights. By our contract, a
rights payment would be made to Sierra Club Books (1/3 on
excercise, 2/3 on commencement of principal photography) in the
approximate amount of $71,450 less the $5,000 already paid. The
exact amount of the rights payment will depend on the final budget
of the film. As additional consideration for the rights, you will
receive 2.5% of the net profits.

The terms and conditions of subscribing are more fully described
in the offering memorandum which I left with you. Exhibit A, the
Limited Partnership Agreement, and particularly Article II
Admission of Limited Partners, details the areas of concern to
you.

I will send a copy of this letter, along with the offering
materials, to Alan Freeland in the hopes that he can confirm the
above. You may wish to employ him as your "purchaser
representative" to further evaluate the offering. However, it
would be a conflict of interest for me to appoint him on your
behalf.

If you have any questions, please give me a call. In the meantime,
thank you for your support. The backing of the Sierra Club is a
very important factor in our plans, and I trust that you will be
justly rewarded for your efforts.

Sincerely yours,

Thomas A. Cohen

enclosure

RIVER WHY-KIWI PARTNERS

SUBSCRIPTION BOOKLET
FOR MEMORANDUM NO. ____

Instructions to Subscribers
Subscription Agreement and Power of Attorney
Confidential Investor Suitability Statement
Purchaser Representative Disclosure Statement
Certificate for Partnership Investors
Certificate for Corporate Investors

THE MATERIALS CONTAINED IN THIS BOOKLET ARE NOT AN OFFER TO SELL OR A SOLICITATION OF OFFERS TO BUY ANY SECURITIES OF RIVER WHY-KIWI PARTNERS. OFFERS FOR SALE OF LIMITED PARTNERSHIP UNITS MAY BE MADE ONLY THROUGH THE CONFIDENTIAL OFFERING MEMORANDUM.

## INSTRUCTIONS TO SUBSCRIBERS

Persons wishing to subscribe for units of limited partnership interest (""Units") in River Why-Kiwi Partners (the ""Partnership") are required to complete the documents in this Subscription Booklet and return them to the General Partner of the Partnership. Additional copies of the documents are included, for reference purposes, as exhibits to the Confidential Offering Memorandum dated February 1, 1987 (""Memorandum").

1. Subscription Agreement. Please complete the Subscription Agreement in the following manner.

(a) Insert the amount of your subscription on page 8 and complete all of the information requested. Be sure to indicate whether you are investing in Class A Units, Class B Units, or both.

(b) Complete the appropriate (individual, corporate, partnership or trust) signature line at the end of the Subscription Agreement.

2. Confidential Investor Suitability Statement. Please complete all of the information requested by the Confidential Investor Suitability Statement and sign and date that statement.

3. Purchaser Representative Disclosure Statement. If you are being advised by a purchaser representative (your lawyer, accountant or other purchaser representative) in connection with your investment, please sign in the space provided in the Purchaser Representative Disclosure Statement and arrange for that person to complete the remainder of the Purchaser Representative Disclosure Statement. If you do not have a purchaser representative, you should leave this document blank.

4. Payment. Please select ONE of the following methods of payment.

(a) Make your check in the amount of your investment ($50,000 per Unit, minimum of one Unit) payable to ""River Why-Kiwi Partners." OR

(b) (Class A Partners only) Have your bank provide you with an irrevocable letter of credit in the amount of your investment ($50,000 minimum) in favor of ""River Why-Kiwi Partners" in care of The Bank of New Zealand, Los Angeles. OR

(c) (Class A Partners only) If you wish to provide stock certificates or other readily realizable assets as collateral, please contact the General Partner for details.

5. Special Requirements for Partnerships, Corporate or Trust Investors. Partnership or corporate investors must also complete the appropriate attached certificates. Trust investors must attach a copy of their trust agreement (and any amendments to it) to their Subscription Agreement.

6. Additional Documents. If the subscriber is a resident of a state other than California, additional documents may be required and, if so, they must also be executed after being furnished.

7. Mailing Instructions. Please send this entire Subscription Booklet, any documents required to be attached and your payment to:

> Thomas A. Cohen
> Hammermark Productions
> P.O. Box 5002
> Mill Valley, CA 94942

1

SUBSCRIPTION AGREEMENT
FOR INVESTMENT IN
RIVER WHY-KIWI PARTNERS

THESE SECURITIES IN THE FORM OF UNITS OF LIMITED PARTNERSHIP INTEREST IN RIVER WHY-KIWI PARTNERS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. THE UNITS CANNOT BE SOLD, TRANSFERRED, ASSIGNED, OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THE AGREEMENT AND CERTIFICATE OF LIMITED PARTNERSHIP FOR THE PARTNERSHIP AND APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND WILL NOT BE TRANSFERRED OR RECORDED EXCEPT IN COMPLIANCE WITH THE PARTNERSHIP AGREEMENT AND THOSE LAWS.

1. PURPOSE. This Subscription Agreement is entered into by the undersigned for the purpose of investing in River Why-Kiwi Partners, a limited partnership to be formed (""Partnership"), by purchasing units of limited partnership interest in the Partnership (""Units"), as described in the Partnership's Confidential Offering Memorandum dated February 1, 1987, including the Exhibits to it (""Memorandum").

2. SUBSCRIPTION. The undersigned subscribes for and agrees to purchase, subject to acceptance by Thomas A. Cohen, the General Partner of the Partnership (""General Partner"), the number of Units that are indicated on page 8 below, at a price of $50,000 per Unit (minimum investment--one Unit) for the total subscription amount set forth on page 8 below; and agrees to become a limited partner in the Partnership (""Limited Partner") and be bound by all the terms and conditions of the Partnership's Agreement and Certificate of Limited Partnership in the form attached to the Memorandum as an Exhibit (""Partnership Agreement").

3. PAYMENT AND EFFECTIVENESS OF SUBSCRIPTION. An investor will subscribe for Units by delivery to the General Partner of a signed Subscription Agreement, a Confidential Investor Suitability Statement, a Purchaser Representative Disclosure Statement (if required) and his personal check, letter of credit, or other readily realizable asset to ""River Why-Kiwi Partners" for the amount of the purchase price for the Units purchased. Prior to acceptance by the General Partner of an investor's subscription, the undersigned investor will have the unilateral and unqualified right to have his signed Subscription Agreement and payment returned to him at anytime.

This subscription will become effective on acceptance by the General Partner and deposit of the investor's payment in an escrow account with The Bank of New Zealand. Acceptance will be made in writing by certified mail, effective two days after mailing. No check will be cashed until accepted by the General Partner.

The subscriber will be admitted to the Partnership as a Limited Partner after acceptance by the General Partner of subscriptions for at least 2 Units. If at least 2 Units are not sold by October 17, 1987, the undersigned's cash payment will be returned to the undersigned, with interest, if any. No interest will be paid on the amount of any check held by the General Partner pending acceptance or return.

4. REPRESENTATIONS BY SUBSCRIBER. The undersigned represents and warrants as follows:

(a) He and his Purchaser Representative(s), if retained, have received and read the Memorandum setting forth information relating to the Partnership and the Partnership Agreement.

(b) He and his Purchaser Representative, if any, have had the opportunity to obtain additional information to verify the accuracy of the information contained in the Memorandum and to evaluate the merits and risks of this investment.

(c) He and his Purchaser Representative have had the opportunity to ask questions of and receive satisfactory answers from the General Partner concerning the terms and conditions of the offering and the information in the Memorandum and have relied on no other information in subscribing for Units.

(d) He represents and warrants that the information furnished by him to the Partnership in the Confidential Investor Suitability Statement submitted with this Subscription Agreement is true, complete and correct in all respects.

(e) He is advised that the Units are not registered under the Securities Act of 1933, as amended, and are not qualified under the securities laws of any State but are offered under non-public offering exemptions from such registration and qualification,    and that, in this regard, the Partnership, General Partner and the other subscribers in

2

the offering are relying on his representations in this Subscription Agreement and the related Confidential Investor Suitability Statement; he is further advised, however, that the General Partner reserves the right to apply for a permit from the California Department of Corporations or for qualification in any other State to sell the Units.

(f) He understands the following provision with respect to offers and sales of Units in California:

The sale of the securities which are the subject of this Subscription Agreement has not been qualified with the Commissioner of Corporations of the State of California and the issuance of those securities or the payment or receipt of any part of the consideration for those securities prior to that qualification is unlawful, unless that sale is exempt from qualification. The rights of all parties to this Subscription Agreement are expressly condtioned on that qualification being obtained, or on the General Partner determining that this offering is exempt from those qualification requirements.

(g) He is advised that no federal or state agency has recommended or endorsed purchase of the Units or passed on the adequacy or accuracy of the information set forth in the Memorandum.

(h) By virtue of his preexisting personal or business relationship with the General Partner, or by reason of his business or financial experience or the business or financial experience of his professional advisor who is unaffiliated with and who is not compensated by the Partnership or any affiliate or selling agent of the Partnership, directly or indirectly, it can be reasonably assumed that he had the capacity to protect his own interests in connec tion with the transaction.

(i) He is advised that there will be no public market for the Units, that there will be restrictions on the transferability of the Units and that it is likely that he will not be able to liquidate his investment.

(j) He is acquiring the Units solely for his own account, for investment purposes only, and not with a view to the distribution or resale of them, and he has no present or contemplated intention, agreement, understanding or arrangement to sell, assign, transfer, subdivide, hypothecate, or otherwise dispose of all or any part of the Units.

(k) In relation to his income, net worth, or both he is able to bear the economic risks of an investment in the Partnership, including, but not limited to, the risk of the loss of part or all of his investment in the Partnership, and the probable inability to sell or transfer his Units in the Partnership for an indefinite period of time.

(l) He either: (1) has a net worth of at least $150,000 (exclusive of home, furnishings and personal automobiles), or (2) has a net worth of at least $75,000 (exclusive of home, furnishings and personal automobiles) and has a taxable income for each of the two most recent taxable years, and expects to continue to have a taxable income, of at least $75,000.

(m) He has not duplicated or distributed the Memorandum to anyone other than his Purchaser Representative or other personal advisors.

(n) It has at no time been represented, guaranteed, or warranted to me by my broker, the General Partner, his agents and employees or any other person, expressly or implicitly that:

(i) I will or will not remain as owner of the Units an exact or approximate length of time prior to sale of any property to be owned by the Partnership or sale of my Units;

(ii) A percentage of profit or any amount or type of consideration or both will be realized as a result of this investment;

(iii) Past performance or partnership experience on the part of the General Partner or any other person, including, without limitation, their salesmen, associates, brokers, bankers, investment advisers, agents, directors, writers, actors or employees, in any way indicates the predictable results of the ownership of Units or of the overall Partnership business plan; or

(iv) Any specific tax benefits will accrue as a result of investment in the Partnership.

(o) I will notify the General Partner immediately of any material change in any statement made in this Subscription Agreement occurring prior to my receipt of the General Partner's acceptance of my subscription.

3

(p) If the undersigned is a partnership, joint venture corporation or trust, it was not organized or reorganized for the specific purpose of acquiring Units.

5. ADOPTION OF PARTNERSHIP AGREEMENT. The undersigned hereby adopts, accepts and agrees to be bound by all the terms and provisions of the Partnership Agreement, in the form set forth in an Exhibit to the Memorandum, and to perform all obligations under that Partnership Agreement imposed on a Limited Partner for the Units being purchased. The undersigned will become a Limited Partner following acceptance of this subscription, in whole or in part, by the General Partner, on (i) payment of the subscription amount as provided in Section 2 above, (ii) satisfaction of the offering requirements under the Memorandum for the Units purchased, and (iii) the recording of the Partnership Agreement showing the undersigned as a Limited Partner.

6. SPECIAL POWER OF ATTORNEY.

(a) By signing this Subscription Agreement the undersigned hereby appoints the General Partner, with full power of substitution, the undersigned's true and lawful attorney-in-fact, for the undersigned and in his name, place and stead, to execute, acknowledge, file and record: (i) the Partnership Agreement and any amendments to it in accordance with the Partnership Agreement; (ii) any separate certificates of limited partnership as well as amendments to any certificate which are required to be filed, or which the General Partner deems it advisable to file; (iii) any trade name certificate or amendment to it or other instrument or document which may be required to be filed by the Partnership under the laws of any state or by any governmental agency, or which the General Partner deems it advisable to file; (iv) any instrument or document which may be required to effect the continuation of the Partnership, the admission of additional or substituted limited partners, or the dissolution and termination of the Partnership (provided that continuation, admission or dissolution and termination are in accordance with the terms of the Partnership Agreement), or to reflect any reduction in the contributions of any partner; and (v) powers of attorney on behalf of the Partnership.

(b) This power of attorney is a special power of attorney coupled with an interest, and will not be revoked, will survive the assignment, delivery, or transfer by the undersigned of all or part of his interest in the Partnership and, being coupled with an interest, will survive the death, disability or cessation of the existence as a legal entity of the undersigned; except that where a Limited Partner's assignee has been approved by said attorneys, as General Partner of the Partnership, for admission to the Partnership as a substituted Limited Partner, this power of attorney will survive the delivery of that assignment for the sole purpose of enabling those attorneys to execute, acknowledge and file any instrument to carry out that substitution.

(c) The existence of this power of attorney will not preclude execution of any instrument by the undersigned individually on any matter. A person dealing with the Partnership may conclusively presume and rely on the fact that any instrument executed by the attorney-in-fact is authorized, regular and binding without further inquiry.

(d) The appointment of the General Partner as attorney-in-fact under this power of attorney automatically will terminate as to that person at the time it ceases to be a General Partner and from that time will be effective only as to the substituted General Partner designated or elected under the Partnership Agreement.

7. LIMITATIONS ON TRANSFER. The undersigned recognizes that: (i) the Units have not been registered under the Securities Act of 1933, as amended, or qualified under the securities laws of any State and, accordingly, he must bear the economic risk of an investment in the Units for an indefinite period of time; (ii) neither this Subscription Agreement nor the Units may be assigned, pledged, encumbered or otherwise transferred by him without registration or qualification, unless exempt and unless, in the opinion of counsel of the Partnership, that transfer would be in compliance with all applicable federal and state securities laws; (iii) he is not and will not be entitled to make any transfers of the Units under the exemption afforded by Rule 144 under the Securities Act of 1933, as amended; and (iv) any certificate or other document evidencing his Units will bear a legend stating that the Units have not been registered or qualified under applicable securities laws and referring to the restrictions on transferability and sale of the Units described in this Section and that any transfer will also be subject to the restriction on transfer of the Partnership Agreement described in the Memorandum.

8. ACCEPTANCE OF SUBSCRIPTION. The General Partner has full discretion to accept or reject the subscription of the undersigned for all or any part of the subscribed Units. If all or any part of the undersigned's subscription is not accepted by the General Partner, the undersigned's personal check will be returned to the undersigned and a new personal check requested from the undersigned for the part of the subscription which is accepted.

4

9. SUCCESSORS AND ASSIGNS. The agreements and representations set forth in this Subscription Agreement will become effective and binding on the undersigned, his heirs, legal representatives, successors and assigns on the acceptance of this subscription by the General Partner in the space provided below.

10. SUBSCRIBER'S INDEMNITY. The undersigned agrees to indemnify and hold harmless the Partnership and the General Partner from and against all loss, damage, liability or expense, including reasonable attorneys' fees and costs which they may incur, arising out of any misrepresentation, breach of warranty, or failure to perform or fulfill any covenants or agreements of the undersigned contained in this Subscription Agreement or arising out of any resale or distribution of any Units by the undersigned in violation of the Securities Act of 1933, as amended, or any other applicable federal and State securities laws.

11. MISCELLANEOUS.

(a) All notices or other communications given or made under this Subscription Agreement will be in writing and will be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the respective parties at the addresses set forth in this Subscription Agreement. Each party may change its address by notice given under this Section.

(b) This Subscription Agreement will be construed under and governed by the laws of the State of California.

(c) Whenever the context requires, the use of the singular number will be deemed to include the plural and vice versa. Each gender will be deemed to include any other gender, and each will include corporation, partnership, trust or other legal entity whenever the context so requires.

(d) This Agreement constitutes the entire agreement between the parties for the subject matter of it and may be amended only by a writing executed by all parties.

IN WITNESS OF THIS SUBSCRIPTION AGREEMENT, subject to acceptance by the General Partner, the undersigned has completed this Subscription Agreement and related power of attorney to evidence his subscription to River Why-Kiwi Partners and its execution, by this counterpart, of the Partnership Agreement.

Date:_____ , 198___

No. of Class A Units subscribed for:_____

No. of Class B Units subscribed for:_____

Cash payment   $_____ ($_____ per Unit)  OR

Irrevocable Letter of Credit (for Class A Units only)  $_____ ($_____ per Unit)  OR

Readily Realizable Assets (for Class A Units only) valued at $_____ ($_____ per Unit)

In the form of _____.

5

Units to be registered as follows: (please print)

Name(s):_____

_____

Residence:_____

_____

_____

Telephone:_____

Mailing address (if different from residence address):

_____

_____

_____

Co-owners to hold as:

Joint Tenants _____

Tenants in common_____

Community Property_____

Social Security or Employer I.D. Number: _____

Driver's License:_____ (State and Number)

State in which Subscriber is registered to vote:_____

State of Domicile or Principal Place of Business (if different from residence address):

_____

IN CALIFORNIA, IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFORE, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES.

Dated:_____, 19_____

(SIGNATURE LINE FOR INDIVIDUAL INVESTORS AND TRUSTEES)

_____
Signature

_____
Signature

(SIGNATURE LINE FOR CORPORATE INVESTORS)

_____
(Name of Corporation)

By: _____
Authorized Officer

_____
(Print Name of Authorized Officer)

(SIGNATURE LINE FOR PARTNERSHIP INVESTORS)

_____
(Name of Partnership)

By:_____
Authorized Partner

_____
(Print Name of Authorized Partner)

**Acceptance**

The foregoing subscription is hereby accepted to the extent of _____ Class A Units and/or

_____ Class B Units

(a $_____ capital contribution).

Date:_____, 198___

RIVER WHY-KIWI PARTNERS
c/o Thomas A. Cohen
P.O. Box 5002
Mill Valley, CA 94942

By: Thomas A. Cohen, General Partner

By: _____

7

### SUITABILITY STATEMENT
### FOR INVESTMENT IN
### RIVER WHY-KIWI PARTNERS

Purchasers of units of limited partnership interest ("Units") in River Why-Kiwi Partners (""Partnership") must meet certain requirements in order for the Partnership to comply with exemptions from registration under federal and State securities laws. Before any sale of Units is made to you, the General Partner must be reasonably satisfied that:

1. You have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of an investment in the Partnership, and

2. You are able to bear the high economic risks of the investment, which necessarily include the ability to sustain a total loss of your investment.

You are requested to submit the information requested by this Statement in connection with the Partnership's consideration of selling Units to you.

By signing this Statement, you also confirm your understanding that the General Partner will be relying on the accuracy and completeness of your responses to establish the Partnership's legal right to sell these securities to you without registration under federal and State securities laws. Your answers will at all times be kept strictly confidential; however, you agree by signing this Statement that the General Partner may present this Statement to any parties as he deems appropriate if called upon to establish the legality of your participation in the offering.

If there is any change in the information you provide in this Statement before the closing of the offering, please contact the General Partner immediately.

Please answer or initial all questions which are applicable to you. Corporate, trust and partnership investors should answer only the appropriate questions.

1. Name:_____ Age:_____

Social Security or Taxpayer Identification Number:_____ Marital Status:_____

I intend to register the investment in the following name(s): _____

2. Residence Address: _____

I have lived in the State of_____ continuously for the past _____years.

3. Business Address: _____

4. Telephone No.: Residence: (_____) _____ Business: (_____) _____

5. Current Employment and Position Held: _____ How Long? _____

6. Principal Occupation or Business for Last Five Years: _____

7. Educational Background (include any professional or business education, and any degrees received): _____
_____

8. Please describe any other substantial experience you have had in business, accounting and financial matters: __
_____
_____

9. Financial Condition:

   (a) Income:

     (i) My personal income (check one space in each column; do not include your spouse's income) is:

| | Two Years Ago | Last Year | Current Year ( Expected ) |
|---|---|---|---|
| Under $50,000 | | | |
| $50,001-$75,000 | | | |
| $75,001-$100,000 | | | |
| $100,001-$200,000 | | | |
| Over $200,000 | | | |

     (ii) My spouse's income (check one space in each column) is:

| | Two Years Ago | Last Year | Current Year ( Expected ) |
|---|---|---|---|
| Under $50,000 | | / | |
| $50,001-$75,000 | | | |
| $75,001-$100,000 | | | |
| $100,001-$200,000 | | | |
| Over $200,000 | | | |

  (b) Net Worth:

   (i) My net worth (excess of total assets over total liabilities) at fair market value (exclusive of equity in home, furnishings and personal automobiles) is (check applicable bracket):

_____ Less than $125,000

_____ $125,000 - $150,000

_____ $150,001 - $200,000

_____ $200,001 - $250,000

_____ $250,001 - $300,000

_____ $300,001 - $400,000

_____ $400,001 - $500,000

_____ $500,001 - $750,000

_____ $750,001 - $1,000,000

_____ Over $1,000,000

9

√(ii) The amount of my net worth as shown above which is in liquid assets (cash, marketable securities or assets readily convertible to cash) is (check applicable bracket):

_____ Less than $125,000

_____ $125,000 - $150,000

_____ $150,001 - $200,000

_____ $200,001 - $250,000

_____ $250,001 - $300,000

_____ $300,001 - $400,000

_____ $400,001 - $500,000

_____ $500,001 - $750,000

_____ $750,001 - $1,000,000

_____ Over $1,000,000

(iii) The fair market value of my home is $ _____,subject to mortgage(s) or other

encumbrance(s) of $_____. My equity in my automobile and home furnishings aggregates

approximately $ _____ .

√o. _____(Please initial if correct). Considering the foregoing, and all other factors in my financial and personal circumstances (including, but not limited to, health problems, unusual family responsibilities and requirements for current income), I believe that I am able to bear the economic risk of an investment in the Units, including a loss of my entire investment, and I have no need in the foreseeable future for liquidity in an investment in the Partnership.

√11. Initial either of the following which applies to you (you must check either (a) or (b)):

(a) _____I have sufficient knowledge and experence in financial, business and tax matters to be capable of evaluating the merits and risks of an investment in the Partnership.

(b) _____(Please initial if correct) I intend to employ one or more Purchaser Representatives to assist me in evaluating the risks and merits of an investment in the Partnership and I, together with that Purchaser Representative(s), have sufficient knowledge and experience in financial, business and tax matters to be capable of evaluating the merits and risks of an investment in the Partnership.

Name of Purchaser Representative: _____

Address: _____

Occupation: _____

Telephone No.: (_____) _____

Note: Your Purchaser Representative(s) must fill out a Purchaser Representative Disclosure Statement addressed to the General Partner, which you must also sign.

12. Describe any business or personal relationship you have with Thomas A. Cohen or Hammermark Productions: please include the name of the individual(s) with whom you have such a relationship, the length of time you have known him (them), and any business or investment transactions which you have entered into with him (them).

13. In the space below, please describe your prior investment experience. The following information should be provided, if available: (a) Name of Venture. (b) Activity of Venture (e.g., real estate, oil and gas, film etc.). c) Form of Venture (e.g., corporation, limited or general partnership or joint venture). (d) Amount Invested. (e) Nature of Offering (e.g., private offering or public (registered) offering). (f) Whether or not you retained a Purchaser Representative to assist you in evaluating the investment:

_____

_____

_____

_____

_____

I certify that all of the foregoing information and answers which I have provided are true, correct and complete to the best of my knowledge as of the date of this Statement.

EXECUTION OF THIS DOCUMENT DOES NOT INDICATE ANY INTENT TO PURCHASE ANY UNITS OR NOTES OFFERED. THANK YOU FOR YOUR HELP.

Date:_____, 198_____

(SIGNATURE LINE FOR INDIVIDUAL
INVESTORS AND TRUSTEES)

_____
Signature

(SIGNATURE LINE FOR CORPORATE INVESTORS)

_____
(Name of Corporation)

By:_____
Authorized Officer

_____
(Print Name of Authorized Officer)

(SIGNATURE LINE FOR PARTNERSHIP INVESTORS)

_____
(Name of Partnership)

By:_____
Authorized Partner

_____
(Print Name of Authorized Partner)

11

## PURCHASER REPRESENTATIVE DISCLOSURE STATEMENT

For: RIVER WHY-KIWI PARTNERS

Name of Purchaser Being Represented: _____

     The purchaser named above has asked me to act as a Purchaser Representative to assist the purchaser in evaluating an investment in the Partnership as described in the Confidential Offering Memorandum dated February 1, 1987 ("'Memorandum"). I understand that the purchaser and I (and any other Purchaser Representatives retained by the purchaser) together must possess the knowledge and experience to be capable of evaluating the risks and merits associated with an investment in the Partnership.

     I provide the following information and make the following representations with the intent that they may be relied upon by the Partnership and its General Partner (Thomas A. Cohen) in determining my suitability to act as Purchaser Representative for the purchaser named above in evaluating an investment in the Partnership.

1.  Name, address, and occupation of Purchaser Representative:

_____

_____

2.  I have, either myself or together with my client, sufficient knowledge and experience in financial, business and tax matters to be capable of evaluating the merits and risks of an investment in the Partnership and making an informed investment decision with respect to that investment _____. (Initial)

3. Current employment and position held: _____How long? _____

4.  Educational Background:_____

_____ Degree(s)?_____

5.  Areas and nature of experience (e.g., legal matters, tax matters, financial or business consultant, etc.): _____

_____

6.  Do you now have, have you had within the past two years or are you contemplating in the future any material relationships (including, without limitation, as a broker-dealer) between yourself (or your affiliates) and the Partnership or its General Partner? _____.

7.  Are you an affiliate, director, officer or other employee of, or beneficial owner of one percent or more of the equity interests in, the Partnership or any affiliate of the Partnership? _____.
(For this purpose, an "'affiliate" of a person or entity is an individual, partnership, corporation or other entity that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such person or entity.)

8.  If the answer to Question 6 or 7 is yes, please describe the relationship, with whom it exists or existed and the amount of money received within the past two years from any of the persons or entities described in Questions 6 and 7 as a result of those relationships: _____

_____        _____

Name    (Please Print)                   Signature of Purchaser Representative

_____        _____

Street Address                        City and State    Zip Code

12

NOTE: A copy of this Disclosure Statement must be given to the purchaser whom you represent and the purchaser must execute the following Acknowledgement. This Disclosure Statement and Acknowledgement must be completed, signed and returned with the purchaser's subscription documents prior to the purchaser's purchase of any of the Partnership's securities.

## ACKNOWLEDGEMENT BY PURCHASER

I hereby represent and acknowledge that I have received and read a copy of the foregoing Purchaser Representative Disclosure Statement. Notwithstanding any of the disclosures contained in it, I designate _____ as my Purchaser Representative for purposes of evaluating the merits and risks of an investment in the Partnership referred to above. I understand and acknowledge that execution of this Acknowledgement does not indicate any intent to purchase any of the securities offered in the Memorandum.

Dated:_____ , 19_____

(SIGNATURE LINE FOR INDIVIDUAL
INVESTORS AND TRUSTEES)

_____
Signature

(SIGNATURE LINE FOR CORPORATE INVESTORS)

_____
(Name of Corporation)

By:_____
Authorized Officer

_____
(Print Name of Authorized Officer)

(SIGNATURE LINE FOR PARTNERSHIP INVESTORS)

_____
(Name of Partnership)

By:_____
Authorized Partner

_____
(Print Name of Authorized Partner)

13

**PRODUCTIONS**

Mill Valley, California 94942
(415) 383 4866

# HAMMERMARK

April 14, 1987

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Further to our phone conversation yesterday, this is to ask that
you invest $15,000 in RIVER WHY-KIWI PARTNERS. I arrived at this
figure based on your need to avoid risk and my need to deal in
round numbers.

Based on the current budget of $1,429,000 the total rights
payments to Sierra Club Books would be $71,450. As I understand
it, your share of that would amount to $14,290. I rounded that
figure up to $15,000 because that would make your ownership share
one percent (1%) of the total offering. This will put you at risk
for $710, however I'd be willing to personally guarantee a
donation to the Sierra Club for this amount if you haven't
recouped it in two years.

If this meets with your approval, please fill out the subscription
booklet previously delivered and mail it back to me with a check
to RIVER WHY-KIWI PARTNERS for $15,000.

Thanks for your support.

Sincerely yours,

Thomas A. Cohen



April 16, 1987

Tom Cohen
HAMMERMARK PRODUCTIONS
Post Office Box 5002
Mill Valley, CA 94942

Dear Tom:

Thanks for your letter of April 14.  I'm tempted by the investment, but
because of its unusual nature, I need to check it with folks here.  I
might give Allan Freeland a call, too.

In haste,

                                        Sincerely,


                                        Jon Beckmann
                                        Publisher


JB/bf



Post Office Box 5002
Mill Valley, California 94942
(415) 383 4866



May 7, 1987

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

This will confirm our conversation yesterday in which you agreed to extend the option on the motion picture rights to "The River Why" under the following terms and conditions:

1. The terms and conditions of our original agreement for those rights executed by you on October 17, 1984 remain unchanged.

2. At my option, the term of the agreement may be extended for an additional twelve months beginning October 17, 1987.

3. In consideration of the extension on the option period (per 2 above), Hammermark Productions shall pay $2,000, which sum shall be credited against the final purchase price.

If this is your understanding of the agreement, kindly indicate your approval by signing and returning the enclosed duplicate original of this letter for my file.

HAMMERMARK PRODUCTIONS

By _____
Its President


Accepted and Agreed this ___ 14 ___ day
of ___ May ___, 1987
_____
For Sierra Club Books

## RIVER WHY PARTNERS
**P.O. Box 5002 · Mill Valley, CA · 94942**
**(415) 383-4866**

August 29, 1987

Jon Beckman
730 Polk St
San Francisco, CA 94109

Dear Jon:

I am pleased to enclose the Prospectus and Investment Guide for
River Why Partners, the limited partnership being formed to
finance the motion picture, "The River Why."

I have included the entire Market Opportunities Assessment in the
Prospectus. It was prepared by the author of Off Hollywood, who
could arguably be called the country's leading expert on "American
Independent" films. His market study accurately summarizes current
trends in the film industry, and points to the numerous
opportunities available to exploit "The River Why." I highly
recommend that you read it.

The rest of the Prospectus contains a variety of information which
should be of value in evaluating River Why Partners as an
investment. But like any such document, it does contain its share
of caveats and legal boiler plate. My financial adviser once told
me that a Prospectus is like the warning label on a bottle of
medicine--it tells you everything that can go wrong, but very
little about the benefits. Consequently, I expect that you may
have some questions after reviewing it.

You will note that all investments are put into an escrow account
at Wells Fargo Bank until the 1.5 million is raised. Money cannot
be released from the escrow account without approval of the
California Department of Corporations. Consequently, I hope you
will feel comfortable investing $10,000 to $15,000 with the
knowledge that you will get it back as a rights payment shortly
after the offering closes or, failing that, your investment will
be returned with interest. As we discussed previously, your
investment in this project is important for psychological as well
as financial reasons. We feel we will be able to attract more
investors based on the fact that Sierra Club Books has money in
it.

As I told Danny Moses the other day, we are launching a $25,000
advertising and direct mail campaign to raise the funds. Bantam
Books has promised a discount coupon to allow direct mail
recipients to purchase "The River Why."

I look forward to having you join us in this venture.
Sincerely yours,

Thomas A. Cohen
Producer/director

P.S. Subscription Agreement is last page of Prospectus.
Please fill out + return with check.

September 10, 1987

Thomas Cohen
RIVER WHY PARTNERS
P.O. Box 5002
Mill Valley, CA  94942

Dear Tom:

Thanks for your letter and the prospectus. In spirit, I am with you.
Practically, because of the unusual nature of the deal, I'll have to
talk to other folks here, before asking accounting to draw up a check.
I'm up to my ears in 1989 calendar selections and preparation for the
Frankfurt Book Fair, so I must beg for a little time to do what I need
to here before committing.

Sincerely,

Jon Beckmann
Publisher

JB/bf

# Sierra Club Books ❧

730 Polk Street
San Francisco, California 94109
(415) 776-2211
Telex: 182652 MICROLINK LSA

September 25, 1987

Tom Cohen
HAMMERMARK PRODUCTIONS
Post Office Box 82
Mill Valley, CA  94942

Dear Tom:

I'm about to leave for Europe and the Frankfurt Book Fair, and
will be back in the office on October 19.  I've done a little
thinking about the Under_Why project, and am leaning toward
investing $10,000 on the terms you indicate.  Our concern, as you
know, focuses on not losing the money rather than on any profit,
and a few questions have arisen.  One is what happens in the
unlikely event that you disappear or die before the movie is
made?  It's been suggested that we make short term life insurance
coverage for our investment part of the arrangement.  Another
concern was that if the $1,500,000 was not raised, an attempt
might be made to make the movie for less, putting at risk part of
our investment, but, more importantly, leading to a film that was
insufficiently funded.  Lastly, where would the money reside
while the rest of the fund raising took place--in an escrow
account?  I'd certainly feel more comfortable making a pledge
based on the raising of some sum of money than actually turning
over cash at this early stage.

As you see, we want to be helpful, but I'm afraid we are more
than a little like the reluctant bride.

Sincerely,

Jon Beckmann
Publisher

JB/bf

Sent to PO Box 5092
10-12-87
B4

# HAMMERMARK
## PRODUCTIONS



Post Office Box 5002
Mill Valley, California 94942
(415) 383 4866

# HAMMERMARK

October 14, 1987

Mr. Jon Beckmann
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Enclosed please find my check for $2,500 to extend the option on THE RIVER WHY for an additional year as per our prior agreement.

In response to your letter of September 25, 1987 (which I received October 13), the following comments may ease your concerns in regard to investing.

In the event I die or disappear during filming, our production insurance would cover the loss. This is mentioned in the Prospectus on page 12 (Insurance and Completion) in reference to cast insurance. The standard policy, which we will carry, would insure against injury or incapacity to not only the principal cast, but also the producer and director.

Because this is a public limited partnership offering there are several conditions to meet before funds can be expended. One is that we must raise aggregate capital contributions of $1,500,000 in order to have funds released from our escrow account at Wells Fargo Bank. The funds you choose to invest must be made payable to "Wells Fargo Bank, Escrow Agent for River Why Partners." The bank will not release those funds to me until authorized to do so by the State of California, consequently there is no risk that this partnership can proceed with insufficient funds.

Finally, any investment made is placed in an interest bearing escrow account at Wells Fargo. If the $1,500,000 cannot be raised within the time limits set forth in the Prospectus, your money will be returned to you with interest. Your only risk as regards being an early investor is that you could possibly have invested your money at a higher rate of return in some alternative investment vehicle.

On the other hand, your early cash investment is of enormous importance
to us--not only for its monetary value, but for its psychological
importance. Just as publishers are reluctant to publish first time
novelists, investors are reluctant to be the first to put money into a
project. And while, at this point, you would not be the first to invest in
River Why Partners, your relatively early committment will have a
positive influence on the many potential investors who are standing on the
sidelines.

I would be happy to discuss these or any other details with you, but urge
you in the strongest possible manner to make an investment soon. Thanks
for your continued support.

Sincerely yours,

Thomas A. Cohen

## RIVER WHY PARTNERS
### P.O. BOX 5002 · MILL VALLEY, CA · 94942
### (415) 383-4866

October 12, 1988

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Enclosed is my check number 5897 for $13,547.65 for the exercise
of the purchase of motion picture and allied rights to THE RIVER
WHY. Pursuant to our contract dated October 17, 1984, this
represents the balance of the one third of the funds due.

My calculations are based on a proposed budget for the movie,
exclusive of rights payments, of $1,234,093. Per our agreement,
five percent of that figure is $61,704.65, and one third of that
is $20,547.65. Since previous option payments totaling $7,000 are
to be credited against that amount, the enclosed check brings the
total payment to that required by the contract. The remaining two
thirds will be paid on commencement of photography, which I hope
will be next Summer.

Please note that it is still possible that I may try to mount the
film for under $500,000 in which case the total rights payment is
to be $12,500. I expressly reserve the right to receive a refund
from you of $8,047.65 in that event.

I look forward to seeing you at the movies.

Sincerely yours,

Thomas A. Cohen
General Partner

PARTNERS

October 27, 1988

Mr. Thomas A. Cohen
Hammermark Productions
P.O. Box 5002
Mill Valley, CA   94942

Dear Tom:

After returning from three weeks on the road, I have found
your check and letter with respect to The River Why. You have
met the terms of the contract, and we all hope that the movie will
be an award-winner, despite the author's apprehensions. We look
forward to learning more about the shooting schedule, casting,
etc.

I have no questions about the arithmetic, but I don't see
anything in our agreement that relates to a refund. In any case,
we wish you well with the production, and hope that it will be
a smashing success.

Sincerely,

Jon Beckmann
Publisher

JB:dgm

# MICHAEL SNELL LITERARY AGENCY

Box 655 • Truro, Massachusetts 02666
(508) 349-3718

October 1, 1993

Thomas A. Cohen
555 California Street
Suite 2950
San Francisco, CA
94104-1605

Dear Mr. Cohen:

I am writing to inform you that David James Duncan has appointed
me his sole and exclusive agent with respect to his novel
THE RIVER WHY, including all subsidiary rights.

According to the documents in my possession, you have failed to
meet your obligations under terms of the agreement pertaining
to the film rights for THE RIVER WHY and the rights should
properly revert to the author and Sierra Club Books.

Please do not move forward with the project in any direction
until this matter has been resolved.

Sincerely,

Michael Snell

Michael Snell, President

MS/ps


Copies: David James Duncan
        Jon Beckman, Sierra Club Books

## WHO'S WHO

David James Duncan (author) is the author of the novel The Brothers K, which was developed by Imagine for director Ron Howard; and My Story As Told By Water, a 2001 finalist for the National Book Award.

William Hurt (actor) has expressed interest in playing the role of "H2O", the father of Gus. He won an Academy Award for his role in **Kiss of the Spider Woman** and has been nominated three other times (**A History of Violence**, **Broadcast News**, and **Children of a Lesser God**).

Matthew Leutwyler (director) has directed four features films including the romantic comedy, **This Space Between Us.** After forming the production company with Miranda Bailey, Francey Grace, and **The River Why** producer Jun Tan, he directed the award winning comedy-horror-musical **Dead & Breakfast**. Ambush was one of the production companies on **The Squid & The Whale**, (Academy Award® nomination for best screenplay) starring Jeff Daniels and Laura Linney. Ambush also produced the comedy **The Oh In Ohio** starring Parker Posey and Danny DeVito, **Wonderful World** starring Matthew Broderick, **Against the Current** starring Joseph Fiennes and Leutwyler's latest film, **Unearthed**, which premiered at the 2007 Tribeca Film Festival.

⟨— —⟩

**Vertical Frontier**    |    **Big Bill Tilden** | **Order**

COMPANY    ::    VIDEO    ::    SERVICES    ::    CONTACT    ::    ORDER