1  Lizbeth Hasse (#104517)
   Creative Industry Law Group
2  526 Columbus Ave., 2nd floor
   San Francisco, CA 94133
3  (415) 433-4380

4
   Thomas A. Cohen (#154581)
5  Law Offices of Thomas A. Cohen
   639 Front St., 4th floor
6  San Francisco, CA 94111
   (415) 777-1997
7

8  Attorneys for Defendants
   Thomas A. Cohen dba Hammermark Productions
9  Kristi Denton Cohen dba Peloton Productions

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

14  DAVID JAMES DUNCAN,                    Case No.:  CV 08 2243 BZ

15           Plaintiff,                    ECF CASE

16      vs.                               MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT OF MOTION
17  THOMAS A. COHEN d/b/a                 TO DISMISS COMPLAINT [FRCP12(b)6];
    HAMMERMARK PRODUCTIONS, KRISTI        SPECIAL MOTION TO STRIKE UNDER
18  DENTON COHEN d/b/a PELOTON            THE ANTI-SLAPP STATUTE.
    PRODUCTIONS, and SIERRA CLUB          [CCP § 425.16];
19  BOOKS,
                                          Date:  July 2, 2008-Unless Expedited by Order
20           Defendants                   Time:  10 a.m.
                                          Courtroom: G
21

22

23

24

25

<u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................... 2

   A.   The Publishing Agreement and Motion Picture Rights Agreement .............. 2

   B.   Option Payments and Screenplay ................................................................. 3

   C.   The Prospectus and the Exercise of the Option ........................................... 4

   D.   The 1990's .................................................................................................... 5

   E.   The 2000's .................................................................................................... 6

   F.   The Stipulated Judgment in San Francisco Superior Court ......................... 6

III. THE CLAIMS AGAINST THE COHENS ARE BARRED AS A MATTER OF LAW AND
    SHOULD BE STRICKEN WITH PREJUDICE PURSUANT TO CALIFORNIA'S ANTI-
    SLAPP STATUTE............................................................................................... 8

   A.   The California Anti-SLAPP Statute Applies Here; Requires Mr. Duncan to
       Demonstrate a "Probability of Prevailing" on His Claims ........................... 8

   B.   Mr. Duncan Cannot Demonstrate a Probability of Prevailing ..................... 10

IV.  THE COPYRIGHT CLAIM SHOULD BE DISMISSED................................... 11

   A.   Mr. Duncan Does Not Have Standing to Bring a Copyright Claim Because He Is Not
       the Owner of the Motion Picture Rights and His Claim Is Time Barred...................... 11

   B.   The State Court Judgment Must Be Honored ............................................... 13

   D.   Even If Duncan Had Standing, The Statute of Limitations Has Run ........................... 14

   E.   Knowledge of Tom Cohen's Allegedly Fraudulent Conduct Cannot Be   Imputed to
       Ms. Denton Cohen Because They Were Not Married at the Time.............................. 15

V.   MR. DUNCAN HAS FAILED TO SHOW THAT A JUSTICIABLE CASE OR
    CONTROVERSY EXISTS AND THEREFORE, HIS CLAIM FOR  DECLARATORY
    RELIEF MUST BE DISMISSED....................................................................... 16

VI. THE FRAUD CLAIM MUST BE DISMISSED ................................................... 18

    A.    The Fraud Claim is Fatally Vague ................................................ 18

    B.    Mr. Duncan Did Not Personally Rely on Cohen's Representations ............................. 19

    C.    Mr. Cohen Did Not Defraud Duncan .......................................... 20

    D.    Duncan Is Time Barred From Alleging Fraud Against Cohen ...................................... 21

    E.    Sierra Club Books Did Not Owe a Fiduciary Duty to Duncan; Any Fraud  Claims Relying on Breach of Fiduciary Duty Are Wrong. ........................................... 22

VII.  THE CONSPIRACY CLAIM MUST BE DISMISSED ...................................... 23

    A.    There Is No Separate Tort Cause of Action for Conspiracy ......................................... 23

    B.    The Conspiracy Claim Is Fatally Vague ....................................... 23

VIII.  THE FALSE ADVERTISING AND RIGHT OF PUBLICITY CLAIMS MUST BE DISMISSED BECAUSE NOMINATIVE USE OF DUNCAN'S NAME IS AUTHORIZED BY THE RIGHTS AGREEMENT ........................................................ 24

VIII.  CONCLUSION ............................................................................ 25

1

<u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

3

*Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000) ..................................... 17

4

*Algrant v. Evergreen Valley Nurseries Ltd. Partnership* (3rd Cir. 1997) 126 F 3d 178. 181-182 21

5

*Allen v. McCurry* (1980) 449 U.S. 90, 96, 101 S. Ct. 411, 415-16, 66 L. Ed. 2d 308.................. 14

6

*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) .............................. 24

7

*Dealertrack, Inc. v. Huber* (2006) 460 F. Supp. 2d 1177, 1180 ...................................... 9

8

*Derish v. San Mateo-Burlingame Board of Realtors* (9th Cir.1983) 724 F.2d 1347, 1349 ......... 15

9

*Entertainment Research Group v. Genesis Creative Group* (9th Cir. 1997) 122 F.3d 1211, 1228

10

................................................................................................................................. 27

11

*Feist Publications, Inc. v. Rural  Tel. Serv. Co., Inc.* (1991) 499 U.S. 340, 360......................... 12

12

*Films by Jove, Inc. v. Berov* (D.N.Y. 2004) 341 F. Supp. 2d 199, 209 ........................................ 12

13

*International Medical Prosthetics Research Assocs. v. Gore Enters. Holdings, Inc.* (Fed.Cir.

14

1986) 787 F.2d 572, 576 ............................................................................................. 20

15

*Matthew Bender & Co., Inc. v. West Publishing Co.*, 39 U.S.P.Q.2d (S.D.N.Y. 1996) 1079, 1083

16

................................................................................................................................. 19

17

*MCA Records, Inc. v. Charly Records* (C.D. Cal. 1994) 865 F. Supp. 649................................. 15

18

*Metabolife Int'l, Inc., v. Wornick* (9th Cir. 2001) 264 F.3d 832, 839............................................ 8

19

*Metabolife Int'l v. Wornick*

20

264 F.3d 832 (9th Cir. 2001) ....................................................................................... 8, 9

21

*Morris v. Castle Rock Entm't*  (S.D.N.Y. 2003) 246 F. Supp. 2d 290, 293-295.......................... 13

22

*New York Times Co., Inc. v. Tasini* (2001) 121 S. Ct. at 2388-89................................................ 13

23

*Parklane Hosiery Co. v. Shore* (1979) 439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552............... 14

24

*Ritchie v. Williams* (6th Cir. 2005) 395 F.3d 283, 289 ............................................................... 17

25

*Roley v. New World Pictures* (9th Cir. 1994) 19 F. 3d 479 ........................................ 17

*Siegel v. National Periodical Publications, Inc.* (S.D.N.Y. 1973) 364 F. Supp. 1032 ................ 15

*Sobini Films v. Tri-Star Pictures,Inc.* (C.D. Cal. Nov. 21, 2001) 2001 U.S. Dist. LEXIS 23509,

    61 U.S.P.Q.2D (BNA) 1930 .......................................................................... 19

*Sweedlow, Inc. v. Rohm & Haas Co.* (9th Cir. 1972) 455 F.2d 884 ........................................ 20

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*

    190 F.3d 963 (9th Cir. 1999) ................................................................................ 8

*Vernitron Corp. v. Benjamin* (2d Cir. 1971) 440 F.2d 105, 108 ........................................ 15

*Wilson v. Steinhoff*  (2d Cir.1983) 718 F.2d 550, 552 ................................................ 14

*Zuill v. Shanahan* (9th Cir. 1996)  80 F.3d 1366, 1369 ................................................ 16

**State Cases**

*City of Hope National Medical Center v. Genentech, Inc.*, 2008 Cal. LEXIS 4435, 31-32 (Cal.

    Apr. 24, 2008) .............................................................................................. 26

*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal. App. 4th 1308, 1318-1319 ............... 25

*Hall v. Time Warner, Inc.* (2007) 153 Cal. App. 4th 1337, 1347 ................................. 10

*Hills Transp. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal. App. 2d 702 at 709 ....... 23

*Hills Transp. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal. App. 2d 702, 706 .......... 21

*Hills Transp. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal. App. 2d 702, 708 .......... 21

*Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal. App. 4th 1050, 1067–1068

    ........................................................................................................ 10

*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal. App. 4th 1571, 1581 ................................. 27

*Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal. App. 4th 941, 949 ....................... 10

*Magpali v. Farmers Group* (1996) 48 Cal. App. 4th 471, 482 .......................................... 24

*Magpali v. Farmers Group* (1996) 48 Cal. App. 4th 471, 482 .......................................... 22

*Okun v. Superior Court* (1981) 29 Cal. 3d 442 .......................................................... 9

*Schauer v. Mandarin Gems of California, Inc.* (2005) 125 Cal. App. 4th 959, 960. .................... 15

*Small v. Fritz Companies, Inc.* (2003) 30 Cal. 4th 167, 184 ....................................... 21

*Watson v. Sutro* (1890) 86 Cal. 500, 516 ......................................................... 25

*Wolf v. Superior Court* (2003) 107 Cal. App. 4th 25 ............................................... 26

*Woodson v. Winchester* (1911) 16 Cal. App. 472, 476 .............................................. 22

**Federal Statutes**

*17 U.S.C. §507(b)* ............................................................................ 16

17 USC § 106(2) ............................................................................... 12

17 USC §101 .................................................................................. 12

**State Statutes**

California Code of Civil Procedure § 425.16 ............................................... passim

California Civil Code § 1689 ........................................................... 13, 15

California Civil Code, § 18 .................................................................. 25

**Other Authorities**

3 M. Nimmer & D. Nimmer, Nimmer on Copyright  12.05[C] (2004) ......................... 17

Witkin, California Procedure 4th, Pleading § 687 ..................................... 22

## I.      INTRODUCTION

This case is about creative control—not money.  The author of <u>The River Why</u>, David James Duncan, wants to invalidate a rights agreement for which he has been paid in order to prevent the Cohen defendants from making a movie based on his novel.   As he put it in a recent letter:

> I would much rather spend the rest of my life fighting you—no matter how ugly or endless the legal mire—than to ever have to watch your version of my novel appear on a movie screen.

Declaration of Thomas A. Cohen ("Cohen Dec."), Ex. H.

Mr. Duncan's "abuse of the judicial process" in order to "chill the valid exercise of the constitutional right[] of free speech" is precisely the reason the California Legislature enacted the anti-SLAPP statute.  CCP § 425.16(a).  It applies here.  Mr. Duncan's case against the Cohen defendants must be dismissed.  CCP §§ 425.16(b); 425.16(e)(3) and (4).

The October 1984 Rights Agreement ("Rights Agreement") for the motion picture rights to Duncan's novel has been endorsed by the only parties to the Agreement—Sierra Club Books and the Cohen defendants—and ratified by the San Francisco Superior Court.  Mr. Duncan has no standing to bring a copyright suit on the motion picture rights, because he sold those rights. He is also time barred.  His claim for declaratory relief must be dismissed because the Cohens have never threatened him with litigation, and therefore the case is not ripe.  Mr. Duncan's supplemental claims for fraud are defectively vague, factually inaccurate and fail to allege his reliance on any purported misrepresentations by the Cohen defendants.  Mr. Duncan has no Lanham Act claim for use of his name in connection with the movie version of his book because the Rights Agreement not only allows such use—it requires it.

## II.   STATEMENT OF FACTS[1]

### A.   The Publishing Agreement and Motion Picture Rights Agreement

In November 1981, Mr. Duncan entered into a Publishing Agreement with Sierra Club Books and received a $3,000 advance for his novel, The River Why.  Cohen Dec., Ex. A.  Paragraph 1 of the Publishing Agreement states: "The Author agrees to deliver . . .  [The River Why] . . . and hereby grants and assigns to Publisher the sole and exclusive right to publish the work . . ..  The Author also grants to the Publisher such further rights as are specified hereinafter."  Id.  Motion picture rights were among the subsidiary rights listed.  Id.  Sierra Club Books could act as exclusive agent for the motion picture rights.  Proceeds from the sale of those rights were to be divided between the parties.  Id.

Shortly after the novel's publication in 1983, Tom Cohen, then a filmmaker, met with Sierra Club Books and Duncan to discuss acquisition of the movie rights.  Mr. Cohen initially proposed that Mr. Duncan write the screenplay.  Mr. Duncan was interested, and began the screenwriting process, but ultimately decided not to pursue it.  Id.  Mr. Cohen, not then a lawyer, entered into negotiations with Sierra Club Books for the movie rights.   Cohen represented his wholly owned corporation, Hammermark Productions, Inc., while Sierra Club Books was represented by an outside expert, Andrea Nachtigall.  Ms. Nachtigall, the daughter

---

[1] On a motion to dismiss, a court is limited to examining the facts alleged in the complaint. A court may also consider documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions."  *Branch v. Tunnell* (9th Cir. 1994) 14 F.3d 449, 453.  On an anti-SLAPP motion, the court must consider supporting and opposing affidavits stating the facts upon which the liability or defense is based.  CCP § 425.16(b)(2).

of the Chairman Emeritus of The William Morris Agency, was a lawyer with motion picture experience who owned her own agency. Id.

In October 1984, Sierra Club Books and Hammermark Productions, Inc. entered into a Rights Agreement consisting of a two page letter and a four page addendum entitled "Exhibit A." The Rights Agreement provided for a series of option payments and an exercise price based on the size of the movie's budget. Complaint Ex. 1. ¶¶ 6-7. Exhibit A of the Rights Agreement specifically provides that Hammermark had the right "for the purpose of advertising and exploiting the rights granted . . . the right to use . . . the Work's author's name, portrait, picture or likeness and biographical data." Id. Ex. A ¶ 6. A typewritten addition to Exhibit A <u>requires</u> that the film credit read: "Based on the book by David James Duncan." Id.

### B.    Option Payments and Screenplay

Mr. Cohen paid Sierra Club Books $1,250 on execution of the Rights Agreement. On April 12, 1985, he paid an additional $1,250 and notified SCB that a screenplay had been written and that <u>The Paper Chase</u> author John Osborn would begin a rewrite "next week." Cohen Dec., Ex B. Those events extended the first option period to April 17, 1986. Paragraph 3 of the Rights Agreement did not require that a screenplay be tendered to Duncan. It only required that it "be written before the [first 12 month] option period expires."

The Rights Agreement provides that either party may freely assign their rights. Complaint, Ex. 1, ¶ 9. On or about August 15, 1985, Hammermark Productions, Inc. officially dissolved as a California corporation, and assigned all its rights to *The River Why* and five other titles to Thomas A. Cohen. The assignment is recorded at the Copyright Office—Document Number V3479D245. The subsequent January 1, 2004 assignment from Cohen to Peloton

Productions was also recorded at the Copyright Office—Document Number V3553 DE985 P1. Cohen Dec., Ex. D.

In the fall of 1985, Mr. Cohen sent a draft of the script he wrote with Mr. Osborn to Duncan, who "detested" it. Complaint ¶ 25. On April 9, 1986, Cohen wrote to Sierra Club Books, extending the option for 18 months and enclosing check number 5099 for $2,500. Cohen Dec., Ex. C. In May 1987, Cohen and Sierra Club Books negotiated a one year extension of the option. Complaint, Ex. 7. A $2,000 payment for that extension was made on October 14, 1987. Id., Ex. 11. Mr. Cohen and his attorney put together a public limited partnership offering as a vehicle to finance the film.

### C. The Prospectus and the Exercise of the Option

The prospectus for River Why Partners (Cohen Dec., Ex. E) shows that Mr. Cohen went to great lengths to plan the production and develop a good faith budget for the movie. The budget was highly detailed. The prospectus contains an explicit budget summary and refers prospective investors to a 429 line item budget available on request from the general partner. Id. p. 16. In addition to identifying Mr. Cohen as the producer/director (this would be his third feature film in that capacity), the prospectus disclosed an experienced executive producer, production manager, editor, Oscar nominated director of photography and several actors who had expressed interest in participating in the film. Id. p. 17-18. The prospectus for River Why Partners provides that the rights would be transferred from Tom Cohen to the Limited Partnership on commencement of photography. Id. p. 13. As a public offering, River Why Partners was registered with the SEC and approved by the securities regulators of several states including California. Id. p. 1; Cohen Dec., ¶ 12.

As a public offering, any qualified member of the public was free to invest, and many people did.  While Mr. Cohen offered Sierra Club Books an opportunity to invest, SCB never communicated a final decision to Cohen about investing, and never put money into the film.  Cohen Dec., ¶ 13.

As the option deadline approached, the state of Oregon expressed interest in investing and Mr. Cohen was optimistic that he would be able to raise the necessary financing.  Id., ¶ 14.  The state sent the offering materials to its Los Angeles investment advisor for review.  That review was still pending when Mr. Cohen exercised the option and paid the portion of the purchase price owed under the Rights Agreement--$13,547.65.  Id., Ex. F.  The exercise of the option was by personal check (#5897) drawn on Mr. Cohen's individual account.  Id.  The cover letter states that Cohen "*hopes*" photography would commence in the summer of 1989.  Id.  Sierra Club Books responded with a letter confirming that "you have met the terms of the contract."  Complaint, Ex. 13.

Between 1984 and 1988, Mr. Cohen sent five different checks to Sierra Club Books totaling $20,547.65.  Cohen Dec., ¶ 15.  Presumably, Mr. Duncan accepted his share of those payments from Sierra Club Books on all five occasions.

### D.    The 1990's

Sometime after Mr. Cohen exercised the option, Oregon decided not to invest, and the public offering was terminated.   On October 1, 1993, Mr. Duncan's agent, Mike Snell, wrote Mr. Cohen stating that the rights "should properly revert to the author and Sierra Club Books."  Complaint, Ex. 14.  On December 23, 1993, Mike Snell wrote another letter to Mr. Cohen stating that a number of serious filmmakers had approached him about the film rights, "but I have only been able to say someone holds an option to the work.  Perhaps I should put these

people in touch with you?"  Cohen Dec., Ex. G.  Over the years since then, Mr. Snell has referred filmmakers to Mr. Cohen with the understanding that Mr. Cohen owned the rights. Cohen Dec. ¶ 17.  In the mid-1990's, Mr. Cohen optioned his rights to a third party producer on two separate occasions.  Id.  Both Mr. Duncan and Mr. Snell were well aware of these transactions. Id.   That producer was unable to develop or finance a film, and the options lapsed.  Id.

### E.    The 2000's

In 2004, Kristi Denton Cohen d/b/a Peloton Productions decided to tackle *The River Why*. Having recently completed her acclaimed feature documentary, *Vertical Frontier,* narrated by Tom Brokaw and executive produced by Sierra Club Productions, she began her development of *The River Why* by writing to Mr. Duncan and offering to include him in the process.  Id. ¶ 18.  The effort proved fruitless, and culminated in a November 10, 2005 letter from Mr. Duncan stating: "I would much rather spend the rest of my life fighting you—no matter how ugly or endless the legal mire—than to ever have to watch your version of my novel appear on a movie screen."  Id., Ex. H.

### F.    The Stipulated Judgment in San Francisco Superior Court

In April 2007, Mr. Duncan's attorney wrote a letter to the Cohens demanding that they cease and desist efforts to make the film, and threatening legal action if they did not.  Id. ¶ 19. When efforts at settlement proved fruitless, Peloton filed a declaratory relief action against Sierra Club seeking court validation of the Rights Agreement.  Id.  Peloton's attorney asked Mr. Duncan's attorney if she would like to have Duncan added as a defendant in the declaratory relief action.  Declaration of Lizbeth Hasse ¶ 3.  That invitation was vigorously declined.  Id.

1    Sierra Club's demurrer to Peloton's verified complaint was overruled on October 12,

2    2007.  Id. ¶ 4.  Sierra Club filed an answer, and Peloton demurred to the answer.  Id.  The

3    parties then agreed to a stipulated judgment, which was entered on November 28, 2007.

4    The Stipulated Judgment entered in *Peloton Productions v. Sierra Club* (Id. Ex. A) found

5    the following pertinent facts to be true. [2]

6

7         In October 1984, Hammermark Productions, Inc. entered into an agreement
          regarding a motion picture to be based on author David James Duncan's novel,
8         The River Why, published by Sierra Club (hereafter the "Agreement.").   In 2004,
          Hammermark's successor in interest, Thomas A. Cohen, assigned his interests in
9         The River Why and the screenplays based on it to Peloton Productions, which is
          owned by his wife, Kristi Denton Cohen.
10        Sierra Club [] admitted that it was the publisher of the novel, that it entered
          into an Agreement with Peloton's predecessor in interest for the motion picture
11        rights, and that it was represented in those negotiations by an agent with expertise
          in motion picture rights.  Sierra Club's verified answer admitted that in the
12        Agreement it warrants that it "has sole, exclusive, and unencumbered ownership
          of all rights of every kind and character" to the novel and that it had the right to
13        act as the author's exclusive agent for the disposition of motion picture rights to
          The River Why.  Sierra Club admitted that it was paid for the exercise of the
14        option and, on October 27, 1988, wrote a letter confirming that the terms of the
          Agreement had been met.
15        In consideration of the pleadings filed in this action and these stipulated
          facts, the Court  HEREBY ORDERS, ADJUDGES AND DECREES:
16        1.  The October 1984 Agreement between Hammermark Productions, Inc.
          and Sierra Club is valid and binding on all parties and their assignees and
17        successors in interest;
          2.  Subject only to further contingent payments as set forth in the October
18        1984 Agreement, Peloton is the owner of the motion picture rights to the novel
          The River Why written by David James Duncan.
19

20

21

22

23

24
          _____

25        [2] Defendants request the Court take judicial notice of the pleadings filed in Peloton Productions  v. Sierra Club
          (San Francisco Superior Court Case No. CGC 07-465687) which is attached as Exhibit A to the Declaration of
          Lizbeth Hasse.

MOTION TO STRIKE UNDER CCP § 425.15

**III.    THE CLAIMS AGAINST THE COHENS ARE BARRED AS A MATTER OF LAW AND SHOULD BE STRICKEN WITH PREJUDICE PURSUANT TO CALIFORNIA'S ANTI-SLAPP STATUTE**

A SLAPP suit is one in which the plaintiff's alleged injury results from petitioning or free speech activities by a defendant that are protected by the federal or state constitutions. California's anti-SLAPP statute was "enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc., v. Wornick* (9th Cir. 2001) 264 F.3d 832, 839.   "[T]here comes a time when the finality of litigation is almost as important as the decision therein.  In the preservation of the free exercise of speech . . . the early termination of [the] lawsuit is highly desirable." *Okun v. Superior Court* (1981) 29 Cal. 3d 442.

Specifically, California's anti-SLAPP statute allows a defendant to file a special motion to strike a plaintiff's complaint if it "arises from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue."  Cal. Code Civ. Proc. § 425.16(b)(1).  Special Motions to Strike under California's anti-SLAPP statute are appropriately made in federal court, and if granted, the plaintiff's complaint should be dismissed.  *See Metabolife*, supra, 264 F.3d at 839. It need not be shown that the suit was brought with the intention to chill the party's speech. The opposing party's intentions are ultimately beside the point.  *Dealertrack, Inc. v. Huber* (2006) 460 F. Supp. 2d 1177, 1180 (citations omitted).

**A.    The California Anti-SLAPP Statute Applies Here; Requires Mr. Duncan to Demonstrate a "Probability of Prevailing" on His Claims**

A court considering a motion to strike under the anti-SLAPP statute must engage in a two-part inquiry. *First*, a defendant must make an initial *prima facie* showing that the plaintiff's

suit arises from an act in furtherance of the defendants' "rights of petition or free speech."
*Metabolife*, supra, 264 F.3d 832, 839-40. *Second*, once the defendant has made a *prima facie*
showing, the burden shifts to the plaintiff to demonstrate a "reasonable probability of
prevailing" on his claims. *Id*.

In 2004, the Legislature enacted Section 425.17 and in so doing specifically provided
continuing SLAPP protection to motion pictures. The Senate Analysis of section 425.17,
subdivision (d) confirms that movie producers are protected. *Ingels v. Westwood One
Broadcasting Services, Inc.* (2005) 129 Cal. App. 4th 1050, 1067–1068, quoting Sen. Com. on
Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003.)

As to the first prong, the Complaint recites examples of the wide public interest and
critical acclaim for The River Why and its message of environmental activism set in a coming-
of-age story. Complaint ¶ 1. Those allegations demonstrate that Mr. Duncan's suit arises from
an act in furtherance of the defendant's "rights of petition or free speech" under the anti-
SLAPP statute. The acts from which the complaint arises constitute conduct (the Cohens'
actions to develop and produce a film based on rights they contractually acquired) in
furtherance of defendants' right of free speech "in connection with a public issue or an issue of
public interest" CCP § 425.16(e)(4); *See, e.g*., *Hall v. Time Warner, Inc.* (2007) 153 Cal. App.
4th 1337, 1347 (Lawsuit against producers of a television show, *Celebrity Justice,* of interview
with Marlon Brando's former housekeeper subject to anti-SLAPP motion); *Kronemyer v.
Internet Movie Database Inc.* (2007) 150 Cal. App. 4th 941, 949 (A movie website listing the
independent motion picture *My Big Fat Greek Wedding* was a topic of widespread public
interest within the purview of the anti-SLAPP statute under the ambit of §§ 425.16(e)(3) and
(4)).

1    A lawsuit designed to: (i) stop production of a motion picture based on a novel with

2    widespread public interest; and (ii) prevent the producer's version of the novel from appearing

3    on a movie screen clearly satisfies the first prong of the anti-SLAPP analysis.

### B.    Mr. Duncan Cannot Demonstrate a Probability of Prevailing

5        Both the law and the facts are aligned against Mr. Duncan.    His copyright claim is both

6    time barred and swallowed by the Rights Agreement.    Because he does not own the movie

7    rights, he has no standing.    His fraud claim is fatally vague, does not plead scienter or actual

8    reliance, and is rebutted by the facts.    Mr. Duncan's false advertising claims are completely

9    negated by the Rights Agreement, which not only allows, but requires the use of his name.

10    Each of these claims is discussed in greater detail below in connection with the FRCP 12(b)(6)

11    motion to dismiss.    Mr. Duncan will not be able to demonstrate a probability of prevailing in

12    his lawsuit.    The complaint must be stricken with prejudice under CCP § 426.16.

1        <u>MOTION TO DISMISS UNDER FRCP 12(B)(6)</u>

2        **IV.    THE COPYRIGHT CLAIM SHOULD BE DISMISSED**

3        **A.    Mr. Duncan Does Not Have Standing to Bring a Copyright Claim Because**
         **He Is Not the Owner of the Motion Picture Rights and His Claim Is Time**
4        **Barred**

5        Mr. Duncan is not the owner of the motion picture rights, and therefore has no standing to

6    bring the First Claim for Relief for copyright infringement.  He claims that any preparation of a

7    derivative work based on his novel (i.e., a motion picture) violates copyright law.  This

8    contention fails for a variety of reasons.

9        To prevail on copyright infringement of a derivative work, a plaintiff has to show: (1)

10   ownership of the copyright in issue; and (2) infringement/improper appropriation, i.e., that

11   defendant's work is a derivative work impermissibly based on plaintiff's work.  See *Feist*

12   *Publications, Inc. v. Rural  Tel. Serv. Co., Inc*. (1991) 499 U.S. 340, 360.  There is no copyright

13   infringement of Duncan's rights if, at the time of the acts complained of, Duncan was not the

14   owner of the motion picture rights.

15       The Copyright Act provides:

16       Any of the exclusive rights comprised in a copyright, including any subdivision of
17       any of the rights specified by section 106 [17 USCS § 106], may be transferred as
         provided by clause (1) and *owned separately*. The owner of any particular
18       exclusive right is entitled, to the extent of that right, to all of the protection and
         remedies accorded to the copyright owner by this title.
19

20   17 USCS § 201(d)(2) (emphasis added).  See *Films by Jove, Inc. v. Berov* (D.N.Y. 2004) 341 F.

21   Supp. 2d 199, 209 (citing *New York Times Co., Inc. v. Tasini* (2001) 121 S. Ct. at 2388-89)

22   (Copyright consists of a bundle of rights each of which may be transferred separately).

23       One of the separate rights specified in 17 USC § 106(2) is the right "to prepare derivative

24   works based upon the copyrighted work."  Derivative work is defined in 17 USC §101 as "a

25

1    work based upon one or more preexisting works, such as a . . . dramatization . . . motion picture

2    version . . . or any other form in which a work may be recast, transformed, or adapted." The

3    1984 Rights Agreement specifically grants to Hammermark the rights to "use, adapt, translate,

4    subtract from, add to, and change [Duncan's novel] . . . in the making of motion picture and

5    television productions." Rights Agreement ¶ 2 and Ex. A.3.a. Thus, Hammermark, not

6    Duncan, owns the motion picture rights.

7        Given the validity of the grant of rights between Sierra Club Books and Hammermark, as

8    confirmed in the stipulated judgment entered in San Francisco Superior Court, any complaint

9    about whether Hammermark or its successor (Peloton) infringed Duncan's copyright must fail.

10    When an agreement between a writer and a producer assigns the copyright for the motion

11    picture rights to the writer's work, the writer cannot state a valid claim for copyright

12    infringement. See *Morris v. Castle Rock Entm't* (S.D.N.Y. 2003) 246 F. Supp. 2d 290, 293-

13    295 (Granting producers' motion to dismiss writer's copyright claim: "If the Court were to find

14    that the Contract was now invalid simply because it did not result in an actual production, it

15    would be encouraging every failed writer, director and producer in the entertainment world to

16    litigate based on their own unfulfilled production deals.")

17        Here, the motion picture rights were expressly transferred to Hammermark from the

18    Sierra Club by written agreement when the option was exercised and the portion of the

19    purchase price owed under the agreement was timely paid (and accepted with acknowledgment

20    by Sierra Club) at the time of exercise. The parties to the Rights Agreement have not rescinded

21    it. Since Duncan is not the owner of the copyright at issue and cannot rescind the Rights

22    Agreement under California law (Civ. Code § 1689), he has no standing, and his claim must be

23    dismissed.

1

**B.     The State Court Judgment Must Be Honored**

2     This Court is not free to revisit the validity of the Rights Agreement.  The doctrine of

3 collateral estoppel may be invoked where the issue of law or fact in the subsequent proceeding

4 has been litigated and determined by a valid and final judgment. *Wilson v. Steinhoff*  (2d

5 Cir.1983) 718 F.2d 550, 552.  It is not necessary that the parties be identical in both suits.

6 *Parklane Hosiery Co. v. Shore* (1979) 439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552

7 (permitting the use of offensive collateral estoppel).  Courts have construed 28 U.S.C. § 1738

8 (full faith and credit) so as to require federal courts to "give preclusive effect to state court

9 judgments whenever the courts of the state from which the judgments emerge would do so."

10 *Allen v. McCurry* (1980) 449 U.S. 90, 96, 101 S. Ct. 411, 415-16, 66 L. Ed. 2d 308; *Derish v.*

11 *San Mateo-Burlingame Board of Realtors* (9th Cir.1983) 724 F.2d 1347, 1349.

12

13     A federal copyright case involving the copyright to Superman comics is instructive.  In

14 *Siegel v. National Periodical Publications, Inc.* (S.D.N.Y. 1973) 364 F. Supp. 1032

15 (superceded by statute) the creators of the Superman comic strip, like Mr. Duncan here, signed

16 away their rights and later sued claiming that they, and not defendants, were entitled to the

17 copyright.   Defendants sought a motion for summary judgment to dismiss plaintiffs' complaint

18 because the comic strip was a work for hire and the agreements between the parties divested

19 plaintiffs of the renewal copyrights.  The court granted summary judgment holding that "the

20 various agreements between the parties, as well as the consent judgment in the [state court

21 action] action divested plaintiffs of the renewal copyrights.   . . . *The findings of the State*

22 *Supreme Court . . . are binding upon us here. The terms of the stipulation of settlement in that*

23 *action, and the consent judgment are also binding.*"  *Id.* at 1035 emphasis added (citing

24 *Vernitron Corp. v. Benjamin* (2d Cir. 1971) 440 F.2d 105, 108).  See also *MCA Records, Inc. v.*

25

1  *Charly Records* (C.D. Cal. 1994) 865 F. Supp. 649 (Collateral estoppel appropriate where court

2  found privity through a common contractual interest in a music rights agreement).

3  **C.    Under California Law Duncan May Not Rescind the Rights Agreement**

4  Duncan may not rescind the Rights Agreement under the guise of a copyright

5  infringement suit.   By its plain and unambiguous terms, Duncan is not a party to the Rights

6  Agreement.  He is a third party who would like the Rights Agreement terminated.  Under

7  California law, only the parties to a contract may rescind it.  Civ. Code § 1689;  *Schauer v.*

8  *Mandarin Gems of California, Inc.* (2005) 125 Cal. App. 4th 959, 960.

9  **D.    Even If Duncan Had Standing, The Statute of Limitations Has Run**

10  Even if Duncan had the basis for a copyright claim, which he does not, the statute of

11  limitations for a copyright *ownership claim* is three (3) years, a period which accrues when the

12  claimant has knowledge of the violation or is chargeable with such knowledge.  *17 U.S.C.*

13  *§507(b)*; *Zuill v. Shanahan* (9th Cir. 1996)  80 F.3d 1366, 1369 ("claims of co-ownership, as

14  distinct from claims of infringement, accrue when plain and express repudiation of co-

15  ownership is communicated to the claimant, and are barred three years from the time of

16  repudiation.")

17

18  Mr. Duncan has been aware of  Cohen's ownership for at least twenty years.

19  Hammermark and its successors have been openly claiming exclusive ownership of the motion

20  picture rights to The River Why since the 1980's.  The statutory period for any action to

21  establish ownership begins to run whenever there is a "plain and express repudiation" of

22  ownership by one party as against the other. *Ritchie v. Williams* (6th Cir. 2005) 395 F.3d 283,

23  289 (citing *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000); *Zuill v. Shanahan*,

24  80 F.3d 1366 (9th Cir. 1996).

25

In *Ritchie* the defendants waited 10 years to file suit.  Their claim was time barred.

Since the first element of an infringement claim is ownership by the plaintiff and the Williams group is now time-barred from asserting ownership, it is only logical that their infringement actions must fail.  As Nimmer puts it, the alternative approach (allowing infringement claims even though a free-standing ownership claim would be time-barred) leads to results that are "potentially bizarre."

*Ritchie,* supra, citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright  12.05[C] (2004).

Even if there were a rolling statute of limitations because of continuing infringement (as opposed to claims of ownership), an action may only be brought for damages for all acts that accrued within three years preceding filing of the lawsuit.  *Roley v. New World Pictures* (9th Cir. 1994) 19 F. 3d 479.  A plaintiff in a continuing copyright infringement case must produce evidence that the defendant engaged in actionable conduct within the three year statutory time frame, not simply rely on naked allegations and speculation.  If a plaintiff meets this proof threshold, then he can proceed with his infringement cause of action, but only for damages within the three years preceding the filing of the suit pertaining to a violation still in existence at that time.  If the proof threshold is met, and if Mr. Duncan can show that he still has ownership of the motion picture rights (a very big if), Mr. Duncan would be limited to recovery of only those damages that accrued within three years preceding the filing of his suit.  However, since the film has not been made, there has been no infringing activity and there are no damages.

### E.     Knowledge of Tom Cohen's Allegedly Fraudulent Conduct Cannot Be Imputed to Ms. Denton Cohen Because They Were Not Married at the Time

The Complaint alleges that knowledge of Tom Cohen's fraudulent conduct (and therefore willful copyright infringement) is imputed to Ms. Denton Cohen by reason of the Cohens' fiduciary relationship.  Complaint ¶ 45.  The Complaint does not specify why the relationship is

fiduciary.  Defendants assume that Mr. Duncan is relying on the California Family Code § 1100 which states: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships . . . ."

Mr. Duncan's theory fails because Tom Cohen purchased the rights in 1984. The allegedly fraudulent acts—the offer of an investment opportunity and extension of the option period--were in April and May 1987 (Complaint Ex. 4-7), but the Cohens did not marry until July 25, 1987.  Regardless, the Rights were purchased with separate, not community property, and were never held jointly or in Ms. Denton Cohen's name until 2004.  Cohen Dec. ¶ 16. Any claim that Ms. Denton Cohen's copyright infringement is willful, because of her imputed knowledge of her husband's fraud, must fail.

## V.    MR. DUNCAN HAS FAILED TO SHOW THAT A JUSTICIABLE CASE OR CONTROVERSY EXISTS AND THEREFORE, HIS CLAIM FOR  DECLARATORY RELIEF MUST BE DISMISSED

Mr. Duncan has turned the Declaratory Judgment Act on its head.  The Act is designed to shield a *plaintiff* from embarking on an actual program of manufacture, use or sale which may turn out to be illegal.  See *Matthew Bender & Co., Inc. v. West Publishing Co.*, 39 U.S.P.Q.2d (S.D.N.Y. 1996) 1079, 1083.  Here, Mr. Duncan seeks declaratory relief as a sword to prevent *defendants* from exercising their rights.

In suits requesting a judicial declaration of intellectual property invalidity or non-infringement, courts apply a two-part test to determine whether an actual controversy exists, thereby invoking the court's subject matter jurisdiction pursuant to the Declaratory Judgment Act.  *Sobini Films v. Tri-Star Pictures,Inc.* (C.D. Cal. Nov. 21, 2001) 2001 U.S. Dist. LEXIS 23509, 61 U.S.P.Q.2D (BNA) 1930 (internal citations omitted).  The plaintiff must show both

1   (1) an explicit threat or other action by the rights holder, which creates a reasonable

2   apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and

3   (2) present activity which could constitute infringement or concrete steps taken with the intent

4   to conduct such activity.  *Id.*

> In other words, the declaratory judgment *plaintiff* must have a real and reasonable apprehension that *he* will be subject to liability if *he* commences or continues the activity in question, and the *plaintiff* must have actually produced the accused article or have engaged in preparations for production such that but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the *plaintiff* would and could begin production immediately. The test, however stated, is objective and is applied to the facts existing when the complaint is filed.

*Id.* (emphasis added).

Here, declaratory judgment plaintiff Duncan cannot satisfy the two part test.  He has not

alleged, because he cannot, that the Cohen defendants have ever threatened an infringement

suit against him.  A defendants' simple assertion (against a claim of infringement by plaintiff)

that they hold a copyright in certain material generally does not amount to a threat of litigation.

See *International Medical Prosthetics Research Assocs. v. Gore Enters. Holdings, Inc.*

(Fed.Cir. 1986) 787 F.2d 572, 576.

Nor has Mr. Duncan alleged, as he must, that he would and could begin production

immediately.  See *Sweedlow, Inc. v. Rohm & Haas Co.* (9th Cir. 1972) 455 F.2d 884.  While he

claims to have put together a production team, he has not written a script or raised any money

which would enable them to produce a movie.  *Sobini* is instructive.  There, the plaintiff

production company sought a declaration that (i) it was entitled to produce, market and

distribute a filmed version of its "treatment" of the Zorro character without any interference

from defendant distributors of existing Zorro movies; and (ii) that plaintiff's "treatment" did not

infringe any of defendants' copyrights.  The court granted defendants' motion to dismiss in part

because plaintiff failed the two part test.  With regard to part two of the test, the court found

that plaintiff "has not even reached 'preliminary agreements' or obtained commitments from

'key talent' such as a director and lead actors, nor has [plaintiff] even entered into a contract

with a writer (or writers) to create a screenplay for 'Zorro 2040.'"  *Sobini*, supra, 2001 U.S.

Dist. LEXIS 23509*18.  Here, the same can be said for Mr. Duncan who has not alleged, as he

must, that he has obtained commitments from a director or lead actors or even created a script.

There is no separate statute of limitations for declaratory relief actions.  "An action for

declaratory relief will be barred to the same extent the applicable statute of limitations bars the

concurrent legal remedy."  *Algrant v. Evergreen Valley Nurseries Ltd. Partnership* (3rd Cir.

1997) 126 F 3d 178. 181-182.  As noted above, Mr. Duncan's copyright and fraud claims are

time barred.  His claim for declaratory relief must be dismissed.

## VI.    THE FRAUD CLAIM MUST BE DISMISSED

Duncan's claim of fraud against Tom Cohen must be dismissed for failure to plead

specific facts.  The complaint charges a false promise from Cohen to Sierra Club Books to

commence production based on an allegedly sham budget.

### A.    The Fraud Claim is Fatally Vague

No specific facts were pleaded to show from what data the falsity of Cohen's intentions

could be inferred, or how, when, where, through whom, and in what circumstances Sierra Club

Books or Duncan became justified in relying upon these representations.  Failure to allege such

facts is fatal.  See, *Hills Transp. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal. App.

2d 702, 706 (demurrer sustained without leave to amend).   Every element of the cause of

action for fraud must be alleged in the proper manner (i.e., factually and specifically), and the

policy of liberal construction of the pleadings will not ordinarily be invoked to sustain a

pleading defective in any material respect.  *Small v. Fritz Companies, Inc.*  (2003) 30 Cal. 4th 167, 184.  "In so differentiating a false promise from the great bulk of broken promises, the allegations necessary to show contemporaneous intention not to perform should be clear, specific, and unequivocal." *Hills Transp. Co. v. Southwest Forest Industries, Inc*. (1968) 266 Cal. App. 2d 702, 708.  A breach or a later failure to comply with the terms of an agreement will not suffice, because nonperformance is not sufficient to support a fraud claim.  *Magpali v. Farmers Group* (1996) 48 Cal. App. 4th 471, 482.

Because Mr. Duncan failed to allege facts that are crucial to any fraud claim, the claim must be dismissed.

### B.    Mr. Duncan Did Not Personally Rely on Cohen's Representations

Mr. Duncan also fails to state a claim by neglecting to allege how he personally, as opposed to Sierra Club Books, relied on any alleged misrepresentations by Mr. Cohen.  To state a cause of action for fraud based on misrepresentation, a plaintiff must plead that he actually relied on the misrepresentation. "Thus, a fraud action cannot be maintained based on a third party's reliance." *City & County of San Francisco v. Philip Morris, Inc.* (N.D. Cal. 1997) 957 F. Supp. 1130, 1142.  Even taking all of Duncan's alleged facts as true, the Court can at most determine that Sierra Club Books relied on Mr. Cohen's alleged misrepresentations and that this reliance led Sierra Club Books to act in a way that was adverse to Mr. Duncan's interests.  Mr. Duncan does not allege that he himself was induced to rely on Mr. Cohen's misrepresentations.

Even if there were reliance, Duncan has not alleged money damages.  Damage is an essential element of a fraud cause of action.  In a tort action, the damage must be pecuniary. Witkin, California Procedure 4th, Pleading § 687; *Woodson v. Winchester* (1911) 16 Cal. App. 472, 476.  Duncan's complaint alleges no money damages for fraud, but instead seeks

1    rescission of a contract to which he is only a third party beneficiary without the right to rescind.

2    *Schauer*, *supra,* 125 Cal App 4th at 960.

3        C.    **Mr. Cohen Did Not Defraud Duncan**

4        Mr. Duncan's allegation that Mr. Cohen defrauded him is merely a conclusion, and a

5    mere conclusion need not be accepted as true absent supporting allegations establishing why it

6    was fraudulent.  See *SEC v. Seaboard Corp.* (9th Cir. 1982) 677 Fed 2d 1315, 1316 (failure to

7    allege facts showing scienter).

8        Duncan has failed to allege clear specific and unequivocal facts necessary to show that

9    Cohen did not intend—at the time of the promise—to produce *The River Why* on a budget of

10   just under $1.5 million.  Nor will Duncan be able to truthfully make such an allegation.  In

11   crafting his 73 page complaint, Duncan fails to include exhibits which would undermine his

12   fraud allegations.  While, for example, Exhibits 4, 8 and 11 to the Complaint reference the

13   prospectus Cohen used to raise production funds for the film, Duncan does not include the

14   prospectus.  By failing to include the prospectus and by ignoring the facts contained in it,

15   Duncan has restricted "the court's gaze to whatever softlit and artfully-draped tableau [he] has

16   currently placed on stage in [his] latest pleadings."  *Hills Transp. Co. v. Southwest Forest*

17   *Industries, Inc.* (1968) 266 Cal. App. 2d 702 at 709.

18       This Court need not restrict its gaze.  In ruling on a motion to dismiss a complaint, the

19   court may consider documents attached to the motion that are central to the fraud claim (e.g.

20   public disclosure documents filed with the SEC and the offering memorandum) even though

21   such documents were not attached to the complaint or mentioned therein.  *Cortec Industries,*

22   *Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

The prospectus for River Why Partners, Cohen Dec., Ex. E, shows that, contrary to Duncan's unsupported allegations, Mr. Cohen had gone to great lengths to plan the production and develop a good faith budget.  In fact, there was a 429 line item budget.  The prospectus named  thirteen experienced movie industry personnel as being attached to the film.  Id. p. 17-18.  Moreover, because River Why Partners was a public offering, it was registered with the SEC and approved by the securities regulators of several states including California.  The prospectus alone is sufficient to demonstrate the falsity of Duncan's predicate allegation that Cohen "had taken no concrete steps to plan the production or develop a good faith budget."  Complaint 16:13-14.  Moreover, his allegation that Cohen promised to commence production in the summer of 1989 is contradicted by Exhibit 12 in which Mr. Cohen writes that he "hopes" to commence production then.   Even if Mr. Cohen's hoped for production could be construed as a promise, which it cannot, "nonperformance is not sufficient to support a fraud claim."  *Magpali v. Farmers Group* (1996) 48 Cal. App. 4th 471, 482.

### D.    Duncan Is Time Barred From Alleging Fraud Against Cohen

The statute of limitations on Duncan's fraud claim against Cohen has long since run.  A cause of action for fraud or mistake is governed by a three-year statute of limitations. (Code Civ. Proc., § 338, subd. (d).  The allegedly fraudulent acts committed by Mr. Cohen took place in 1987.  By law, Duncan had constructive notice of those acts because his agent, Sierra Club Books, was aware of all the facts in 1987.

Notice may be actual or constructive. Civ. Code, § 18.  "Actual notice is 'express information of a fact,' while constructive notice is that 'which is imputed by law.'  A person with 'actual notice of circumstances sufficient to put a prudent man upon inquiry' is deemed to have constructive notice of all facts that a reasonable inquiry would disclose. [citations]

Notice possessed by one person—actual or constructive—may be imputed to another person. For example, it has long been the rule in California that notice to an agent is notice to the principal. *Watson v. Sutro* (1890) 86 Cal. 500, 516.   There is no difference in this respect between actual and constructive notice.  *E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal. App. 4th 1308, 1318-1319.

Whether Duncan has a timely separate fraud claim against Sierra Club Books based on facts he allegedly first learned in 2005 or 2006 is not relevant to the Cohen defendants. "Claims based on two independent legal theories against two separate defendants can accrue at different times." *Id.* at 1323.  Duncan's fraud claims against Cohen accrued in 1987 because all representations of fact were made to the agent for the movie rights, Sierra Club Books, at that time.  Duncan's fraud claim against Mr. Cohen is untimely and must be dismissed.

### E.    Sierra Club Books Did Not Owe a Fiduciary Duty to Duncan; Any Fraud Claims Relying on Breach of Fiduciary Duty Are Wrong

Recent case law makes clear that Sierra Club Books is not Duncan's fiduciary. Therefore, no fraud claim can be based on the allegation that Cohen offered an investment opportunity to Sierra Club, as Duncan's fiduciary, knowing that the offer created a conflict of interest.

The California Supreme Court in *City of Hope National Medical Center v. Genentech, Inc.*, 2008 Cal. LEXIS 4435, 31-32 (Cal. Apr. 24, 2008) cited *Wolf v. Superior Court* (2003) 107 Cal. App. 4th 25 with approval : "We agree with the holding in *Wolf* that fiduciary obligations are not necessarily created when one party entrusts valuable intellectual property to another for commercial development in exchange for the payment of compensation contingent on commercial success."

1    In *Wolf* the plaintiff novelist entered into a contract with Disney assigning his rights in

2  exchange for, among other things, a percentage of net profits from the film *Who Framed Roger*

3  *Rabbit*.   The novelist sued Disney for breach of contract and for breach of fiduciary duty.  The

4  trial court sustained Disney's demurrer to the fiduciary duty cause of action. The Court of

5  Appeal affirmed concluding that every contract to some extent requires a party to repose trust

6  and confidence in the other, one party's right to contingent compensation, standing alone, does

7  not give rise to a fiduciary duty. *Id.* at 31.

8    Such is the case here.  There was no fiduciary obligation created by the Publication

9  Agreement or the Rights Agreement.

10             **VII.    THE CONSPIRACY CLAIM MUST BE DISMISSED**

11    **A.    There Is No Separate Tort Cause of Action for Conspiracy**

12    Without a fraud claim, Mr. Duncan's conspiracy claim cannot stand.  His allegation of

13  conspiracy is made under California law, but "under California law, there is no separate and

14  distinct tort cause of action for civil conspiracy." *Entertainment Research Group v. Genesis*

15  *Creative Group* (9th Cir. 1997) 122 F.3d 1211, 1228.  As a result, in order for Mr. Duncan to

16  have a valid civil conspiracy cause of action, there must be a specific tort upon which he could

17  base his conspiracy claim. See *Id.*  Since, as noted above, Mr. Duncan's tort claim for fraud

18  fails to state a claim, his claim of conspiracy to commit fraud must fail as well.

19    **B.    The Conspiracy Claim Is Fatally Vague**

20    Even if the underlying fraud claim survives dismissal, the conspiracy claim must be

21  dismissed for lack of specificity.

22    To prove a claim for civil conspiracy, plaintiff must provide substantial evidence of three

23  elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in

24

25

furtherance of the conspiracy, and (3) damages arising from the wrongful conduct.  As is well established, civil conspiracy is not an independent tort.  Rather, civil conspiracy is a "legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal. App. 4th 1571, 1581 (citations omitted).

Duncan is required to plead with specificity all three elements: that Sierra Club Books knew about Cohen's alleged scheme to defraud Duncan of his rights to The River Why, that Sierra Club Books intentionally joined Cohen in this scheme and that such intentional joinder was done for the purpose of injuring Duncan.  *Id.* at 1582.

The complaint lacks each of these three required elements and must be dismissed.

## VIII.   THE FALSE ADVERTISING AND RIGHT OF PUBLICITY CLAIMS MUST BE DISMISSED BECAUSE NOMINATIVE USE OF DUNCAN'S NAME IS AUTHORIZED BY THE RIGHTS AGREEMENT

Mr. Duncan alleges that Ms. Denton Cohen's use of his name—describing him as author of The River Why—is false advertising and violates his right of publicity.  This claim is flatly contradicted by the Rights Agreement.

Exhibit A paragraph 6 of the Rights Agreement (Complaint, Ex. 1) specifically provides that defendants have the right:

> Solely for the purpose of advertising and exploiting the rights granted to Hammermark hereunder, the right to use, and to license cause or permit others to use, the Work's author's name, portrait, picture or likeness and biographical data.

Moreover, a typewritten notation to the Rights Agreement requires that if the title of the film is the same as the title of the book, the credit must read: "Based on the book by David James Duncan."  Id.

1    Ms. Denton Cohen had, and has, every right to use Duncan's name on her web page and

2  elsewhere for the purpose of promoting the production of a movie based on his novel.

3                                  **VIII.   CONCLUSION**

4    Mr. Duncan's complaint must be stricken under CCP § 425.16.   A prevailing defendant

5  on a special motion to strike "shall be entitled to recover his or her attorney's fees and costs."

6  CCP § 425.16(c).  The complaint must also be dismissed under FRCP 12(b)(6).

7

8    Dated:  May 16, 2008

9                                   _____/s/  Lizbeth Hasse_____
10                                  Lizbeth Hasse
                                    Creative Industry Law Group
11
                                    and
12
13                                  Thomas A. Cohen
                                    Law Offices of Thomas A. Cohen
14
                                    Attorneys for the Cohen Defendants
15

16

17

18

19

20

21

22

23

24

25

1   Lizbeth Hasse (#104517)
    Creative Industry Law Group
2   526 Columbus Ave., 2nd floor
    San Francisco, CA 94133
3   (415) 433-4380

4
    Thomas A. Cohen (#154581)
5   Law Offices of Thomas A. Cohen
    639 Front St., 4th floor
6   San Francisco, CA 94111
    (415) 777-1997
7
8   Attorneys for Defendants
    Thomas A. Cohen dba Hammermark Productions
9   Kristi Denton Cohen dba Peloton Productions

10

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13

14  DAVID JAMES DUNCAN,              Case No.:  CV 08 2243 BZ

15          Plaintiff,
                                     DECLARATION OF LIZBETH HASSE IN
16      vs.                          SUPPORT OF DEFENDANTS MOTION TO
                                     DISMISS AND SPECIAL MOTION TO
17  THOMAS A. COHEN et al,           STRIKE;  REQUEST FOR JUDICIAL
                                     NOTICE
18          Defendants
                                     Date:  July 2, 2008-Unless Expedited by Order
19                                   Time:  10:00 a.m.
                                     Courtroom: G
20

21      I, Lizbeth Hasse, declare:

22      1.  I am counsel of record for Defendants Thomas A. Cohen d/b/a Hammermark

23  Productions and Kristi Denton Cohen d/b/a Peloton Productions ("Cohen Defendants") in the

24  above-captioned action.

25

2.  This declaration is submitted in support of the application by Cohen Defendants for a motion to dismiss David James Duncan's complaint under FRCP 12(b)(6) and their Special Motion to Strike under the anti-SLAPP statute, Calif. Code Civ. P. § 425.16.

3.  On or about September 21, 2007, I communicated with Mr. Duncan's attorney, Annette Hurst, asking her if she would like to have Duncan added as a defendant in the declaratory relief action in San Francisco Superior Court—Peloton Productions v. Sierra Club. Ms. Hurst vigorously declined the opportunity.

4.  Sierra Club's demurrer to Peloton's verified complaint was overruled on October 12, 2007.  Sierra Club filed an answer, and Peloton demurred to the answer.  The parties then agreed to a stipulated judgment, which was entered on November 28, 2007.  A true and correct copy of that judgment (without its exhibits) is attached hereto as Exhibit A.  I respectfully request that the Court take judicial notice of the San Francisco Superior Court judgment and the pleadings filed in Case Number CGC 07-465687.

5.  Between Mr. Cohen and me the attorneys working on this matter have spent 71.1 hours at an average billing rate of $350 per hour preparing for and drafting the Motion to Dismiss and Special Motion to Strike under the California anti-SLAPP statute.  We anticipate working at least another 16 hours on the reply brief, and more hours if there is a hearing.

6.  I declare under penalty of perjury of the laws of the United States that the foregoing is true except as to those matters alleged on information and belief.

Dated:  May 16, 2008

_/s/  Lizbeth Hasse_____
Lizbeth Hasse
Attorney for the Cohen Defendants

# Exhibit A

Exhibit A

1  Lizbeth Hasse (#104517)
   Creative Industry Law Group
2  526 Columbus Ave., 2nd floor
   San Francisco, CA 94133
3  (415) 433-4380

4  Thomas A. Cohen (#154581)
   Law Offices of Thomas A. Cohen
5  639 Front St., 4th floor
   San Francisco, CA 94111
6  (415) 777-1997

7
   Attorneys for Plaintiff
8  Peloton Productions

9

10         SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              FOR THE COUNTY OF SAN FRANCISCO

12

13  PELOTON PRODUCTIONS, a sole         Case No.: CGC 07-465687
    proprietorship owned by Kristi Denton Cohen,
14                                       (proposed)
15              Plaintiff,               ORDER FOR ENTRY OF STIPULATED
                                         JUDGMENT
16       vs.
                                         Date:  November 28, 2007
17  SIERRA CLUB,                         Time:  11:00 a.m.
                                         Dept.: 302
18              Defendant

19

20       The Court having considered the Ex Parte Application by plaintiff Peloton Productions

21  for an Order for Entry of Stipulated Judgment, and good cause appearing, hereby orders the

22  entry of the attached Stipulated Judgment.

23       Dated: November 26, 2007
                    28
24                                       PATRICK J. MAHONEY

25                                       _____
                                         Patrick Mahoney
                                         Judge of the Superior Court

Order for Entry of Stipulated Judgment—page 1

ENDORSED
F I L E D
San Francisco County Superior Court

NOV 2 8 2007

GORDON PARK-LI, Clerk
BY: _____JOCELYN C. ROQUE_____
                              Deputy Clerk

1    Lizbeth Hasse (#104517)
Creative Industry Law Group
2    526 Columbus Ave., 2nd floor
San Francisco, CA 94133
3    (415) 433-4380

4    Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
5    639 Front St., 4th floor
San Francisco, CA 94111
6    (415) 777-1997

7

8    Attorneys for Plaintiff
Peloton Productions

9

ENDORSED
F I L E D
San Francisco County Superior Court

NOV 2 8 2007

GORDON PARK-LI, Clerk
BY: _____JOCELYN C. ROQUE_____
Deputy Clerk

10                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                        FOR THE COUNTY OF SAN FRANCISCO

12

13    PELOTON PRODUCTIONS, a sole          Case No.: CGC 07-465687
proprietorship owned by Kristi Denton Cohen,
14
STIPULATED JUDGMENT
15              Plaintiff,

16        vs.

17    SIERRA CLUB,

18              Defendant

19

20        This Stipulated Judgment was prepared by and through counsel of record for the parties

21    to this action, plaintiff Peloton Productions was represented by its attorneys, Lizbeth Hasse and

22    Thomas A. Cohen, defendant Sierra Club was represented by Thomas R. Burke of Davis

23    Wright Tremaine LLP.

24

25

Stipulated Judgment—page 1

By and through their attorneys of record, Plaintiff Peloton Productions, a sole proprietorship owned by Kristi Denton Cohen and Defendant Sierra Club (collectively, the "Parties") consent to entry of this Stipulated Judgment without a noticed motion, hearing or trial. The Parties having stipulated to the provisions set forth herein and the issuance of this Stipulated Judgment, the Court having reviewed the provisions and good cause appearing finds:

1. In October 1984, Hammermark Productions, Inc. entered into an agreement regarding a motion picture to be based on author David James Duncan's novel, The River Why, published by Sierra Club (hereafter the "Agreement."). A true and correct copy of the Agreement is attached hereto as Exhibit A. In 2004, Hammermark's successor in interest, Thomas A. Cohen, assigned his interests in The River Why and the screenplays based on it to Peloton Productions, which is owned by his wife, Kristi Denton Cohen.

2. On April 3, 2007, Duncan's attorney delivered a letter to Peloton demanding that it "cease and desist all or any activity with respect to" The River Why. The letter further states: "Mr. Duncan hereby terminates in its entirety the October 2, 1984 Agreement and all exhibits, amendments, extensions and any and all other terms associated therewith."

3. On or about July 31, 2007, Peloton filed a verified complaint against Sierra Club only, seeking a declaration from this Court that the Agreement is valid and binding. Sierra Club demurred on the grounds that Mr. Duncan was a necessary or indispensable party and should have been included in the lawsuit.

4. Peloton opposed the demurrer on the grounds that Duncan is not a party to the Agreement, and that only the parties to a contract may rescind or terminate it. Sierra Club's demurrer was overruled by the Honorable Patrick Mahoney on October 12, 2007, who stated: "No judgment in this action would bind David James Duncan, and therefore he is neither a

Stipulated Judgment—page 2

1    necessary nor indispensable party.  Plaintiff takes the risk that Mr. Duncan will file a claim, but

2    that is a risk that plaintiff is willing to take."

3        5.  Sierra Club then filed a verified answer which admitted that it was the publisher of the

4    novel, that it entered into an Agreement with Peloton's predecessor in interest for the motion

5    picture rights, and that it was represented in those negotiations by an agent with expertise in

6    motion picture rights.  Sierra Club's verified answer admitted that in the Agreement it warrants

7    that it "has sole, exclusive, and unencumbered ownership of all rights of every kind and

8    character" to the novel and that it had the right to act as the author's exclusive agent for the

9    disposition of motion picture rights to The River Why.  Sierra Club admitted that it was paid for

10   the exercise of the option and, on October 27, 1988, wrote a letter confirming that the terms of

11   the Agreement had been met.

12

13        In consideration of the pleadings filed in this action and these stipulated facts, the Court

14   HEREBY ORDERS, ADJUDGES AND DECREES:

15        1.  The October 1984 Agreement between Hammermark Productions, Inc. and Sierra

16   Club is valid and binding on all parties and their assignees and successors in interest;

17        2.  Subject only to further contingent payments as set forth in the October 1984

18   Agreement, Peloton is the owner of the motion picture rights to the novel The River Why

19   written by David James Duncan; and

20        3.  Each party is to bear its own attorneys' fees and costs.

21   ///

22   ///

23   ///

24

25

Stipulated Judgment—page 3

1  Lizbeth Hasse (#104517)
   Creative Industry Law Group
2  526 Columbus Ave., 2nd floor
   San Francisco, CA 94133
3  (415) 433-4380

4
   Thomas A. Cohen (#154581)
5  Law Offices of Thomas A. Cohen
   639 Front St., 4th floor
6  San Francisco, CA 94111
   (415) 777-1997
7
8  Attorneys for Defendants
   Thomas A. Cohen dba Hammermark Productions
9  Kristi Denton Cohen dba Peloton Productions

10
11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13
14  DAVID JAMES DUNCAN,                  Case No.:  CV 08 2243 BZ

15            Plaintiff,
                                         DECLARATION OF THOMAS A. COHEN
16     vs.                               IN SUPPORT OF DEFENDANTS' MOTION
                                         TO DISMISS AND SPECIAL MOTION TO
17  THOMAS A. COHEN et al,               STRIKE

18            Defendants                 Date:  July 2, 2008-Unless Expedited by Order
                                         Time:  10:00 a.m.
19                                       Courtroom: G

20
21
22     I, Thomas A. Cohen, declare:

23     1.  I am one of the attorneys of record for myself and Kristi Denton Cohen d/b/a Peloton

24  Productions ("Cohen Defendants") in the above-captioned action.

25

2.  This declaration is submitted in support of the application by Cohen Defendants for a motion to dismiss David James Duncan's complaint under FRCP 12(b)(6) and Calif. Code Civ. P. § 425.16.

The Publishing Agreement and Motion Picture Rights Agreement

3.  I am informed and believe that in November 1981, Mr. Duncan entered into a Publishing Agreement with Sierra Club Books for his novel, The River Why.   Attached as Exhibit A is the copy of the Publishing Agreement provided to me by Mike Snell, Mr. Duncan's agent.  In a cover letter transmitting the Publishing Agreement, Mr. Snell indicated that the handwritten markups and redactions were not in the original.

4.  Paragraph 1 of the Publishing Agreement states: "The Author agrees to deliver . . . [The River Why] . . . and hereby grants and assigns to Publisher the sole and exclusive right to publish the work . . ..  The Author also grants to the Publisher such further rights as are specified hereinafter."   Among the further rights are those enumerated in paragraph 5(I)(1)— including "Motion picture and/or dramatic."   Paragraph 7 states that if Duncan has not appointed an agent [which in 1984 he had not] Sierra Club Books had the right to act as his exclusive agent for disposition of subsidiary rights, which included motion picture rights. Sierra Club Books paid Duncan a $3,000 advance.

5.  I worked in production for KQED TV from 1970 to 1977, and thereafter produced and directed two independent feature films.  Shortly after publication of The River Why in 1983, I met with Sierra Club Books and Duncan to discuss acquisition of the movie rights.  Although interested, Sierra Club Books told me that they wanted to shop the novel in Hollywood before offering the rights to me.  Having no success in Hollywood, SCB and Duncan reopened discussions with me.  I initially proposed that Mr. Duncan write the screenplay.  Mr. Duncan

was interested, and began the screenwriting process, but ultimately decided not to pursue it.

6. I had not attended law school at that point in my career. I entered into negotiations with Sierra Club Books for the movie rights representing my wholly owned corporation, Hammermark Productions, Inc. Sierra Club Books was represented by an outside expert, Andrea Nachtigall. Ms. Nachtigall, the daughter of the Chairman Emeritus of The William Morris Agency, was a lawyer with motion picture experience who owned her own agency.

7. In October 1984, Sierra Club Books and Hammermark Productions, Inc. entered into a Rights Agreement consisting of a two page letter and a four page addendum entitled "Exhibit A." A true and correct copy of the Rights Agreement is attached to the Complaint as Exhibit 1. The Rights Agreement provided for a series of option payments and an exercise price based on the size of the movie's budget. Exhibit A of the Rights Agreement specifically provides that Hammermark had the right "for the purpose of advertising and exploiting the rights granted . . . the right to use . . . the Work's author's name, portrait, picture or likeness and biographical data." A typewritten addition to Exhibit A requires that the film credit read: "Based on the book by David James Duncan."

Option Payments and Screenplay

8. I paid Sierra Club Books $1,250 on execution of the Rights Agreement. On April 12, 1985, I paid an additional $1,250 and notified SCB that a screenplay had been written and that The Paper Chase author John Osborn would begin a rewrite "next week." Attached as Exhibit B is a true and correct copy of the contents (no letterhead; no signature) of my April 12, 1985 letter. Those events extended the first option period to April 17, 1986. Paragraph 3 of the Rights Agreement did not require that a screenplay be tendered to Duncan. It only required that it "be written before the [first 12 month] option period expires."

9.  The Rights Agreement provides that either party may freely assign their rights.  On or about August 15, 1985, Hammermark Productions, Inc. officially dissolved as a California corporation, and assigned all its rights to *The River Why* and five other titles to me.  The assignment is recorded at the Copyright Office—Document Number V3479D245.  The subsequent January 1, 2004 assignment from Cohen to Peloton Productions was also recorded at the Copyright Office—Document Number V3553 DE985 P1.  True and correct copies of records of those assignments from the Copyright Office website are attached as Exhibit D.

10.  In the fall of 1985, I sent a draft of the script I wrote with John Osborn to Duncan, who "detested" it.   Industry professionals were not so dismissive: the script was a finalist for the highly competitive Sundance Institute's summer filmmaker's lab, and Mr. Osborn's agent at the powerful Creative Artists Agency agreed to represent it.  There were no takers, and I continued to develop the project as an independent film.

11.  On April 9, 1986, I wrote Sierra Club Books, extending the option for 18 months and enclosing my check number 5099 for $2,500.  Attached as Exhibit C is a true and correct copy of the contents of that letter (no letterhead; no signature).  The handwriting at the bottom of Exhibit C is mine, and was written on or about April 9, 1986.   In the months that followed, I explored various financing options and continued to develop the script and assemble talent for the film.  Realizing that more time would be needed to raise money,  I contacted Sierra Club Books and negotiated a one year extension of the option upon payment of $2,000 before October 17, 1987.  That payment was made on October 14, 1987.

The Prospectus and the Exercise of the Option

12.  The prospectus for River Why Partners, drafted by outside counsel, shows that I went to great lengths to plan the production and develop a good faith budget for the movie.  A true

1    and correct copy of relevant excerpts of the prospectus is attached as Exhibit E.  The entire

2    prospectus is more than 50 pages long and is available for inspection on request.  The budget

3    for the film was highly detailed.  The prospectus contains an explicit budget summary and

4    refers prospective investors to a 429 line item budget available on request from me (the general

5    partner).  In addition to identifying me as the producer/director (this would be my third feature

6    film in that capacity), the prospectus disclosed an experienced executive producer, production

7    manager, editor, Oscar nominated director of photography and several actors who had

8    expressed interest in participating in the film—including Timothy Bottoms and Edward

9    Hermann.  The prospectus for River Why Partners provides that the rights would be transferred

10   from me to the Limited Partnership on commencement of photography.  As a public offering,

11   River Why Partners was registered with the SEC and approved by the securities regulators of

12   several states including California.

13       13.  As a public offering, any qualified member of the public was free to invest, and

14   many people did.  While I offered Sierra Club Books an opportunity to invest, SCB never

15   communicated a final decision to me about investing, and never put money into the film.

16       14.  As the option deadline approached, I was optimistic that I would be able to raise the

17   necessary financing.  This optimism was based, in part, on meetings I had with Oregon

18   government officials who expressed interest in financing a substantial part of the budget.

19   Oregon had successfully invested in the film *Stand by Me*, and was interested in supporting a

20   movie which would, among other things, showcase the state's beautiful rivers.   The state sent

21   the offering materials to its Los Angeles investment advisor for review.  That review was still

22   pending in October 1988 when I, not River Why Partners, exercised the option and paid the

23   portion of the purchase price owed under the Rights Agreement--$13,547.65.  Attached as

Exhibit F is a true and correct copy of the October 12, 1988 transmittal letter and check.  The

exercise of the option was by personal check (#5897) drawn on my individual account.   The

letter states that I hope photography would commence in the summer of 1989.   Sierra Club

Books responded with a letter confirming that "you have met the terms of the contract."

Complaint, Ex. 13.

15.  Between 1984 and 1988, I sent five different checks to Sierra Club Books totaling

$20,547.65.  It am informed and believe that Mr. Duncan accepted his share of those payments

from Sierra Club Books on all five occasions.

16.  I married Kristi Denton (Cohen) on July 25, 1987.  The rights to <u>The River Why</u>

were purchased with separate, not community property, and were never held jointly or in my

wife's name until 2004.

<u>The 1990's</u>

17.  Sometime after I exercised the option, Oregon decided not to invest, and the public

offering was terminated.   On October 1, 1993, Mr. Duncan's agent, Mike Snell, wrote to me

stating that the rights "should properly revert to the author and Sierra Club Books."  Complaint,

Ex. 14.  On December 23, 1993, Mike Snell wrote another letter to me stating that a number of

serious filmmakers had approached him about the film rights, "but I have only been able to say

someone holds an option to the work.  Perhaps I should put these people in touch with you?"

Attached as Exhibit G is a true and correct copy of Mr. Snell's letter.  Over the years since

then, Mr. Snell has referred filmmakers to me with the understanding that I owned the rights.

In the mid-1990's, I optioned the movie rights to a third party producer on two separate

occasions.  Based on phone conversations I had with Mr. Snell, I know that both he and Mr.

Duncan were well aware of these transactions.  That producer was unable to develop or finance a film, and the options lapsed.

The 2000's

18.  In 2004, my wife, Kristi Denton Cohen d/b/a Peloton Productions ,decided to tackle *The River Why*.  Having recently completed her acclaimed feature documentary, *Vertical Frontier,* narrated by Tom Brokaw and executive produced by Sierra Club Productions, she began her development of *The River Why* by writing to Mr. Duncan and offering to include him in the process.  The effort proved fruitless, and culminated in a November 10, 2005 letter from Mr. Duncan stating: "I would much rather spend the rest of my life fighting you—no matter how ugly or endless the legal mire—than to ever have to watch your version of my novel appear on a movie screen."  Attached as Exhibit H is a true and correct copy of Mr. Duncan's November 10, 2005 letter.

The Stipulated Judgment in San Francisco Superior Court

19.  In April 2007, Mr. Duncan's attorney, Annette Hurst, wrote a letter to my wife and me demanding that we cease and desist efforts to make the film, and threatening legal action if we did not.  When efforts at settlement proved fruitless, Peloton filed a declaratory relief action against Sierra Club seeking court validation of the Rights Agreement.


I declare under penalty of perjury of the laws of the United States that the foregoing is true except as to those matters alleged on information and belief.

Dated:  May 16, 2008


_/s/  Thomas A. Cohen_____
Thomas A. Cohen

# Document Removed by Order of Court.