ANNETTE L. HURST (Bar No. 148738)
ELISABETH R. BROWN (Bar No. 234879)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone:  +1.415.772.6000
Facsimile:   +1.415.772.6268
E-mail:       Annette.Hurst@HellerEhrman.com
                   Elisabeth.Brown@HellerEhrman.com

Attorneys for Plaintiff
DAVID JAMES DUNCAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>                              Plaintiff,<br><br>     v.<br><br>THOMAS A. COHEN d/b/a HAMMERMARK PRODUCTIONS, KRISTI DENTON COHEN d/b/a PELOTON PRODUCTIONS, and SIERRA CLUB BOOKS<br><br>                              Defendants. | Case No.: 3:08-cv-02243-BZ<br><br>**DECLARATION OF ELISABETH R. BROWN IN OPPOSITION TO APPLICATION FOR EXPEDITED HEARING** |

I, Elisabeth R. Brown, declare as follows:

1.     I am an attorney licensed to practice before this Court, I am an associate with the law firm Heller Ehrman LLP, and I am counsel for Plaintiff Duncan in this action.  I make this declaration in opposition to Defendants' Application for Expedited Hearing.  I have personal knowledge of the facts set forth herein, except as indicated, and I could and would testify competently to them if called upon to do so.

2.     On May 16, 2008, I confirmed with Annette Hurst, lead counsel for Plaintiff Duncan, that she is available to attend a hearing on July 2, 2008.

Heller
Ehrman LLP

---

**DECLARATION OF ELISABETH R. BROWN IN OPPOSITION TO APPLICATION FOR EXPEDITED HEARING**
**CASE NO.: 3:08-CV-02243-BZ**

3.    I am informed and believe and thereupon state that the Defendants in this lawsuit have been aware that Plaintiff Duncan disputes that either Defendants Thomas Cohen or his wife Kristi Denton Cohen have any valid claim to the derivative film rights in Duncan's copyright in *The River Why*.  Over the course of the past year, in an attempt to resolve this dispute, the parties have engaged in unsuccessful settlement discussions, including a mediation in October 2007.

4.    On or about July 31, 2007, Defendant Denton Cohen initiated a lawsuit in San Francisco Superior Court against the Sierra Club.  Denton Cohen sought a declaration that a letter agreement between Sierra Club and Defendant Cohen, in which Sierra Club purported to convey to Cohen an option in the right to prepare a derivative film work in *The River Why*, was valid.  In ruling on a demurrer filed by the Sierra Club, Judge Mahoney expressly ruled that a judgment in that case would not be binding upon Plaintiff Duncan. Nonetheless, at no time has Denton Cohen or Cohen filed a lawsuit for declaratory relief against Duncan.

5.    Settlement discussions between Plaintiff Cohen and the Defendants stalled following the mediation efforts in October 2007.  In one last effort to reinvigorate these discussions, Duncan sent the Defendants a courtesy copy of his complaint in this action on or about March 13, 2008, a full six weeks before he actually filed the complaint on April 30.

6.    Both Annette Hurst and I are counsel for a plaintiff in a trademark case pending in the District Court for the Central District of California, Case No. CV08-01281 RSWL (CWx).  Today, we were served with four different motions to dismiss in that action, each raising a multitude of legal issues.  Pursuant to the Local Rules in the Central District, our opposition briefs are due on June 4 and we will both be taking principal roles in responding to these motions.  Accordingly, it will be very onerous for Plaintiff's counsel to simultaneously oppose the motion to dismiss in this action on an unnecessarily expedited timetable, particularly when there is a properly noticed date available to both parties.

7.    Attached hereto as Exhibit 1 is a true and correct copy of a cease and desist letter sent by Annette Hurst to Kristi Denton Cohen on April 3, 2007.

Heller
Ehrman LLP

2

**DECLARATION OF ELISABETH R. BROWN IN OPPOSITION TO APPLICATION FOR EXPEDITED HEARING**
**CASE NO.: 3:08-CV-02243-BZ**

1    8.    Attached hereto as Exhibit 2 is a true and correct copy of the Order for Entry

2  of Stipulated Judgment in that action.

3    I declare under penalty of perjury under the laws of the State of California that the

4  foregoing is true and correct.

5    Executed this 16th  day of May 2008 at San Francisco, California.

6

7                                          /s/ *Elisabeth R. Brown*

8                                        Elisabeth R. Brown

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Heller
Ehrman LLP

**DECLARATION OF ELISABETH R. BROWN IN OPPOSITION TO APPLICATION FOR EXPEDITED HEARING**
**CASE NO.: 3:08-CV-02243-BZ**

# EXHIBIT 1

# HellerEhrman LLP

April 3, 2007

Annette L. Hurst
Annette.Hurst@hellerehrman.com
Direct +1.415.772.6840
Direct Fax +1.415.772.1790
Main +1.415.772.6000
Fax +1.415.772.6268

43039.0001

*Via Federal Express*

Kristi Denton-Cohen
Peloton Productions
38 Miller Avenue, #488
Mill Valley, CA  94942

Thomas Cohen, Esq.
639 Front Street, 4th Floor
San Francisco, CA  94111

Re:    *The River Why*

Dear Mr. and Ms. Cohen:

As you will recall, I represent David James Duncan, author of the book *The River Why* (as well as other publications).  We understand that Ms. Denton-Cohen appeared recently at the Outdoor Retailers Convention in Salt Lake City where she represented to others that she was continuing to engage in efforts to produce a film based upon *The River Why*.  It also appears that Peloton Productions is extensively advertising its efforts to produce this film on its website, including statements concerning actors with whom it purportedly has agreements for starring roles.

Mr. Duncan hereby demands that Peloton Productions or any other party claiming to be a successor-in-interest to Hammermark Productions, Inc. ("Hammermark") cease and desist all or any activity with respect to the preparation of derivative works of the novel *The River Why* as such conduct is in violation of the United States Copyright Act.  Mr. Duncan further demands that Peloton, and any or all other persons claiming to be successors to Hammermark, confirm in writing that they no longer make any claim to any ownership, license, or other form of interest in any right associated with *The River Why*.

I am available at your convenience to discuss these matters, but Mr. Duncan expects a response in writing to this correspondence no later than April 16, 2007, or he is prepared to initiate litigation to achieve the ends described above.

The factual and legal grounds for these demands are set out below.  This letter is not intended to inflame; rather, I have set forth what I believe is a fair statement of the facts and

**HellerEhrman**LLP

Kristi Denton-Cohen
Thomas Cohen, Esq.
April 3, 2007
Page 2

have set aside those issues that may cause a great deal of controversy, emotional or otherwise. What is left in my view would be more than enough to justify a grant of summary judgment. I therefore hope that we can avoid litigation and come to a quick and amicable resolution of this matter.

As you know, Mr. Cohen executed an agreement on October 2, 1984 on behalf of Hammermark with Andrea Nachtigall, a literary agent, concerning the film and television rights to *The River Why*. Putting aside for now any issues of authorization, that agreement granted to Hammermark an option on specified terms to acquire certain rights.

In particular, the negotiated price for the rights was to be paid in two installments: one-third on exercise of the option, and two-thirds on "commencement of photography." 10/2/84 Letter ¶6. The consideration for the rights also included a promise of a future running royalty. *Id.* ¶7. The option was to expire twelve months from execution by Sierra Club—on October 16, 1986. That period could be extended for an additional six months (to April 16, 1987) if a screenplay were written during the specified period and an extension payment tendered.

In 1985, when Mr. Cohen tendered a screenplay, the relationship with Mr. Duncan began to deteriorate over artistic differences. Hammermark did not exercise the option by the deadline of April 16, 1987. Instead, on May 7, 1987, *after* the eighteen-month period of the option had expired, Hammermark (via Mr. Cohen) and Sierra Club executed a letter agreement purporting to grant a further twelve-month extension of time in exchange for a further $2000 payment.

That further option was set to expire on May 6, 1988. On October 14, 1987, Mr. Cohen sent a letter to Jon Beckman reciting that a check for $2,500 was enclosed "to extend the option on THE RIVER WHY for an additional year as per our prior agreement." 10/14/87 Ltr ¶1. Mr. Duncan has no written record of such purported "prior agreement."

"River Why Partners" then purported to exercise the option in a letter dated October 12, 1988 from Mr. Cohen to Jon Beckman at Sierra Club. We have no record of any written assignment from Hammermark to River Why Partners or any other document that would authorize that entity to exercise the option. Still, at the time that October 12, 1988 letter was written (and more than four years since the initial option grant had already passed), Mr. Cohen stated that "[t]he remaining two thirds [of the price] will be paid on commencement of photography, which I hope will be next Summer." Mr. Duncan has his doubts concerning the accuracy and veracity of other matters addressed in that letter, but we will put those aside for purposes of this correspondence.

As we all know, principal photography on the film never commenced, and a film has not been distributed. Accordingly, Mr. Duncan has never been paid the remainder of the

HellerEhrman LLP

required consideration for the rights—either based upon the October 1988 projected budget or in the form of the running royalty. From time to time during the late 1980s and early 1990s, other potential opportunities to make a film based on *The River Why* presented themselves, but Mr. Duncan was never able to pursue anything because of the cloud on title created when Mr. Cohen continued to assert rights to third parties and refused to relinquish control of them. Then, in 2005, Ms. Denton-Cohen informed Mr. Duncan that she was engaged anew in the preparation of a screenplay based on the book, and intended to resume production activity with respect to the film. Mr. Duncan immediately objected.

Under California law, the 10/2/84 Letter Agreement carried with it a variety of unexpressed legal obligations and restrictions. Those include, without limitation, the covenant of good faith and fair dealing implied in every agreement under California law, the obligation of an exclusive licensee to exercise best efforts in exploiting the licensed subject matter, the requirement for good and valid consideration to support a contract, and, perhaps most pertinent to our current discussions, the limitation of California Civil Code Section 1657, which provides as follows: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."

As you know, the 10/2/84 Agreement did not specify a deadline for the commencement of photography (and payment of the remaining two-thirds of the price). Under Section 1657, without such a deadline, the time period within which performance was required is a "reasonable" one. We have no doubt that more than twenty-two years since the initial option grant and nearly twenty years since its purported exercise is more than a "reasonable" period of time within which to commence photography—particularly, though without limitation, when measured against Mr. Cohen's stated expectation in the fall of 1987 that photography would commence by the following summer.

Indeed, under these circumstances I believe summary judgment of the question of a reasonable time is likely to be granted—particularly when one considers that Mr. Duncan has been injured in the interim by having to turn away other suitors, and that the fact he has ultimately been paid so little of even the now-ancient and agreed-upon consideration has resulted in a plainly oppressive circumstance. To seek such a judgment, Mr. Duncan is prepared to bring a copyright infringement and declaratory relief lawsuit. If it becomes necessary, we are confident that experts are available who will attest to the unreasonableness of the period of time that has elapsed for commencement of photography. It is difficult to imagine anyone with any credibility and relevant experience being willing to state the contrary. Indeed, we do not understand how you would oppose such a motion at all—and would be gratified to be educated with respect to any arguments or evidence you believe could be presented to establish that the time has in fact been "reasonable."

HellerEhrman LLP

Thus, to the extent considered necessary and not already accomplished by notice, operation of law or otherwise, Mr. Duncan hereby terminates in its entirety the October 2, 1984 Agreement and all exhibits, amendments, extensions and any and all other terms associated therewith. Mr. Duncan of course views the Agreement as having been improperly "extended," and subsequently terminated on numerous occasions. Still, as the purpose of these types of letters is to reserve all rights to one's position, Mr. Duncan is hereby doing so. Finally, in that vein, please allow me to reiterate that this letter does not encompass every argument that Mr. Duncan might choose to make concerning this matter, and there are numerous other points of contention concerning authority, expiration of the option, invalid assignments and so forth.

We understand that this venture started out of a profound respect for *The River Why*, and Mr. Duncan thanks you for your admiration of his work. We sincerely hope the time has come when you are able to let go of *The River Why*. The alternative will be a costly legal proceeding for all concerned, but one we are confident will be successful for Mr. Duncan. We hope litigation can be avoided, and look forward to your agreement for a prompt and amicable resolution of this matter.

Sincerely yours,

Annette L. Hurst

**EXHIBIT 2**

1   Lizbeth Hasse (#104517)
    Creative Industry Law Group
2   526 Columbus Ave., 2nd floor
    San Francisco, CA 94133
3   (415) 433-4380

4
    Thomas A. Cohen (#154581)
5   Law Offices of Thomas A. Cohen
    639 Front St., 4th floor
6   San Francisco, CA 94111
    (415) 777-1997
7

8   Attorneys for Plaintiff
    Peloton Productions

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 FOR THE COUNTY OF SAN FRANCISCO

12

13  PELOTON PRODUCTIONS, a sole          Case No.:  CGC 07-465687
    proprietorship owned by Kristi Denton Cohen,
14                                       NOTICE OF ENTRY OF ORDER OF
                                         STIPULATED JUDGMENT
15          Plaintiff,

16      vs.

17  SIERRA CLUB,

18          Defendant

19

20      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21      PLEASE TAKE NOTICE that the attached Order for Entry of Stipulated Judgment was

22  filed November 28, 2007.

23      Dated: November 28, 2007

24                                              _____
                                                Thomas A. Cohen
25                                              Attorney for Peloton Productions

Notice of Entry of Order of Stipulated Judgment—page 1

1

PROOF OF SERVICE

2  STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

3      I am over the age of 18 and not a party to the within action. My business address is 639
4  Front St., San Francisco, California 94111. I am an active member of the State Bar Of
   California.

5      On November 28, 2007 I served the document(s) described as:

6

7  Notice of Entry of Order of Stipulated Judgment

8  on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope
   addressed as follows:

9      Thomas Burke                          Attorney for Sierra Club
10     Davis Wright Tremaine LLP
       505 Montgomery St., Suite 800
11     San Francisco, CA 94111

12     Annette Hurst                         Attorney for David James Duncan
       Heller Ehrman LLP
13     333 Bush St.
       San Francisco, CA 94104

14
15  On the above date,

16  _X_  (BY MAIL) I then deposited such envelope, with postage thereon fully prepaid, in the
   United States mail at San Francisco, CA..

17
18  ___ (BY PERSONAL SERVICE) I then caused such envelope to be delivered by hand to the
   attorney for plaintiff.

19
20  ___ (BY TELECOPIER) I transmitted the document(s) by facsimile machine to the number
   indicated after the address(es) noted above.

21  I declare under penalty of perjury of the laws of the State of California that the foregoing is true
   and correct.

22
23  San Francisco, CA
   Dated: November 28, 2007

24
                                           _____
25                                         Thomas A. Cohen

1    Lizbeth Hasse (#104517)
     Creative Industry Law Group
2    526 Columbus Ave., 2nd floor
     San Francisco, CA 94133
3    (415) 433-4380

4
     Thomas A. Cohen (#154581)
5    Law Offices of Thomas A. Cohen
     639 Front St., 4th floor
6    San Francisco, CA 94111
     (415) 777-1997

7
     Attorneys for Plaintiff
8    Peloton Productions

9

ENDORSED
F I L E D
San Francisco County Superior Court

**NOV 2 8 2007**

GORDON PARK-LI, Clerk
BY: _____ JOCELYN C. ROQUE _____
Deputy Clerk

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 FOR THE COUNTY OF SAN FRANCISCO

12

13    PELOTON PRODUCTIONS, a sole       Case No.: CGC 07-465687
     proprietorship owned by Kristi Denton Cohen,
14                             (proposed)
15          Plaintiff,             ORDER FOR ENTRY OF STIPULATED
                                JUDGMENT
16        vs.
                           Date: November 28, 2007
17    SIERRA CLUB,               Time: 11:00 a.m.
                           Dept.: 302
18          Defendant

19

20         The Court having considered the Ex Parte Application by plaintiff Peloton Productions

21    for an Order for Entry of Stipulated Judgment, and good cause appearing, hereby orders the

22    entry of the attached Stipulated Judgment.

23        Dated: November 26, 2007
                28
24

                            PATRICK J. MAHONEY
25                       _____
                               Patrick Mahoney
                         Judge of the Superior Court

1  Lizbeth Hasse (#104517)
   Creative Industry Law Group
2  526 Columbus Ave., 2nd floor
   San Francisco, CA 94133
3  (415) 433-4380

4  Thomas A. Cohen (#154581)
   Law Offices of Thomas A. Cohen
5  639 Front St., 4th floor
   San Francisco, CA 94111
6  (415) 777-1997

7
   Attorneys for Plaintiff
8  Peloton Productions

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                    FOR THE COUNTY OF SAN FRANCISCO

12

13  PELOTON PRODUCTIONS, a sole            Case No.: CGC 07-465687
    proprietorship owned by Kristi Denton Cohen,
14
                                           STIPULATED JUDGMENT
15           Plaintiff,

16       vs.

17  SIERRA CLUB,

18           Defendant

19

20      This Stipulated Judgment was prepared by and through counsel of record for the parties

21  to this action, plaintiff Peloton Productions was represented by its attorneys, Lizbeth Hasse and

22  Thomas A. Cohen, defendant Sierra Club was represented by Thomas R. Burke of Davis

23  Wright Tremaine LLP.

24

25

ENDORSED
F I L E D
San Francisco County Superior Court

NOV 28 2007

GORDON PARK-LI, Clerk
BY:      JOCELYN C. ROQUE
                      Deputy Clerk

1    By and through their attorneys of record, Plaintiff Peloton Productions, a sole

2    proprietorship owned by Kristi Denton Cohen and Defendant Sierra Club (collectively, the

3    "Parties") consent to entry of this Stipulated Judgment without a noticed motion, hearing or

4    trial. The Parties having stipulated to the provisions set forth herein and the issuance of this

5    Stipulated Judgment, the Court having reviewed the provisions and good cause appearing finds:

6    1. In October 1984, Hammermark Productions, Inc. entered into an agreement regarding

7    a motion picture to be based on author David James Duncan's novel, The River Why,

8    published by Sierra Club (hereafter the "Agreement."). A true and correct copy of the

9    Agreement is attached hereto as Exhibit A. In 2004, Hammermark's successor in interest,

10   Thomas A. Cohen, assigned his interests in The River Why and the screenplays based on it to

11   Peloton Productions, which is owned by his wife, Kristi Denton Cohen.

12

13   2. On April 3, 2007, Duncan's attorney delivered a letter to Peloton demanding that it

14   "cease and desist all or any activity with respect to" The River Why. The letter further states:

15   "Mr. Duncan hereby terminates in its entirety the October 2, 1984 Agreement and all exhibits,

16   amendments, extensions and any and all other terms associated therewith."

17   3. On or about July 31, 2007, Peloton filed a verified complaint against Sierra Club only,

18   seeking a declaration from this Court that the Agreement is valid and binding. Sierra Club

19   demurred on the grounds that Mr. Duncan was a necessary or indispensable party and should

20   have been included in the lawsuit.

21   4. Peloton opposed the demurrer on the grounds that Duncan is not a party to the

22   Agreement, and that only the parties to a contract may rescind or terminate it. Sierra Club's

23   demurrer was overruled by the Honorable Patrick Mahoney on October 12, 2007, who stated:

24

25   "No judgment in this action would bind David James Duncan, and therefore he is neither a

Stipulated Judgment—page 2

1   necessary nor indispensable party. Plaintiff takes the risk that Mr. Duncan will file a claim, but

2   that is a risk that plaintiff is willing to take."

3       5. Sierra Club then filed a verified answer which admitted that it was the publisher of the

4   novel, that it entered into an Agreement with Peloton's predecessor in interest for the motion

5   picture rights, and that it was represented in those negotiations by an agent with expertise in

6   motion picture rights. Sierra Club's verified answer admitted that in the Agreement it warrants

7   that it "has sole, exclusive, and unencumbered ownership of all rights of every kind and

8   character" to the novel and that it had the right to act as the author's exclusive agent for the

9   disposition of motion picture rights to The River Why. Sierra Club admitted that it was paid for

10   the exercise of the option and, on October 27, 1988, wrote a letter confirming that the terms of

11   the Agreement had been met.

12       In consideration of the pleadings filed in this action and these stipulated facts, the Court

13   HEREBY ORDERS, ADJUDGES AND DECREES:

14       1. The October 1984 Agreement between Hammermark Productions, Inc. and Sierra

15   Club is valid and binding on all parties and their assignees and successors in interest;

16       2. Subject only to further contingent payments as set forth in the October 1984

17   Agreement, Peloton is the owner of the motion picture rights to the novel The River Why

18   written by David James Duncan; and

19       3. Each party is to bear its own attorneys' fees and costs.

20

21   ///

22   ///

23   ///

24

25

1

2    Dated: Nov. 21, 2007                    By: _____ General Counsel
3
                                                    Sierra Club
4

5    Dated: November 26, 2007

6                                             _____
7                                                  Thomas R. Burke
                                              Davis Wright Tremaine LLP
8                                             Attorneys for Sierra Club

9    Dated:

10   November 26, 2007        _____

                                              Kristi Denton Cohen
11                                            Peloton Productions

12   Dated: November 26, 2007

13                                            _____
14                                                 Thomas A. Cohen
                                              Attorney for Peloton Productions
15

16   IT IS SO ORDERED.

17   Dated:

18        NOV 2 8 2007

19                                            PATRICK J. MAHONEY
20                                            _____
                                                  Patrick Mahoney
21                                            San Francisco Superior Court Judge

22

23

24

25

Stipulated Judgment—page 4

Exhibit A

# HAMMERMARK

October 2, 1984

Ms. Andrea Nachtigall
1885 Lombard St.
San Francisco, CA. 94123

Dear Andrea:

This letter, when signed by your client Sierra Club
Books, ("Seller") comprises our agreement with regard to the
motion picture rights in the original literary work entitled
"The River Why" by David James Duncan (the "Work").

1. Seller warrants to Hammermark Productions, Inc. ("Hammermark"),
that Seller has the sole, exclusive, and unencumbered ownership of
all rights of every kind and character throughout the world in
the Work.

2. Seller hereby grants to Hammermark the exclusive and
irrevocable right and option, for the period specified below, to
purchase and acquire the motion picture, television, and allied
rights in the work (collectively, the "Rights") for the purchase
price and upon the terms and conditions specified herein. These
rights are more fully described by Exhibit A to this agreement
and incorporated by this reference.

3. The option shall be effective during the period commencing on
the date Seller executes this agreement and ending at midnight
twelve (12) months thereafter. If a screenplay based on the Work
is written before the option period expires then the option
period will be extended, for no additional consideration, for six
(6) months for a total option period of eighteen (18) months.

4. In consideration of the grant by Seller of the within option,
Hammermark shall pay $1,250 on execution of this agreement, and
$1,250 in six months.

5. If a screenplay is written, the option period may be extended
for an additional eighteen months upon payment of an
additional $2,500. Any consideration paid for option rights (per
paragraphs 4 or 5) shall be credited against the final purchase
price.

6. In consideration of the sale and conveyance from Seller to
Hammermark of the Motion Picture, Television, and Allied Rights
in the event such option is exercised, Hammermark shall pay to
Seller (one third on excercise and two thirds on commencement of
photography) the amounts listed below.

A. the motion picture excceds $500,000 in direct cash costs, then the purchase price shall be five percent (5%) of the budget with a minimum price of $25,000 and a maximum of $200,000. Additionally, Seller shall receive two and one half percent (2 1/2%) of one hundred percent of the net profits of the motion picture.

B. If the budget for the motion picture is below $500,000 in direct cash costs, then the purchase price shall be $12,500. Additionally, Seller shall receive five percent (5%) of one hundred percent of the net profits of the motion picture.

7. The definition of net profits will be no less favorable to the Seller than to other profit participants.

8. The Sierra Club name may not be used in connection with advertising or promotion of the motion picture or with related merchandise without the express consent of the Seller, which consent will not be unreasonably withheld.

9. Hammermark and Seller may transfer or assign their rights under this agreement without the prior consent of the other party.

If the foregoing is acceptable to you, kindly indicate your approval by signing and returning the enclosed duplicate original of this letter for my file.

HAMMERMARK PRODUCTIONS, INC.,
a California corporation

By_____
    Thomas A. Cohen
    Its President

Accepted and Agreed this 17
day of___October___, 1984

_____

Enclosure: Exhibit A

Addendum: See Exhibit A page 4

Exhibit A

Motion Picture, Television, and Allied Rights

Exhibit to that certain Letter Agreement, dated
Oct 2 , 198 , by and between Hammermark Productions,
Inc. ("Hammermark"), a California corporation, and
Sierra Club Books.

1. All motion picture rights including, but not
limited to, the rights to produce, project, exhibit, broad-
cast, and transmit an unlimited number of motion pictures
(including without limitation "remake" and "sequel" motion
pictures, as said terms are commonly understood in the
United States motion picture industry), theatrically, non-
theatrically, on television, by means of cassettes and car-
tridges, and in all other media, now or hereafter known, and
in all gauges and sizes. The term "motion picture," or
words of similar import, as used in this Exhibit, shall be
deemed to mean and include any present or future kind of
motion picture in any gauge, without or with sound recorded
synchronously therewith, whether the same is produced on
film or magnetic or video tape or wire or any other sub-
stance or by any other method or means now or hereafter used
for the production, exhibition, or transmission of any kind
of motion picture, and whether the same is produced ini-
tially for theatrical, non-theatrical, or television exhibi-
tion or transmission or otherwise. The first motion picture
produced hereunder is sometimes hereinafter referred to as
"the Motion Picture."

2. All television rights including, but not
limited to, the rights to produce, project, exhibit, broad-
cast, and transmit an unlimited number of television produc-
tions (including without limitation "series" and "specials,"
as such terms are commonly understood in the United States
television industry), on television and in all other media
now or hereafter known and in all gauges. The term "tele-
vision production," or words of similar import, as used in
this Exhibit, shall be deemed to mean and include any pre-
sent or future kind of television production without or with
sound recorded synchronously therewith, whether the same is
produced on film or magnetic or video tape or wire or any
other substance or by any other method or means now or here-
after used for the production, exhibition, or transmission
of any kind of television production, and whether the same
is produced initially for television exhibition or
transmission or otherwise.

Page 1 of 4

3.    The Rights shall include, without limitation, the rights to:

a.    use, adapt, translate, subtract from, add to, and change the Work and the title thereof, or any other title by which it (or any part thereof) has been or may at any time be known, in the making of motion pictures and television productions as a part of or in conjunction with any such motion picture and television production or both;

b.    combine the Work in any manner with any other work or works in the making of motion pictures and television productions;

c.    use the Work and any part thereof, including without limitation the characters contained therein, and said titles and any similar titles, in conjunction with motion pictures and television productions based upon all or any part or parts of the Work or other literary, dramatic, or dramatico-musical works, or a combination thereof, or in conjunction with musical compositions used for or in connection with such motion pictures and television productions, whether or not written for, or used in, or in connection with, or in any manner whatsoever apart from, any such motion pictures and television productions;

d.    project, transmit, exhibit, broadcast, and otherwise reproduce the Work and any part or parts thereof pictorially and audibly by the art of cinematography or any process analogous thereto in any manner, including the right to project, transmit, reproduce, and exhibit motion pictures and television productions and any part or parts thereof (including without limitation, by so-called "pay," "free," "free home," "closed circuit," "theatre," "toll," "CATV," or "subscription" television), and by the use of cartridges, cassettes or other devices similar or dissimilar, and by so-called "EVR," "Cartrivision" or other similar systems and by any other process of transmission now known or hereafter to be devised;

e.    publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, and license others to publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, such motion pictures and television productions and the scripts of the same and such musical compositions and any part thereof;

f.    record, reproduce, and transmit sound, including spoken words, dialogue, music, and songs, by any manner or means (including mechanical and electrical means




and any other means now known or hereafter developed), whether extracted from or based upon the Work or otherwise, and to interpolate other spoken words, dialogue, music, and songs, in or in connection with or as part of the production, reproduction, transmission, exhibition, performance, or presentation of such motion pictures and television productions;

g. make, copyright, use, vend, license and otherwise exploit, and license others to make, copyright, use, vend, license and otherwise exploit, in any manner, records, tapes and other sound-reproducing devices based in whole or in part on such motion pictures and television productions or such musical compositions, or any part or parts thereof, including the right to use the title of the Work and any similar titles in connection therewith;

h. make, copyright, use, vend, license, and otherwise exploit, and license others to make, copyright, use, vend, license, and otherwise exploit, in any manner, records, tapes, and other sound-reproducing devised based in whole or in part on the Work, or any part or parts thereof;

i. arrange for any and all merchandising and commercial tie-ups of any sort and nature arising out of or connected with the Work and/or the title thereof, the characters contained therein, or said motion pictures and television productions, or any combination thereof; and

j. generally to produce, reproduce, remake, reissue, transmit, exhibit, and perform motion pictures and television productions of any and all kinds.

4. The right, but only for purposes of advertising and exploiting motion pictures and television productions, to make, publish and copyright, or cause to be made, published and copyrighted, in the name of Hammermark or its nominees, in any and all languages, excerpts from the Work and synopses, scenarios and other versions of the Work and of any motion pictures or television productions made pursuant to this Exhibit (each not exceeding 7,500 words in length), with or without illustrations of any type or kind whatsoever, on condition that then existing copyrights in the Work shall not thereby become invalidated. No use by Hammermark of the name of the author of the Work shall be made in connection with any of the foregoing in such manner as would indicate that he is the author of any such synopses, scenarios, or other versions. The author of the Work shall be appropriately indicated, however, to be the author of the Work.



5.  The right to broadcast and transmit by radio and television excerpts from and condensations of the Work or any motion pictures and television productions produced pursuant hereto, or both; but, with respect to such broadcasts on radio, then only for advertising and exploitation purposes, each not to exceed 10 minutes in length.

6.  Solely for the purposes of advertising and exploiting the rights granted to Hammermark hereunder, the right to use, and to license, cause, or permit others to use, the Work's author's name, portrait, picture or likeness, and biographical data.

*        *        *        *        *

ADDENDUM

A. Credit:  If the title of the film is the same as the title of the book: "Based on the book by David James Duncan."

If the title of the film is different from the title of the book: "Based on The River Why by David James Duncan."

B. Anything not specifically referred to herein shall be negotiated in good faith.

Page 4 of 4