1 | ANNETTE L. HURST (Bar No. 148738)
2 | ELISABETH R. BROWN (Bar No. 234879)
  | HELLER EHRMAN LLP
3 | 333 Bush Street
  | San Francisco, CA  94104-2878
4 | Telephone: +1.415.772.6000
5 | Facsimile:  +1.415.772.6268
  | E-mail:     Annette.Hurst@HellerEhrman.com
6 |             Elisabeth.Brown@HellerEhrman.com

8 | Attorneys for Plaintiff
  | DAVID JAMES DUNCAN

10 | UNITED STATES DISTRICT COURT
11 | NORTHERN DISTRICT OF CALIFORNIA

DAVID JAMES DUNCAN,

                      Plaintiff,

v.

THOMAS A. COHEN et al.,

                      Defendants.

Case No.: 3:08-cv-02243-BZ

**DECLARATION OF MATT SALINGER IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION**

**Date: TBD**
**Time: TBD**
**Dep't: Courtroom G, 15th Floor**

Heller Ehrman LLP

**DECLARATION OF MATT SALINGER**
CASE NO.: 3:08-CV-02243-BZ

I, Matt Salinger, declare pursuant to 28 U.S.C. Section 1746, as follows:

1. I am a successful actor in film, television and stage, and a successful producer of more than a dozen small-budget independent films as well as theatrical productions. I attended Princeton University and graduated from Columbia University in 1983 with a degree in art history, minoring in drama. I have been involved in the entertainment business since the early 1980s. A true and correct copy of a recent version of my biography is attached hereto as Exhibit A. I also am known in some circles for being the son of the writer J.D. Salinger.

2. I have known David James Duncan for several years and I am a fan of his works. When I first learned of the situation regarding the motion picture rights to his novel *The River Why* a few years ago, I was shocked that an author could be subject to a situation where his rights were tied up for more than twenty years without a film being produced. Eventually, I contacted a family friend, Rich Guggenhime at the Heller Ehrman law firm, and asked him if someone there could help. I believe as a result, David engaged Heller Ehrman and Annette Hurst to assist him.

3. I have reviewed the October 2, 1984 Letter Agreement from the perspective of a film producer with more than a dozen films under his belt and with the perspective of having negotiated numerous agreements with authors for film rights, many in conjunction with various attorneys specializing in entertainment law and a few entirely by myself. As a producer, I probably tend to be somewhat biased in favor of producers. Although I am not a lawyer, and I am not offering a legal opinion about the document, my opinions herein are informed by working with some of the biggest name lawyers in the entertainment business. In my view, there are numerous significant (if not glaring) problems with that agreement from the perspective of basic industry standards, suggesting that the agreement was at best amateurish and at worst a deliberate and collusive attempt to exploit David Duncan. Given the short time available, I am going to focus on two of those problems in my testimony for the Court at this time, and those two problems are interrelated: the lack of an express reversion clause and the lack of an express time deadline for commencement of

photography and the payment of the contingent portion of the option price.

4.  Every contract for an author's rights in which I have been involved in the last two decades has allowed for reversion to the author. It is a standard term that is universally requested by every agent with whom I have negotiated, and to the best of my current recollection without going back and looking at every one of them in light of the pressing time circumstances, such a provision was present in every agreement with any author that I have ever signed. A reversion clause is also a standard requirement in all form contracts issued by the Writers Guild of America, the union representing the vast majority of all working screenwriters. In my opinion, the lack of a reversion clause in the Letter Agreement is completely inexplicable in light of industry custom and practice.

5.  Additionally, paragraph 6 of the Letter Agreement provides that the exercise of the option occurs upon payment of the purchase price in two installments: 1/3 upon "exercise" and 2/3 upon "commencement of photography." This means that the option exercise (or "purchase") price was structured with a partial contingent payment, and the contingency was the commencement of filming. There is no express deadline set out for filming to begin.

6.  The lack of an express deadline for commencement of photography coupled with the lack of a reversion clause together have the effect of allowing the producer to sit on the rights without taking any action whatsoever to exploit them. In my view, a contract without either of these protections for the author is a shocking result that is completely at odds with industry norms—even from the perspective of a producer. As a producer of small-budget independent films (as was contemplated by this Agreement), I would never even ask for, let alone expect to receive, terms of this nature. I would be embarrassed to do so.

7.  I have been asked by counsel for Mr. Duncan to assume that the lack of an express deadline for payment of the partial contingent payment upon commencement of photography means that commencement (and hence payment) was supposed to occur within a "reasonable time" as measured by industry expectations. A diligent and competent

producer of a small budget independent film (say, a budget under $5,000,000 as all of my films have been) should be able to commence filming within 12-18 months of obtaining the option.  In my experience, a reasonable period of time for a producer to begin filming after optioning rights is 2-3 years.  The greatest amount of time I could possibly expect to obtain in an agreement with an author would be 3-5 years, but any agreement with a 5 year period would be expected to include additional payments during the extended period that the author had the option to accept or reject.  In fact, the WGA's current forms use a reversion period of five years even after full payment of the purchase price and when there is no express deadline to commence filming.  This form reflects a longstanding, customary and ingrained industry practice for the protection of authors.  This is clear evidence of industry custom to demonstrate that five years is the absolute maximum period of time within which to commence filming in order that a requirement for a "reasonable" period of time be met.

8.   I also find it very surprising that Peloton Productions would proceed to filming without a clear chain of title to the rights.  No reputable producer would ask any investor to invest in a film with a copyright infringement lawsuit pending against the production.  Accordingly, in my view it is reasonable to believe that the Cohens are financing the film that is about to commence production by themselves, or perhaps with the assistance of a few family and friends.

9.   Over time, as I have gotten to know David Duncan better, I have become interested in producing a film of *The River Why*, but that was never and is not my motivation for offering testimony in this matter.  Since initially learning of the circumstances, I have thought that this was a bad and unjust thing happening to a good guy and which cried out to be corrected.  This is the kind of thing that gives producers in the film business a bad name, and from the perspective of ethics in the industry I find it abhorrent.  There is no contract between David and me concerning the future disposition of his motion picture rights should he be successful in this lawsuit, although I am interested in producing a film of his novel if one is not produced and distributed by the Cohens.

10.   Novels like *The River Why* which are appropriate for small budget

4

independent films are almost never the subject of multiple motion pictures. If a film is produced by the Cohens, it would be almost impossible for David—or me—to raise funds to produce another film, and I expect that would be universally true for anyone else interested in producing a film from the book. As such, it is likely that if the Cohens are permitted to produce a film, and it is virtually certain if they are permitted to distribute a film, that even if this Court later determines that they should not have done so the cat will be out of the bag (so to speak), and David Duncan will not have another opportunity in the reasonably foreseeable future (if not the remainder of his expected lifetime) to exploit his motion picture rights in the novel. That would especially be a shame for all of us who admire his extraordinary literary work, and would like to see it faithfully and scrupulously recreated for film.

    I declare under penalty of perjury that the foregoing is true and correct and that this declaration was hereby executed at Wilton, Connecticut on July 3, 2008.

_____
Matt Salinger

Heller
Ehrman LLP

5

DECLARATION OF MATT SALINGER

Matt Salinger

After a decade as a successful actor he formed New Moon Productions in 1994 and has produced or executive produced twelve independent feature films, all outside the studio system, working with many first time directors, writer-directors, and such talented and eclectic actors as Angelina Jolie, Stephen Rea, Mary Lousie Parker, Ricky Jay, Diane Keaton, Alfred Molina, Dr. Haing Ngor, Danny Aiello, Martin Sheen, Paul Sorvino, Lisa Kudrow, Forrest Whittaker, John Bon Jovi, Bob Balaban, & Lloyd and Beau Bridges. His films have been bought by Miramax, Lion's Gate, Columbia Tristar, Warner Brothers, and Paramount, among others.  His latest film, "Love Comes Lately" (from three short stories by Nobel prize winner Isaac Bashevis Singer), was an official selection at both the Toronto and Sundance festivals in 2008, and is in active national distribution as this is written.  Tiring of the compromises he had to make in film world, and looking for the best possible material, he discovered Pamela Gien's play "The Syringa Tree" in Larry Moss's acting studio when it was first shown to the public.  He has been with the show for ten years, helping develop it, bringing it to ACT in Seattle, to New York (where it won every award it was eligible for, including an Obie for Best Play of the Year in 2001), to the RNT in London, on a National Tour that he also general managed, and more recently to Canada, where the production he co-produced with CanStage, and with alternating actresses (one white, one black) won the Dora award- Toronto's Tony equivalent- for Best Play, and Best Actress.  He produced the television version of the play that aired on Trio, had two touring companies of the play, and is looking forward to working on the film version, which he plans on shooting in South Africa in 2009.  It is currently being packaged by CAA.   Matt is working with one of the creators of "Hoop Dreams" and "Talking Jazz" writer Ben Sidran on a documentary style film set today amidst the culture of passing jazz greats, and he is most excited to be working with Pam and Larry again on Pam's script "The Lily Field", which they are currently casting, and he is concurrently working on a family film entitled "Jimmy Nolan," a baseball story about a boy with autism, that Nolan Ryan just signed on for.  Matt is on the board of North Country School/Camp Treetops, an extraordinary junior boarding school and camp in the Adirondack Mountains; he is a frequent speaker on the independent film world (most recently at Saybrook college, Yale), and was just appointed Managing Director of Film Finances, Connecticut.  Film Finances International is the largest and most successful completion bonding company in the world, with offices around the world, and has bonded more than 6,000 films to date.