ANNETTE L. HURST (Bar No. 148738)
ELISABETH R. BROWN (Bar No. 234879)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: +1.415.772.6000
Facsimile:  +1.415.772.6268
E-mail:     Annette.Hurst@HellerEhrman.com
            Elisabeth.Brown@HellerEhrman.com

Attorneys for Plaintiff
DAVID JAMES DUNCAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>                              Plaintiff,<br><br>   v.<br><br>THOMAS A. COHEN et al.,<br><br>                              Defendants. | Case No.: 3:08-cv-02243-BZ<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS  AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION**<br><br>**Date: TBD**<br>**Time: TBD**<br>**Dep't: Courtroom G, 15th Floor** |


# INTRODUCTION

No more grievous wrong can be suffered by an artist than desecration of the integrity of his or her work. In this case, Plaintiff David James Duncan ("Duncan"), author of the novel *The River Why*, seeks to prevent precisely such a wrong through the unauthorized preparation of a motion picture derivative work from a detestable screenplay of his novel. After more than twenty years of suffering while one or more of the Defendants improperly claimed a right in his work, Duncan must now suffer even further while Defendants up the ante by taking the truly remarkable step of commencing to film a work without any right to do so and *with a lawsuit pending against them*. Having waited this long, surely they can wait a little while longer—unless they also improperly intend to deprive Duncan of his relief before he can get to trial in this action. Defendants Peloton Productions and Kristi Denton Cohen should be immediately restrained and enjoined from violating Duncan's copyright with the filming of *any* work (let alone one from a screenplay he detests) based upon *The River Why*.

It is undisputed that Duncan owns the copyright in his novel, that the copyright is registered, that his novel is an original work of authorship fixed in a tangible medium of expression, and that Defendants Peloton and Denton Cohen have no authorization, written or otherwise, from Duncan to prepare a motion picture derivative work—though that is precisely what they are about to do unless restrained by this Court. Duncan's prima facie case of copyright infringement is therefore ironclad.

In undertaking the truly disreputable act of filming without a grant of rights from the author and while a suit is pending against them, Defendants thus rely as a defense upon a nearly twenty-four-year-old option found in a Letter Agreement signed by someone other than Duncan and granted (if at all) to someone other than Peloton or Denton Cohen. The law provides for scrupulous examination of such option contracts, and in order to sustain this defense at trial, Denton Cohen and Peloton will have to show the propriety, proper exercise, and valid transfer of the option in every material respect. But Defendants cannot even hope to do this, as there are so many defects in the option that in some respects it

would be laughable were it not so tragic for Duncan. If Peloton and Denton Cohen make and distribute a film, they will forever deprive Duncan of his right to see his novel faithfully reproduced in film. This is a wrong that cannot be remedied by any amount of money, and it must be stopped.

## STATEMENT OF FACTS

The detailed facts supporting the Application are set out in the Verified Amended and Supplemental Complaint and exhibits thereto, the Declaration of Matt Salinger, and the Declaration of Annette L. Hurst, as well as other pleadings and papers on file in this action referenced herein. What follows is a brief summary of the key facts demonstrating Duncan's entitlement to provisional relief.

### A.  The Invalidity Of The Option.

Duncan is the author of the novel *The River Why* and the owner of United States Copyright Registration No. TX-1-078-799 dated March 7, 1983, titled THE RIVER WHY. Verified Amended and Supplemental Complaint ("VASC") ¶¶1, 20. In November 1981, Duncan and Sierra Club Books ("SCB") entered a Publishing Agreement that granted SCB the right to publish *The River Why* and to act as Duncan's agent for ancillary rights, including the derivative film rights, until such time as Duncan appointed a different agent. VASC ¶14 & Ex. 1; SCB Answer ¶14. The Publishing Agreement did not convey the copyright in *The River Why* to SCB. VASC Ex. 1 ¶3 (requiring registration of copyright in name of Duncan). SCB was the "exclusive *agent*" for dealing in the ancillary rights. *Id.* ¶7 (emphasis added).

In the spring of 1983, SCB published *The River Why*. VASC ¶22. In October 1984, Defendant Cohen, acting as President of Defendant Hammermark Productions, Inc. ("Hammermark"), sent a proposed letter agreement ("Letter Agreement") to Andrea Nachtigall, who was apparently working for SCB. VASC ¶23; *see* SCB Answer ¶16. The Letter Agreement proposed that Hammermark would option the right to prepare a film derivative work of *The River Why*. VASC Ex. 2. Cohen was aware at all relevant times that Duncan was the principal who owned the copyright to the *The River Why* and that SCB

acted only as his agent with respect to the film rights. Request for Judicial Notice in Support of Opposition to Motion to Dismiss and Special Motion to Strike (Docket #26) ("RJN") Ex. 1 (state court complaint) ¶14; VASC ¶23.

The Letter Agreement is in many respects a terribly written contract. *See* Declaration of Matt Salinger ¶¶3-6. Amongst its many significant problems it misrepresents SCB's status, purporting that SCB *owned* and had the right itself to convey rights to the copyright in *The River Why*, when in fact SCB was only authorized to serve as Duncan's agent. VASC ¶27 & Exs. 1, 2. This error was plain on the face of the Letter Agreement and was repeated in the handwritten identification in Exhibit A thereto of the "seller" as "Sierra Club Books." VASC Ex. 2.

Apart from this egregious error, the option also was shockingly inconsistent with industry standards for the reasonable protection of authors. Salinger Decl. ¶¶3-6. It contained no reversion clause. *Id.* ¶4. It had a two-part purchase price with the second payment contingent upon commencement of filming. VASC Ex. 2 (Letter Agreement) ¶6. *There was no deadline for the occurrence of the contingency*. *Id.*; *see* Salinger Decl. ¶5. Taken together, these two omissions resulted in a completely inappropriate structure wherein Hammermark was entitled to sit on the rights indefinitely with no express obligation to exploit them. Salinger Decl. ¶¶3-6.

**B.    The Fraudulent Administration, Expiration And Repeated Terminations Of The Invalid Option.**

The administration of the option by SCB was as remarkably inappropriate as the option itself. The option expired, at the latest, in October 1987. VASC ¶22 & Ex. 2. Long before then, indeed, pursuant to papers signed only two months after the option was purportedly granted, Hammermark Productions *had dissolved as an entity*. VASC ¶¶29, 32 & Ex. 5. Thus, the only existing counterparty to the option *no longer existed* when it was set to expire.

Six months before it was set to expire, in early April 1987 and *unbeknownst to Duncan*, Cohen offered Duncan's agent, SCB, an opportunity to invest in his film

production on its own behalf. VASC ¶31 & Exhs. 6, 7, and 8. During the same time period, Cohen asked SCB to grant a new option, extending the already three-year-option for a fourth year from October 17, 1987 until October 17, 1988. VASC ¶32; *see* SCB Answer ¶24. On approximately May 7, 1987—one month after making the investment opportunity available—Cohen, in his capacity as "President" on "Hammermark Productions" letterhead, executed a new option for an additional twelve months. VASC ¶¶32, 33 & Ex 9. At that point, Hammermark had been dissolved since at least August 1985, and had no legal right to continue conducting business! *See* Cal. Corp. Code §2010(a).

SCB never consulted Duncan regarding the new option, and both parties had every reason to know that he would object to it. VASC ¶¶33, 34. Despite SCB's awareness of Duncan's disapproval of Cohen's script, and with an investment opportunity in hand, SCB went ahead and granted Cohen the new option. VASC ¶34. Before the unauthorized extended option commenced, SCB further communicated its decision to invest $10,000 in the project, contingent on Cohen's raising the additional needed funds for a $1.5 million production. VASC ¶35 & Exs. 10, 11, 12.

In or about October 1988, yet another entity—"River Why Partners"—purported to partially exercise the option with the initial installment of the purchase price. VASC ¶¶37, 38, 39; *see* Cohen Decl. Ex. F (Docket #12-4). There was no contemporaneous written assignment between Hammermark and River Why Partners. VASC ¶38. In making the initial payment in his capacity as "General Partner" of RWP, Cohen stated the remaining 2/3 would be paid upon "commencement of photography, which I hope will be next summer." VASC. ¶37 & Ex. 14. In this, at least, Cohen appeared to recognize industry standards. His proposed date to commence filming was nearly five years from the grant of the option, which by any measure was the outer limit of a reasonable time to complete the purchase and exploit the rights. *See* Salinger Decl. ¶¶3-7.

Following the purported exercise of the option, Hammermark and River Why Partners failed to perform. "Next summer" came and went, but photography did not commence. In fact, *five more years* came and went without commencement of photography

by anyone. VASC ¶42. By 1993, when photography still had not commenced, and Duncan's new literary agent, Snell, sent a letter to Cohen confirming the termination of the option and reversion of rights to Duncan. VASC ¶43 & Ex. 18. At that point, nearly ten years had passed since the purported option grant. By any measure of reasonableness, this was far beyond an appropriate time for commencement of photography. Salinger Decl. ¶7. To this day, no one has ever paid the contingent installment of the option purchase price. VASC ¶¶43, 62, 67.

### C.  Peloton's Newly Threatened Filming And The Harm To Duncan.

Denton Cohen and Peloton did not purport to acquire rights until 2004, long after the 1993 termination by Snell. VASC ¶45; *see* Memorandum of Points and Authorities in Support of Motion to Dismiss Complaint; Special Motion to Strike Under the Anti-SLAPP Statute (Docket #12) at p. 3. Moreover, Denton Cohen has been unable to produce a full chain of title, let alone any writing granting her or Peloton rights with an execution date (as opposed to an "as of" effective date) prior to any of Duncan's numerous reiterations of termination culminating in a cease and desist letter from his current counsel in April 2007. *See* VASC ¶¶ 4, 101, 50 & Ex. 20. Duncan repeatedly requested chain of title. VASC ¶101. The only reasonable inference is that Denton Cohen did not have anything in writing prior to the middle of 2007, and that the assignment which has subsequently been produced was created *after* the repeated notices of termination.

At no time since early 2006, when Duncan retained counsel, has Denton Cohen ever disclosed that she intended to commence filming in the summer of 2008. VASC ¶53. Rumors in early June of new activity were viewed with alacrity. A reputable producer would not proceed to photography with a lawsuit pending alleging copyright infringement and challenging his or her right to do so. Salinger Decl. ¶8. This alacrity was reinforced by the filings made by the Cohen Defendants in connection with their various motions. In their Motion to Expedite, Defendants said that they needed a quick decision so that they could "raise funds" to begin production. May 13, 2008 Motion to Expedite (Docket #7) at 2:4-8. Moreover, in their Motion to Dismiss and Special Motion to Strike, Defendants made the

claim that Duncan could not plead infringing activity *within the last three years*. Docket #12 at 15; Docket #29 at 11.

Duncan's counsel confronted Denton Cohen's counsel on July 2 and was flabbergasted to learn, that despite court filings disingenuously implying no activity had occurred within the past three years, Peloton intended to commence filming "sometime next week." *Id.* ¶¶13, 14. Duncan took immediate steps thereafter to stop that filming from occurring, including a letter to the Court the same day and the filing of this Application within two days (on the July 4th holiday).

The imminent filming and subsequent distribution of a motion picture by Peloton and Denton Cohen will destroy David Duncan's opportunity to see his novel realized in film in a manner consistent with his vision. Salinger Decl. ¶10. In fact, it will almost certainly destroy any opportunity that he would have during his lifetime to exploit his exclusive right to make a motion picture derivative work. *Id.*

## ARGUMENT

Duncan requests four forms of relief in the Ex Parte Application, and is entitled to all of them. Rule 15 requires the Court to permit amendment and supplementation of the Complaint. Part I, *infra*. Given Duncan's likelihood of success on the merits and the irreparable harm that will befall him if Denton Cohen and Peloton are permitted to deprive him of the relief he seeks in this lawsuit, the Court should restrain them from commencing filming next week. Part II, *infra*. Good cause exists to award Duncan expedited discovery in connection with the OSC. Part III, *infra*. It is in the best interests of all parties to get this case resolved quickly on the merits after a full and fair trial, as is expressly contemplated by Rule 65(a), and advancement and consolidation to permit such relief should be ordered. Part IV, *infra*.

**I.  DUNCAN IS ENTITLED TO AMEND AND SUPPLEMENT HIS COMPLAINT.**

Duncan is entitled under Federal Rule of Civil Procedure 15 subsections (a) and (d) to amend and supplement his pleading. Because of the strong federal policy favoring

resolution of cases on their merits, leave to amend should be freely granted unless the opposing party can make a showing of unfair prejudice or bad faith on the part of the moving party. *See Martinez v. Newport Beach City*, 125 F.3d 777, 785 (9th Cir.1997), *overruled in part on other grounds*; *see also Grier v. Brown*, 230 F. Supp.2d 1108, 1111 (N.D. Cal. 2002) (citing *Martinez* favorably); *San Luis & Delta-Mendota Water Authority v. U.S. Dept. of Interior*, 236 F.R.D. 491, 496 (E.D. Cal. 2006). The proposed Verified Amended and Supplemental Complaint contains new matter concerning past events that were the subject of the Complaint learned for the first time during the pendency of this lawsuit (amendment), and also new matter occurring for the first time since the filing of the complaint (supplementation). There has been only one prior complaint, and this lawsuit has been pending for only a few months and until now, was only in its initial stages. There is no serious argument to be made opposing Duncan's right to file the Verified Amended and Supplemental Complaint.

II. **DUNCAN SHOULD BE AWARDED PROVISIONAL RELIEF PENDING TRIAL.**

Provisional relief is properly awarded where the plaintiff has demonstrated either likely success on the merits and the possibility of irreparable harm, or that there are serious questions and the balance of hardships tips sharply in plaintiff's favor. These are not separate tests, but represent the ends of a continuum on which the merits showing and harm showing may vary inversely to equate to an overall entitlement to relief. *Republic of Phillipines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

As noted above, there is no question that Duncan will establish a prima facie case of copyright infringement upon which to premise his request for provisional relief and that the statute authorizes such relief. Duncan owns a copyright in his novel, it is registered, and Denton Cohen and Peloton are about to invade his statutory rights under Section 106, entitling him to injunctive relief under Section 504. *LGS Architechts, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1156 (9th Cir. 2006) ("A plaintiff must meet two requirements to establish a prima facie case of copyright infringement: (1) ownership of the

allegedly infringed material and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright holders.").

Thus, the ultimate result on the claim of copyright infringement in this case will turn on whether the option is a valid defense. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) ("The existence of a license creates an affirmative defense to a claim of copyright infringement."). In light of the procedural context, Duncan has the burden to address that issue. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 714-15 (9th Cir. 2007). If the option was (a) void from its inception, (b) voidable and rescinded due to subsequent impropriety, (c) expired, or (d) was otherwise properly terminated—if *any one* of these arguments is correct—then Peloton and Denton Cohen have no defense and will be adjudicated infringers.

The Ninth Circuit has expressly recognized the propriety of awarding provisional relief to support the remedy of contractual rescission where such relief is necessary to preserve the status quo and to prevent the defendants from depriving the Court of the ability to award effective relief. *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222 (9th Cir. 1978) ([W]e are reviewing a preliminary injunction designed to preserve the ultimate availability of rescission in the event it is determined necessary at the conclusion of a trial on the merits. We can reverse the grant of this injunction as an abuse of discretion only if we conclude that under no conceivable circumstances could a final decree involving rescission be permissible. This we cannot do.)

The circumstances in *Coca-Cola* are apposite. In that case, the government sought to stop completion of a merger under the Sherman Act, and the Ninth Circuit affirmed the district court's injunction on the ground that the contract might be rescinded and if the merger were permitted to proceed in the meantime, the government would have been deprived of its remedy. Here, as in *Coca-Cola*, if Defendants are permitted to proceed, they will effectively deprive Duncan of all of the relief he seeks, and will cause him irreparable harm. The requested provisional relief should be awarded.

### A. Duncan Has A Strong Likelihood Of Success On The Merits.

Under California law, a contract is substantively unconscionable when it "shocks the conscience." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1172 -1173 (9th Cir. 2003) (applying California law; finding contract substantively unconscionable where the terms of the agreement so one-sided and grossly favored the drafting party). Additionally, under California law, options are strictly construed to the benefit of the optionor. *See Cummings v. Bullock*, 367 F.2d 182, 186 (9th Cir. 1966). Under the Copyright Act, an agreement purporting to transfer exclusive rights must be expressed in a *clear* writing, and ambiguities are construed against the transferee. *See Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 825-826 (9th Cir. 2001) (explaining the transfer of exclusive rights must be in writing); *Micro Star v. Formgen Inc.* 154 F.3d 1107, 1113 (9th Cir. 1998) ("Section 204 of the Copyright Act requires the transfer of the exclusive rights granted to copyright owners (including the right to prepare derivative works) to be in writing."); *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 936 (N.D. Cal. 1992) (explaining that Section 204 requirement is analogous to statute of frauds and must "state with reasonable certainty the essential terms of the agreement."); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1159 (S.D.N.Y. 1996) ("[T]he terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear."); *Bieg v. Hovnanian Enterprises, Inc.*, 157 F. Supp. 2d 475, 480 (E.D. Pa. 2001) ("Although the word 'copyright' does not need to be mentioned in a transfer document, the 'terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear.').

The option in the Letter Agreement was void on its face because SCB did not own the rights it purported to sell. It was also void from its inception because it was an unconscionable agreement. As explained in the Salinger declaration, the option grossly departed from industry norms for the protection of authors because it lacked either a reversion clause or a deadline for commencement of filming. Taken together, these two omissions created a situation where the optionee could make a partial payment on the

purchase price and then sit on the rights indefinitely without exploiting them. This was shockingly inappropriate, as admitted by Duncan's editor at SCB, who called the agreement a "terrible mistake." VASC ¶¶36, 63.

SCB's extension of the option agreement is unenforceable against Duncan because the extension was the product of constructive fraud and because Cohen participated in it. *See* Civ. Code §1689 (a). SCB granted the extension while it was laboring under a material conflict of interest because it was considering investment in the film for its own account at the time the extension was granted. This is plainly a ground for rescission under California law. *See Standard Realty & Dev. v. Ferrera*, 151 Cal. App.2d 514, 516 (1957) (permitting principal to rescind contract entered between agent and third party, where agent failed to disclose that it was acting on behalf of principal and third party). The extension of the option was also void from the perspective that Hammermark, the purported counter-party to the extension, did not even exist as an entity at the time thereof.

The initial, partial, exercise of the option in 1988 was also void because the party purporting to exercise the option, River Why Partners, did not even own it at the time.

The option was never fully exercised and the Exhibit A rights purchased, because *the second payment upon which the purchase depended was never made*. The option therefore expired and/or was properly terminated because it was not completely exercised within the required " reasonable time." Since the option provides no express deadline for the commencement of filming and the second payment, under California law the limitation of a reasonable time is therefore implied. Cal. Civ. Code §1657; *City of Stockton v. Stockton Plaza Corp.*, 261 Cal. App. 2d 639, 644, (1968) (finding that, absent a specified time in a contract, a condition precedent must be performed within a reasonable time and an option must be exercised within a reasonable time).

*City of Stockton* is apposite. In that case, the court applied Section 1657 to confirm the city of Stockton's termination of a lease, because the lessee failed to obtain financing to proceed with redevelopment of the property, as foreseen in the contract. *Id.* at 642. The contract permitted the *lessee* to terminate the lease if it did not procure the requisite

financing for the project within one year, but it did not provide a similar right to the city. *Id.* The contract did not specify any time by which the city could terminate the lease if the lessee failed to procure the requisite financing, a condition precedent to proceeding with the redevelopment. In holding that the contract could not be construed to permit the lessee to sit on the property indefinitely without developing it, the court applied Section 1657 to permit the city to terminate the lease because the lessee had failed to obtain the financing within a reasonable time. *Id.* at 646.

Here, as in *City of Stockton*, a material requirement of the exercise of the option contract was never met. Here, as in that case, the optionee seeks to sit on the property indefinitely without exploiting it to the detriment of the owner. This result the law plainly does not allow. The exercise of Hammermark's option was to be completed by the commencement of photography. Five years is the most that could be characterized as a reasonable time for commencement of photography in light of industry standards. Salinger Decl. ¶7. In recognition of these standards, the Writer's Guild of America form agreements *require reversion after five years even where all payments have been made. Id.* Even Cohen recognized that he should be expected to commence filming by the summer of 1989, five years after the option was granted. VASC Ex. 14. Thus, under any sensible measure of "reasonable time," this option expired after five years without complete payment of the purchase price and commencement of filming. It was also properly terminated on this ground, repeatedly, starting in 1993. VASC ¶¶43, 46, 49.

More than twenty years has now passed without payment of the full purchase price and commencement of filming, and under any conceivable measure, this was not a reasonable time. Peloton and Denton-Cohen had constructive and actual notice of Duncan's repeated efforts to terminate the option long before they sought to undertake filming. While Duncan does not believe he is required to return any payment as the Cohen Defendants have had the benefit of the option for nearly twenty-four years, and have wielded it to their tax benefit and to Duncan's detriment by scaring off other potential producers, nonetheless in an abundance of caution Duncan has tendered the exercise price to them in support of his

claims. VASC ¶¶5, 41, 42, 45.

The law, industry custom, and just plain basic fairness support Duncan's quest to terminate the option. He has a very strong likelihood of prevailing on one or more of these theories at trial.

### B. The Balance Of Hardships Tips Sharply In Duncan's Favor.

In addition to a strong likelihood of success, Duncan also will suffer serious irreparable harm if Denton Cohen and Peloton are not restrained from making a film. Although an ironclad presumption of irreparable injury flowing from copyright infringement may no longer be appropriate in light of the Court's decision in *eBay Inc. v. Mercexchange, LLC*, 547 U.S. 388 (2006), nonetheless the Ninth Circuit's repeated conclusion that irreparable injury occurs in a case of copyright infringement is fully applicable here. *See, e.g., Micro-Star v. Formgen, Inc.*, 154 F.3d 1107 (9th Cir. 1998); *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824 (9th Cir. 1997).

*The River Why* novel cannot reasonably be expected to support multiple films. Salinger Decl. ¶10. Thus, Duncan will get only one shot at a film production of his novel. If Denton Cohen and Peloton usurp that opportunity, Duncan is exceedingly unlikely to have another one in his lifetime. Salinger Decl. ¶10. Moreover, if Peloton and Denton Cohen proceed, Duncan will suffer an artistic injury when a detestable screenplay written by Cohen, rather than a faithful reproduction of his novel, takes the screen. *See id.* ¶10. If Peloton and Denton Cohen are permitted to proceed, they will effectively deprive Duncan of all of the relief he seeks on is copyright and declaratory relief claims. By any relevant measure, these types of harm are not compensable with money damages, and are irreparable.

In contrast, Defendants have waited more than twenty years to commence filming, and it is inconceivable that they cannot wait a few months more. Although Denton Cohen only purported to acquire the option in 2004, she married Cohen in 1997. Cohen Decl. ¶16 (Docket #12-4). Defendants will suffer no cognizable injury in being restrained from committing an unlawful act. *See Apple Computer Inc. v. Franklin Computer Corp.*, 714

F.2d 1240, 1255 (3d Cir. 1983). Moreover, Denton Cohen has long had knowledge of Duncan's assertions that she lacked any legal right to make a film based upon his novel, and chose to proceed knowing of such jeopardy. She has, in legal parlance, plainly assumed the risk—as also noted by the Superior Court judge in holding that the state court action would not bind Duncan in any respect.

Moreover, even if by some miracle Defendants manage to convince a jury that the option agreement permits Peloton and Denton Cohen to proceed, they will still have every opportunity to make a film. Duncan has no intention of proceeding in the meantime given this dispute. *See* Salinger Decl. ¶8 (no reputable producer would proceed when there is a contest over the rights).

What Peloton and Denton Cohen are seeking to do is the essence of disturbing the *status quo pendente lite*, and what Duncan seeks to restrain is solely the commission of acts that would alter that state of affairs. This a traditional, wholly appropriate request for provisional relief, and it should be granted.

### III. GOOD CAUSE EXISTS FOR EXPEDITED DISCOVERY.

At bottom, this is not that complicated a case. It is not a big document case. Permitting expedited discovery in support of the Ex Parte Application, as well as in support of the OSC and requested advancement of trial on the merits, is important and necessary because it will permit Duncan finally to establish all of the circumstances surrounding the option, as well as any purported assignments thereof.

### IV. EFFICIENT, PROMPT AND FAIR RELIEF WILL BE AFFORDED ALL PARTIES BY ADVANCEMENT OF THE TRIAL DATE AND CONSOLIDATION OF THE OSC HEARING WITH THE MERITS.

Rule 65(a) authorizes the Court to advance trial on the merits and consolidate it with the preliminary injunction hearing. That makes sense here. The key witnesses overlap substantially, the documents are not that many, and all parties would benefit from a quick resolution of this case on the merits so that they can proceed with knowledge of their respective rights and obligations.

Heller
Ehrman LLP

## CONCLUSION

For all of the foregoing reasons, the requested TRO should be granted to prevent Denton Cohen and Peloton from altering the more than twenty-year status quo by commencing filming next week. In order to facilitate certainty for all parties and to preserve the efficacy of the relief that Duncan seeks in this lawsuit, the Court should further advance the trial, consolidate it on the merits in connection with the OSC, and should order expedited discovery by the end of July so that this matter can be concluded in its entirety with a trial on the merits in September 2008.

Dated: July 4, 2008                    Respectfully submitted,

                                       HELLER EHRMAN LLP


                                       By     /s/ *Annette L. Hurst*
                                              ANNETTE L. HURST

                                       Attorneys for Plaintiff
                                       DAVID JAMES DUNCAN