1  ANNETTE L. HURST (Bar No. 148738)
2  ELISABETH R. BROWN (Bar No. 234879)
   HELLER EHRMAN LLP
3  333 Bush Street
   San Francisco, CA  94104-2878
4  Telephone:  +1.415.772.6000
   Facsimile:   +1.415.772.6268
5  E-mail:       Annette.Hurst@HellerEhrman.com
                  Elisabeth.Brown@HellerEhrman.com
6

7

8  Attorneys for Plaintiff
   DAVID JAMES DUNCAN
9

10            UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12  DAVID JAMES DUNCAN,                    Case No.: 3:08-cv-02243-BZ

13                          Plaintiff,

14                                          **DECLARATION OF ANNETTE L.**
                                            **HURST IN SUPPORT OF** *EX*
15       v.                                 *PARTE* **APPLICATION**

16  THOMAS A. COHEN et al.,
                                            **Date: TBD**
17                          Defendants.      **Time: TBD**
                                            **Dep't: Courtroom G, 15th Floor**
18

19

20

21

22

23

24

25

26

27

Heller
Ehrman LLP  28

I, Annette L. Hurst, declare as follows:

1.  I am an attorney licensed to practice before this Court, and I am a shareholder with the law firm of Heller Ehrman LLP, counsel of record for Plaintiff David James Duncan ("Duncan") in this action.  I make this declaration in support of Plaintiff Duncan's *Ex Parte* Application for a Temporary Restraining Order, Order to Show Cause re Preliminary Injunction, and Consolidation of Preliminary Injunction Motion with an Expedited Trial on the Merits.  I have personal knowledge of the facts set forth herein, except as indicated, and I could and would testify competently to them if called upon to testify.

2.  I was retained by Mr. Duncan in early 2006.  Thereafter, in February 2006, I spoke with Mr. Cohen and informed him that Mr. Duncan was of the view that the Letter Agreement was terminated, and that neither he, nor his wife, Ms. Denton Cohen, had the right to prepare a film based upon his novel *The River Why* and that such a film would be a copyright infringement.  Mr. Cohen informed me that he did not have time to deal with the issue at that time, as he was preparing for a trial of a class action matter, but that he would get back to me when his schedule permitted.

3.  In the meantime, I approached Sierra Club Books in an effort to enlist their aid in resolving the dispute with the Cohens concerning the option in the Letter Agreement.  After approximately a year of sporadic negotiations, Mr. Duncan and Sierra Club Books reached a compromise in March 2007 contingent upon also reaching a compromise with the Cohens.  In the meantime, I had not heard again from Mr. Cohen, but in early 2007 the Peloton Productions web site appeared to reflect newly increased activity with regard to a film production.

4.  Accordingly, shortly after the compromise with Sierra Club was signed, I sent a cease and desist demand to Ms. Denton Cohen on April 3, 2007.  Attached hereto as Exhibit A is a true and correct copy of my April 3, 2007 letter.  This letter again initiated approximately one year of settlement negotiations, which included correspondence, proposed agreements, an in-person meeting between myself, Ms. Hasse and the Cohens in

DECLARATION OF ANNETTE L. HURST IN SUPPORT OF *EX PARTE* APPLICATION
CASE NO.: 3:08-CV-02243-BZ

Heller
Ehrman LLP

San Francisco, and an in-person meeting between Ms. Denton Cohen and Mr. Duncan in Montana. The settlement discussions culminated in an October 24, 2007 mediation with the Cohens, Mr. Duncan and his advisors Matt Salinger and Patrick Markey, myself and Ms. Hasse with John Bates at JAMS in San Francisco.

5. In the meantime, on August 1, 2007, while settlement discussions were ongoing, Denton Cohen filed a lawsuit against the Sierra Club in the Superior Court for The County of San Francisco (Case No. CGC07-465687). *See* Docket #26 (Request for Judicial Notice) Ex. 1. I learned of this lawsuit from Sierra Club's attorney, Mr. Burke, shortly before a response was due to the Complaint. At that time, Mr. Burke and Sierra Club were fully aware of Duncan's position that the option was invalid and had been terminated. Sierra Club demurred to the complaint, asserting that the real dispute was between Ms. Denton Cohen and Mr. Duncan, and therefore, that Ms. Denton Cohen failed to join an indispensable party. The Court denied the demurrer, but in doing so expressly held that no judgment in that case would bind Mr. Duncan and that "[Ms. Denton Cohen] takes the risk that Mr. Duncan will file a claim, but that is a risk [she] is willing to take." *See* Docket #26 (Request for Judicial Notice) Ex. 2 at p. 2.

6. On November 29, 2007, I received an email from Sierra Club's counsel, Mr. Burke, informing me that Sierra Club had entered a stipulated judgment in the Superior Court case, purporting to affirm the validity of Ms. Denton Cohen's alleged right to prepare a film derivation work in *The River Why*. Attached hereto as Exhibit B is a true and correct copy of Mr. Burke's email and the attached stipulated judgment. On the day the e-mail was sent I was at a pretrial conference in Boston for a patent infringement case that ultimately went to trial for two weeks commencing on December 10, and continued into January when the matter settled.

7. I nonetheless responded to the e-mail on a "reply-all" basis, with copies to Ms. Hasse and Mr. Cohen, as follows:

> Mr. Burke: I am not sure why you are sending this to me, since you have already represented to me that the Court has ruled that this lawsuit will not be binding in any way upon David Duncan. Mr. Duncan is not, and never has

been, a participant in the lawsuit. He does not recognize any judgment in the matter.

To be clear, moreover, we view this stipulated judgment as yet another breach of fiduciary duty by Sierra Club to David Duncan, and will proceed accordingly.

Mr. Cohen: As you are a party and not, as far as I know, counsel of record, I am not sure why you are copied on this communication. I will assume, however, that Ms. Hasse has consented to direct communication with you for these purposes and thus I reply to both of you.

It is Mr. Duncan's continuing position, as he first expressed through Mr. Snell in 1993, that the agreement is terminated, and that he owns the film rights to his work, *The River Why*. Any one of you or your successors who acts to the contrary does so with full notice of his position, and can expect to be held responsible for willful copyright infringement.

7. Following the session with JAMS, the ball was in the Cohens' court to make a further proposal. I participated in further telephone conversations with Mr. Bates, and upon information and belief, it is my understanding that Mr. Bates engaged the other side in further conversations, looking for a compromise. Despite these continued efforts, I received no proposal from the other side. As I was engaged in two trials in the fourth quarter of 2007 (a trademark infringement case in Los Angeles in October and the patent infringement case in Boston in December), I was then unable to press the issue.

8. After I came up for air in the first quarter of 2008, and in light of the silence from the Cohens, we prepared the Complaint in this action. I also spent time during the first quarter of 2008 obtaining authorization from Heller Ehrman to represent Mr. Duncan in a lawsuit on a pro bono basis, as he could not afford to pay for a lawsuit. As a last ditch effort to invigorate the settlement discussions, I sent a courtesy copy of the fully drafted and signed Complaint to Ms. Hasse and Mr. Burke on March 13, 2008. This prompted a final effort at settlement, led by entertainment lawyer Jay Shanker on behalf of Sierra Club in early 2008, which too was unsuccessful. By April of this year, it thus became apparent that settlement options had been exhausted and the dispute simply could not be resolved without litigation. Accordingly, Mr. Duncan authorized the filing of a lawsuit and it was filed on April 30, 2008.

9. Throughout the above-described settlement discussions and at no time before or

Heller
Ehrman LLP

4

since the filing of this lawsuit, did Ms. Denton Cohen or her counsel suggest that she or her production company would begin filming in the summer of 2008.  Indications were to the contrary.  For example, on May 13, 2008, the Cohen Defendants filed an application with the Court requesting an expedited hearing on their forthcoming motion to dismiss the complaint.  *See* Docket ##6-7 (Declaration of Lizbeth Hasse in Support of Application for Expedited Hearing and Application for Expedited Hearing, respectively).  As grounds for the expedited hearing, the Cohen Defendants asserted that "any delay in resolving this case greatly impacts the ability of defendants to raise money and begin production of a film based on The River Why.  Investors are unwilling to put money into a film when the rights are being challenged by the author."  Docket #6 ¶6 (Declaration of Lizbeth Hasse in Support of Application for Expedited Hearing) and Docket #7 (Application for Expedited Hearing) at 2:4-8.

10. Furthermore, on June 6, 2008, in their Reply in Support of Special Motion to Strike and Motion to Dismiss, the Cohen Defendants argued that Mr. Duncan's copyright claims were barred by the statute of limitations, notwithstanding his allegations of ongoing conduct, stating Mr. Duncan "has not alleged, *nor could he*, *anything amounting to infringement*." Docket #29 (Reply Memorandum of Points and Authorities in Support of Motion to Dismiss and Special Motion to Strike Under the Anti-SLAPP Stature) at 11 (emphasis added).  Given that Peloton was apparently planning to commence filming just a month later, this statement in a court pleading signed by an attorney was at best disingenuous in its implication that no preparation of a derivative work had occurred within the prior three years or, certainly, was about to occur.

11. In light of the foregoing, I viewed with skepticism media reports, beginning in the first week of June, that Denton Cohen was in the midst of negotiations to enter contracts with various actors.  Even absent the clear implications from the Cohen Defendants in *court pleadings signed by an attorney* that they were seeking investment and needed resolution of the suit to commence filming, I could not fathom that investors would invest or that any reputable producer would recklessly enter into contractual obligations and undertake

Heller
Ehrman LLP

5

1  filming while a copyright infringement lawsuit was pending against her.  Accordingly, I

2  believed these reports to be nothing more than industry chatter, and a possible litigation

3  tactic by the Cohen Defendants to generate public interest in the project in order to garner

4  support for their anti-SLAPP motion.

5      12. Nonetheless, I began investigating the rumors of renewed activity.  I asked an

6  attorney and friend of Mr. Duncan, Bret Simmons, to contact the Oregon department of

7  film, to ascertain the validity of these reports.  Mr. Simmons reported that the Oregon

8  officials were not aware of any imminent efforts to begin filming, and that no permits had

9  issued.

10     13. As June wore on, Mr. Duncan received more reports of potential activity related

11  to a film production of his novel.  By the beginning of July, it was difficult to discount

12  them, but given the circumstances with the court pleadings filed by defendants, I frankly did

13  not trust counsel to give me a truthful answer.  Because one report suggested that the actor

14  William Hurt had signed onto the project, on the morning of July 2, 2008, I contacted Mr.

15  Hurt's agent at Creative Artists Agency, Hilda Queally.  In response to a voicemail I left for

16  her, I received a call from Charles Melniker, who identified himself as a Business Affairs

17  Executive for Mr. Hurt.  He informed me that he handled all contracts for Mr. Hurt and that

18  Mr. Hurt did not use a separate lawyer.  Mr. Melniker stated that there was a contract with

19  Mr. Hurt for *The River Why* and that he, Melniker, had been involved in those negotiations

20  on Mr. Hurt's behalf.  Mr. Melniker also stated that he and Mr. Hurt were entirely unaware

21  of any pending lawsuit concerning the film rights.  Later that day, in connection with the

22  Rule 26(f) conference of counsel, I confronted Ms. Hasse and asked her whether Denton

23  Cohen intended to begin filming.  She stated that Denton Cohen intended to begin filming

24  "sometime next week."

25     14. Immediately after that statement by Ms. Hasse, I reiterated Mr. Duncan's view

26  that to proceed would be an infringement, and demanded that Defendants refrain from doing

27  so.  I proposed that we meet and confer for an expedited trial schedule and that defendants,

28  if they would not agree not to commence filming, at least agree that they would not

Heller
Ehrman LLP

6

DECLARATION OF ANNETTE L. HURST IN SUPPORT OF *EX PARTE* APPLICATION
CASE NO.: 3:08-CV-02243-BZ

undertake any distribution of a film prior to resolution of this suit.  I was concerned that Mr. Duncan would not be able to afford even a nominal bond that might be required in connection with provisional relief.  I proposed a trial within 90-120 days, depending on the time required by Defendants to prepare.  We agreed to adjourn the conference to July 3 so that all parties could consult with their clients.  On July 3, we resumed the conference but were unable to reach agreement.  Immediately afterward, I sent an e-mail asking Ms. Hasse and Mr. Burke to stipulate to the filing of an Amended and Supplemental Complaint.  A true and correct copy of that e-mail is attached as Exhibit C.  A short time later, I provided notice, both by e-mail and fax, that Mr. Duncan would seek ex parte relief to restrain Peloton and Denton Cohen from commencing production of the film.

15. Assuming that discovery proceeds on an expedited basis, I would be prepared to try this case on the merits by September 15, 2008.  I will separately provide the document requests and limited interrogatories directed to each of the defendants that Duncan requests be expedited.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was hereby executed on July 4, 2008 at San Francisco, California.

_____/s/ *Annette L. Hurst*_____
ANNETTE L. HURST

Heller
Ehrman LLP

DECLARATION OF ANNETTE L. HURST IN SUPPORT OF *EX PARTE* APPLICATION
CASE NO.: 3:08-CV-02243-BZ

# HellerEhrman LLP

April 3, 2007

Annette L. Hurst
Annette.Hurst@hellerehrman.com
Direct +1.415.772.6840
Direct Fax +1.415.772.1790
Main +1.415.772.6000
Fax +1.415.772.6268

43039.0001

*Via Federal Express*

Kristi Denton-Cohen
Peloton Productions
38 Miller Avenue, #488
Mill Valley, CA 94942

Thomas Cohen, Esq.
639 Front Street, 4th Floor
San Francisco, CA 94111

**Re:** *The River Why*

Dear Mr. and Ms. Cohen:

As you will recall, I represent David James Duncan, author of the book *The River Why* (as well as other publications). We understand that Ms. Denton-Cohen appeared recently at the Outdoor Retailers Convention in Salt Lake City where she represented to others that she was continuing to engage in efforts to produce a film based upon *The River Why*. It also appears that Peloton Productions is extensively advertising its efforts to produce this film on its website, including statements concerning actors with whom it purportedly has agreements for starring roles.

Mr. Duncan hereby demands that Peloton Productions or any other party claiming to be a successor-in-interest to Hammermark Productions, Inc. ("Hammermark") cease and desist all or any activity with respect to the preparation of derivative works of the novel *The River Why* as such conduct is in violation of the United States Copyright Act. Mr. Duncan further demands that Peloton, and any or all other persons claiming to be successors to Hammermark, confirm in writing that they no longer make any claim to any ownership, license, or other form of interest in any right associated with *The River Why*.

I am available at your convenience to discuss these matters, but Mr. Duncan expects a response in writing to this correspondence no later than April 16, 2007, or he is prepared to initiate litigation to achieve the ends described above.

The factual and legal grounds for these demands are set out below. This letter is not intended to inflame; rather, I have set forth what I believe is a fair statement of the facts and

Heller Ehrman LLP  333 Bush Street  San Francisco, CA  94104-2878  www.hellerehrman.com

Exhibit A

HellerEhrman LLP

have set aside those issues that may cause a great deal of controversy, emotional or otherwise. What is left in my view would be more than enough to justify a grant of summary judgment. I therefore hope that we can avoid litigation and come to a quick and amicable resolution of this matter.

As you know, Mr. Cohen executed an agreement on October 2, 1984 on behalf of Hammermark with Andrea Nachtigall, a literary agent, concerning the film and television rights to *The River Why*. Putting aside for now any issues of authorization, that agreement granted to Hammermark an option on specified terms to acquire certain rights.

In particular, the negotiated price for the rights was to be paid in two installments: one-third on exercise of the option, and two-thirds on "commencement of photography." 10/2/84 Letter ¶6. The consideration for the rights also included a promise of a future running royalty. *Id.* ¶7. The option was to expire twelve months from execution by Sierra Club—on October 16, 1986. That period could be extended for an additional six months (to April 16, 1987) if a screenplay were written during the specified period and an extension payment tendered.

In 1985, when Mr. Cohen tendered a screenplay, the relationship with Mr. Duncan began to deteriorate over artistic differences. Hammermark did not exercise the option by the deadline of April 16, 1987. Instead, on May 7, 1987, *after* the eighteen-month period of the option had expired, Hammermark (via Mr. Cohen) and Sierra Club executed a letter agreement purporting to grant a further twelve-month extension of time in exchange for a further $2000 payment.

That further option was set to expire on May 6, 1988. On October 14, 1987, Mr. Cohen sent a letter to Jon Beckman reciting that a check for $2,500 was enclosed "to extend the option on THE RIVER WHY for an additional year as per our prior agreement." 10/14/87 Ltr ¶1. Mr. Duncan has no written record of such purported "prior agreement."

"River Why Partners" then purported to exercise the option in a letter dated October 12, 1988 from Mr. Cohen to Jon Beckman at Sierra Club. We have no record of any written assignment from Hammermark to River Why Partners or any other document that would authorize that entity to exercise the option. Still, at the time that October 12, 1988 letter was written (and more than four years since the initial option grant had already passed), Mr. Cohen stated that "[t]he remaining two thirds [of the price] will be paid on commencement of photography, which I hope will be next Summer." Mr. Duncan has his doubts concerning the accuracy and veracity of other matters addressed in that letter, but we will put those aside for purposes of this correspondence.

As we all know, principal photography on the film never commenced, and a film has not been distributed. Accordingly, Mr. Duncan has never been paid the remainder of the

HellerEhrman LLP

required consideration for the rights—either based upon the October 1988 projected budget or in the form of the running royalty. From time to time during the late 1980s and early 1990s, other potential opportunities to make a film based on *The River Why* presented themselves, but Mr. Duncan was never able to pursue anything because of the cloud on title created when Mr. Cohen continued to assert rights to third parties and refused to relinquish control of them. Then, in 2005, Ms. Denton-Cohen informed Mr. Duncan that she was engaged anew in the preparation of a screenplay based on the book, and intended to resume production activity with respect to the film. Mr. Duncan immediately objected.

Under California law, the 10/2/84 Letter Agreement carried with it a variety of unexpressed legal obligations and restrictions. Those include, without limitation, the covenant of good faith and fair dealing implied in every agreement under California law, the obligation of an exclusive licensee to exercise best efforts in exploiting the licensed subject matter, the requirement for good and valid consideration to support a contract, and, perhaps most pertinent to our current discussions, the limitation of California Civil Code Section 1657, which provides as follows: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."

As you know, the 10/2/84 Agreement did not specify a deadline for the commencement of photography (and payment of the remaining two-thirds of the price). Under Section 1657, without such a deadline, the time period within which performance was required is a "reasonable" one. We have no doubt that more than twenty-two years since the initial option grant and nearly twenty years since its purported exercise is more than a "reasonable" period of time within which to commence photography—particularly, though without limitation, when measured against Mr. Cohen's stated expectation in the fall of 1987 that photography would commence by the following summer.

Indeed, under these circumstances I believe summary judgment of the question of a reasonable time is likely to be granted—particularly when one considers that Mr. Duncan has been injured in the interim by having to turn away other suitors, and that the fact he has ultimately been paid so little of even the now-ancient and agreed-upon consideration has resulted in a plainly oppressive circumstance. To seek such a judgment, Mr. Duncan is prepared to bring a copyright infringement and declaratory relief lawsuit. If it becomes necessary, we are confident that experts are available who will attest to the unreasonableness of the period of time that has elapsed for commencement of photography. It is difficult to imagine anyone with any credibility and relevant experience being willing to state the contrary. Indeed, we do not understand how you would oppose such a motion at all—and would be gratified to be educated with respect to any arguments or evidence you believe could be presented to establish that the time has in fact been "reasonable."

**HellerEhrman** LLP

Kristi Denton-Cohen
Thomas Cohen, Esq.
April 3, 2007
Page 4

Thus, to the extent considered necessary and not already accomplished by notice, operation of law or otherwise, Mr. Duncan hereby terminates in its entirety the October 2, 1984 Agreement and all exhibits, amendments, extensions and any and all other terms associated therewith. Mr. Duncan of course views the Agreement as having been improperly "extended," and subsequently terminated on numerous occasions. Still, as the purpose of these types of letters is to reserve all rights to one's position, Mr. Duncan is hereby doing so. Finally, in that vein, please allow me to reiterate that this letter does not encompass every argument that Mr. Duncan might choose to make concerning this matter, and there are numerous other points of contention concerning authority, expiration of the option, invalid assignments and so forth.

We understand that this venture started out of a profound respect for *The River Why*, and Mr. Duncan thanks you for your admiration of his work. We sincerely hope the time has come when you are able to let go of *The River Why*. The alternative will be a costly legal proceeding for all concerned, but one we are confident will be successful for Mr. Duncan. We hope litigation can be avoided, and look forward to your agreement for a prompt and amicable resolution of this matter.

Sincerely yours,

Annette L. Hurst

SF 1344085 v2

**Brown, Elisabeth R.**

| | |
|---|---|
| **From:** | Hurst, Annette L. |
| **Sent:** | Thursday, November 29, 2007 9:44 PM |
| **To:** | Brown, Elisabeth R. |
| **Subject:** | FW: Peloton v. Sierra Club: Notice of Entry of Order of Stipulated Judgment |
| **Attachments:** | 1613_001.pdf |

**From:** Burke, Thomas [mailto:THOMASBURKE@dwt.com]
**Sent:** Thursday, November 29, 2007 3:08 PM
**To:** Hurst, Annette L.
**Cc:** tom@thomascohen.com
**Subject:** Peloton v. Sierra Club: Notice of Entry of Order of Stipulated Judgment

FYI.

**Thomas R. Burke** | Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800 | San Francisco, CA 94111-6533
Tel: (415) 276-6552 | Fax: (415) 276-6599
Email: thomasburke@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/BurkeThomas.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

# Exhibit B

Lizbeth Hasse (#104517)
Creative Industry Law Group
526 Columbus Ave., 2nd floor
San Francisco, CA 94133
(415) 433-4380

Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
639 Front St., 4th floor
San Francisco, CA 94111
(415) 777-1997

Attorneys for Plaintiff
Peloton Productions

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PELOTON PRODUCTIONS, a sole proprietorship owned by Kristi Denton Cohen,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>SIERRA CLUB,<br><br>　　　　Defendant | Case No.:  CGC 07-465687<br><br>NOTICE OF ENTRY OF ORDER OF STIPULATED JUDGMENT |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that the attached Order for Entry of Stipulated Judgment was

filed November 28, 2007.

Dated: November 28, 2007

_____
Thomas A. Cohen
Attorney for Peloton Productions

Notice of Entry of Order of Stipulated Judgment—page 1

1

<u>PROOF OF SERVICE</u>

2

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

3

     I am over the age of 18 and not a party to the within action.  My business address is 639

4

Front St., San Francisco, California 94111.  I am an active member of the State Bar Of
California.

5

    On November 28, 2007 I served the document(s) described as:

6

7

Notice of Entry of Order of Stipulated Judgment

8

on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope
addressed as follows:

9

     Thomas Burke                    Attorney for Sierra Club

10

     Davis Wright Tremaine LLP
     505 Montgomery St., Suite 800

11

     San Francisco, CA 94111

12

     Annette Hurst                    Attorney for David James Duncan
     Heller Ehrman LLP

13

     333 Bush St.
     San Francisco, CA 94104

14

On the above date,

15

16

_X_  (BY MAIL) I then deposited such envelope, with postage thereon fully prepaid, in the
United States mail at San Francisco, CA..

17

___ (BY PERSONAL SERVICE) I then caused such envelope to be delivered by hand to the

18

attorney for plaintiff.

19

___ (BY TELECOPIER) I transmitted the document(s) by facsimile machine to the number
indicated after the address(es) noted above.

20

21

I declare under penalty of perjury of the laws of the State of California that the foregoing is true
and correct.

22

San Francisco, CA

23

Dated: November 28, 2007

24

_____
            Thomas A. Cohen

25

Notice of Entry of Order of Stipulated Judgment—page 2

1  Lizbeth Hasse (#104517)
   Creative Industry Law Group
2  526 Columbus Ave., 2nd floor
   San Francisco, CA 94133
3  (415) 433-4380

4  Thomas A. Cohen (#154581)
   Law Offices of Thomas A. Cohen
5  639 Front St., 4th floor
   San Francisco, CA 94111
6  (415) 777-1997

7

8  Attorneys for Plaintiff
   Peloton Productions

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 FOR THE COUNTY OF SAN FRANCISCO

12

13  PELOTON PRODUCTIONS, a sole          Case No.: CGC 07-465687
    proprietorship owned by Kristi Denton Cohen,
14                                       (proposed)  JCM
                                         ORDER FOR ENTRY OF STIPULATED
15          Plaintiff,                   JUDGMENT

16      vs.                              Date:  November 28, 2007
                                         Time:  11:00 a.m.
17  SIERRA CLUB,                         Dept.: 302

18          Defendant

19

20        The Court having considered the Ex Parte Application by plaintiff Peloton Productions

21  for an Order for Entry of Stipulated Judgment, and good cause appearing, hereby orders the

22  entry of the attached Stipulated Judgment.

23        Dated: November 26, 2007
                           28
24                                       PATRICK J. MAHONEY
                                         _____
25                                       Patrick Mahoney
                                         Judge of the Superior Court

Order for Entry of Stipulated Judgment—page 1

ENDORSED
FILED
San Francisco County Superior Court

NOV 28 2007

GORDON PARK-LI, Clerk
BY: ___JOCELYN C. ROQUE___
                    Deputy Clerk

Lizbeth Hasse (#104517)
Creative Industry Law Group
526 Columbus Ave., 2nd floor
San Francisco, CA 94133
(415) 433-4380

Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
639 Front St., 4th floor
San Francisco, CA 94111
(415) 777-1997

Attorneys for Plaintiff
Peloton Productions

ENDORSED
F I L E D
San Francisco County Superior Court

**NOV 2 8 2007**

GORDON PARK-LI, Clerk
BY: _JOCELYN C. ROQUE_
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

PELOTON PRODUCTIONS, a sole
proprietorship owned by Kristi Denton Cohen,

    Plaintiff,

    vs.

SIERRA CLUB,

    Defendant

Case No.: CGC 07-465687

STIPULATED JUDGMENT

This Stipulated Judgment was prepared by and through counsel of record for the parties

to this action, plaintiff Peloton Productions was represented by its attorneys, Lizbeth Hasse and

Thomas A. Cohen, defendant Sierra Club was represented by Thomas R. Burke of Davis

Wright Tremaine LLP.

1    By and through their attorneys of record, Plaintiff Peloton Productions, a sole

2    proprietorship owned by Kristi Denton Cohen and Defendant Sierra Club (collectively, the

3    "Parties") consent to entry of this Stipulated Judgment without a noticed motion, hearing or

4    trial. The Parties having stipulated to the provisions set forth herein and the issuance of this

5    Stipulated Judgment, the Court having reviewed the provisions and good cause appearing finds:

6    1. In October 1984, Hammermark Productions, Inc. entered into an agreement regarding

7    a motion picture to be based on author David James Duncan's novel, The River Why,

8    published by Sierra Club (hereafter the "Agreement."). A true and correct copy of the

9    Agreement is attached hereto as Exhibit A. In 2004, Hammermark's successor in interest,

10   Thomas A. Cohen, assigned his interests in The River Why and the screenplays based on it to

11   Peloton Productions, which is owned by his wife, Kristi Denton Cohen.

12

13   2. On April 3, 2007, Duncan's attorney delivered a letter to Peloton demanding that it

14   "cease and desist all or any activity with respect to" The River Why. The letter further states:

15   "Mr. Duncan hereby terminates in its entirety the October 2, 1984 Agreement and all exhibits,

16   amendments, extensions and any and all other terms associated therewith."

17   3. On or about July 31, 2007, Peloton filed a verified complaint against Sierra Club only,

18   seeking a declaration from this Court that the Agreement is valid and binding. Sierra Club

19   demurred on the grounds that Mr. Duncan was a necessary or indispensable party and should

20   have been included in the lawsuit.

21   4. Peloton opposed the demurrer on the grounds that Duncan is not a party to the

22   Agreement, and that only the parties to a contract may rescind or terminate it. Sierra Club's

23   demurrer was overruled by the Honorable Patrick Mahoney on October 12, 2007, who stated:

24   "No judgment in this action would bind David James Duncan, and therefore he is neither a

25

1   necessary nor indispensable party.  Plaintiff takes the risk that Mr. Duncan will file a claim, but

2   that is a risk that plaintiff is willing to take."

3        5.  Sierra Club then filed a verified answer which admitted that it was the publisher of the

4   novel, that it entered into an Agreement with Peloton's predecessor in interest for the motion

5   picture rights, and that it was represented in those negotiations by an agent with expertise in

6   motion picture rights.  Sierra Club's verified answer admitted that in the Agreement it warrants

7   that it "has sole, exclusive, and unencumbered ownership of all rights of every kind and

8   character" to the novel and that it had the right to act as the author's exclusive agent for the

9   disposition of motion picture rights to The River Why.  Sierra Club admitted that it was paid for

10  the exercise of the option and, on October 27, 1988, wrote a letter confirming that the terms of

11  the Agreement had been met.

12

13       In consideration of the pleadings filed in this action and these stipulated facts, the Court

14  HEREBY ORDERS, ADJUDGES AND DECREES:

15       1.  The October 1984 Agreement between Hammermark Productions, Inc. and Sierra

16  Club is valid and binding on all parties and their assignees and successors in interest;

17       2.  Subject only to further contingent payments as set forth in the October 1984

18  Agreement, Peloton is the owner of the motion picture rights to the novel The River Why

19  written by David James Duncan; and

20       3.  Each party is to bear its own attorneys' fees and costs.

21  ///

22  ///

23  ///

24  ///

25

Stipulated Judgment—page 3

Dated: Nov. 21, 2007

By: *Laura Hrelin General Counsel*
         Sierra Club

Dated: November 26, 2007

                  Thomas R. Burke
          Davis Wright Tremaine LLP
          Attorneys for Sierra Club

Dated:

November 26, 2007

           Kristi Denton Cohen
            Peloton Productions

Dated: November 26, 2007

            Thomas A. Cohen
       Attorney for Peloton Productions

IT IS SO ORDERED.

Dated:

**NOV 2 8 2007**

         PATRICK J. MAHONEY

           Patrick Mahoney
      San Francisco Superior Court Judge

Exhibit A

Mill Valley, California 94942
(415) 383 4866

# HAMMERMARK

October 2, 1984

Ms. Andrea Nachtigall
1885 Lombard St.
San Francisco, CA. 94123

Dear Andrea:

This letter, when signed by your client Sierra Club Books, ("Seller") comprises our agreement with regard to the motion picture rights in the original literary work entitled "The River Why" by David James Duncan (the "Work").

1. Seller warrants to Hammermark Productions, Inc. ("Hammermark"), that Seller has the sole, exclusive, and unencumbered ownership of all rights of every kind and character throughout the world in the Work.

2. Seller hereby grants to Hammermark the exclusive and irrevocable right and option, for the period specified below, to purchase and acquire the motion picture, television, and allied rights in the work (collectively, the "Rights") for the purchase price and upon the terms and conditions specified herein. These rights are more fully described by Exhibit A to this agreement and incorporated by this reference.

3. The option shall be effective during the period commencing on the date Seller executes this agreement and ending at midnight twelve (12) months thereafter. If a screenplay based on the Work is written before the option period expires then the option period will be extended, for no additional consideration, for six (6) months for a total option period of eighteen (18) months.

4. In consideration of the grant by Seller of the within option, Hammermark shall pay $1,250 on execution of this agreement, and $1,250 in six months.

5. If a screenplay is written, the option period may be extended for an additional eighteen months upon payment of an additional $2,500. Any consideration paid for option rights (per paragraphs 4 or 5) shall be credited against the final purchase price.

6. In consideration of the sale and conveyance from Seller to Hammermark of the Motion Picture, Television, and Allied Rights in the event such option is exercised, Hammermark shall pay to Seller (one third on exercise and two thirds on commencement of photography) the amounts listed below.

A. the motion picture exceeds $500,000 in direct cash costs, then the purchase price shall be five percent (5%) of the budget with a minimum price of $25,000 and a maximum of $200,000. Additionally, Seller shall receive two and one half percent (2 1/2%) of one hundred percent of the net profits of the motion picture.

B. If the budget for the motion picture is below $500,000 in direct cash costs, then the purchase price shall be $12,500. Additionally, Seller shall receive five percent (5%) of one hundred percent of the net profits of the motion picture.

7. The definition of net profits will be no less favorable to the Seller than to other profit participants.

8. The Sierra Club name may not be used in connection with advertising or promotion of the motion picture or with related merchandise without the express consent of the Seller, which consent will not be unreasonably withheld.

9. Hammermark and Seller may transfer or assign their rights under this agreement without the prior consent of the other party.

If the foregoing is acceptable to you, kindly indicate your approval by signing and returning the enclosed duplicate original of this letter for my file.

HAMMERMARK PRODUCTIONS, INC., a California corporation

By_____
Thomas A. Cohen
Its President

Accepted and Agreed this 17
day of___October_____, 1984

_____

Enclosure: Exhibit A

Addendum: See Exhibit A page 4

Exhibit A

Motion Picture, Television, and Allied Rights

Exhibit to that certain Letter Agreement, dated
Oct 2 , 198 , by and between Hammermark Productions,
Inc. ("Hammermark"), a California corporation, and
Sierra Club Books

1. All motion picture rights including, but not
limited to, the rights to produce, project, exhibit, broad-
cast, and transmit an unlimited number of motion pictures
(including without limitation "remake" and "sequel" motion
pictures, as said terms are commonly understood in the
United States motion picture industry), theatrically, non-
theatrically, on television, by means of cassettes and car-
tridges, and in all other media, now or hereafter known, and
in all gauges and sizes. The term "motion picture," or
words of similar import, as used in this Exhibit, shall be
deemed to mean and include any present or future kind of
motion picture in any gauge, without or with sound recorded
synchronously therewith, whether the same is produced on
film or magnetic or video tape or wire or any other sub-
stance or by any other method or means now or hereafter used
for the production, exhibition, or transmission of any kind
of motion picture, and whether the same is produced ini-
tially for theatrical, non-theatrical, or television exhibi-
tion or transmission or otherwise. The first motion picture
produced hereunder is sometimes hereinafter referred to as
"the Motion Picture."

2. All television rights including, but not
limited to, the rights to produce, project, exhibit, broad-
cast, and transmit an unlimited number of television produc-
tions (including without limitation "series" and "specials,"
as such terms are commonly understood in the United States
television industry), on television and in all other media
now or hereafter known and in all gauges. The term "tele-
vision production," or words of similar import, as used in
this Exhibit, shall be deemed to mean and include any pre-
sent or future kind of television production without or with
sound recorded synchronously therewith, whether the same is
produced on film or magnetic or video tape or wire or any
other substance or by any other method or means now or here-
after used for the production, exhibition, or transmission
of any kind of television production, and whether the same
is produced initially for television exhibition or
transmission or otherwise.

Page 1 of 4

3. The Rights shall include, without limitation, the rights to:

a. use, adapt, translate, subtract from, add to, and change the Work and the title thereof, or any other title by which it (or any part thereof) has been or may at any time be known, in the making of motion pictures and television productions as a part of or in conjunction with any such motion picture and television production or both;

b. combine the Work in any manner with any other work or works in the making of motion pictures and television productions;

c. use the Work and any part thereof, including without limitation the characters contained therein, and said titles and any similar titles, in conjunction with motion pictures and television productions based upon all or any part or parts of the Work or other literary, dramatic, or dramatico-musical works, or a combination thereof, or in conjunction with musical compositions used for or in connection with such motion pictures and television productions, whether or not written for, or used in, or in connection with, or in any manner whatsoever apart from, any such motion pictures and television productions;

d. project, transmit, exhibit, broadcast, and otherwise reproduce the Work and any part or parts thereof pictorially and audibly by the art of cinematography or any process analogous thereto in any manner, including the right to project, transmit, reproduce, and exhibit motion pictures and television productions and any part or parts thereof (including without limitation, by so-called "pay," "free," "free home," "closed circuit," "theatre," "toll," "CATV," or "subscription" television), and by the use of cartridges, cassettes, or other devices similar or dissimilar, and by so-called "EVR," "Cartrivision" or other similar systems and by any other process of transmission now known or hereafter to be devised;

e. publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, and license others to publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, such motion pictures and television productions and the scripts of the same and such musical compositions and any part thereof;

f. record, reproduce, and transmit sound, including spoken words, dialogue, music, and songs, by any manner or means (including mechanical and electrical means



and any other means now known or hereafter developed), whether extracted from or based upon the Work or otherwise, and to interpolate other spoken words, dialogue, music, and songs, in or in connection with or as part of the production, reproduction, transmission, exhibition, performance, or presentation of such motion pictures and television productions;

g. make, copyright, use, vend, license and otherwise exploit, and license others to make, copyright, use, vend, license and otherwise exploit, in any manner, records, tapes and other sound-reproducing devices based in whole or in part on such motion pictures and television productions or such musical compositions, or any part or parts thereof, including the right to use the title of the Work and any similar titles in connection therewith;

h. make, copyright, use, vend, license, and otherwise exploit, and license others to make, copyright, use, vend, license, and otherwise exploit, in any manner, records, tapes, and other sound-reproducing devised based in whole or in part on the Work, or any part or parts thereof;

i. arrange for any and all merchandising and commercial tie-ups of any sort and nature arising out of or connected with the Work and/or the title thereof, the characters contained therein, or said motion pictures and television productions, or any combination thereof; and

j. generally to produce, reproduce, remake, reissue, transmit, exhibit, and perform motion pictures and television productions of any and all kinds.

4. The right, but only for purposes of advertising and exploiting motion pictures and television productions, to make, publish and copyright, or cause to be made, published and copyrighted, in the name of Hammermark or its nominees, in any and all languages, excerpts from the Work and synopses, scenarios and other versions of the Work and of any motion pictures or television productions made pursuant to this Exhibit (each not exceeding 7,500 words in length), with or without illustrations of any type or kind whatsoever, on condition that then existing copyrights in the Work shall not thereby become invalidated. No use by Hammermark of the name of the author of the Work shall be made in connection with any of the foregoing in such manner as would indicate that he is the author of any such synopses, scenarios, or other versions. The author of the Work shall be appropriately indicated, however, to be the author of the Work.



5.  The right to broadcast and transmit by radio and television excerpts from and condensations of the Work or any motion pictures and television productions produced pursuant hereto, or both; but, with respect to such broad-casts on radio, then only for advertising and exploitation purposes, each not to exceed 10 minutes in length.

6.  Solely for the purposes of advertising and exploiting the rights granted to Hammermark hereunder, the right to use, and to license, cause, or permit others to use, the Work's author's name, portrait, picture or likeness, and biographical data.

*     *     *     *     *     *     *     *

## ADDENDUM

A. Credit:  If the title of the film is the same as the title of the book: "Based on the book by David James Duncan."

If the title of the film is different from the title of the book: "Based on The River Why by David James Duncan."

B. Anything not specifically referred to herein shall be negotiated in good faith.

Page 4 of 4

**Brown, Elisabeth R.**

| | |
|---|---|
| **From:** | Hurst, Annette L. |
| **Sent:** | Thursday, November 29, 2007 10:07 PM |
| **To:** | Burke, Thomas |
| **Cc:** | tom@thomascohen.com; Brown, Elisabeth R. |
| **Subject:** | RE: Peloton v. Sierra Club: Notice of Entry of Order of Stipulated Judgment |

Mr. Burke:  I am not sure why you are sending this to me, since you have already represented to me that the Court has ruled that this lawsuit will not be binding in any way upon David Duncan.  Mr. Duncan is not, and never has been, a participant in the lawsuit.  He does not recognize any judgment in the matter.

To be clear, moreover, we view this stipulated judgment as yet another breach of fiduciary duty by Sierra Club to David Duncan, and will proceed accordingly.

Mr. Cohen:  As you are a party and not, as far as I know, counsel of record, I am not sure why you are copied on this communication.  I will assume, however, that Ms. Hasse has consented to direct communication with you for these purposes and thus I reply to both of you.

It is Mr. Duncan's continuing position, as he first expressed through Mr. Snell in 1993, that the agreement is terminated, and that he owns the film rights to his work, *A River Why*.  Any one of you or your successors who acts to the contrary does so with full notice of his position, and can expect to be held responsible for willful copyright infringement.

Sincerely yours,
Annette Hurst

**Annette Hurst** | Attorney | **Heller**Ehrman LLP | 333 Bush Street | San Francisco, CA 94104
tel: +1.415.772.6840 | fax: +1.415.772.1790 | email: annette.hurst@hellerehrman.com | web:
www.hellerehrman.com

---

**From:** Burke, Thomas [mailto:THOMASBURKE@dwt.com]
**Sent:** Thursday, November 29, 2007 3:08 PM
**To:** Hurst, Annette L.
**Cc:** tom@thomascohen.com
**Subject:** Peloton v. Sierra Club: Notice of Entry of Order of Stipulated Judgment

FYI.

**Thomas R. Burke** | Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800 | San Francisco, CA 94111-6533
Tel: (415) 276-6552 | Fax: (415) 276-6599
Email: thomasburke@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/BurkeThomas.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

# Exhibit C