Lizbeth Hasse (#104517)
Creative Industry Law Group
526 Columbus Ave., 2nd floor
San Francisco, CA 94133
(415) 433-4380

Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
639 Front St., 4th floor
San Francisco, CA 94111
(415) 777-1997

Attorneys for Defendants
Thomas A. Cohen dba Hammermark Productions
Kristi Denton Cohen dba Peloton Productions

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>          Plaintiff,<br><br>     vs.<br><br>THOMAS A. COHEN d/b/a HAMMERMARK PRODUCTIONS, KRISTI DENTON COHEN d/b/a PELOTON PRODUCTIONS, and SIERRA CLUB BOOKS,<br><br>          Defendants | Case No.: CV 08 2243 BZ<br><br>ECF CASE<br><br>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF<br><br>Date: July 11, 2008<br>Time: 9:00 a.m.<br>Courtroom: G, 15th floor |

Defendants' Memo. of Points and Authorities re Opposition to Ex Parte Application

No urgency is created by on-going principal photography on the film, and no amount of name calling will convert this contract dispute over the validity of the motion picture Rights Agreement into a copyright case. Mr. Duncan cannot prevail on his copyright claim, because he cannot establish ownership of the motion picture rights. Sierra Club Books sold those rights to Hammermark Productions in 1984.[1] Whether Sierra Club Books was the owner, as opposed to the exclusive and authorized agent, for those rights, is of no consequence, because Mr. Duncan ratified the Agreement by accepting payment for them on five different occasions. The Rights Agreement between the Cohen defendants and Sierra Club was also held to be valid by the San Francisco Superior Court on November 28, 2007. Defendants expressly asked Mr. Duncan to join that declaratory action to expedite a resolution or clarification, and Mr. Duncan through his attorney explicitly refused. Now Mr. Duncan wants to rewrite or rescind the Rights Agreement. But that is purely a question of contract law. There is no federal jurisdiction over a state law contract dispute simply because it concerns a copyright. Even if there were federal jurisdiction, the claim for copyright ownership is time barred, and any possible demand for emergency relief years too late.

Plaintiff makes much of a "change in status quo". However, any change here is neither surprising nor harmful or potentially harmful to plaintiff. The producer has been making steady progress towards commencement of principal photography on this film since 2004. That year Ms. Denton took on the project and began corresponding with Mr. Duncan to keep him informed of specific developments in the production, including interested actors, directors and a revised shooting script and to enlist his collaboration if he so chose. Her effort was to satisfy aesthetic concerns Mr. Duncan claimed to have. Mr. Duncan's counsel admits that she has been aware of Peloton's website about the film production since "early 2007" and that it

---

[1] The facts are supported by the accompanying Declarations of Kristi Denton Cohen, Lizbeth Hasse and Thomas A. Cohen.

reflected "increased activity." Hurst Dec. in Support of Ex Parte Application ¶ 3. The website listed the current director Matt Leutwyler and the prominent actor William Hurt as being attached to the film. Duncan and his counsel were told that the production was originally planned for the fall of 2007, but was delayed by Duncan's threats and the declaratory relief action in state court. When Ms. Hurst's complaints grew more vociferous, Defendants' counsel invited her to join that declaratory relief action filed in San Francisco Superior Court in 2007 to confirm the motion picture rights contract for The River Why, to which she emphatically stated "no." Now that a principal photography as planned and to be expected is underway, consistent with the producer's disclosures about the timing and specific personnel and with the information posted on the website more than a year ago, Mr. Duncan seeks a TRO with no legal basis, no actual emergency and no apparent imminent or irreparable harm. Mr. Duncan's counsel has herself stated that there will be harm to her client "if Peloton is permitted to distribute a film." Plaintiff's Ex Parte Application ¶ 4. Even if Plaintiff had grounds for his claim that his rights will be infringed or that his artistic integrity will be compromised, no harm can be caused until the film now being shot is edited, completed through post-production and released in distribution to the public, a process that will take, at minimum many months. The only harmful change in status quo at this point is Plaintiff's filing of a TRO at precisely the time the expected principal photography commenced, a move nonetheless consistent with Duncan's announcement- his quote- that he would rather spend the rest of his life fighting the Cohens "no matter how ugly or endless the legal mire—than to ever have to watch your version of my novel appear on a movie screen."

      While Mr. Duncan claims concern for his artistic integrity is at the bottom of this action, he has chosen not to read the screenplay he calls "detestable" since 1985. While even that script, co-written by the author of The Paper Chase, was good enough to have been a finalist in the Sundance writer's workshop, there have been many refinements since. The script and the production team put together by Kristi Denton Cohen have attracted actors of the

highest caliber: Academy Award winner, William Hurt; Academy Award nominee, Kathleen Quinlan; Screen Actors Guild Award nominee, Dallas Roberts; Emmy Award nominee, William Devane; star of Peabody Award and Emmy Award winning *Friday Night Lights*, Zach Gilford; and rising star, Amber Heard—all of whom are working now on a tight shooting schedule at a fraction of their customary salaries because they love the script and the project. Ms. Denton Cohen informed Mr. Duncan and the public of her production team and interested actors on the film as it became material, but Mr. Duncan professed little interest in anything but trying to take back his rights.

No producer, much less Ms. Denton Cohen, should be forced to stop a costly and well-planned film shoot because a frivolous lawsuit is filed at the most critical point in the film production. Mr. Duncan appears to join a tradition of disgruntled authors (e.g. Ken Kesey—*One Flew Over the Cuckoo's Nest;* P.L.Travers—*Mary Poppins*) who sold the rights to their novels and then complained about the results all the way to the bank. The River Why was Mr. Duncan's first novel for which Sierra Club Books, the publisher, paid him a mere $3,000 advance—as opposed to more than $20,000 for the film rights paid by the Cohens' predecessor entity in the 1980s. Now that principal photography has commenced, Sierra Club Books has been paid a good deal more under that Rights Agreement. The total fees paid for the motion picture rights to the novel are significantly more than any actor, director, producer or other participant will be paid for their participation in *The River Why*. Mr. Duncan sold the rights to his novel. A San Francisco Superior Court judgment, Case No. CGC 07-465687 entered November 28, 2007, holds that the contract between the Cohen defendants and Sierra Club Books for those rights is valid. Mr. Duncan was invited to join that declaratory rights action, and his attorney expressly declined to do so. Mr. Duncan then filed a lawsuit on April 30, 2008 but claimed to have no time to submit a declaration in support of his opposition to the motion to dismiss. Now he seeks to stop a principal photography that has been in planning for at least 4 years because of concerns he claims to have had since 1985. Mr. Duncan has no grounds now

for emergency relief or for any relief.

### I. AMENDING THE COMPLAINT IS PREMATURE.

**A. The Court Should Rule on the Motion to Dismiss and Special Motion to Strike Before Granting Leave to Amend, Considering the TRO or Expediting Any Discovery Schedule**

While leave to amend should be freely granted, Plaintiff is using the proposed TRO and proposed verified amended complaint to finesse the defects in his opposition to the pending 12(b)(6) and anti-SLAPP motions. Despite having two weeks to do so, Plaintiff failed to present admissible evidence in opposition to the anti-SLAPP motion. Duncan's counsel offered this: "[I]t [was] impossible for us to prepare a declaration from Mr. Duncan setting forth his testimony regarding the entire case in such a short period of time." Hurst Dec. in Opposition to Motion to Dismiss ¶ 10. Although Plaintiff claims he had no time to provide evidence in opposition to the special motion to strike, he now seeks to have a decision rendered on an extraordinary motion for extraordinary relief which raises essentially the issues raised in the Motion to Dismiss and anti-SLAPP motions. It would be burdensome on the Court and the defendants to now have to start the entire 12(b)(6) and anti-SLAPP motion process all over again simply because extraordinary relief was sought to advance the filing of an amended verified complaint. This is particularly true since much of the fact and law supporting dismissal remains unchanged—e.g. no federal jurisdiction over state law contract issues, statute of limitations, etc.

**B. There Is No "New Matter" Justifying an Amendment**

Plaintiff's protestations to the contrary, none of the alleged "new matter" is truly new. Mr. Duncan has known of Kristi Denton Cohen's efforts to commence photography since at least as early as January 2004. In a series of letters and phone calls beginning then, she informed Duncan of her efforts to engage an executive producer and a director. On September 13, 2004, Ms. Denton Cohen wrote Duncan to say that a rewrite of the script had been

completed and that she had been to the Sundance Independent Producer's Conference with the project.  In February 2005, she wrote to say there was "definite interest in the project." At least as early as October 2007, Duncan and his attorney were made expressly aware by Ms. Denton Cohen that defendants had aligned with a successful Los Angeles production company, Ambush Entertainment.   Actor William Hurt has been attached for a long time—and was even mentioned by Plaintiff in the draft complaint and its exhibits which were sent to defendants on March 13, 2008.

By the time Ms. Hurst filed Plaintiff's Supplemental Objections to Evidence on June 13, the news of the film was everywhere.  Some of the news clippings were attached to Ms. Hurst's declaration—including one dated June 4, 2008 with a large picture of David James Duncan stating that the Oregon state film office had confirmed that *The River Why* would begin production on July 7, 2008.  Hurst Dec. in Support of Plaintiff's Supplemental Objections to Evidence, Ex. A.  Ms. Hurst's declaration that these reports were nothing more than "industry chatter" must be viewed skeptically. Hurst Dec. in Support of Ex Parte Application, ¶ 11. Surely, confirmation of the start date from the Oregon state film office carries weight.

The essence of the "new matter" allegation is that plaintiff did not know that defendants would start filming this summer.  See Hurst Dec. in Support of Ex Parte Application ¶¶ 9, 10, 11.  Defendants' counsel asked Ms. Hurst to stipulate to an expedited hearing on the 12(b)(6) and anti-SLAPP motions.  Ms. Hurst refused.  Hasse Dec. in Support of Motion for Expedited Hearing ¶ 5.  On May 13, 2008, Defendants filed the Motion, stating that it was necessary because any delay impacted their ability to raise money to "begin production."  Id. ¶ 6.  Why would they have filed a motion to expedite on the grounds stated if they did not intend to "begin production" soon?

The Court should revisit the request for leave to amend only after it decides the pending dismissal motions.  There is no "new matter," and the Court's decision on the dismissal

1 motions may resolve all of the federal issues and define the case going forward.

## II. PROVISIONAL RELIEF MUST BE DENIED.  DUNCAN WILL NOT SUFFER IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS OVERWHELMINGLY FAVORS DEFENDANTS.

As recently confirmed by the Supreme Court, Duncan must meet his burden with respect to the traditional four-part test for injunctive relief.  He must demonstrate: (1) that he will suffer an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendants, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a (permanent) injunction.  *MGM Studios, Inc. v. Grokster, Ltd.* (C.D. Cal. 2007) 518 F. Supp. 2d 1197, 1208 citing *eBay Inc. v. MercExchange, L.L.C.* (2006) 126 S. Ct. 1837, 1839,  "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *eBay*, supra, at 1841.  Further, the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 1840.

There is no emergency presented here that would justify a temporary restraining order.

### A.  Mr. Duncan Will Not Suffer Irreparable Injury

Duncan argues that his artistic integrity will be irreparably harmed if the Cohens' version of his novel "takes the screen."  Memo In Support of Ex Parte Application. 13:18-19.  Putting aside the fact that there is no *droit moral* under US federal or state law, the production of a film is not the same thing as exhibition ("taking the screen") of it.  The film is months away from completion of post-production.  If *The River Why* is never exhibited, Duncan's reputation cannot be irreparably harmed, because no one outside of a few production employees will ever see it.  Thus, there is no *emergency* requiring an immediate halt to the

current production.

Even if and when the film is exhibited, Duncan's unprotectable "artistic integrity" will not be irreparably harmed.  As a threshold matter, Mr. Duncan apparently asks this Court to determine that the screenplay is "detestable."  Memo 13:17-19.  Without that finding, how can the Court conclude that Duncan's artistic integrity is at risk?  Perhaps there is a case in which a court determined the artistic merits of a creative work, but Defendants are not aware of one.  Moreover, how can Duncan claim that the shooting script, a well-refined screenplay is detestable when he has not read it?  One would think that participation by the highly regarded actors associated with Defendants' film is proof enough that the screenplay is worthy.

The claim that Duncan will only get one shot at a film production of his novel is also spurious.  He already had his shot.  Tom Cohen offered Duncan the opportunity to write the screenplay in 1984.  Mr. Duncan started the process and then abandoned it stating that he preferred not to write it.  He later declined offers to participate or even to read the new script.  As for artistic integrity, many esteemed authors have had films made of their works by others that have been more and less successful, adhered closely to or departed from their work; the rendering of a story in motion picture form has not undermined the artistic integrity of a novelist or author of the underlying work.

Duncan alleges that production of Defendants' film will result in an injury that cannot be compensated with money damages.   This very issue was addressed in *Chase-Riboud v. Dreamworks Inc.* (C.D. Cal. 1997) 987 F. Supp. 1222, 1232.  There, the author gave a production company the right to license the theatrical motion picture rights to her novel.  The screenwriter for the studio's movie participated in pitching the author's novel to major studios.  The production company abandoned the project, and the studio retained the screenwriter as a writer.   Subsequently, the studio announced that a movie based on the same historical facts as the author's novel would be produced. The author sued for copyright infringement and sought a preliminary injunction.  She argued that she suffered irreparable injury because the Defendants

"virtually destroyed the market for film rights to [her] novel." *Id.* at 1232. The court denied injunctive relief, holding that "Although it may be unlikely that another film or television studio will seek to obtain the right to [her novel], the lack of a film or television market for her book speaks to money damages. Any harm arising from that particular injury may be redressed should Plaintiff ultimately prevail on the merits of her claim."

The same is true here. If Duncan prevails at trial, and is subsequently unable to interest a studio or independent producer in acquiring the rights to his novel, that injury can be redressed with money damages. Any claim that his artistic vision of a film is impaired by the current production is highly speculative. Neither he, nor his producer, Matt Salinger, have a script, director, actors, budget, location or financing for an "artistically correct" version of The River Why. In Silicon Valley, they call this "vaporware."

### B. The Very Fact That It Took This Long to Mount the Production Is Proof That the Opportunity Is Fleeting. Any Delay Could Be Fatal. The Balance of Hardships Requires That Duncan's Motion Be Denied.

While Duncan argues that "it is inconceivable that Defendants cannot wait a few months more" to start filming, that is decidedly untrue. There are many factors that go into making a film even after a great script is developed. The two basic requirements are financing and the creative elements (director and actors). See Erickson, Tulchin & Halloran, The Independent Film Producer's Survival Guide (2005). A third factor here is the weather constraints on shooting in Oregon, of which Mr. Duncan is well aware. Securing the financial and creative components is the chicken and egg quandary that almost all independent producers must resolve. The problem is that talent does not want to commit to do the picture and pass up other work unless the financing is in place, and the financiers will not underwrite the production unless they know that quality talent has committed. Id. Such has been the case with *The River Why*. A very abbreviated version of the chicken and egg quandary follows.

As Ms. Denton Cohen told Mr. Duncan and others on many occasions, she wanted to

Defendants' Memo. of Points and Authorities re Opposition to Ex Parte Application

9

shoot the film in Oregon in the early fall of 2007 for a variety of reasons having to do with weather and the change of seasons. However, financing and commitments were delayed. Once Ms. Denton Cohen got a firm commitment from Zach Gilford to play the lead this summer, plans were made final. By contract, Mr. Gilford has to be back on the set of *Friday Night Lights* in Texas by early August 2008 and is committed there well into late fall. By then, the weather in Oregon is too wet to make shooting feasible. Similarly, actor William Hurt had a brief window in July that he could commit. In addition, a threatened Screen Actors Guild strike which could begin anytime after July 1, but which did not affect independent producers, provided an opportunity to employ quality actors and crew who would otherwise be working on studio pictures. Importantly, the director, Matt Leutwyler, also had an opening this summer which allows him to devote himself exclusively to the film. With these elements in place, investors were willing to go forward. It would be next to impossible to re-align talent, money, locations, weather and a myriad of other details in "a few months." By November, the rains in Oregon make it impractical to shoot an outdoor movie like *The River Why*, which means that it would be at least May 2009 before the film could start. By then, the demands on talent and crew make it unlikely that a similarly qualified group could be assembled. The lead actors all have "pay or play" contracts. If production is enjoined, they still must be paid.

In short, if the Court enjoins production of the film, it is unlikely that it can be resuscitated any time soon, if ever and the hardship on the producer defendants will be extreme. This is, of course, exactly what Mr. Duncan wants. By contrast, Mr. Duncan states that he runs a risk that he will suffer artistic injury. But surely, his reputation as a writer is already solidified. The shooting of a film by those who purchased motion picture rights, rights he had been willing to sell anyway cannot tarnish that reputation. Nor, if he prevails at trial, will he be prevented from doing what he wants with his motion picture rights.

### III. AS DEMONSTRATED IN DEFENDANTS' MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE, DUNCAN CANNOT PREVAIL ON THE MERITS

The Cohen defendants filed comprehensive pleadings in support of their Motion to Dismiss and Special Motion to Strike under California's anti-SLAPP statute. Defendants ask that the Court take judicial notice of those pleadings, which are summarized briefly below.

### A. The Validity of the Rights Agreement Does Not Arise Under Copyright and Has Already Been Decided in State Court

This Court has no jurisdiction to determine the validity of the Rights Agreement, because it is a state law question of contract, not a copyright dispute. Duncan *admits* that this case turns on contract interpretation: "The ultimate result in the claim of copyright infringement in this case *will turn on whether or not the option [Rights Agreement] is a valid defense*." Memorandum in Support of Ex Parte Application 9:3-4 (emphasis added).

The mere fact that a controversy involves a copyright does not give rise to federal jurisdiction. "The word 'copyright' is not so compelling as to invoke federal jurisdiction upon its mere mention. Congress left a considerable residue of power in the state courts to pass on 'copyright questions,' including questions involving constructions of the copyright statute . . . ." *Durgom v. Janowiak* (1999) 74 Cal App 4th 178, 182; *Saturday Evening Post v. Rumbleseat Press* (7th Cir. 1987) 816 F.2d 1191, 1194 ("[A] dispute over the terms of a copyright license is not deemed to arise under the Copyright Act . . . ."). "If the suit is one brought to enforce a right based upon a contract which relates to a copyrighted production, the suit is one which arises out of the contract and is not one arising under the copyright statute, and the federal courts are without jurisdiction." *Dolch v. United California Bank* (9th Cir. 1983) 702 F.2d 178, 183 (citations omitted).

The San Francisco Superior Court has entered a judgment declaring that the Rights Agreement is valid and that the Cohen defendants own the movie rights to Duncan's novel

under that Agreement. The invalidity of the Rights Agreement is asserted by Duncan as the basis for this action. Regardless of the state court's statement that the judgment was not binding on Duncan who chose not to appear, there is no reason for the federal court to revisit that state court's judgment under the guise of a copyright action.

**B.    Duncan Has No Standing Because He Does Not Own the Movie Rights**

*Silvers v. Sony Pictures Entm't, Inc.* (9th Cir. 2005) 402 F.3d 881 (*en banc*) contains an extensive discussion of standing under the Copyright Act. Under the principles enunciated there, Duncan does not have standing to sue for the infringement of the right to make a motion picture after he has sold those rights to make that derivative work. *Silvers* held that the owner of a copyright is not entitled to sue unless the alleged infringement occurred "while he or she [was] the owner of it." Congress' grant of the right to sue was carefully circumscribed. *Id.* at 885.

> This enforced unity of rights [in the 1909 Act] created serious hardships for copyright holders who were interested in assigning the various property rights arising from a copyright separately, for instance selling the motion picture rights in a novel separately from the right to print the novel in book form. [] Congress, aware of these constraints on commercial dealings, largely dispensed with the doctrine of indivisibility in the Copyright Act of 1976. [] Although Congress allowed for divisibility of ownership interests under a copyright, it did not alter the requirement that only owners of an exclusive right in the copyright could bring suit.

*Id.* at 886 (internal citations omitted). Mr. Duncan's theory is apparently that, as the owner of the copyright in the book, he is the copyright proprietor with standing to sue for infringement of any one of the divisible bundle of derivative rights. That is not the law. "Under traditional principles of statutory interpretation, Congress' explicit listing of who may sue for copyright infringement should be understood as an exclusion of others from suing for infringement." *Id.* at 885.

> [E]xclusive rights may be chopped up and owned separately, and each separate owner of a subdivided exclusive right may sue to enforce that owned portion of an exclusive right, no matter how small. For instance, A may own the copyright in a book, while B may own the right to develop the book into a screenplay. A may sue an infringer of the book; B may sue an infringer of the screenplay.

*Id.* at 887. Without ownership, there can be no claim for infringement. *Ritchie v. Williams* (6th Cir. 2005) 395 F.3d 283, 289. As owner of the copyright in the book, and no longer owner of the copyright in the film rights, Duncan may not sue someone he claims is an infringer of the film rights.

### C. The Copyright Claims Are Time Barred

Claims of copyright *ownership*, as distinct from *infringement*, accrue when a repudiation of ownership is communicated to the claimant, and are barred three years from the time of repudiation. *Zuill v. Shanahan* (9th Cir. 1996) 80 F.3d 1366, 1369. Duncan argues that he "indisputably" owns the copyright. However, as discussed in *Silvers*, supra, 402 F.3d at 887, while Duncan may own the copyright to the novel, he does not own the movie rights. *Zuill* compels a finding that any claim to copyright ownership in the film rights is time barred. Even if the claims were not barred by the statute of limitations, they are clearly barred by the doctrine of laches. Duncan allegedly repudiated the Rights Agreement in 1993, but did not file suit until 2008.

### D. Duncan's Focus on the Validity of the Assignments Is Irrelevant and Wrong

Duncan argues at length about the purported invalidity of the assignments of film rights in *The River Why*. These objections are factually and legally without merit. Moreover, even if the assignments were invalid, that does not result in a reversion of rights to Duncan or convert state questions of contract law into a federal copyright case.

First, the Rights Agreement by its express terms freely allowed for assignment by

Hammermark. All the assignments were either confirmed in writing at the time or by subsequent written confirmation. That is all that is required where there is no dispute, as here, between the assignor and assignee. *Magnuson v. Video Yesteryear* (9th Cir. 1996) 85 F.3d 1424. Even if the assignments were invalid, Duncan would have no argument. All failure of assignment would accomplish is the reversion of the motion picture rights back to the Assignor—Hammermark Productions, Inc.

Importantly, there is no writing requirement when transfer of a copyright arises by operation of law. 17 U.S.C. 204(a). Here, the motion picture rights transferred from Hammermark Productions, Inc. to its sole shareholder, Thomas A. Cohen (dba/ Hammermark), when the corporation dissolved. *Fantasy, Inc. v. Fogerty* (N.D. Cal. 1987) 664 F. Supp. 1345, 1356 (where assets were transferred from dissolving corporation to its sole shareholder, sole shareholder succeeded to ownership of copyright by operation of law). Any motion picture rights in the novel or the screenplay acquired after the Cohen's 1987 marriage automatically transferred the rights to both spouses (Cohen and Denton Cohen) by operation of the California law of community property. *In re Marriage of Worth* (1987) 195 Cal. App. 3d 768, 774.

### E.     Unless the Court Grants Leave to Amend, Unconscionability Is Not an Issue

Duncan argues that the Rights Agreement is void as unconscionable. This was not pled in the complaint filed April 30, 2008 and is not now before the Court. Even if it were, how unconscionable could a Rights Agreement be that pays the author more than six times the amount he received as an advance on his novel and promises much more once the film is made?

### F.     Mr. Salinger's Purported Expert Declaration Is Highly Suspect

Much of Duncan's argument is based on the Declaration of Matt Salinger. This, so called, expert evidence is not admissible, and an inappropriate basis on which to grant a TRO.

Mr. Salinger stands to become the producer of Duncan's version of the film only if Duncan prevails in this lawsuit.  This is no different, and no more acceptable, than an expert witness being paid solely on contingency.  See *Von Kesler v. Baker* (1933) 131 Cal. App. 654 cited with approval in *In re Tableware Antitrust Litig.*, 2007 U.S. Dist. LEXIS 89998 (citing Cal R Prof Conduct 5-310(B); ABA Model Rule 3.4(b) comment).

While Salinger abhors the Cohens' ethics, he apparently has no qualms about his own efforts to sabotage their film for his own purposes.  He may not, as he claims, have a contract to produce the film if Duncan prevails in this lawsuit, but he has been presented in writing as "the producer who has agreed to work with [Duncan] on the film."  He attended the JAMS mediation session and presented himself as Duncan's producer.  On July 2, 2008, in an act that flirts with intentional interference with contract, he called D/F Management, which manages several of the actors in the Cohens' film including the lead, and left a message about this lawsuit.  According to an email from D/F Management, "Matt Salinger is trying to position himself as the 'real' producer."

Further, Salinger's expertise on industry custom and practice is similarly overstated. He cites the Writers Guild agreement for the proposition that there is an automatic reversion of motion picture rights after five years.  But the reversion clause of the WGA agreement specifically on its face applies only to original literary material created under an agreement for the writing of a script "i.e., not based on any pre-existing material."  Here, we are dealing only with the acquisition of pre-existing material, motion picture rights in a pre-existing novel which were optioned and purchased, not with the writing under contract of a script by Duncan. Even if the WGA agreement applied here, which it does not, the reacquisition of rights may be exercised *only* in a two year window following the fifth year of the contract, and *only* if the film is not in active development.  "After the two year period, the writer's right to reacquire expires."  Article 16.A.8.  There is a long definition of active development, which includes rewriting of the script, employment of a director, production manager or others in active

preparation of a film or another person engaged to prepare a budget. In short, the right to reacquire a script written under a WGA writing agreement is significantly circumscribed and cannot even serve as an analogy for the acquisition of rights in pre-existing material which occurred here.

Mr. Salinger's peroration on standard option agreements is similarly flawed. The Independent Film Producer's Guide, supra, written by three Hollywood entertainment lawyers, states that one formula often used by independent producers "is to set the purchase price as a percentage of the budget. The typical range is 1% to 3%." Here, Tom Cohen agreed to pay 5%. The Guide goes on to say that one solution where the budget may be in flux at the time of exercise is to set a floor amount to be paid against the ultimate purchase price at the time the "direct cost budget" is determined, which is the "final production budget" as approved by the producer and the completion guarantor. As Mr. Salinger may well know, given that he appears to work for a completion guarantor, the determination of a budget sufficient for a completion bond does not occur until the cusp of principal photography. In short, while acquisition deals differ considerably, the Cohen/Sierra Club Books contract is substantially in line with customary deals, particularly with those in existence in the eighties, when the contract was entered into, with the exception that Cohen paid a higher percentage of the budget for motion picture rights than is typical.

Mr. Salinger's claim that a film should be made within five years is not borne out by the history of the movie business. One of many examples is The Monkey Wrench Gang based on Edward Abbey's 1975 novel. Another is The Confederacy of Dunces (1987) by John Kennedy Toole. Both novels are of approximately the same vintage as The River Why. Motion pictures for each have been in development since publication. Neither has been shot.

Finally, Mr. Salinger is silent on one subject with which he is intimately familiar—the right of an author not to sell the movie rights in the first place. His father, J.D. Salinger, has famously refused all entreaties to sell the movie rights to The Catcher in the Rye. If Mr.

Duncan really wanted to protect his artistic integrity, he could have done so by refusing to accept money for the movie rights in the first place. Instead, he accepted the payments and only became vocally disenchanted after the fact when he decided he did not like the script being developed.

## IV.   EXPEDITED DISCOVERY WOULD WORK A HARDSHIP ON DEFENDANTS

It was the Cohen defendants that requested an expedited resolution of this case by seeking to place the motion to dismiss and special anti-SLAPP motion before the Court without delay.  It was Duncan and his attorney that refused to cooperate with scheduling.  Now, Duncan wants to use discovery as a weapon to force the Cohens to stop filmmaking to accommodate expedited discovery.

The Cohen defendants are in favor of resolving this case as soon as possible.  They proved that by filing dismissal motions and a request for an expedited hearing.  Now that production is underway, they have no time to respond to discovery, and will not have time until mid-August at the earliest.  Duncan already has virtually all of the documents at issue that bear on the motion picture rights issue and will not be prejudiced in any way by proceeding on an orderly discovery schedule.

## V.   AN EARLY TRIAL DATE MAY BE PREFERRED

The Cohen defendants would prefer an early trial date provided there is sufficient time to hear a motion for summary judgment and for discovery to be conducted in an orderly matter if the case is not decided before then.

Dated:  July 8, 2008

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

          /s/ Lizbeth Hasse
Lizbeth Hasse
Creative Industry Law Group

and

Thomas A. Cohen
Law Offices of Thomas A. Cohen

Attorneys for the Cohen Defendants

Defendants' Memo. of Points and Authorities re Opposition to Ex Parte Application