Lizbeth Hasse (#104517)
Creative Industry Law Group
526 Columbus Ave., 2nd floor
San Francisco, CA 94133
(415) 433-4380

Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
639 Front St., 4th floor
San Francisco, CA 94111
(415) 777-1997

Attorneys for Defendants
Thomas A. Cohen dba Hammermark Productions
Kristi Denton Cohen dba Peloton Productions

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>　　　　　Plaintiff,<br><br>　vs.<br>THOMAS A. COHEN et al,<br><br>　　　　　Defendants | Case No.:  CV 08 2243 BZ<br><br>DECLARATION OF KRISTI DENTON COHEN IN SUPPORT OF DEFENDANTS OPPOSITION TO EX PARTE APPLICATION<br><br>Date:  July 11, 2008<br>Time:  9:00 a.m.<br>Courtroom: G |

　　　I, Kristi Denton Cohen, declare:

　　　1. I am a defendant in the above-captioned action and state the following of my own personal knowledge.

　　　2. Mr. Duncan told me he has not read the screenplay since 1985.  While even that

Denton Cohen's Declaration Re Opposition to Ex Parte Application—page 1

script, co-written by the author of The Paper Chase, was good enough to have been a finalist for the Sundance writer's workshop, there have been many revisions and refinements since. The script and the production team I put together is good enough to have attracted the talents of Academy Award winner, William Hurt, Academy Award nominee, Kathleen Quinlan, Screen Actors Guild Award nominee, Dallas Roberts, Emmy Award nominee, William Devane, the star of Peabody Award and Emmy Award winning *Friday Night Lights*, Zach Gilford, and rising star, Amber Heard—all of whom are working at a fraction of their normal salaries on the production of the River Why motion picture because they love the script and the project.

   3. This was Mr. Duncan's first novel for which he was paid a $3,000 advance from his publisher—as opposed to more than $20,000 for the film rights paid by Hammermark in the 1980s. Now that principal photography has commenced Sierra Club Books has been paid substantially more. The total fees paid for the motion picture rights to the novel are significantly more than any actor, director, producer or other participant will be paid for their participation in *The River Why*.

   4. On May 13, 2008, we filed the Motion to Expedite, stating that it was necessary because any delay impacted our ability to raise money and to "begin production." Why would we bother to have filed a motion to expedite if we had not intended, as we stated, to "begin production" soon? Mr. Duncan has known of my continual efforts to mount the production since at least as early as January 2004. In a series of letters and phone calls beginning then, I informed Mr. Duncan of my efforts to engage an executive producer and a director for the film. On September 13, 2004, I wrote Mr. Duncan to say that a rewrite of the script had been completed and that I had been to the Sundance Independent Producer's Conference with the project. In February 2005, I wrote to say there was "definite interest in the project." As least as early as October 2007, Mr. Duncan and his attorney were expressly informed by me that I had aligned with a successful Los Angeles production company, Ambush Entertainment. The actor William Hurt has been attached to the film production for a long time—and was even

mentioned in the draft complaint and its exhibits which were sent to me by Mr. Duncan's attorney on March 13, 2008.

5. By the time Ms. Hurst filed Plaintiff's Supplemental Objections to Evidence on June 13, the news of shooting of the film was "everywhere" in the entertainment industry. Some of the news clippings were even attached to Ms. Hurst's declaration—including one dated June 4, 2008 with a large picture of David James Duncan stating that the Oregon state film office had confirmed that *The River Why* would begin production on July 7, 2008. This statement was close to accurate. In fact, we started production on July 6, 2008 because of the need to accommodate actor's schedules.

6. As I told Mr. Duncan and others on many occasions, I wanted to shoot the film in Oregon in the early fall of last year for a variety of reasons having to do with weather and the change of seasons. Once I got a firm commitment from Zach Gilford to play the lead, plans solidified around a shoot date in July 2008. By contract, Mr. Gilford has to be back on the set of *Friday Night Lights* in Texas by early August and is committed there well into winter. By then, the weather in Oregon is too wet to make shooting feasible. Similarly, William Hurt had a brief window in July that he could commit. In addition, a threatened Screen Actors Guild strike which could begin anytime after July 1, but which did not affect independent producers, provided an opportunity to employ quality actors and crew who would otherwise be working on studio pictures. The director, Matt Leutwyler, also had an opening this summer which allowed him to devote himself exclusively to the film. With these elements in place, investors were willing to finalize commitments. It would be next to impossible to align talent, money, locations, and a myriad of other details I have organized over the past several years in "a few months," and the weather additionally precludes flexibility. I disclosed many specific elements relating to filming to David Duncan last fall. Once I had the long sought commitments all in place, I could not delay commencement of the shoot. By November, the rains in Oregon make it impractical to shoot an outdoor movie like *The River Why*, which means that it would be at

least May before the film could start.  By then, other demands on talent and crew make it highly unlikely that a similarly qualified group could be assembled.

7.  Matt Salinger may not, as he claims, have a contract to produce the film if Duncan prevails in this lawsuit, but he has been presented to me in writing as "the producer who has agreed to work with [Duncan] on the film."  He attended the JAMS mediation session and presented himself to me as Duncan's producer.  On July 2, 2008, in an act that flirts with intentional interference with contract, he called Steve Dontanville, the principal of D/F Management, which manages several of the actors in the my film including the lead, and left a message informing him of this lawsuit.  According to an email sent to me from D/F Management, "Matt Salinger is trying to position himself as the 'real' producer."  A true copy of that email is attached hereto as Exhibit A.  Matt Salinger opines about the customary inclusion of a reversion to a writer in a WGA contract. However, the WGA guidelines to apply to writing contracts are not the acquisition of pre-existing material.  A true copy of the relevant sections of the current WGA agreement is attached in Exhibit B.

I declare under penalty of perjury of the laws of the United States that the foregoing is true.

Dated:  July 8, 2008

                                            _/s/  Kristi Denton Cohen_____

-----Original Message-----
From: "Charles Mastropietro" <cm@df-mgmt.com>
Sent 7/2/2008 4:34:41 PM
To: "Kristi Denton Cohen" <KDC@pelotonproductions.com>, "Tom Cohen" <tomcohen@ionix.net>
Subject: Fwd: RIVER WHY lawsuit


Begin forwarded message:


**From:** Chris Kosek <ck@df-mgmt.com>
**Date:** July 2, 2008 4:29:53 PM EDT
**To:** Frank Frattaroli <ff@df-mgmt.com>
**Cc:** Daniel Pancotto <dp@df-mgmt.com>, Charles Mastropietro <cm@df-mgmt.com>, Steve Dontanville <sd@df-mgmt.com>
**Subject: RIVER WHY lawsuit**

We just got an message from Matt Salinger, a friend of Steve's. He said the writer of THE RIVER WHY novel is bringing a lawsuit against the producers regarding the underlying rights to the material. Steve is trying to get ahold of Matt to discuss it with him. The name of the attorney in San Francisco bringing the suit is Annette Hurst 415-772-6840.

Charles and Steve just discussed this. Apparently the writer sold the rights years ago, and the film producers got their option after that sale. The novel-writer wants to make the film himself, and Matt Salinger is trying to position himself as the "real" producer. Production is cutting the novel-writer a check anyway. Both Charles and Steve think the lawsuit has no legal standing.

Chris Kosek
D/F Management
310-558-3333

       (5) or subparagraphs 3.b.(1), (3) and (4). In any grants, assignments or licenses hereafter made or entered into by writer concerning the separable material, the writer will expressly except and reserve such rights to the Company. The writer will deliver to the Company an executed copy of any such grant, assignment or license promptly following the execution thereof.

  f. **Notices.** All notices which the Company is required or may desire to serve upon a writer, a claimant, or the Guild, under the provisions of this Article 16.A., shall be addressed to such writer, claimant or the Guild, at the Guild's office in either Los Angeles, California or New York, New York; all notices which a writer, a claimant or the Guild is required or may desire to serve upon the Company under the provisions of this Article 16.A. shall be addressed to the Company at its headquarters for the production of theatrical films in California, as provided in the last paragraph of Article 41 or, if the Company has no such headquarters in California, at the address it has designated for service of process pursuant to Article 41. Such notices may be served by registered mail or telegram. Any notice so mailed, postage prepaid, shall be conclusively deemed to have been received on the second day following deposit if posted within the State of California, or on the fifth day following such deposit if posted from a place outside the State of California but within the continental United States, or on the tenth day following such deposit if posted from a place outside the continental United States. Any notice delivered to a telegraph office, toll prepaid, shall be conclusively deemed to have been received upon the day following such delivery. Notwithstanding the foregoing, there shall be no presumption of receipt during the period of any strike or work stoppage in the United States mail system.

8. Writer's Right to Reacquire Literary Material

The provisions of this subparagraph 8. apply only to literary material (i) which is original, *i.e.*, not based on any pre-existing material, and (ii) which has not been exploited in any medium.

  a. With respect to literary material acquired by Company subject to the terms of the 1970 or 1973 WGA agreement, if the writer who has written the same desires to purchase Company's right, title and interest therein, the Guild, on behalf of such writer, may notify Company in writing of such desire. Within ninety (90) days following receipt of such written notice, Company shall notify the Guild of the terms and conditions, including the price at which it will sell its right, title and interest in such literary material; provided, however, that Company may instead notify the Guild that the literary material

- 197 -

does not meet one or more of the conditions precedent specified in the first sentence of this subparagraph 8. or that the literary material is in active development at the time of the Company's notification to the Guild. If the Company proceeds in accordance with the foregoing proviso and the Guild disputes the factual basis upon which the Company relies for so proceeding, such dispute shall be subject to the grievance and arbitration provisions of this Agreement. However, the Company's decision regarding the terms and conditions of the sale shall not be subject to challenge by the Guild or by the writer on any grounds whatsoever whether in arbitration or otherwise.

The purchase price designated by Company shall not be in excess of the total direct costs previously incurred by Company in relation only to such literary material, including payments for the acquisition of the literary material and for writing services connected therewith (including writing services in relation to treatments and screenplays based thereon), and fringe benefit costs in relation thereto, such as pension and health fund payments and social security payments, but exclusive of overhead and exclusive of costs of any other kind (e.g., costs relating to proposed production other than writing costs).

Within thirty (30) days following notice from the Company of the terms and conditions on which it will sell its right, title and interest in such literary material, including the purchase price, the Guild, on behalf of the writer, may serve written notice of acceptance of such terms and conditions and, immediately following service of such notice, the parties shall proceed to close the transaction. Failure to effect such purchase in accordance with the procedure specified by the foregoing provisions shall result in the forfeiture of writer's right to purchase such material. At any time before receipt of notice of acceptance of the terms and conditions of sale, Company may dispose of such literary material or of any rights therein or with respect thereto or may itself commence active development of such material and, in either such event, the writer shall no longer have the right to acquire Company's right, title or interest in such material.

   b. In addition to the foregoing, but with respect only to literary material acquired by a Company on and after March 2, 1977 but prior to March 2, 1981, the writer may reacquire such literary material in accordance with the procedures set forth below if production of a theatrical or television motion picture based on the literary material

has not commenced upon expiration of the following applicable time period:

(1) If, during the five (5) year period after (a) the Company's purchase or license of the literary material (if written by a professional writer), or (b) completion of the writer's services rendered in connection with the literary material, the Company has not had additional writing services rendered thereon or otherwise actively developed the literary material, and if, further, upon expiration of said five (5) year period, the Company is not engaged in negotiations for the sale or license of the literary material to a third party, then upon expiration of said five (5) year period; or

(2) If, upon expiration of the five (5) year period referred to in subparagraph (1) above, the Company is engaged in negotiations for the sale or license of the literary material to a third party, but has not also had additional writing services rendered thereon or otherwise actively developed the literary material, and if said negotiations do not result in a sale or license thereof, then upon the conclusion of said negotiations; or

(3) If neither subparagraph (1) or (2) above applies, then upon expiration of the seven (7) year period after (a) the Company's purchase or license of the literary material (if written by a professional writer), or (b) completion of the writer's services rendered in connection with the literary material.

If the writer does reacquire such literary material, such reacquisition is subject to all existing commitments, such as security interests, participations, options, turnaround rights, employment rights, etc.

At any time during the two (2) year period immediately following expiration of the applicable time period set forth above, the Guild may give the written notice provided in the first sentence of subparagraph 8.a. (hereafter "Guild's notice") and, within ninety (90) days thereafter, Company shall give the written notice provided in the second sentence of subparagraph 8.a. (hereafter "Company's notice"), stating the terms and conditions on which it will sell its right, title and interest in such literary material, including the purchase price. Upon the giving of Company's notice, the literary property shall be deemed literary material which the Company has decided it will not exploit in any medium in the future. The purchase price designated by Company shall not be in excess of the total direct costs previously

- 199 -

incurred by Company in relation only to such literary material as set forth in the second paragraph of subparagraph 8.a. above. Within one hundred twenty (120) days of the giving of the Company's notice (during which period the Company shall not exploit, produce, sell or dispose of said material to any third person), the Guild, on behalf of the writer, may serve written notice of acceptance of such terms and conditions and, immediately following service of such notice, the parties shall proceed to close the transaction. Failure to effect such purchase in accordance with the procedure specified by the foregoing provisions by the end of such two (2) year period (i.e., the years commencing after the expiration of the applicable time period set forth above) shall result in the forfeiture of writer's right to purchase such material any time thereafter under any provision of this subparagraph 8. Within said two (2) year period, the Guild, on behalf of the writer, may repeat the Guild's notice one (1) or more times. All of the procedures and rights above described with respect to the first giving of the Guild's notice shall apply to the first such repeat notice. All of said procedures and rights shall also apply to the second and any subsequent repeat notices except that the Company shall not exploit, produce, sell or dispose of said material to any third person during any period between the giving of the Guild's second (or subsequent) repeat notice and the expiration of one hundred twenty (120) days following the giving of the Company's respective notice.

Furthermore, if Company had previously granted some other person or company the right or option to acquire such material or any rights therein, the writer of such literary material shall not have the right to purchase the same so long as such other right remains outstanding. In the event that more than one (1) writer is involved in the writing of such literary material, the Guild shall have the sole responsibility to determine which of such writers has the right to purchase as provided herein and all interested writers shall be bound by the decision of the Guild.

c. In addition to the foregoing, but with respect only to literary material acquired by Company on or after March 2, 1981 but prior to March 8, 1988, the writer may reacquire such literary material on the terms set forth below upon expiration of the five (5) year period following the later of (i) the Company's purchase or license of the covered literary material, or (ii) completion of the writer's services rendered in connection with the literary material. The writer may reacquire such literary material pursuant to this paragraph only if it is not in active development at the time that the procedures for reacquiring the literary material are instituted.

- 200 -

Examples of active development for the purpose of this paragraph are:

(1) Employment of a writer to rewrite the literary material;

(2) Employment of a director, major actor or other key above-the-line element on a pay-or-play basis for a motion picture based upon the literary material;

(3) A production designer, production manager or other supervisor is in active preparation for the production of the motion picture;

(4) A unit production manager or other person is engaged to prepare a budget for the motion picture; or

(5) Production has commenced upon a theatrical or television motion picture based on the literary material.

If the writer does reacquire such literary material, such reacquisition is subject to all existing commitments, such as security interests, participations, options, turnaround rights, employment rights, etc.

Furthermore, if Company had previously granted some other person or company the right or option to acquire such material or any rights therein, the writer of such literary material shall not have the right to purchase the same so long as such other right remains outstanding. In the event that more than one (1) writer is involved in the writing of such literary material, the Guild shall have the sole responsibility to determine which of such writers has the right to purchase as provided herein and all interested writers shall be bound by the decision of the Guild.

The writer shall reacquire the literary material pursuant to the foregoing paragraphs upon payment to the Company of all compensation actually paid by the Company to the writer for services in connection with the literary material, or for the purchase or license of the literary material in the case of a professional writer. The writer shall obligate the acquiring company to reimburse the Company for any other direct cost previously incurred by the Company in relation to such literary material (as described in the second paragraph of subparagraph 8.a.) out of the first revenue after production costs have been recovered. The document by which the writer reacquires the literary material shall contain a provision setting forth the obligations referred to in the preceding sentence.

    d.    **Reacquisition under the 1988 Basic Agreement, the 1992 Extension Agreement, the 1995 Basic Agreement, the 1998 Basic Agreement, the 2001 Basic Agreement and the 2004 Basic Agreement**

With respect only to literary material acquired by Company on or after August 8, 1988, the writer may reacquire such literary material pursuant to the terms set forth below upon expiration of the five (5) year period following the later of (i) the Company's purchase or license of the covered literary material, or (ii) completion of the writer's services rendered in connection with the literary material, if such literary material is not in active development. Examples of active development for the purpose of this paragraph are included in subparagraph c. above. If the writer does reacquire such literary material, such reacquisition is subject to existing commitments, such as security interests, participations, turnaround rights and employment rights.

    (1)    **Procedures for Reacquisition**

        (a)    At any time during the two (2) year period immediately following expiration of the Company's five (5) year period within which to actively develop the material, the writer may notify the Company in writing of the writer's intent to reacquire the material. With respect only to literary material written on or after May 2, 2001, the writer's two (2) year period to reacquire the material shall commence upon written notice from the writer to the Company of the writer's intent to reacquire. Such notice may be given at any time during the five (5) years immediately following the expiration of the Company's five (5) year period within which to actively develop the material. The writer shall include in such notice the address(es) where further correspondence and notices relating to reacquisition of the material shall be sent.

        (b)    If the material is not in active development at the time Company receives writer's notice of intent to reacquire, then, within sixty (60) days following receipt of such notice, Company shall have the right to place the material into active development. However, during such sixty (60) day period, the material will be deemed to be placed into active development only if, during such period, Company employs a writer to

- 202 -

rewrite the literary material or Company employs a director or major actor on a pay-or-play basis for a motion picture based upon the literary material.

(c) Within sixty (60) days following receipt of writer's notice of intent to reacquire, Company shall give the writer and the Guild written notice of the terms and conditions (which shall not include a so-called "changed elements" clause, i.e., a right of first and/or last refusal or provisions which have the same effect) upon which it will sell its right, title and interest in the literary material, and the price of the material as set forth in this subparagraph d., and the encumbrances and/or commitments, if any (such as security interests, participations, employment rights, future options and/or future turnaround rights) that were attached to the literary material at the time the Company received the writer's notice of intent to reacquire the literary material.

(d) In the alternative, the Company may notify the writer and the Guild that the literary material does not meet one or more of the conditions precedent specified in the first sentence of this subparagraph 8, or that the literary material is in active development at the time of the Company's notification to the writer or that the literary material has been sold or is under option or is in turnaround to a third party. If the Company advises the writer that the literary material has been sold to a third party, the Company shall include in its written notice the identity of the third party and the date of such sale. If the Company advises the writer that the literary material is in active development, or is under option, or is in turnaround, at the time of the Company's notification to the writer, the two (2) year period for reacquisition, or any time remaining on it, shall be tolled during the period of such active development, option or turnaround and until the writer receives notice from the Company that the script is no longer in active development, or under option or in turnaround. In such event, the Company shall include in its written notice the expiration date of any option or turnaround right. Should any such option or turnaround

- 203 -

right be exercised by a third party, the Company shall promptly notify the writer and the Guild.

(e) In the event the literary material is in active development at the time of the Company's receipt of the writer's notice of intent to reacquire and the Company later ceases to actively develop the material, and/or if the Company places the material into active development within the sixty (60) day period following writer's notice of intent to reacquire the material, and the Company later ceases to actively develop the material, Company shall notify the writer and the Guild promptly in writing that the material is no longer in active development. If, within thirty (30) days after receipt of such written notice from the Company, the writer advises the Company in writing that he/she desires to reacquire the material in accordance with his/her earlier notice, then the Company shall give the writer and the Guild the written notice of the terms and conditions, purchase price, encumbrances and/or commitments as described above within sixty (60) days after receipt of the writer's most recent notice to reacquire. In such event, Company shall have no right to place the material into active development during this latter sixty (60) day period, or thereafter during the writer's period for reacquisition. If the writer provides written notice of intent to reacquire more than thirty (30) days after writer's receipt of Company's notice that active development of the material has ceased, then the procedures contained within the first four subparagraphs of this "Procedures for Reacquisition" section shall apply for the remainder of the writer's period for reacquisition.

(f) If the Company proceeds in accordance with subparagraph (d) of this "Procedures for Reacquisition" section and the Guild or the writer disputes the factual basis upon which the Company relies for so proceeding, such dispute shall be subject to the grievance and arbitration provisions of Articles 10, 11 and 12 of this Agreement. However, the Company's decision regarding the terms and conditions of the sale, as distinguished from

- 204 -

the purchase price, shall not be subject to challenge by the Guild or the writer on any grounds whatsoever, whether in arbitration or otherwise. Notwithstanding the preceding sentence, disputes as to whether the terms and conditions of the reacquisition sale conform to the express provisions of this Article 16.A.8.d. shall be subject to the grievance and arbitration provisions of Articles 10, 11 and 12 of this Agreement.

(g) The writer shall reacquire such literary material if writer tenders the purchase price within six (6) months after writer's receipt of the Company's notice. The Company shall not further encumber the literary material during such six (6) month period by entering into new agreements or commitments, such as options, turnarounds, security interests, participations and employment rights, or actively develop or sell the literary material. In the event the writer fails to make the payment within such six (6) month period, the writer may reinstitute the procedure for reacquisition at any time within the time remaining in the two (2) year period referred to above, it being understood that such procedures need only be commenced, and not completed, within the two (2) year period.

(2) **Rights and Procedures for Reacquisition of Material That Has Been Sold or Optioned**

If the Company sells or options the literary material prior to the expiration of the writer's period to reacquire such material from the Company, then such writer's rights to reacquire shall be extended on the following basis and the Company, the writer and the buyer, as applicable, shall be subject to the following procedures in regard thereto:

(a) If the Company sells the literary material to another person or company, it shall obligate the acquiring person or company (hereinafter referred to as "the buyer") in a written agreement to comply with the provisions of this subparagraph 8.d. Said written agreement shall further obligate the buyer(s) in subsequent sales transactions to comply with the provisions of this subparagraph 8.d. The buyer(s) shall have

- 205 -

       five (5) years from the date of its/their agreement with the Company for such sale to place the material into active development (as described in subparagraph 8.c. above). The writer shall have the right to reacquire the literary material from the buyer upon the expiration of such five (5) year period in accordance with the procedures set forth in this subparagraph 8.d.

  (b) If the literary material or any rights therein are placed under option or into turnaround during the period when the Company may actively develop the material, the Company's active development period shall be tolled while such material is under option or in turnaround or for eighteen (18) months, whichever is shorter.  Only the first such option or turnaround granted by the Company shall toll the Company's active development period.

  (c) If an option is exercised, the buyer shall have five (5) years from the effective date of the option agreement to put the literary material into active development (as described in subparagraph 8.c. above). Thereafter, the writer shall have the right to reacquire the literary material from the buyer in accordance with the procedures set forth in this subparagraph 8.d.

  (d) If an option is not exercised and the Company's period of active development, as provided in this subparagraph 8.d., has ended, and the writer's notice of intent to reacquire was received during the time the literary material was under option, the writer may, without further notice to Company, reacquire such material in accordance with the provisions of this subparagraph 8.d.  In such event, Company will be deemed to have received the writer's notice of reacquisition on the date of expiration of the option period, irrespective of the date it was actually received.

 (3) **Payment**

  (a) The writer shall reacquire the literary material pursuant to this subparagraph 8.d. upon payment to the Company (or the buyer, if applicable) of all compensation actually

- 206 -

   paid by the Company (or the buyer, if applicable) to the writer for services in connection with the literary material and/or for the purchase or license of the literary material from the writer or Company. It is understood that the purchase price, as set forth in the preceding sentence, is the sole monetary consideration due from the writer to the Company to reacquire the literary material. In no event will the writer be obligated to pay more than the amount specified in the first sentence of this subparagraph (3)(a) (*e.g.*, in the form of profit participations to the Company).

 (b) If the writer reacquires the literary material from the Company (or buyer, if applicable) and the writer thereafter sells or licenses the literary material to a third party, the writer shall obligate such third party to reimburse the Company (or buyer, if applicable), upon the commencement of principal photography, for any other direct cost previously incurred by the Company (or buyer, if applicable) in relation to such literary material (as described in the second paragraph of subparagraph 8.a.) plus interest thereon. The document by which the writer reacquires the literary material shall contain a provision setting forth the obligations referred to in the preceding sentence.

(4) **Procedure if More Than One Writer Desires to Reacquire the Literary Material**

In the event that more than one writer is involved in the writing of such literary material, the Guild shall have the sole responsibility to determine which of such writers has the right to purchase as provided herein and all interested writers shall be bound by the decision of the Guild.

(5) **Special Notice and Receipt Provisions Applicable to Reacquisition**

All notices which the Company is required or may desire to serve upon a writer pursuant to the provisions of this Article 16.A.8.d. shall be addressed to such writer at the address(es) specified by the writer in his or her first notice to the Company, as provided in subparagraph (a) under "Procedures for Reacquisition" above. Company shall direct correspondence and notices

hereunder to the writer at such address(es), notwithstanding any contrary provisions for the giving of notice in the writer's deal memorandum or personal service agreement and, by so doing, shall be deemed to have fulfilled the notice requirements hereunder, as provided herein, notwithstanding any contrary notice provisions in the writer's deal memorandum or personal service agreement.  The writer may, by notice to the Company, amend such address(es) and, after receipt of an amendment, the Company shall use such amended address(es) for purposes of this Article 16.A.8.d.

All notices which the Company is required or may desire to serve upon the Guild pursuant to the provisions of this Article 16.A.8.d. shall be addressed to the Guild, either at its principal office in Los Angeles County, California, or New York, New York.

All notices which a writer or the Guild is required or may desire to serve upon the Company (or the buyer(s)) pursuant to the provisions of this Article 16.A.8.d. shall be addressed to the Company at its headquarters for the production of motion pictures in California or to the buyer at its headquarters in Los Angeles County or to such other address provided by the buyer to the writer and the Guild.

Such notices may be served by registered mail or telegram.  Any notice so mailed, postage prepaid, shall be conclusively deemed to have been received (a) on the fifth day following deposit if mailed within the State of California to an addressee within the State of California; or (b) on the tenth day following such deposit in the continental United States if mailed to an addressee in a state within the continental United States different from the state of deposit; or (c) on the twentieth day following deposit if mailed in the continental United States to an addressee outside of the continental United States or if mailed outside of the continental United States to an addressee within the continental United States.  Any notice delivered to a telegraph office, toll prepaid, shall be conclusively deemed to have been received upon the day following such delivery.  Notwithstanding the foregoing, there shall be no presumption of receipt by mail during the period of any strike or work stoppage in the United States mail system.

- 208 -

      For purposes of the foregoing, time computations relating to notices to or from the writer shall be determined by the address of the writer, not the Guild, regardless of the fact that the Guild may be required to be copied on notices to the writer and that the Guild may be copied on notices given by the writer.

  e.  The following shall apply to original literary material which is optioned by the Company from a professional writer on or after November 1, 2004. The writer of the optioned literary material may reacquire revisions of such material, pursuant to the terms and conditions set forth in Article 16.A.8.d. above, within a two (2) year period commencing upon written notice from the writer to the Company of the writer's intent to reacquire. Such notice may be given not earlier than one (1) year after the date of expiration of the option and no later than six (6) years after the date of the expiration of the option.

9.  Hot Line Dispute Resolution

In disputes concerning separation of rights under Article 16, the WGA or the Company may elect to initiate the Hot Line Dispute Resolution procedure under Article 48.E., but shall not be required to do so unless the provisions of Article 16 otherwise specifically obligate the parties to do so. If the WGA or the Company elects to initiate the Hot Line procedure, the WGA (or the Company) will not be precluded from filing a grievance or arbitration claim if use of the Hot Line procedure does not resolve the dispute within seven (7) days after the initial contact with the other party's designated representative.

10.  Publication Fee

The Company shall have the right to publish the screenplay on videodiscs/videocassettes whether or not the writer(s) of a theatrical motion picture qualifies for separated rights. A one-time fee of $5,000 shall be paid in the aggregate to the credited writer(s) of the motion picture as compensation for such exploitation right ("Publication Fee"). The Publication Fee shall be due whether or not the Company chooses to exploit such right.

Such Publication Fee shall be paid through the Guild's Residual Department within thirty (30) days after (but not before) the final determination of writing credit on the motion picture. The Publication Fee may not be prepaid nor may it be offset or credited against any other compensation.

The payment of the Publication Fee and any exercise of this right on videodiscs/videocassettes shall not otherwise affect the writer's publication rights under this Article 16.

- 209 -