Lizbeth Hasse (#104517)
Creative Industry Law Group
526 Columbus Ave., 2nd floor
San Francisco, CA 94133
(415) 433-4380

Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
639 Front St., 4th floor
San Francisco, CA 94111
(415) 777-1997

Attorneys for Defendants
Thomas A. Cohen dba Hammermark Productions
Kristi Denton Cohen dba Peloton Productions

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>       Plaintiff,<br><br>  vs.<br><br>THOMAS A. COHEN et al,<br><br>       Defendants | Case No.: CV 08 2243 BZ<br><br>DECLARATION OF THOMAS A. COHEN IN OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION<br><br>Date:  July 11, 2008<br>Time:  9:00 a.m.<br>Courtroom: G |

   I, Thomas A. Cohen, declare:

   1. I am one of the attorneys of record for myself and Kristi Denton Cohen d/b/a Peloton Productions ("Cohen Defendants") in the above-captioned action.

Cohen Declaration re Ex Parte Application —page 1

2. This declaration is submitted in opposition to Plaintiff's Ex Parte Application for Relief. It is an exact duplicate, except for the fact that I have omitted all exhibits, of the declaration and reply declarations I submitted in support of the application by the Cohen Defendants for a motion to dismiss David James Duncan's complaint under FRCP 12(b)(6) and Calif. Code Civ. P. § 425.16.

The Publishing Agreement and Motion Picture Rights Agreement

3. I am informed and believe that in November 1981, Mr. Duncan entered into a Publishing Agreement with Sierra Club Books for his novel, The River Why. [Attached as Exhibit A] is the copy of the Publishing Agreement provided to me by Mike Snell, Mr. Duncan's agent. In a cover letter transmitting the Publishing Agreement, Mr. Snell indicated that the handwritten markups and redactions were not in the original.

4. Paragraph 1 of the Publishing Agreement states: "The Author agrees to deliver . . . [The River Why] . . . and hereby grants and assigns to Publisher the sole and exclusive right to publish the work . . .. The Author also grants to the Publisher such further rights as are specified hereinafter." Among the further rights are those enumerated in paragraph 5(I)(1)— including "Motion picture and/or dramatic." Paragraph 7 states that if Duncan has not appointed an agent [which in 1984 he had not] Sierra Club Books had the right to act as his exclusive agent for disposition of subsidiary rights, which included motion picture rights. Sierra Club Books paid Duncan a $3,000 advance.

5. I worked in production for KQED TV from 1970 to 1977, and thereafter produced and directed two independent feature films. Shortly after publication of The River Why in 1983, I met with Sierra Club Books and Duncan to discuss acquisition of the movie rights. Although interested, Sierra Club Books told me that they wanted to shop the novel in Hollywood before

offering the rights to me. Having no success in Hollywood, SCB and Duncan reopened discussions with me. I initially proposed that Mr. Duncan write the screenplay. Mr. Duncan was interested, and began the screenwriting process, but ultimately decided not to pursue it.

6. I had not attended law school at that point in my career. I entered into negotiations with Sierra Club Books for the movie rights representing my wholly owned corporation, Hammermark Productions, Inc. Sierra Club Books was represented by an outside expert, Andrea Nachtigall. Ms. Nachtigall, the daughter of the Chairman Emeritus of The William Morris Agency, was a lawyer with motion picture experience who owned her own agency.

7. In October 1984, Sierra Club Books and Hammermark Productions, Inc. entered into a Rights Agreement consisting of a two page letter and a four page addendum entitled "Exhibit A." A true and correct copy of the Rights Agreement is attached to the Complaint as Exhibit 1. The Rights Agreement provided for a series of option payments and an exercise price based on the size of the movie's budget. Exhibit A of the Rights Agreement specifically provides that Hammermark had the right "for the purpose of advertising and exploiting the rights granted . . . the right to use . . . the Work's author's name, portrait, picture or likeness and biographical data." A typewritten addition to Exhibit A <u>requires</u> that the film credit read: "Based on the book by David James Duncan."

<u>Option Payments and Screenplay</u>

8. I paid Sierra Club Books $1,250 on execution of the Rights Agreement. On April 12, 1985, I paid an additional $1,250 and notified SCB that a screenplay had been written and that <u>The Paper Chase</u> author John Osborn would begin a rewrite "next week." [Attached as Exhibit B] is a true and correct copy of the contents (no letterhead; no signature) of my April 12, 1985 letter. Those events extended the first option period to April 17, 1986. Paragraph 3 of the

Rights Agreement did not require that a screenplay be tendered to Duncan.  It only required that it "be written before the [first 12 month] option period expires."

9.  The Rights Agreement provides that either party may freely assign their rights.  On or about August 15, 1985, Hammermark Productions, Inc. officially dissolved as a California corporation, and assigned all its rights to *The River Why* and five other titles to me.  The assignment is recorded at the Copyright Office—Document Number V3479D245.  The subsequent January 1, 2004 assignment from Cohen to Peloton Productions was also recorded at the Copyright Office—Document Number V3553 DE985 P1.  True and correct copies of records of those assignments from the Copyright Office website [are attached as Exhibit D].

10.  In the fall of 1985, I sent a draft of the script I wrote with John Osborn to Duncan, who "detested" it.   Industry professionals were not so dismissive: the script was a finalist for the highly competitive Sundance Institute's summer filmmaker's lab, and Mr. Osborn's agent at the powerful Creative Artists Agency agreed to represent it.  There were no takers, and I continued to develop the project as an independent film.

11.  On April 9, 1986, I wrote Sierra Club Books, extending the option for 18 months and enclosing my check number 5099 for $2,500.  [Attached as Exhibit C] is a true and correct copy of the contents of that letter (no letterhead; no signature).  The handwriting at the bottom of Exhibit C is mine, and was written on or about April 9, 1986.   In the months that followed, I explored various financing options and continued to develop the script and assemble talent for the film.  Realizing that more time would be needed to raise money,  I contacted Sierra Club Books and negotiated a one year extension of the option upon payment of $2,000 before October 17, 1987.  That payment was made on October 14, 1987.

The Prospectus and the Exercise of the Option

12. The prospectus for River Why Partners, drafted by outside counsel, shows that I went to great lengths to plan the production and develop a good faith budget for the movie. A true and correct copy of relevant excerpts of the prospectus is [attached as Exhibit E]. The entire prospectus is more than 50 pages long and is available for inspection on request. The budget for the film was highly detailed. The prospectus contains an explicit budget summary and refers prospective investors to a 429 line item budget available on request from me (the general partner). In addition to identifying me as the producer/director (this would be my third feature film in that capacity), the prospectus disclosed an experienced executive producer, production manager, editor, Oscar nominated director of photography and several actors who had expressed interest in participating in the film—including Timothy Bottoms and Edward Hermann. The prospectus for River Why Partners provides that the rights would be transferred from me to the Limited Partnership on commencement of photography. As a public offering, River Why Partners was registered with the SEC and approved by the securities regulators of several states including California.

13. As a public offering, any qualified member of the public was free to invest, and many people did. While I offered Sierra Club Books an opportunity to invest, SCB never communicated a final decision to me about investing, and never put money into the film.

14. As the option deadline approached, I was optimistic that I would be able to raise the necessary financing. This optimism was based, in part, on meetings I had with Oregon government officials who expressed interest in financing a substantial part of the budget. Oregon had successfully invested in the film *Stand by Me*, and was interested in supporting a movie which would, among other things, showcase the state's beautiful rivers. The state sent the offering materials to its Los Angeles investment advisor for review. That review was still

pending in October 1988 when I, not River Why Partners, exercised the option and paid the portion of the purchase price owed under the Rights Agreement--$13,547.65. [Attached as Exhibit F] is a true and correct copy of the October 12, 1988 transmittal letter and check. The exercise of the option was by personal check (#5897) drawn on my individual account. The letter states that I hope photography would commence in the summer of 1989. Sierra Club Books responded with a letter confirming that "you have met the terms of the contract." Complaint, Ex. 13.

15. Between 1984 and 1988, I sent five different checks to Sierra Club Books totaling $20,547.65. I am informed and believe that Mr. Duncan accepted his share of those payments from Sierra Club Books on all five occasions.

16. I married Kristi Denton (Cohen) on July 25, 1987. The rights to The River Why were purchased with separate, not community property, and were never held jointly or in my wife's name until 2004.

The 1990's

17. Sometime after I exercised the option, Oregon decided not to invest, and the public offering was terminated. On October 1, 1993, Mr. Duncan's agent, Mike Snell, wrote to me stating that the rights "should properly revert to the author and Sierra Club Books." Complaint, Ex. 14. On December 23, 1993, Mike Snell wrote another letter to me stating that a number of serious filmmakers had approached him about the film rights, "but I have only been able to say someone holds an option to the work. Perhaps I should put these people in touch with you?" [Attached as Exhibit G] is a true and correct copy of Mr. Snell's letter. Over the years since then, Mr. Snell has referred filmmakers to me with the understanding that I owned the rights. In the mid-1990's, I optioned the movie rights to a third party producer on two separate

occasions. Based on phone conversations I had with Mr. Snell, I know that both he and Mr. Duncan were well aware of these transactions. That producer was unable to develop or finance a film, and the options lapsed.

The 2000's

18. In 2004, my wife, Kristi Denton Cohen d/b/a Peloton Productions ,decided to tackle *The River Why*. Having recently completed her acclaimed feature documentary, *Vertical Frontier,* narrated by Tom Brokaw and executive produced by Sierra Club Productions, she began her development of *The River Why* by writing to Mr. Duncan and offering to include him in the process. The effort proved fruitless, and culminated in a November 10, 2005 letter from Mr. Duncan stating: "I would much rather spend the rest of my life fighting you—no matter how ugly or endless the legal mire—than to ever have to watch your version of my novel appear on a movie screen." [Attached as Exhibit H] is a true and correct copy of Mr. Duncan's November 10, 2005 letter.

The Stipulated Judgment in San Francisco Superior Court

19. In April 2007, Mr. Duncan's attorney, Annette Hurst, wrote a letter to my wife and me demanding that we cease and desist efforts to make the film, and threatening legal action if we did not. When efforts at settlement proved fruitless, Peloton filed a declaratory relief action against Sierra Club seeking court validation of the Rights Agreement.

THE FOLLOWING IS FROM COHEN REPLY DECLARATION

20. There has been no public solicitation of investors for The River Why since 1988's SEC registered public offering. I was the sole general partner of River Why Partners.

21. In April 1987, the Rights Agreement was still in its originally contracted second 18 month term. Even without the allegedly fraudulent one year extension, it would not have

expired until October 1987. Even if Sierra Club had rejected the offer of a one year extension, I still could have, and would have, exercised the option before its expiration.

22. [Attached hereto, as Exhibit A], are true and correct copies of the assignments recorded in the Copyright office between Hammermark Productions, Inc. and me; and between me and Peloton Productions.

23. In response to Plaintiff's Objections to Evidence, Objection Number 7, I declare under penalty of perjury that I completed a first draft screenplay based on The River Why before October 1985.

24. In response to Plaintiff's Objections to Evidence, Objection Number 11, I declare under penalty of perjury that the facts contained in the excerpts of the prospectus attached as Exhibit E to the Declaration of Thomas A. Cohen in Support of Defendants' Motion to Dismiss are true. More specifically, the facts as to the detailed budget and the recitation of names of actors and other motion picture professionals attached to the project are true.

25. In response to Plaintiff's Objections to Evidence, Objection Number 12, I declare under penalty of perjury that I personally handled the filing of the prospectus with the SEC and various corporation commissioners of several states. I did most of the work preparing and filing the prospectus, but had outside counsel advise and consult with me on its preparation.

I declare under penalty of perjury of the laws of the United States that the foregoing is true except as to those matters alleged on information and belief.

Dated: July 8, 2008

                                            /s/ Thomas A. Cohen
                                                Thomas A. Cohen