ANNETTE L. HURST (Bar No. 148738)
ELISABETH R. BROWN (Bar No. 234879)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone:  +1.415.772.6000
Facsimile:  +1.415.772.6268
E-mail:      Annette.Hurst@HellerEhrman.com
             Elisabeth.Brown@HellerEhrman.com

Attorneys for Plaintiff
DAVID JAMES DUNCAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>                              Plaintiff,<br><br>      v.<br><br>THOMAS A. COHEN et al.,<br><br>                              Defendants. | Case No.: 3:08-cv-02243-BZ<br><br>**STIPULATED MOTION FOR ADMINISTRATIVE RELIEF AND [PROPOSED] ORDER** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Plaintiff Duncan and Defendants Cohen and Denton Cohen hereby move the court

for administrative relief to remove two documents from the public record that contain Mr.

Duncan's confidential personal information and replace those documents with redacted

versions in compliance with Local Rule 3-17(a)(1).  Specifically, both Exhibit 1 to Plaintiff

Duncan's Verified Amended and Supplemental Complaint for Copyright Infringement,

Declaratory Relief, Breach of Fiduciary Duty, Fraud, Constructive Fraud, Conspiracy to

Defraud, False Advertising, and Invasion of the Right of Publicity ("Verified Amended and

Supplemental Complaint") (Docket No. 38-2) and Exhibit A to the Declaration of Thomas

Cohen in Support of Motion to Dismiss ("Cohen Declaration") (Docket No. 12-5) include

confidential personal information that should be redacted from the public record pursuant to

Local Rule 3-17(a)(1).

Heller
Ehrman LLP

**MOTION FOR ADMINISTRATIVE RELIEF AND [PROPOSED] ORDER**
**Case No.: 3:08-cv-02243-BZ**

Accordingly, Plaintiff Duncan and Defendants Cohen and Denton Cohen hereby file as Exhibit 1 to this Motion for Administrative Relief a true and correct copy of Plaintiff Duncan's Verified Amended and Supplemental Complaint with appropriate redactions made to Exhibit 1 thereto.  In addition, the parties file as Exhibit 2 to this Motion for Administrative Relief a true and correct copy of the Cohen Declaration with appropriate redactions made to Exhibit A thereto.

Dated:  July 11, 2008                    Respectfully submitted,

                                         HELLER EHRMAN LLP

                                          By:   /s/ Elisabeth R. Brown

                                          Attorneys for Plaintiff
                                          David James Duncan

Dated:  July 11, 2008                    Respectfully submitted,

                                         CREATIVE INDUSTRY LAW GROUP

                                          By:   /s/Lizbeth Hasse

                                          Attorneys for Defendants
                                          Thomas A. Cohen and Kristi Denton Cohen


# [PROPOSED] ORDER

PURSUANT TO STIPULATION, IT IS SO ORDERED, that the documents filed at Docket #38 and Docket # 12 be removed from the public record and replaced with the redacted versions attached as Exhibits 1 and 2, respectively, to the Stipulated Motion for Administrative Relief.

Dated:                                   _____

                                         United States Magistrate Judge

**MOTION FOR ADMINISTRATIVE RELIEF AND [PROPOSED] ORDER**
**Case No.: 3:08-cv-02243-BZ**

Heller
Ehrman LLP

ANNETTE L. HURST (Bar No. 148738)
ELISABETH R. BROWN (Bar No. 234879)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: +1.415.772.6000
Facsimile:  +1.415.772.6268
E-mail:      Annette.Hurst@HellerEhrman.com
             Elisabeth.Brown@HellerEhrman.com


Attorneys for Plaintiff
DAVID JAMES DUNCAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JAMES DUNCAN,<br><br>                              Plaintiff,<br><br>     v.<br><br>THOMAS A. COHEN, HAMMERMARK PRODUCTIONS, INC., a dissolved California Corporation, RIVER WHY PARTNERS, a California limited partnership of unknown status, KRISTI DENTON COHEN, PELOTON PRODUCTIONS, SIERRA CLUB BOOKS, AND DOES 1-10,<br><br>                              Defendants. | Case No.: CV 08 2243 BZ<br><br>**VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT FOR COPYRIGHT INFRINGEMENT, DECLARATORY RELIEF, BREACH OF FIDUCIARY DUTY, FRAUD, CONSTRUCTIVE FRAUD, CONSPIRACY TO DEFRAUD, FALSE ADVERTISING, AND INVASION OF THE RIGHT OF PUBLICITY**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff David James Duncan ("Duncan" or "Plaintiff") complains in this action

against Defendants Thomas A. Cohen ("Cohen"), Hammermark Productions Inc., River

Why Partners, Kristi Denton Cohen (Denton Cohen), Peloton Productions ("Peloton"),

Sierra Club Books ("SCB") and Does 1-10 as follows:

Heller
Ehrman LLP       28

## **INTRODUCTION**

1.      Duncan is an author of award winning books, short stories, and essays, including two best-selling novels, *The River Why* and *The Brothers K*. *The River Why*, a fictional environmental activism and coming-of-age story, was SCB's first fictional publication, and its critical and commercial success strongly contributed to the launch of SCB as a publisher of fiction. Among Duncan's many distinctions as an author, *The River Why* ranks thirty-fifth on the *San Francisco Chronicle* list of The 20th Century's 100 Best Books of the American West and *The Brothers K* is an American Library Association Best Books Award-winner and a *New York Times* Notable Book. Both novels won the Pacific Northwest Booksellers Award. Duncan's book *Citizens Dissent*, co-authored with Wendell Berry, won the American Library Association's 2003 Award for the Preservation of Intellectual Freedom. The staying power of *The River Why* and its importance to SCB is obvious—in 2002, Duncan, through SCB, released the 20th Anniversary Edition of *The River Why*.

2.      Defendant Denton Cohen (a producer primarily of corporate training films with one documentary to her credit) and her company Peloton (and its production subsidiary Doe 1) have engaged in, and continue to engage in, conduct infringing Duncan's literary work copyright in *The River Why*. *Duncan has never granted any rights of any kind in his work to Denton Cohen or Peloton*. Denton Cohen nonetheless contends that she is authorized to prepare the motion picture derivative work by virtue of a 1984 Letter Agreement between her husband, Thomas Cohen, acting on behalf of Hammermark Productions, Inc., and Sierra Club Books. In the more than twenty years since that Letter Agreement was made, no film was produced by Cohen or anyone claiming through him. On July 2, 2008 and while this lawsuit was pending alleging copyright infringement, Duncan learned that Peloton now intends to begin production of the film sometime during the second week of July 2008.

3.      The option set forth in the Letter Agreement does not authorize Peloton to film, distribute or publicly perform or display a derivative work of *The River Why* for one or

Heller
Ehrman LLP

more of the following reasons: the Letter Agreement is void as substantively unconscionable; it is void because the purported seller, SCB, never owned the rights it purported to convey; the initial option, its renewal and purported exercise were voidable as a result of fraud, breach of fiduciary duty, defective or improper exercise, and should be ordered rescinded; and, the Letter Agreement was terminated for breach due to Cohen's failure to commence photography within a reasonable period of time after the purported exercise.

4.      Peloton had constructive knowledge of Duncan's first termination of the Letter Agreement sent through his agent Michael Snell in 1993 by virtue of Cohen and Denton Cohen's fiduciary relationship; Peloton had constructive and, upon information and belief, actual knowledge of Duncan's reiteration of that termination in his 2005 letter to the Cohens; Peloton had constructive, and upon information and belief, actual knowledge of the second reiteration of that termination in a telephone call between Duncan's counsel and Thomas Cohen in March 2006; Peloton had actual knowledge of the third reiteration of that termination in a letter dated April 2007 sent by Duncan's counsel; Peloton had actual knowledge of the fourth reiteration of that termination in connection with the filing of this lawsuit in April 2008. Upon information and belief, at no time prior to its constructive and actual knowledge of Duncan's various attempts to terminate did Peloton possess a written assignment of rights with a chain of title consistent with the requirements of Section 204 of the Copyright Act.

5.      In June 2008, Duncan learned for the first time that the entity purporting to exercise the option in the Letter Agreement in 1985, River Why Partners, did not in fact own the option at the time. Duncan shortly thereafter confirmed his tender of the exercise price in connection with his ongoing demand for rescission. On July 2, 2008, Duncan learned that, despite the filing of this lawsuit and its claim in motion practice that Plaintiff could not allege recent infringement, Peloton in fact intends to commence filming in the second week of July 2008.

Heller
Ehrman LLP

6.    Duncan will be irreparably harmed if Peloton makes a film.  Such an act will effectively deprive him of his statutory right to exploit his copyright in a motion picture form.  Duncan therefore files this Verified Amended and Supplemental Complaint and seeks immediate injunctive relief to stop the expected commencement of filming by Peloton during the second week of July 2008, and in all events if the Court cannot act in time to stop filming, Duncan requests an order stopping the post-production editing, marketing, promotion, distribution, public performance or public display of any such film.

## PARTIES

7.    Duncan is a citizen of Montana residing in Missoula County, Montana.

8.    Defendant Cohen is a citizen of California residing in Marin County, California.

9.    Defendant Denton Cohen is a citizen of California residing in Marin County, California.

10.    Hammermark Productions, Inc. ("Hammermark") is a dissolved California Corporation with its principal place of business in Marin County, California.

11.    River Why Partners is a California limited partnership of unknown present status with its principal place of business in Marin County, California.

12.    Peloton Productions is an entity of unknown status whose principal place of business is in Marin County, California.  Denton Cohen has sole ownership and control over Peloton.

13.    Upon information and belief, Defendant SCB is a division of the Sierra Club with its principal place of business at 85 Second Street, San Francisco, California 94105.

14.    Upon information and belief Defendant Doe 1 is a production company, wholly-owned by Peloton Productions, that was created for the purpose of producing a film derivative work in *The River Why*.

15.    Does 2-10 are other entities and persons who are materially contributing to the unauthorized creation of a motion picture derivative work with knowledge of the infringement.

### NATURE OF THE CASE

16.    This action is for the infringement of a United States copyright, pursuant to the laws of the United States, 17 U.S.C. Section 501 *et seq*., for false advertising, pursuant to Section 43(a) of the Lanham Act, for declaratory relief, breach of fiduciary duty, fraud, constructive fraud, conspiracy to defraud, and invasion of the right of publicity.

### JURISDICTION AND VENUE

17.    Subject matter jurisdiction for copyright infringement and false advertising claims are proper in this Court pursuant to 28 U.S.C. Sections 1331 and 1338. Supplemental jurisdiction over the declaratory relief, breach of fiduciary duty, fraud, constructive fraud, conspiracy to defraud, and invasion of the right of publicity claims are proper in this Court under 28 U.S.C. Section 1367.

18.    Venue is proper in this State and this District pursuant to 28 U.S.C. Section 1400(a).

### INTRADISTRICT ASSIGNMENT

19.    Because this action is an Intellectual Property Action within the meaning of Civil Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

### BACKGROUND FACTS COMMON TO ALL CLAIMS

20.    Duncan owns United States Copyright Registration No. TX-1-078-799 dated March 7, 1983, titled THE RIVER WHY.

21.    On or about November 20, 1981, Duncan and Sierra Club Books ("SCB") entered a Publishing Agreement that granted SCB the right to publish *The River Why* and to act as Duncan's agent for ancillary rights, including the derivative film rights, until such time as Duncan appointed a different agent. The Publishing Agreement did not convey the copyright in *The River Why* to SCB nor did it convey ownership of any rights to prepare derivative works. Instead, SCB was required to register the copyright in Duncan's name and was designated only as the "exclusive agent" regarding certain derivative rights including motion picture rights unless and until Duncan appointed another literary agent. A true and correct copy of the Publishing Agreement is attached hereto as Exhibit 1.

Heller
Ehrman LLP

22.    In or about the spring of 1983, SCB published *The River Why*. *The River Why* was SCB's first novel and strongly contributed to the launch of SCB as a publisher of fiction.

23.    Beginning in 1983, Cohen communicated directly to Duncan his interest in acquiring the right to prepare a film derivative work of *The River Why*. At some point thereafter, Cohen began communicating with Duncan's agent, SCB, regarding the film rights. On or about October 2, 1984, Cohen, acting on behalf of Hammermark, sent an unexecuted proposed letter agreement ("Letter Agreement") to Ms. Andrea Nachtigall, who apparently acted as SCB's agent. The Letter Agreement proposed that SCB would option the right to prepare a film derivative work of *The River Why* to Hammermark. Upon information and belief, Cohen was aware at all relevant times that Duncan owned the copyright to *The River Why* and that SCB acted as his agent only. Upon information and belief, Cohen drafted the Letter Agreement. Attached hereto as Exhibit 2 is a true and correct copy of the Letter Agreement.

24.    Nachtigall forwarded the agreement to Jon Beckmann of SCB asking him to sign it and to confirm SCB had "the right to sell the film and television rights." In response, Beckmann sent Nachtigall the Publishing Agreement, which *does not* confer ownership of *The River Why* copyright to SCB or the right to sell the film and television rights. In addition, Beckmann sent executed copies of the Letter Agreement, despite SCB's lack of ownership and despite questions for Nachtigall about the meaning of the terms contained in the Letter Agreement. Someone whose identity is unknown and at a time unknown to Duncan filled out by hand the identity of the seller in Exhibit A to the Letter Agreement as "Sierra Club Books." Beckmann's response to Nachtigall acknowledged that SCB was a novice with this type of contract and that the Letter Agreement "is a first for us." Attached hereto as Exhibits 3 and 4 are true and correct copies of the correspondence exchanged between Ms. Nachtigall and Mr. Beckmann. Cohen countersigned the Letter Agreement on behalf of Hammermark.

Heller
Ehrman LLP

6

25.    The Letter Agreement afforded Hammermark an option to prepare a film version of *The River Why* upon specified terms.  To exercise the option, the terms required Hammermark to pay a negotiated purchase price in two installments, one-third on "exercise" of the option, and two-thirds on "commencement of photography," in addition to a promise of a future running royalty.  Thus, to fully exercise the option, paragraph 6 of the Letter Agreement required both an immediate partial payment and a contingent partial payment.  The contingent partial payment was contingent upon the commencement of photography.

26.    The Letter Agreement was grossly inconsistent with industry standards for the protection of authors and drafted to Hammermark's advantage.  It contained no express deadline for the commencement of photography and provided no express reversion of rights to Duncan.  Taken together, the absence of both of these terms made it possible for the producer to sit on the rights without exploiting them.  This was a shocking departure from industry norms and substantively unconscionable.

27.    In addition, the Letter Agreement and Exhibit A thereto plainly misrepresented SCB's status, purporting that SCB *owned* and had the right to convey the copyright in *The River Why*, when in fact SCB was only authorized to serve as Duncan's agent.

28.    Under the terms of the unconscionable Letter Agreement, Hammermark's option expired twelve months after SCB's execution—on October 17, 1985.  Hammermark could extend this deadline by an additional six (6) months (to April 17, 1986) should it complete a screenplay prior to the deadline.  If a screenplay were written, Hammermark could then further extend the option period an additional eighteen months upon payment of $2,500.

29.    Unbeknownst to Duncan and discovered only in June 2008, *Hammermark dissolved as a corporation*.  The certificate of dissolution was signed by Cohen, under penalty of perjury, less than two months after the Letter Agreement was signed and prior to any of the extensions and filed with the Secretary of State for the state of California on

Heller
Ehrman LLP

7

August 15, 1985.  Attached hereto as Exhibit 5 is a true and correct copy of documents obtained from the Secretary of State for the state of California evidencing Cohen's declaration of Hammermark's dissolution in 1984.  Upon information and belief, the option right contained in the Letter Agreement was not assigned to Cohen prior to Hammermark's dissolution, and when Cohen purported to extend the option on behalf of Hammermark he did so without disclosing the change in status.  Certainly, no one disclosed this change in status to Duncan.

30.    Cohen proceeded to act as if Hammermark still had a claim to the option right.  Cohen purported to have written a "first draft" of the screenplay himself by on or about April 12, 1985.  Hammermark did not actually tender any screenplay, however, until more than six months later on October 31, 1985, two weeks after the option deadline.  Under the terms of the Letter Agreement, Hammermark's failure to tender the screenplay by October 17, 1985 was grounds for the option to expire.  SCB apparently ignored this breach of the Letter Agreement and purported nonetheless to extend the option deadline until April 17, 1986.

31.    By spring of 1987, SCB and Cohen were acting as if Hammermark had both delivered the screenplay in a timely fashion and had timely made the required $2,500 option payment by April 17, 1986, which would have extended the option for the additional eighteen months until October 17, 1987.  At this time, and in an apparent attempt to extend the option, Cohen offered Duncan's agent, SCB, an opportunity to invest in the film on its own behalf, *without Duncan's knowledge*.  Cohen made his offer to SCB in a phone call and two letters to Beckmann in early April 1987.  Beckmann responded to Cohen on April 16, indicating SCB was "tempted by the investment."  Attached hereto as Exhibits 6, 7, and 8 are true and correct copies of the correspondence exchanged between Cohen and Beckmann.

32.    On or about May 7, 1987, Cohen and SCB improperly agreed to deprive Duncan of the film rights in *The River Why*, by executing a new letter agreement purporting to grant a *further* twelve-month "extension" in exchange for $2000.  This new 12-month

Heller Ehrman LLP

option was not set to begin for another five months (October 17, 1987). This was a *new* option, that was to be tacked on to the end of the unexercised option. In essence, SCB allowed Cohen, acting as "President" in the name of the then-dissolved corporation Hammermark, to finagle at least an additional twelve months—all without Duncan's authorization—for the nominal fee of $2,000. But, a dissolved California corporation does not have the right to continue conducting business except for the purpose of winding up its affairs. Obtaining a further new option was not winding up the affairs of Hammermark.

33.    Worse, SCB's conduct directly followed Cohen's investment offer to SCB. SCB never made a full disclosure to Duncan of the facts and circumstances of this new option. This entirely new option was not provided for under the original Letter Agreement and it was agreed to by SCB while it was entertaining an investment opportunity put forth by Cohen. Attached hereto as Exhibit 9 is a true and correct copy of the May 7, 1987 option agreement.

34.    This new option, which gave Hammermark Productions until October 17, 1988 to exercise it, was negotiated and signed without Duncan's knowledge. Indeed, by that point in time SCB and Cohen had every reason to believe that Duncan would strongly oppose reviving the option. Duncan detested the screenplay Cohen had tendered in 1985 and he unequivocally expressed his dissatisfaction to Cohen and SCB. Despite SCB's awareness of Duncan's disapproval, and with an investment opportunity in hand, SCB purported to grant the new option.

35.    In the meantime, the negotiations concerning SCB's investment opportunity continued. On or about August 29, 1987, Cohen sent an offering memorandum and subscription agreement to SCB relating to the investment opportunity. On or about September 10, 1987, SCB's Beckmann wrote to Cohen, thanking him for the investment prospectus and stating that "because of the unusual nature of the deal, I'll have to talk to other folks here before asking accounting to draw up a check." On or about September 25, 1987, Beckmann communicated SCB's decision to invest $10,000 in the project, contingent on Cohen's raising the additional needed funds for a $1.5 million production. Attached

hereto as Exhibits 10, 11, and 12 are true and correct copies of the correspondence exchanged between Beckmann and Cohen.  On or about October 14, 1987, Hammermark (at that point dissolved for nearly three years and therefore ineligible to carry on any business) sent a letter to Beckmann reciting that a check for $2,500 was enclosed "to extend the option on *The River Why* for an additional year as per our prior agreement."  Attached hereto as Exhibit 13 is a true and correct copy of the October 14, 1987 letter.

36.     When Duncan learned of the "extension," he objected to SCB.  SCB told Duncan he had no choice but to go along with the extension.  Duncan, completely unaware that SCB was entertaining an investment opportunity in the film on its own account and also unaware that SCB was wrong that he had no legal right to refuse, trusted and followed his agent's advice.  Duncan only learned of Cohen's investment offer to SCB in or about late 2005 or early 2006, after he received a copy of SCB's *The River Why* file from a retiring SCB employee, Danny Moses.  Duncan had requested *The River Why* file from Moses, who had previously told Duncan that SCB had made a "terrible mistake" in the handling of the agreement with Cohen.  Moses served as Duncan's editor while employed by SCB.  Director of Publishing Jon Beckmann served as Duncan's literary agent prior to Duncan's appointment of Mike Snell in 1993.  Before receiving the file, Duncan had no knowledge that SCB had extended the option while entertaining an investment opportunity on its own account, nor did he have any reason to suspect his agent, Jon Beckmann, had purported to act on his behalf while laboring under a material conflict of interest.

37.     Under the Letter Agreement, in order to exercise the option, Hammermark was obliged to develop a budget, because the payment due upon exercise was calculated off the film's budget, i.e. 1/3 of 5% of the film's budget.  In or about October 1988, a new entity—"River Why Partners"—purported to exercise the option and assessed a $1,234,093 budget for the film.  Cohen, acting as "General Partner" of River Why Partners ("RWP"), paid the first 1/3 of the required payment of the purchase price on or about October 12, 1988.  Cohen stated the remaining 2/3 of the purchase price would be paid upon

Heller
Ehrman LLP

VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT

1  "commencement of photography, which I hope will be next summer."  Attached hereto as

2  Exhibit 14 is a true and correct copy of RWP's October 12 letter.

3      38.    Upon information and belief, there was no written assignment from

4  Hammermark Productions, Inc. to Cohen at the time of the purported exercise by RWP.  In

5  his declarations filed with the Court in June 2008, Cohen implicitly admitted that RWP

6  never acquired the rights because the RWP prospectus provided that RWP would not

7  acquire them unless and until it commenced photography—which it never did.  Having now

8  obtained that prospectus, it is clear that the River Why Partners did not have the right to

9  exercise the option, as is evident from the 10-Q filed by River Why Partners' on or about

10  November 3, 1988 for the quarter ending September 30, 1988.  River Why Partners reported

11  that "[a] payment of $13,547.65 to Sierra Club Books and David Duncan was accrued in

12  anticipation of exercise before October 17, 1988, of the motion picture rights to the novel

13  <u>The River Why</u>.  When this payment is made, Thomas A. Cohen will own outright (subject

14  to future fees payable on commencement of photography) the rights to the book.  *These*

15  *rights will be transferred to River Why Partners on close of escrow.*"  (emphasis added)

16  Attached hereto as Exhibit 15 is a true and correct copy of the River Why Partners'

17  November 3, 1988 10-Q.  Given the lack of written assignments from Hammermark to

18  Cohen, Hammermark to RWP, or Cohen to RWP, River Why Partners lacked authority to

19  and could not exercise the option consistent with its terms, and it again lapsed.  Moreover,

20  every subsequent purported assignment deriving from Hammermark was and is invalid

21  under 17 U.S.C. Section 204.

22      39.    Additionally, upon information and belief, the proposed budget was a sham

23  designed to fraudulently retain the right to prepare a film derivative work of *The River Why*.

24  To this day, neither Hammermark, Cohen, River Why Partners or anyone else claiming

25  through any of them has produced such a budget for Duncan's review despite repeated

26  requests.  Nor did Cohen have any reasonable basis for warranting that he would make the

27  remaining 2/3 payment upon commencement of photography within a reasonable time, and

28  certainly not by the following summer.

Heller
Ehrman LLP

40. Despite the failure to comply with the terms of the Letter Agreement and its lack of ownership of the option, and in furtherance of its breach of fiduciary duty, SCB purported to accept RWP's partial option exercise payment, while expressly acknowledging Duncan's disapproval for the agreement, noting "the author's apprehensions." Attached hereto as Exhibit 16 is a true and correct copy of SCB's purported acceptance of the partial option exercise payment.

41. Shortly after Duncan learned of the improper partial exercise of the option in light of RWP's lack of ownership of it at the time of the purported exercise, he again confirmed his demand for rescission of the Agreement and tendered the consideration for the exercise. A true and correct copy of that June 30, 2008 tender letter, sent by Duncan through counsel, is attached hereto as Exhibit 17.

42. Hammermark, Cohen and River Why Partners all failed to perform by commencing photography and making the partial contingent payment to complete exercise of the option and purchase of the rights. "Next summer" came and went, but photography did not commence. In fact, *five years* came and went without commencement of photography. By 1993, photography still had not commenced. Duncan forewent various other opportunities to make the film, because of Cohen's continuing assertion to third parties that he owned the exclusive right to prepare motion picture derivative works.

43. In or about 1993, Duncan became aware that Cohen was attempting to sell the film rights to a third party. *But the purchase price had never been fully paid, and the option therefore never fully exercised—thus, even assuming SCB were legally qualified to be the seller (which it was not), no sale of the rights ever occurred.* In light of Cohen's complete failure to perform, in October 1993, Duncan, through his newly appointed literary agent Michael Snell, sent a letter in writing expressly terminating the option and notifying Cohen that the film rights had reverted to Duncan. Attached hereto as Exhibit 18 is a true and correct copy of Mr. Snell's letter to Cohen.

44. Following the termination, Snell made some efforts to cooperate with Cohen in an effort to resolve the situation, but these attempts at an amicable resolution went

1    nowhere.

2        45.    In the eleven years subsequent to 1993, Cohen made no genuine or concrete

3    efforts to exercise his alleged right to prepare a film derivative work of *The River Why*,

4    except dilettantish attempts to "scope out" potential filming sites in Oregon and New

5    Zealand vacation destinations, trips which Cohen took with his wife and have expressly

6    stated were written off on his taxes as business expenses.  Nonetheless, it appears Cohen

7    continued to claim he had the right to prepare the film (although it is unclear in exactly

8    whose name), because upon information and belief, in or about 2004, Cohen purportedly

9    conveyed the Letter Agreement to his wife, Denton Cohen.

10        46.    In or about 2005, Duncan learned of Denton Cohen's renewed efforts to

11    produce the film.  Duncan promptly sent the Cohens a letter reiterating his termination of

12    the Letter Agreement.  In spite of this and every other defect in the chain of title outlined

13    above, Denton Cohen continues to claim the right to prepare the derivative film work of *The*

14    *River Why*.

15        47.    Denton Cohen's company, Peloton Productions, maintains a website

16    advertising *The River Why* production.  On a page entitled "who's who" in the production,

17    the website lists David James Duncan first, as the author of the novel, followed by the

18    names of an actor and director allegedly connected to the project.  Attached hereto as

19    Exhibit 19 is a true and correct copy of the webpage.

20        48.    Duncan has not authorized Peloton to use his name or otherwise to suggest he

21    is affiliated with or endorses the Peloton production in any way.  Denton Cohen has used

22    Duncan's name, without his authorization and in a manner that implies his endorsement to

23    solicit investments from and to attract actors and crew with an affinity for fly fishing,

24    Duncan and his novel.  She targets audiences where she knows Duncan's goodwill is at its

25    highest, including the Salt Lake City Outdoor Retailer Trade Show, where Duncan has been

26    a featured speaker.

27        49.    Throughout 2006 and 2007, Duncan and his attorneys attempted to resolve

28    this dispute with Defendants.  In March 2006, Duncan's counsel again notified Cohen that

Heller
Ehrman LLP

Duncan considered the Letter Agreement terminated.  Thereafter, Duncan sought to resolve the situation first with SCB so that he might spare SCB some embarrassment in the circumstances and in the hopes that he and SCB (his publisher and agent) might present a united front to the Cohens.  He also could not afford to undertake litigation, and hoped to fund a resolution with the Cohens with money from SCB.  That process took quite some time, but by early 2007 Duncan and SCB reached a settlement contingent upon resolution with the Cohens.

50.     As soon as a contingent resolution with SCB was reached, in April 2007, Duncan's counsel immediately sent correspondence to Cohen and Denton-Cohen reiterating the termination of the Letter Agreement and demanding that they cease further production.  A true and correct copy of that letter is attached as Exhibit 20.  Thereafter, the parties met, with and without counsel, in repeated efforts to resolve the situation.  These efforts culminated in an October 2007 mediation with John Bates of JAMS.

51.     While the settlement efforts were ongoing, unbeknownst to Duncan in August 2007 Peloton filed a lawsuit against the Sierra Club in California state court, seeking a declaration that the Letter Agreement was valid and binding.  Despite the Cohens knowledge that Duncan asserted his rights under the Copyright Act to prevent them from producing a film, and despite the pendency of ongoing settlement discussions, the Cohens did not name Duncan as a party nor even disclose the lawsuit to Duncan.  Duncan learned of the lawsuit from SCB shortly before SCB was required to respond to the complaint in that action.

52.     In the state court complaint, Peloton alleges that SCB acted as Duncan's exclusive agent in 1984—thus conceding both that Cohen was aware of the terms of the Publishing Agreement and that SCB did not itself own the rights in *The River Why*, but rather had acted as Duncan's agent.  At the time of the filing of the lawsuit, SCB was fully aware that Duncan took the position that the Letter Agreement to be either unenforceable or to have terminated.  Nonetheless, in November 2007, Sierra Club and Peloton entered a stipulated judgment purporting to validate the Letter Agreement.  The state court judge

Heller
Ehrman LLP

expressly found that no judgment in that case would bind David James Duncan.

53.     On or about March 13, 2008, counsel for Duncan sent a courtesy copy of a draft Complaint to initiate this action to counsel for SCB and the Cohens, in one last effort to invigorate settlement discussions and to attempt resolution without litigation.  These efforts failed, and on April 30, 2008 Duncan filed the original complaint in this matter.  At no time during this entire sequence of events did the Cohens or their counsel ever disclose that they intended to commence filming in the summer of 2008.  Had they done so, Duncan would have ceased his efforts to resolve the matter informally and would have initiated litigation immediately.

54.     Duncan has put together a highly reputable team who can bring *The River Why* to the screen.  Matt Salinger, an actor and producer of more than a dozen small independent films, and Patrick Markey, producer of the acclaimed fly-fishing film *A River Runs Through It*, intend to produce the motion picture version of *The River Why* once Duncan has successfully terminated the Letter Agreement.  Denton Cohen's continuing assertion of validity of the Letter Agreement is causing Duncan ongoing harm and loss of opportunity to option the rights to Salinger and Markey.

55.     Despite her awareness of Duncan's position for at least two years, and her immediate awareness since mid-March that Duncan intended to pursue copyright infringement litigation against her, Denton Cohen intends to initiate filming of her unauthorized motion picture derivative work in the second week of July 2008.

Heller
Ehrman LLP

**FIRST CLAIM FOR RELIEF**

**(Copyright Infringement Against Defendant Denton Cohen, Peloton and Doe 1)**

56.    Paragraphs 1 through 55 are hereby incorporated by reference.

57.    Defendants Denton Cohen, Peloton and Doe 1 are violating 17 U.S.C. Section 106 by engaging in conduct that infringes Duncan's registered copyright in *The River Why* through their efforts to produce, distribute, promote, market, publicly perform and display a film version of his novel.  These defendants intend to commence production during the second week of July 2008 and to obtain an agreement to distribute the film as soon as practicable thereafter.

58.    These Defendants infringement of Duncan's registered copyright is willful. They are about to enter production *despite many notices of termination and the pendency of this lawsuit for copyright infringement*.  Peloton, Denton Cohen and Doe 1 have taken these steps with full knowledge of all of the facts set forth herein demonstrating their lack of authorization to do so.  No reputable film producer would behave in this fashion.

59.    As a direct result of Peloton, Denton-Cohen and Doe 1's immediately threatened commencement of production, Duncan has suffered and will continue to suffer irreparable harm, including but not limited to harm to his reputation and goodwill. Specifically, though without limitation, if these Defendants proceed to production of a film, and certainly if they distribute one, Duncan will be forever deprived of the opportunity to exploit his copyright in motion picture form.  He will be deprived of the opportunity to write and market his own screenplay, and to option the rights to the producer of his choice. Once lost, this is an opportunity that Duncan will never get back.

60.    Duncan is informed and believes and on that basis alleges that Denton Cohen threatens to continue her infringing activities, and unless restrained and enjoined, will continue to do so.  Duncan's remedy at law is not by itself adequate to compensate him for the harm inflicted and threatened by Denton Cohen.

Heller
Ehrman LLP

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

61.    Paragraphs 1 through 60 are hereby incorporated by reference.

62.    An actual controversy now exists between Duncan and Defendants in that Duncan contends, and Defendants deny, that (a) the option in the original Letter Agreement is invalid; (b) the extensions and/or renewals of the option agreement between SCB, Hammermark, and Cohen were invalid; (c) the River Why Partners never had the authority to exercise the option; (d) the option was never fully exercised and no purchase of rights therefore ever occurred prior to Duncan's termination and/or rescission of the option; (e) the assignments of the Letter Agreement are invalid; and (f) even if all of the foregoing were not true, the agreement has since terminated due to material breach and all film rights to *The River Why* have reverted to Duncan subject to whatever obligations he may have to SCB under the Publishing Agreement.

63.    The Letter Agreement is void and/or voidable at Duncan's election, which he has made, because the option contained therein is substantively unconscionable.  The option is a shocking departure from industry norms and customs because it lacks both a reversion clause and an express deadline for commencement of photography.  Taken together, these two omissions were, as later acknowledged by Duncan's SCB editor, Danny Moses, a "terrible mistake."

64.    The Letter Agreement is unenforceable because Cohen knew that SCB did not own the rights and drafted an agreement that nonetheless purported to convey them.  The Letter Agreement is unenforceable by reason of Cohen's and SCB's fraudulent conduct, which was designed to allow Cohen to hang on to the right to prepare a film derivative work of *The River Why* and thereby allow SCB to potentially benefit from an investment opportunity.  In the face of the option deadline, and with knowledge that Duncan disapproved of Cohen's screenplay for *The River Why*, Cohen offered SCB an investment opportunity in the project, while requesting a new option.  Cohen was aware of SCB's fiduciary duties owed to Duncan and had reason to know the investment opportunity created

Heller
Ehrman LLP

a real conflict of interest between SCB and Duncan.  SCB concealed this opportunity from Duncan and, despite its knowledge that Duncan would have preferred to allow the option to expire, SCB purported to create a new option.

65.    Upon the expiration of the fraudulently created option, Cohen perpetuated the fraud by creating a sham film budget.  A film budget was a prerequisite to exercising the option, because the initial partial payment of the purchase price was tied to the film budget.  Cohen, however, was unprepared to commence production.  Nor had he raised the necessary money to support a budget.  Without the money, not even pre-production, let alone photography, could begin.  Cohen's fabricated budget and false promise to commence photography by the next summer were intended to induce SCB to accept the option payment.

66.    Even if the Letter Agreement were enforceable despite substantive unconscionability, fraud, and breach of fiduciary duty the River Why Partners was never authorized to exercise the option.  RWP never actually acquired the option from anyone.  Hammermark was not entitled to extend the option for an additional year after it was dissolved, and therefore was not a proper party to the extension contract.  Moreover, Cohen was not a proper assignee of the rights, because Hammermark Productions did not properly assign the rights, in writing, to Cohen as an individual prior to the purported exercise.  The conveyance of exclusive rights under the Copyright Act can only be effected in writing.  17 U.S.C. § 204(a); *see also Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007).

67.    Alternatively, even if the Letter Agreement were exercisable by River Why Partners, long prior to 2004 when Denton Cohen purported to acquire the option, the Letter Agreement had terminated for failure to commence photography and pay the contingent portion of the purchase price.  After the initial partial payment was made, and in the absence of an express deadline to commence filming, Cohen had a reasonable time under Civil Code Section 1657 to commence photography and complete the exercise of the option.  Relevant industry custom and practice provided that five years would be the absolute maximum period of time considered to be reasonable for commencement of photography under the

Heller
Ehrman LLP

circumstances.  Accordingly, under Civil Code Section 1657, the option expired without full exercise no later than 1993, when Duncan's new agent Snell expressly notified Cohen that it was terminated.  To this day, no monies have been paid by Cohen to Duncan or SCB since the fraudulent $13,547.65 "purchase price" paid two decades ago.

68.    Under California Law, the Letter Agreement also carried with it a variety of unexpressed legal obligations and restrictions.  Those include, without limitation, the covenant of good faith and fair dealing implied in every agreement under California law, the obligation of an exclusive licensee to exercise best efforts in exploiting the licensed subject matter, and the requirement of good and valid consideration to support a contract. Cohen violated his obligation to deal in good faith.  He knowingly and intentionally solicited SCB's investment in the project, knowing that SCB acted as Duncan's agent, and with reason to know that Duncan would not authorize a further extension of the option.  He misrepresented the status of the film and the budget in obtaining the purported extension of the option.  Despite an express termination of the rights in 1993, Cohen secretly purported to assign them to his wife in 2004.

69.    Knowledge of Cohen's fraud and the termination of the Letter Agreement is imputed to Denton Cohen, who allegedly obtained the film rights from Cohen, her husband (and thus her fiduciary) and agent (as her attorney).

70.    Duncan is entitled to a declaration that the Letter Agreement is invalid or otherwise terminated.  The requested judicial declaration is appropriate and necessary at this time so that Duncan can stop Defendants from their unauthorized efforts to prepare a motion picture derivative work of his novel *The River Why*.

### THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against Defendant SCB)

71.    Paragraphs 1 through 70 are incorporated by reference.

72.    Defendant SCB breached its fiduciary duty to Duncan by failing to disclose its investment opportunity prior to granting a further extension of the option to Cohen in May 1987.  The information concerning SCB's business opportunity was material to SCB's

Heller
Ehrman LLP

1  duties owed to Duncan and created a genuine conflict of interest.  In light of Duncan's

2  opposition to Cohen's script, SCB knew or had reason to know that Duncan would oppose a

3  renewal and would want any information concerning SCB's business opportunity in *The*

4  *River Why*.

5        73.    SCB's contemplation of an investment opportunity in Cohen's anticipated

6  production of *The River Why* created a real conflict of interest between SCB and Duncan.

7  SCB agreed to extend the option beyond the terms of the original Letter Agreement without

8  consulting Duncan, while at the same time entertaining the investment opportunity on its

9  own behalf.  SCB knew or had reason to know Duncan would oppose such an extension,

10  because Duncan expressed his dissatisfaction with Cohen's screenplay to SCB.

11        74.    Defendant SCB also breached its fiduciary duty to Duncan by signing the

12  Letter Agreement when it acknowledged it did not understand the terms and holding out

13  Duncan's property, the copyright in *The River Why*, in a manner that made it appear as if

14  SCB owned the property.  Specifically, SCB knowingly signed an agreement that falsely

15  described SCB as the owner of the property, even after Nachtigall directly asked SCB to

16  confirm it owned the rights *which it could not do*.

17        75.    SCB breached its fiduciary duty to Duncan by telling him that he had no

18  choice but to go along with the extended option.  This statement was false, as Duncan was

19  not legally obligated to extend the option.  SCB made this false statement without properly

20  investigating the true legal status of matters.  Until his appointment of a new agent in 1993,

21  Duncan relied throughout upon SCB's obligation to act in his best interests, and trusted

22  SCB's advice and followed it.  Despite his frustration with the circumstances, Duncan's

23  unwillingness to believe ill of SCB continued until he obtained the files from Moses and

24  sought legal advice regarding the contents of those files.

25        76.    Defendant SCB again breached its fiduciary duty to Duncan by entering a

26  stipulated judgment with Denton Cohen purporting to confirm the validity of the Letter

27  Agreement despite Duncan's express instruction that the Letter Agreement was terminated.

28  SCB owed a continued obligation to protect Duncan's property rights, even after the

Heller
Ehrman LLP

1    termination of its agency relationship.  SCB was aware Duncan deemed the Letter

2    Agreement terminated and/or invalid.  Nonetheless, SCB potentially impaired Duncan's

3    property rights by entering the stipulated judgment, despite its fiduciary obligations to him

4    as an agent.

5        77.      Duncan is entitled to an award of compensatory damages, restitution,

6    disgorgement of profits, punitive damages, and any other relief that the court deems just and

7    proper.

8                    **FOURTH CLAIM FOR RELIEF**

9            **(Actual Fraud as to Defendant Cohen; Cal. C. Code § 1572)**

10       78.      Paragraphs 1 through 77 are incorporated by reference.

11       79.      Cohen is liable for fraud.  In the face of the option deadline, and with

12   knowledge that Duncan disapproved of his screenplay for *The River Why*, Cohen offered

13   SCB an investment opportunity in the project, while requesting a new option.  Cohen was

14   aware of SCB's fiduciary duties owed to Duncan and had reason to know the investment

15   opportunity created a real conflict of interest between SCB and Duncan.  Cohen and SCB

16   agreed to the new option agreement *without Duncan's approval.*

17       80.      A year later, upon expiration of the new option created between SCB and

18   Cohen in May 1987, Cohen created a sham film budget in an effort to hang on to the film

19   rights.  Cohen's fabricated budget and promise to commence photography by the next

20   summer were intended to induce SCB to accept the option payment.  The fact that Cohen

21   was in no position to then produce a film derivative work in *The River Why* is evidenced by

22   the fact that, a mere two months after he signed the Letter Agreement, he signed a

23   declaration to dissolve Hammermark Productions *without bothering to provide for*

24   *assignment of the option rights*.

25       81.      Cohen was in no position to warrant the proposed film budget, because he had

26   made none of the concrete steps in accordance with industry practice to develop the budget.

27   For the same reasons, he was in no position to warrant his promise to commence

28   photography within a reasonable time and certainly not by the summer of 1989.  Cohen had

Heller
Ehrman LLP

21

1  no reasonable basis for making the representations and warranties that he made in seeking

2  the purported extension of the option.

3      82.    Knowledge of Cohen's fraud is imputed to Denton Cohen, who allegedly

4  obtained the right to prepare a film derivative work from Cohen, her husband and agent.

5      83.    As a result of Cohen's fraud, Duncan is entitled to a declaration from the

6  court that the Letter Agreement and exercise of the option is unenforceable.

7                              **FIFTH CLAIM**

8              **(Constructive Fraud as to SCB; Cal. C. Code § 1573)**

9      84.    Paragraphs 1 through 83 are incorporated by reference.

10     85.    Prior to granting Cohen a new option in or about May 1987, SCB concealed

11 from Duncan its investment opportunity in Cohen's production.  As Duncan's agent for the

12 ancillary rights in *The River Why*, SCB had a duty to disclose this investment opportunity

13 because it created a genuine conflict of interest between SCB and Duncan.  SCB knew that

14 Duncan would have preferred to allow the option to expire, yet SCB benefited from

15 granting Cohen a new option in order to buy more time to consider the investment

16 opportunity.

17     86.    When Duncan learned of the new option and objected, SCB assured Duncan

18 there was nothing he could do.  Had Duncan been aware of SCB's investment opportunity,

19 however, he would not have relied on his agent's assurances nor would he have accepted

20 the option payment from Cohen.  Instead, he would have endeavored to rescind the new

21 option.

22     87.    Duncan is entitled to a declaration that the Letter Agreement and Cohen's

23 purported exercise of the option are unenforceable.

24                       **SIXTH CLAIM FOR RELIEF**

25              **(Conspiracy to Defraud Against All Defendants)**

26     88.    Paragraphs 1 through 87 are incorporated by reference.

27     89.    The Cohens and SCB agreed to deprive Duncan of the film rights in *The River*

28 *Why* and shared a common intent to defraud Duncan of those rights.  Cohen engaged in

Heller
Ehrman LLP

VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT

fraudulent conduct by inducing SCB to violate its fiduciary duties, developing a fraudulent budget, and making unwarranted promises to perform, all in an effort to hang on to the film rights in *The River Why*. SCB engaged in constructive fraud by creating a new option and concealing material information from Duncan relating to the investment—an investment from which SCB could only benefit if it gave Cohen a new option and allowed him to retain the rights. The Cohens and SCB continued to perpetrate this fraud by entering the November 2007 stipulated judgment, which apparently enabled Denton Cohen and Peloton to attract capital and human resources to her planned film project and enabled her to begin filming in July 2008 despite the pendency of this lawsuit.

90. Knowledge of the conspiracy is imputed to Denton Cohen, who allegedly obtained the right to prepare a film derivative work from Cohen, her husband and agent. Denton Cohen joined the conspiracy to defraud Duncan through her declaratory relief action against SCB that ended with the stipulated judgment.

91. The last overt act of the conspiracy occurred in or about November 2007 when Cohen, Denton Cohen and SCB entered the stipulated judgment.

92. Duncan is entitled to a declaration that the Letter Agreement is unenforceable by reason of the Cohens' and SCB's conspiracy to perpetuate the Letter Agreement and thereby defraud him of the film rights in *The River Why*.

## <u>SEVENTH CLAIM FOR RELIEF</u>

### (False Advertising Against Denton Cohen and Peloton; 15 U.S.C. § 1125)

93. Paragraphs 1 through 92 are incorporated by reference.

94. In violation of 15 U.S.C. Section 1125, Denton Cohen through Peloton Productions has falsely and misleadingly represented that Duncan endorses Denton Cohen's efforts to produce *The River Why*. Peloton Productions prominently lists David James Duncan's name on its webpage for "who's who" in *The River Why* production. Duncan's name is listed along with two other names—an actor and a director who are allegedly interested, or otherwise involved, in the project. Listing Duncan's name in this manner is likely to confuse the public into believing Duncan endorses this project.

Heller
Ehrman LLP

95.     Denton Cohen has solicited investments in the film project by exploiting Duncan's name and creating the false impression that Duncan endorses their efforts.  Upon information and belief, Denton Cohen targets potential investors who have an affinity for Duncan and his novels and she implies that Duncan supports her efforts to bring the novel to the movie screen.

96.     The Peloton Productions website is accessible in interstate commerce and is used to solicit support for *The River Why* project.

97.     As an author of highly acclaimed novels, memoirs, short stories, essays and documentaries, Duncan's name is protected by the Lanham Act.

98.     Duncan is informed and believes and on that basis alleges that Denton Cohen threatens to continue exploiting Duncan's name, and unless restrained and enjoined, will do so.  Duncan's remedy at law is not by itself adequate to compensate him for the harm inflicted and threatened by Denton Cohen.

## EIGHTH CLAIM FOR RELIEF

### (Violation of the Right of Publicity; Cal. Civ. Code § 3344)

99.     Paragraphs 1 through 98 are incorporated by reference.

100.     Denton Cohen through Peloton Productions has knowingly used Duncan's name in her efforts to solicit funds for the production of *The River Why*.  Peloton Productions prominently lists David James Duncan's name on its webpage for "who's who" in *The River Why* production.  Duncan's name is listed along with two other names—an actor and a director who are allegedly interested, or otherwise involved, in the project.

101.     Duncan did not give Denton Cohen permission or authorization to use his name for purposes of soliciting funds from the public or advertising Denton Cohen's production efforts.  Moreover, Denton Cohen has denied requests by Duncan's counsel to furnish a clear chain of title.

102.     Duncan's reputation has been injured as a result of Denton Cohen's actions in an amount to be determined at trial.  Duncan is entitled to an award of the greater of

Heller
Ehrman LLP

statutory or actual damages, in addition to the any profits Denton Cohen has gained through her invasion of Duncan's right of publicity.

103.    Duncan is informed and believes and on that basis alleges that Denton Cohen threatens to continue exploiting Duncan's name, and unless restrained and enjoined, will do so. Duncan's remedy at law is not by itself adequate to compensate him for the harm inflicted and threatened by Denton Cohen.

### **PRAYER**

WHEREAS, Duncan prays for relief as follows:

A.    For a judgment that Denton Cohen has infringed United States Copyright Registration No. TX-1-078-799, pursuant to 17 U.S.C. § 501;

B.    Pursuant to 17 U.S.C. §502, for entry of a temporary restraining order, preliminary and permanent injunction enjoining and restraining Denton Cohen, Peloton Productions, Doe 1 and their officers, directors, agents, servants, employees and all other persons in privity or acting in concert with them from infringement of Copyright Registration No. TX-1-078-799, and in particular restraining them from filming, editing a film, distributing, marketing, promoting, publicly performing or displaying any motion picture work based upon the novel *The River Why*;

C.    For an entry of permanent injunctive relief enjoining and restraining Denton Cohen, Peloton Productions, Doe 1 and their officers, directors, agents, servants, employees and all other persons in privity or acting in concert with them from using David James Duncan's name for solicitation of production assistance, actors, distribution deals, funding or advertising;

D.    For an award to Duncan of his actual damages and any additional profits of the infringer, or statutory damages, whichever is the greatest, pursuant to 17 U.S.C. § 504;

E.    For a finding that Denton Cohen, Peloton and Doe 1's infringement was willful, and for an additional award for willful infringement, pursuant to 17 U.S.C. § 504;

F.    For a finding that the Letter Agreement has been terminated and/or rescinded, pursuant to 28 U.S.C. § 2201 and California law;

Heller
Ehrman LLP

G.      For a finding that SCB has breached its fiduciary duties to Duncan and an award of any compensatory damages, restitution, disgorgement of profits, and punitive damages;

H.      For a finding that the Letter Agreement is unenforceable by virtue of Cohen's, Denton Cohen's and SCB's conspiracy to defraud Duncan of the right to prepare a film derivative work of *The River Why* and Defendants' fraud and constructive fraud perpetrated against Duncan with the intent to allow Cohen and subsequently, Denton Cohen to retain the right to prepare a film derivative work of *The River Why*;

I.      For an award to Duncan of the greater of statutory damages or his actual damages, in addition to profits realized by Denton Cohen for her invasion of Duncan's right to publicity, pursuant to Cal. Civ. Code § 3344;

J.      For an award of Duncan's attorneys' fees, expenses and costs, pursuant to 17 U.S.C. § 505;

K.      For an award to Duncan of such other and further relief as this Court deems just and proper.

Dated: July 4, 2008                  Respectfully submitted,

HELLER EHRMAN LLP


By  _/s/ Annette L. Hurst_____
                    ANNETTE L. HURST
Attorney for Plaintiff
DAVID JAMES DUNCAN

Heller
Ehrman LLP

VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT

## **DEMAND FOR JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff David James Duncan demands a trial by jury on all issues triable by a jury.

Dated: July 4, 2008                         Respectfully submitted,

HELLER EHRMAN LLP


By   _/s/ Annette L. Hurst_____
                              ANNETTE L. HURST
Attorney for Plaintiff
DAVID JAMES DUNCAN


## **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Dated: July 4, 2008                         Respectfully submitted,

HELLER EHRMAN LLP


By   _/s/ Annette L. Hurst_____
                              ANNETTE L. HURST
Attorneys for Plaintiff
DAVID JAMES DUNCAN

Heller
Ehrman LLP

VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT

1   **VERIFICATION**

2          I, David James Duncan, hereby declare under penalty of perjury that the factual

3   statements made in the foregoing Verified Amended and Supplemental Complaint are true

4   of my own personal knowledge and that I would and could competently testify thereto,

5   except where allegations are made upon information and belief and I have a reasonable

6   basis for believing such factual assertions to be true.  In addition, with regard to documents

7   obtained from federal and state agencies or in the course of this litigation, I am relying upon

8   my counsel for attestation as to having obtained them from those agencies and as to the

9   correctness of the copies of those exhibits.

10

11

12                                          DAVID JAMES DUNCAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Heller   28
Ehrman LLP

VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT

<u>PUBLISHING AGREEMENT</u>

THIS AGREEMENT is made this <u>20</u> day of November, 1981

between  David James Duncan           (the "Author") a citizen

of  U.S.A.                    , whose Social Security number is

REDACTED        and the Sierra Club, a California non-profit

corporation (hereinafter called Publisher) relating to a work

tentatively titled:  THE RIVER WHY

(hereinafter referred to as the "Work") in which it is

mutually agreed between the Author and the Publisher as follows:

1.  GRANT OF RIGHTS.  The Author agrees to deliver two
copies of the completed manuscript of the finished work and all
relevant material mentioned in paragraph 9 hereunder to the
Publisher by  January 1, 1982      and hereby grants and
assigns to the Publisher the sole and exclusive right to publish
the work in volume form in the English language throughout the
world.

The Author also grants to the Publisher such further
rights as are specified hereinafter.  The phrase "in volume form"
shall be defined as meaning publication of the work as a whole,
or substantially complete, as a unit or at one time.

2.  AGREEMENT TO PUBLISH.  The Publisher agrees to
publish the work in volume form at its own expense, in style and
price as it deems best,

but shall not be responsible for delays caused by strikes,
lockouts, fires, or other circumstances beyond its control.  In
no event shall the Publisher be obligated to publish a work which
in its opinion violates the common law or statutory copyright or
the right of privacy or any other rights of any person or contains
libelous or obscene matter.

3.  COPYRIGHT.  The Publisher agrees to obtain copyright
in the name of  the Author

either under the United States Copyright Law and the Universal
Copyright Convention, or under the International Copyright Union;
and the Author, or the Publisher on the Author's behalf and at
its option, shall take out renewals whenever they fall due.  Both
parties agree to execute, at any time, all such papers and
documents as may be necessary in order to protect, assign, renew
or otherwise effectuate the rights herein, whether granted to the
Publisher or reserved by the Author.

Exhibit 1



4. ADVANCES. The Publisher shall pay to the Author or his duly authorized representative as an advance against royalties or other sums payable by Publisher to Author in accordance with this Agreement the following amounts:

a)   Upon execution of this Agreement $ 2,000

b)   Upon receipt by Publisher of ____ % of an acceptable manuscript of the Work $_____

c)   Upon receipt by Publisher of an acceptable completed manuscript $ 1,000

d)   Upon completion of printing and binding of the Work $_____

If the Author fails to deliver an acceptable completed manuscript on or before _____ or within an additional three (3) month grace period, Publisher shall have the right to terminate this Agreement and Author agrees to repay to Publisher all advances paid to the Author in connection with the Work. Author shall not have the right to have the Work published elsewhere until this Agreement has been terminated and all advances repaid to Publisher.

5. ROYALTIES. The Publisher will pay Author the following royalties on all copies sold less returns:

A)   Trade edition: 10% of retail price on 1st 10,000 copies sold
12½% on next 5,000 copies sold
15% on all copies sold thereafter

with the following exceptions:

B)   Special discounts: On copies sold at a discount of 50% or more of our retail price, one-half (½) of the stipulated trade royalty.

C)   Export (including Canada): one-half (½) of the stipulated trade royalty.

D)   Sale of overstock: 10% of the amount received, but no royalty shall be paid on copies sold at or below cost.

E)   Other editions:

1)   Softcover edition by Publisher: 7½% on all copies sold

2)   Textbook or low cost hardcover edition by publisher: 5% of the retail price.

3)   Hardcover or softcover edition (licensed to another publisher): proceeds to be divided equally.

4)   Small quantity reprint; on copies sold from a reprinting of 3,000 or less copies made two years or more after first publication, this provision being made for the purpose of keeping the work in print and in circulation as long as possible: one half the trade edition royalties.

F) Direct sales (to individual retail customers by mail, newspaper, magazine, television, radio, or other means): one-half (½) of the stipulated trade royalty.

G) Book club:  proceeds to be divided equally.

H) Gratis copies (review, publicity, and author's): No royalty.

I) Subsidiary rights:  proceeds from the sale of subsidiary rights shall be divided as follows:

|       |                                                                                                                                                                                | To Author | To Publisher |
|-------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----------|--------------|
| (1)   | Motion picture and/or dramatic                                                                                                                                                  | 80%       | 20%          |
| (2)   | Radio and/or television                                                                                                                                                         | 80%       | 20%          |
| (3)   | Commercial uses and adaptations for commercial uses including but not limited to exploitation for novelty items and novelty syndication                                          | 75%       | 25%          |
| (4)   | Publication of parts of the work, or of the complete work or sub-stantially complete or condensed in two or more installments, in magazines or newspapers before publication in volume form | 80%       | 20%          |
| (5)   | Publication in English by British or other foreign publishers                                                                                                                    | 75%       | 25%          |
| (6)   | Publication in foreign languages by other publishers                                                                                                                            | 75%       | 25%          |
| (7)   | Reproduction or storage for reproduction of the text and/or illustrations, or any part there-of in audio and/or visual form; audiovisual teaching material including film strips and motion pictures for educational purposes | 50%       | 50%          |
| (8)   | Reprinting of the work or any part or adaptation thereof, after publication in volume form, in anthologies, magazines, news-papers or other publications                          | 50%       | 50%          |
| (9)   | Publisher may at its own discretion, permit reproduction of the work, without charge, in braille or other forms for use by the physically handicapped                            | NONE      | NONE         |

J) The maximum payment to be made to Author in any one calendar year, all of the foregoing not to the contrary, shall not exceed $          and if Author shall be entitled to any amount in excess of $          in any one year, whether due under this Agreement or other agreements now or hereafter entered into between Author and Publisher.

-3-

6.  PAYMENT.  Publisher shall render statements to Author semi-annually on or before January 31 and July 31 of each year for the preceding six-months periods ending September 30 and March 31, and at the same time shall make payments of all sums due thereon after deducting all advances and expenses chargeable to him, all earnings as calculated herein and accrued to the account of the Author; provided, however, that annual rather than semi-annual payments may be made if semi-annual payments would amount to less than fifty dollars ($50).  The Publisher may, for the first 12 months following publication, set up a reserve of fifteen percent of the earnings due the Author to provide for returns.  Author or Author's representative may inspect Publisher's records relating to Author's account at the mutual convenience of the parties.

7.  AGENT.  All payments hereunder shall be made to Author's agent unless Publisher is advised to the contrary in writing.  Any payment to the agent shall have the same effect as if paid directly to Author.  The agent is hereby authorized to act in reference to all matters arising out of this Agreement. Publisher at its own discretion shall have the exclusive right to dispose of the rights to reprint the work or any part or adaptation thereof, after publication in volume form, in anthologies, magazines, newspapers or other publications.  The agent shall have the exclusive right to dispose of all other subsidiary rights; however, if Publisher is entitled to any share of the proceeds, such disposition shall be subject to Publisher's approval.  If Author has not appointed an agent, it is agreed as follows: Publisher shall have the right to act as Author's exclusive agent for the disposition of all other subsidiary rights in which Publisher is entitled to shares of the proceeds; and either party, subject to the approval of the other, shall have the right to dispose of first periodical rights (publication of parts of the work, or of the complete work or substantially complete or condensed in two or more installments, in magazines or newspapers before publication in volume form), it being understood that Publisher shall be entitled to 10% of the proceeds if Publisher negotiates the sale and none of the proceeds if Author negotiates the sale.

8.  AUTHOR'S WARRANTY.  The Author warrants that he is the sole author or proprietor of the work and that he has full power and right to enter this Agreement; that the Work is original and has not heretofore been published; that the Work is not defamatory, obscene, or violative of any statutory or common law copyright, or of any other personal or property right.  The Author shall indemnify the Publisher and hold it harmless from all costs, expenses (including attorneys' fees), losses, liabilities, damages, and settlements arising out of or in connection with any claim or suit based upon allegations which if true, would constitute a breach of these warranties.  These warranties and indemnifications shall be deemed to include any liability incurred by the Publisher as a result of the sale or license of any subsidiary rights, and shall survive in the event this Agreement is terminated.  The Publisher shall not be obligated to publish the Work if, in its sole opinion, the Work, if published, would result in a breach of any of the foregoing warranties.

-4-

9.   MANUSCRIPT.  The Author agrees to deliver two complete and legible typewritten, double-spaced copies of the Work to the Publisher, retaining a third copy for Author's own files.  If the Author does not deliver two copies or if the copies are illegible or unusuable, Publisher may have copies made or retyped with the costs of duplication or typing to be charged against the Author's royalties.  The Author further agrees to supply as part of the Work all maps, paintings, photographs, drawings, and charts in reproducible form necessary to its completion and publication, and at his own expense to obtain permission, if necessary, for their use in the Work and, upon request, to supply an index if needed.  If not so provided by the Author, the Publisher shall supply such maps, drawings, charts and index and shall obtain such permission, charging the Author's account for the expense involved.  The Work shall consist of approximately ___120,000___ words.

If copyrighted material from other sources is included in the Work, the Author shall, at his own expense, secure in writing from the copyright owners or their legal representatives necessary permission to reprint such material in the Work and in all subsequent editions, including reprints and bookclub editions, and shall provide written documentation thereof to the Publisher at the time of delivery of the manuscript.

The Publisher shall not be liable for any loss resulting from a destruction or other loss of the copies, including any art work, transparencies and similar material delivered to the Publisher, unless the Publisher has failed to carry appropriate insurance therefor, if the same is available and has been requested in writing by the Author and at Author's expense.

10.   EDITING.  The Publisher may have the manuscript edited to conform to a style of punctuation, spelling, capitalization and usage as it deems appropriate.  In no event shall Publisher be obligated to publish a Work which in its sole opinion, may subject it to any claims from any third party.

Author agrees to read, revise if necessary, correct and return promptly all proofs of the Work.  If revisions in the proofs are made at Author's request, other than to correct printer's or editor's errors or additions, after type has been set in conformity with the copy edited manuscript, the cost of such revisions in excess of 10% of the original cost of composition shall be charged to Author and deducted from the income payable to him hereunder.  Upon request of Author, an itemized statement of the charges and costs of such revisions shall be submitted by Publisher; Author or his representative may, during normal business hours and upon prior arrangement, inspect Publisher's books and records relating to such charges.

11.   REVISION.  The Author agrees to revise the Work if the Publisher considers that a revision is necessary.  The manuscript of the revised Work shall be delivered in final form by the Author to the Publisher within a reasonable time after the request by the Publisher.  Should the Author be unable or unwilling to decide upon revisions or to make them, then the Publisher may arrange for the revision and charge the cost thereof against payments due then or thereafter to the Author and may display in the revised Work, and in the advertising, the name of the person, or persons, who revised the Work.  If revisions require resetting of more than 50% of the Work, and if the royalty rate provided in Paragraph 5(A) is on a rising scale, the rate on the new edition shall begin at the original rate provided for the first edition.



12.  PROMOTION.  The Publisher shall have the sole and exclusive right to use parts of the Work, including but not limited to photographic prints and quotations, for promotional purposes and to sell the same in the form of posters, film shorts, slides, or other similar form.  To the extent that the Publisher uses the monies derived from the exercise of its rights under this paragraph for promotion of the Work, the money shall be received by the Publisher without accounting to the Author; otherwise the receipts will be divided as with subsidiary rights in Paragraph 5(I).

13.  AUTHOR'S COPIES.  The Publisher shall give the Author ten (10) copies of the Work free and shall supply the Author with a reasonable number of further copies for personal use, but not for sale or resale, at a discount of forty percent (40%) from the retail price of the trade edition.

14.  OUT-OF-PRINT PROVISION.  (a)  If the Work should be out of print for six months or more in all editions, the Publisher may offer its plates, if any, to the Author at fifty percent (50%) of their cost of manufacturing and composition, and any remaining bound copies or sheets at their manufacturing cost. The Work will be considered in print if it is on sale under the Publisher's imprint or under the licensed imprint of another publisher, or if it is under option or contract for publication in another edition.

(b)  If at any time after two years from the original date of publication hereunder the Work is out of print as above defined and the Author makes written demand on the Publisher to reissue the Work, the Publisher will have six months after such written demand to reprint the Work or to contract for its reissue within a reasonable time.  Upon the Publisher's failure to cause reissue of the Work, and upon payment to the Publisher of any sums owing from the Author, excluding any unearned advance paid hereunder, this Agreement will terminate and all rights herein granted will revert to the Author, subject, however, to any licenses or options previously granted by either party, and to the continuing payment to the Publisher of its share of the proceeds from any such licenses or options.

15.  BANKRUPTCY AND INSOLVENCY.  If a petition in bankruptcy is filed by or against the Publisher, or if it is adjudged insolvent by any court, or if a Trustee or a Receiver of any property of the Publisher is appointed in any suit or proceeding by or against the Publisher, or if the Publisher makes an assignment for the benefit of creditors or takes the benefit of any Bankruptcy or Insolvency Act, or if the Publisher liquidates its business for any cause whatsoever, this Agreement shall terminate automatically without notice, and the termination shall be effective as of the date of the filing of such petition, adjudication, appointment, assignment or declaration or commencement or reorganization or liquidation proceedings.  All rights granted hereunder shall thereupon revert to the Author.  As a condition of the making of this Agreement the Author hereby acquires the right, upon termination, to purchase the plates, remaining copies and sheets as provided in Paragraph 16 hereof.  In the event that the Author does not give notice of his intention to purchase such properties within thirty (30) days after the Author has had notice of the happening of the event herein referred to, the Publisher, Trustee, Receiver, Assignee or other such official, may melt the plates and sell the copies or sheets remaining on hand subject only to payment to the

Author of the royalties herein provided.  In the event the Author
desires to purchase the books and sheets aforesaid, and the
Trustee, Receiver or other said named official deems the price
fixed at fifty (50%) percent of the manufacturing costs or the
metal value to be below the fair market value thereof, then such
value shall be determined by arbitration conducted pursuant to
commercial arbitration rules of the American Arbitration Association
then applicable.

16.  DISPOSAL OF REMAINDERS AND PLATES.  If the Publisher
has remainders or other finished stock on hand which, in its
judgment, cannot be sold on the usual terms and within a reasonable
time, the Publisher shall sell such copies at the best price it
can secure and the royalty to be paid shall be calculated as in
Paragraph 5(D).  When in the judgment of the Publisher, public
demand for the Work is no longer sufficient to warrant its
continued manufacture or sale, the Publisher may discontinue
further manufacture and shall offer the Author the plates and
sheets, if any, on the following terms f.o.b. point of shipment:
the plates at their value for old metal, the engravings at one-
half their original cost, the sheet stock at the cost of gathering
and folding.  Unless the Author shall within thirty (30) days
accept such offer and pay the full amount due calculated as
above, the Publisher may dispose of the plates, sheets and other
property, without further liability for royalties or otherwise.

17.  COMPETITIVE MATERIAL.  The Author agrees that,
while this agreement is in force, he will not, without the
written permission of the Publisher, publish or permit to be
published in book or pamphlet form, or dispose of any subsidiary
rights in, any material controlled by the Author that is based on
the work or is of such a nature as to impede or reduce its sale.

18.  PRIOR PUBLICATION ELSEWHERE.  If the Author
retains the right to first serialization of the work, he shall
notify the Publisher promptly of any such arrangement for publication,
in order that the Publisher, when it publishes the work, may be
in a position to comply fully with all requirements under the
United States Copyright Law, and if any registered copyright
therein shall be in the name of any person or party other than
that stipulated in Paragraph 3 he shall deliver to the Publisher
promptly legally recordable assignment or assignments of such
copyright; he shall not permit serialization of the work as a
whole, substantially complete, or condensed, or publication in a
single installment without the Publisher's written consent; he
shall not require the Publisher to postpone publication, in order
to permit serialization beyond the season for which the book has
been catalogued, without compensation satisfactory to the Publisher.
If the Author should arrange for publication of the work elsewhere
than in the United States (provided Paragraph 1 permits him to do
so), he agrees that it shall not precede publication in the
United States without the Publisher's consent in writing; and
that, if publication elsewhere has taken or will take place with
the Publisher's consent, it shall not be responsible for securing
American copyright if it should be impracticable to do so.

-7-

19.  INTERPRETATION.  This Agreement and any further agreements to which it gives rise shall be interpreted under the laws of the State of California, and shall be binding upon and inure to the benefit of the parties hereto, the heirs, executors, administrators and assigns of the Authors, and the successors and assigns of the Publisher.  The Author may assign any net sums due or to become due hereunder.

20.  LIMITATION.  This Agreement shall not be binding upon either of the parties unless it is signed by both and delivered to the Publisher not later than sixty (60) days after the date of signing by the Author.

21.  ASSIGNMENT OF COPYRIGHT.  The Publisher agrees to assign the copyright of the Work to the Author upon termination of the Agreement and upon written request by the Author to do so. Thereupon, all then existing rights granted to the Publisher under this Agreement shall revert to the Author.

22.  MULTIPLE AUTHORSHIP.  If the Work has been written or is owned by more than one person, the word Author shall include all collaborators, authors, or owners, jointly and severally, and all sums payable to the Author shall be divided equally between or among them.  Publisher shall render separate accounts and make separate payments to each of them unless otherwise provided herein.

23.  WHOLE AGREEMENT.  This Agreement contains the whole understanding of the parties, supersedes all previous oral or written representations or agreements, and may be changed, modified, or terminated only by a written document signed by both parties.

Additional Paragraphs numbered_____ are an integral part of this Agreement.

The changes, alterations, and interlineations made in Paragraphs _____ of this Agreement were made and added before execution.

Signed and delivered the day and year first above written.

AUTHOR                                SIERRA CLUB



—8—

October 2, 1984

Ms. Andrea Nachtigall
1885 Lombard St.
San Francisco, CA. 94123

Dear Andrea:

This letter, when signed by your client Sierra Club
Books,("Seller") comprises our agreement with regard to the
motion picture rights in the original literary work entitled
"The River Why" by David James Duncan (the "Work").

1. Seller warrants to Hammermark Productions, Inc. ("Hammermark"),
that Seller has the sole, exclusive, and unencumbered ownership of
all rights of every kind and character throughout the world in
the Work.

2. Seller hereby grants to Hammermark the exclusive and
irrevocable right and option, for the period specified below, to
purchase and acquire the motion picture, television, and allied
rights in the work (collectively, the "Rights") for the purchase
price and upon the terms and conditions specified herein. These
Rights are more fully described by Exhibit A to this agreement
and incorporated by this reference.

3. The option shall be effective during the period commencing on
the date Seller executes this agreement and ending at midnight
twelve (12) months thereafter. If a screenplay based on the Work
is written before the option period expires then the option
period will be extended, for no additional consideration, for six
(6) months for a total option period of eighteen (18) months.

4. In consideration of the grant by Seller of the within option,
Hammermark shall pay $1,250 on execution of this agreement, and
$1,250 in six months.

5. If a screenplay is written, the option period may be extended
for an additional eighteen months upon payment of an
additional $2,500. Any consideration paid for option rights (per
paragraphs 4 or 5) shall be credited against the final purchase
price.

6. In consideration of the sale and conveyance from Seller to
Hammermark of the Motion Picture, Television, and Allied Rights
in the event such option is excercised, Hammermark shall pay to
Seller (one third on excercise and two thirds on commencement of
photography) the amounts listed below.

    A. If the budget for the motion picture exceeds $500,000 in
direct cash costs, then the purchase price shall be five percent
(5%) of the budget with a minimum price of $25,000 and a maximum
of $200,000. Additionally, Seller shall receive two and one half
percent (2 1/2%) of one hundred percent of the net profits of the
motion picture.

# Exhibit 2

1

B. If the budget for the motion picture is below $500,000 ~~in direct cash costs~~, then the purchase price shall be $12,500. Additionally, Seller shall receive five percent (5%) of one hundred percent of the net profits of the motion picture.

7. The definition of net profits will be no less favorable to the Seller than to other profit participants.

8. The Sierra Club name may not be used in connection with advertising or promotion of the motion picture or with related merchandise without the express consent of the Seller, which consent will not be unreasonably withheld.

9. Hammermark and Seller may transfer or assign their rights under this agreement without the prior consent of the other party.

If the foregoing is acceptable to you, kindly indicate your approval by signing and returning the enclosed duplicate original of this letter for my file.

HAMMERMARK PRODUCTIONS, INC.,
a California corporation

By_____

Thomas A. Cohen
Its President

Accepted and Agreed this _17_
day of ____October____, 198_4_

Enclosure: Exhibit A

Addendum: See Exhibit A page 4

Exhibit A

Motion Picture, Television, and Allied Rights

Exhibit to that certain Letter Agreement, dated
_Oct 2_, 198_7_, by and between Hammermark Productions,
Inc. ("Hammermark"), a California corporation, and
_Sierra Club Books_.

1.  All motion picture rights including, but not
limited to, the rights to produce, project, exhibit, broad-
cast, and transmit an unlimited number of motion pictures
(including without limitation "remake" and "sequel" motion
pictures, as said terms are commonly understood in the
United States motion picture industry), theatrically, non-
theatrically, on television, by means of cassettes and car-
tridges, and in all other media, now or hereafter known, and
in all gauges and sizes. The term "motion picture," or
words of similar import, as used in this Exhibit, shall be
deemed to mean and include any present or future kind of
motion picture in any gauge, without or with sound recorded
synchronously therewith, whether the same is produced on
film or magnetic or video tape or wire or any other sub-
stance or by any other method or means now or hereafter used
for the production, exhibition, or transmission of any kind
of motion picture, and whether the same is produced ini-
tially for theatrical, non-theatrical, or television exhibi-
tion or transmission or otherwise. The first motion picture
produced hereunder is sometimes hereinafter referred to as
"the Motion Picture."

2.  All television rights including, but not
limited to, the rights to produce, project, exhibit, broad-
cast, and transmit an unlimited number of television produc-
tions (including without limitation "series" and "specials,"
as such terms are commonly understood in the United States
television industry), on television and in all other media
now or hereafter known and in all gauges. The term "tele-
vision production," or words of similar import, as used in
this Exhibit, shall be deemed to mean and include any pre-
sent or future kind of television production without or with
sound recorded synchronously therewith, whether the same is
produced on film or magnetic or video tape or wire or any
other substance or by any other method or means now or here-
after used for the production, exhibition, or transmission
of any kind of television production, and whether the same
is produced initially for television exhibition or
transmission or otherwise.

Page 1 of 4

3.  The Rights shall include, without limitation, the rights to:

a.  use, adapt, translate, subtract from, add to, and change the Work and the title thereof, or any other title by which it (or any part thereof) has been or may at any time be known, in the making of motion pictures and television productions as a part of or in conjunction with any such motion picture and television production or both;

b.  combine the Work in any manner with any other work or works in the making of motion pictures and television productions;

c.  use the Work and any part thereof, including without limitation the characters contained therein, and said titles and any similar titles, in conjunction with motion pictures and television productions based upon all or any part or parts of the Work or other literary, dramatic, or dramatico-musical works, or a combination thereof, or in conjunction with musical compositions used for or in connection with such motion pictures and television productions, whether or not written for, or used in, or in connection with, or in any manner whatsoever apart from, any such motion pictures and television productions;

d.  project, transmit, exhibit, broadcast, and otherwise reproduce the Work and any part or parts thereof pictorially and audibly by the art of cinematography or any process analogous thereto in any manner, including the right to project, transmit, reproduce, and exhibit motion pictures and television productions and any part or parts thereof (including without limitation, by so-called "pay," "free," "free home," "closed circuit," "theatre," "toll," "CATV," or "subscription" television), and by the use of cartridges, cassettes, or other devices similar or dissimilar, and by so-called "EVR," "Cartrivision" or other similar systems and by any other process of transmission now known or hereafter to be devised;

e.  publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, and license others to publish, use, copyright, vend, license, exhibit, perform and otherwise exploit, such motion pictures and television productions and the scripts of the same and such musical compositions and any part thereof;

f.  record, reproduce, and transmit sound, including spoken words, dialogue, music, and songs, by any manner or means (including mechanical and electrical means

Page 2 of 4

and any other means now known or hereafter developed), whether extracted from or based upon the Work or otherwise, and to interpolate other spoken words, dialogue, music, and songs, in or in connection with or as part of the production, reproduction, transmission, exhibition, performance, or presentation of such motion pictures and television productions;

g. make, copyright, use, vend, license and otherwise exploit, and license others to make, copyright, use, vend, license and otherwise exploit, in any manner, records, tapes and other sound-reproducing devices based in whole or in part on such motion pictures and television productions or such musical compositions, or any part or parts thereof, including the right to use the title of the Work and any similar titles in connection therewith;

h. make, copyright, use, vend, license, and otherwise exploit, and license others to make, copyright, use, vend, license, and otherwise exploit, in any manner, records, tapes, and other sound-reproducing devised based in whole or in part on the Work, or any part or parts thereof;

i. arrange for any and all merchandising and commercial tie-ups of any sort and nature arising out of or connected with the Work and/or the title thereof, the characters contained therein, or said motion pictures and television productions, or any combination thereof; and

j. generally to produce, reproduce, remake, reissue, transmit, exhibit, and perform motion pictures and television productions of any and all kinds.

4.    The right, but only for purposes of advertising and exploiting motion pictures and television productions, to make, publish and copyright, or cause to be made, published, and copyrighted, in the name of Hammermark or its nominees, in any and all languages, excerpts from the Work and synopses, scenarios and other versions of the Work and of any motion pictures or television productions made pursuant to this Exhibit (each not exceeding 7,500 words in length), with or without illustrations of any type or kind whatsoever, on condition that then existing copyrights in the Work shall not thereby become invalidated. No use by Hammermark of the name of the author of the Work shall be made in connection with any of the foregoing in such manner as would indicate that he is the author of any such synopses, scenarios, or other versions. The author of the Work shall be appropriately indicated, however, to be the author of the Work.

 

Page 3 of 4

5.    The right to broadcast and transmit by radio and television excerpts from and condensations of the Work or any motion pictures and television productions produced pursuant hereto, or both; but, with respect to such broadcasts on radio, then only for advertising and exploitation purposes, each not to exceed 10 minutes in length.

6.    Solely for the purposes of advertising and exploiting the rights granted to Hammermark hereunder, the right to use, and to license, cause, or permit others to use, the Work's author's name, portrait, picture or likeness, and biographical data.

\*    \*    \*    \*    \*

ADDENDUM

A. Credit:

          If the title of the film is the same as the title of the book:  "Based on the book by David James Duncan".

          If the title of the film is different from the title of the book:  "Based on The River Why by David James Duncan."

B. Anything not specifically referred to herein shall be negotiated in good faith.

Page 4 of 4

# THE NACHTIGALL AGENCY
### 1885 Lombard Street
### San Francisco, CA 94123
### 415 - 346 -1115

talent agency

October 12, 1984

Mr. Jon Beckmann
Sierra Club Books
2034 Fillmore
San Francisco, CA
94115

        RE:  <u>The River Why</u>  by David James Duncan

Dear Jon,

Welcome home!

At long last, the agreement between Hammermark Prod-
uctions and Sierra Club Books. Please review it
and call me if you have any questions. If not, please
sign and date both copies of the contract and initial
each page of Exhibit A. Please return both originals
to me and I will send you a copy for your files.
In addition, could you please send me for my files
some document showing that Sierra Club has the right
to sell the film and television rights.

Now that you are back I'm eager to discuss <u>The
Turquoise Dragon</u> by David Wallace.

Best regards,

*Andrea*

H. Andrea Nachtigall


HAN/cn
enclosure


P.S. Please initial the deletions in 6 A and B.


# Exhibit 3

October 17, 1984


Andrea Nachtigall
1885 Lombard St.
San Francisco, CA 94123

Dear Andrea:

Enclosed are two signed copies of The River Why by agreement with Hammermark.
One question:  Is is clear in paragraph six that the sales price includes
a television production?  Six lists "Motion Picture and Television" in the
opening clause but then only specifies "Motion Picture".  Excuse the question
if foolish--this is a first for us.

I'm enclosing a copy of our author's contract with David Duncan.

I'll give you a call when I surface from post-Frankfurt paper pile and talk
about The Turquoise Dragon.  (I'm enclosing a bound galley.)

Best regards,


Jon Beckmann
Publisher

JB/lf

Exhibit 4

974778

D187021

**FILED**
In the office of the Secretary of State
of the State of California

AUG 1 5 1985

MARCH FONG EU, Secretary of State

By _Phyllis E. Buggi_
Deputy

CERTIFICATE OF ELECTION OF

HAMMERMARK PRODUCTIONS, INC.

TO WINDUP AND DISSOLVE

    The undersigned being the President and Secretary of Hammermark Productions, Inc. hereby certifies that:

    1.  He is and has been at all times respectively the duly elected President and Secretary of Hammermark Productions, Inc., a California corporation, and

    2.  By written consent to action without meeting of shareholders the sole shareholder of Hammermark Productions, Inc. has elected to windup and dissolve the corporation.

                             THOMAS A. COHEN

    The undersigned declares under penalty of perjury that all statements in the above certificate are true of his knowledge and that this declaration is executed    on December 11, 1984 at Mill Valley, California.

                             THOMAS A. COHEN

Exhibit 5

FILED
In the office of the Secretary of State
of the State of California

AUG 1 5 1985

MARCH FONG EU, Secretary of State

By _Phyllis E. Biaggi_
Deputy

## CERTIFICATE OF DISSOLUTION

THOMAS A. COHEN certifies that:

1.  He constitutes the sole shareholder and sole director of HAMMERMARK PRODUCTIONS, INC., a California corporation.

2.  The corporation has been completely wound up.

3.  The corporation's known debts and liabilities have been adequately provided for by their assumption by Thomas A. Cohen, 238 East Blithedale, Mill Valley, California 94942.

4.  The corporation's known assets have been distributed to the persons entitled thereto.

5.  The corporation is dissolved.

I further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of my own knowledge.

Date:    on December 11, 1984.

THOMAS A. COHEN

Post Office Box 5002
Mill Valley, California 94942
(415) 383 4866

/ **HAMMERMARK PRODUCTIONS**

# HAMMERMARK

April 8, 1987

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Per our discussion yesterday, this letter is to clarify the procedure for investing in RIVER WHY-KIWI PARTNERS. It is my understanding that you wish to purchase 1 Class B Unit for $50,000. This would make the Sierra Club a direct equity investor (as opposed to those leveraging their investment through Bank of New Zealand securities) in the motion picture, THE RIVER WHY. In order to complete the transaction you will need to fill out the enclosed Subscription Booklet where I have indicated, sign and date it, and return it to me with a check made out to "River Why-Kiwi Partners."

At your preference, the check may be held by me or Alan Freeland un-cashed until the balance of the financing is in place; or it can be deposited in the Bank of New Zealand in Los Angeles where it will earn interest at the rate of 6%. Your subscription plus accrued interest will be returned to you if the offering is not fully subscribed to by October 17, 1987 unless extended to December 31, 1987. As a subscriber to one $50,000 Class B Unit, you will receive 3.33% of all partnership receipts from the motion picture until you have recouped your $50,000. Thereafter you will receive 1.66% of those receipts. As a Class B Partner you will not be required to make further capital contributions.

No matter what happens to the movie, you would receive the following amounts as the seller of the rights. By our contract, a rights payment would be made to Sierra Club Books (1/3 on excercise, 2/3 on commencement of principal photography) in the approximate amount of $71,450 less the $5,000 already paid. The exact amount of the rights payment will depend on the final budget of the film. As additional consideration for the rights, you will receive 2.5% of the net profits.

Exhibit 6

The terms and conditions of subscribing are more fully described in the offering memorandum which I left with you. Exhibit A, the Limited Partnership Agreement, and particularly Article II Admission of Limited Partners, details the areas of concern to you.

I will send a copy of this letter, along with the offering materials, to Alan Freeland in the hopes that he can confirm the above. You may wish to employ him as your "purchaser representative" to further evaluate the offering. However, it would be a conflict of interest for me to appoint him on your behalf.

If you have any questions, please give me a call. In the meantime, thank you for your support. The backing of the Sierra Club is a very important factor in our plans, and I trust that you will be justly rewarded for your efforts.

Sincerely yours,

Thomas A. Cohen

enclosure

RIVER WHY-KIWI PARTNERS

SUBSCRIPTION BOOKLET
FOR MEMORANDUM NO. _____

Instructions to Subscribers
Subscription Agreement and Power of Attorney
Confidential Investor Suitability Statement
Purchaser Representative Disclosure Statement
Certificate for Partnership Investors
Certificate for Corporate Investors

THE MATERIALS CONTAINED IN THIS BOOKLET ARE NOT AN OFFER TO SELL OR A SOLICITATION OF OFFERS
TO BUY ANY SECURITIES OF RIVER WHY-KIWI PARTNERS.  OFFERS FOR SALE OF LIMITED PARTNERSHIP
UNITS MAY BE MADE ONLY THROUGH THE CONFIDENTIAL OFFERING MEMORANDUM.

INSTRUCTIONS TO SUBSCRIBERS

Persons wishing to subscribe for units of limited partnership interest ("Units") in River Why-Kiwi Partners (the "Partnership") are required to complete the documents in this Subscription Booklet and return them to the General Partner of the Partnership. Additional copies of the documents are included, for reference purposes, as exhibits to the Confidential Offering Memorandum dated February 1, 1987 ("Memorandum").

1. Subscription Agreement. Please complete the Subscription Agreement in the following manner.

(a) Insert the amount of your subscription on page 8 and complete all of the information requested. Be sure to indicate whether you are investing in Class A Units, Class B Units, or both.

(b) Complete the appropriate (individual, corporate, partnership or trust) signature line at the end of the Subscription Agreement.

2. Confidential Investor Suitability Statement. Please complete all of the information requested by the Confidential Investor Suitability Statement and sign and date that statement.

3. Purchaser Representative Disclosure Statement. If you are being advised by a purchaser representative (your lawyer, accountant or other purchaser representative) in connection with your investment, please sign in the space provided in the Purchaser Representative Disclosure Statement and arrange for that person to complete the remainder of the Purchaser Representative Disclosure Statement. If you do not have a purchaser representative, you should leave this document blank.

4. Payment. Please select ONE of the following methods of payment.

(a) Make your check in the amount of your investment ($50,000 per Unit, minimum of one Unit) payable to "River Why-Kiwi Partners." OR

(b) (Class A Partners only) Have your bank provide you with an irrevocable letter of credit in the amount of your investment ($50,000 minimum) in favor of "River Why-Kiwi Partners" in care of The Bank of New Zealand, Los Angeles. OR

(c) (Class A Partners only) If you wish to provide stock certificates or other readily realizable assets as collateral, please contact the General Partner for details.

5. Special Requirements for Partnerships, Corporate or Trust Investors. Partnership or corporate investors must also complete the appropriate attached certificates. Trust investors must attach a copy of their trust agreement (and any amendments to it) to their Subscription Agreement.

6. Additional Documents. If the subscriber is a resident of a state other than California, additional documents may be required and, if so, they must also be executed after being furnished.

7. Mailing Instructions. Please send this entire Subscription Booklet, any documents required to be attached and your payment to:

Thomas A. Cohen
Hammermark Productions
P.O. Box 5002
Mill Valley, CA 94942

1

SUBSCRIPTION AGREEMENT
FOR INVESTMENT IN
RIVER WHY-KIWI PARTNERS

THESE SECURITIES IN THE FORM OF UNITS OF LIMITED PARTNERSHIP INTEREST IN RIVER WHY-KIWI PARTNERS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. THE UNITS CANNOT BE SOLD, TRANSFERRED, ASSIGNED, OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THE AGREEMENT AND CERTIFICATE OF LIMITED PARTNERSHIP FOR THE PARTNERSHIP AND APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND WILL NOT BE TRANSFERRED OR RECORDED EXCEPT IN COMPLIANCE WITH THE PARTNERSHIP AGREEMENT AND THOSE LAWS.

1. PURPOSE. This Subscription Agreement is entered into by the undersigned for the purpose of investing in River Why-Kiwi Partners, a limited partnership to be formed ("Partnership"), by purchasing units of limited partnership interest in the Partnership ("Units"), as described in the Partnership's Confidential Offering Memorandum dated February 1, 1987, including the Exhibits to it ("Memorandum").

2. SUBSCRIPTION. The undersigned subscribes for and agrees to purchase, subject to acceptance by Thomas A. Cohen, the General Partner of the Partnership ("General Partner"), the number of Units that are indicated on page 8 below, at a price of $50,000 per Unit (minimum investment--one Unit) for the total subscription amount set forth on page 8 below; and agrees to become a limited partner in the Partnership ("Limited Partner") and be bound by all the terms and conditions of the Partnership's Agreement and Certificate of Limited Partnership in the form attached to the Memorandum as an Exhibit ("Partnership Agreement").

3. PAYMENT AND EFFECTIVENESS OF SUBSCRIPTION. An investor will subscribe for Units by delivery to the General Partner of a signed Subscription Agreement, a Confidential Investor Suitability Statement, a Purchaser Representative Disclosure Statement (if required) and his personal check, letter of credit, or other readily realizable asset to "River Why-Kiwi Partners" for the amount of the purchase price for the Units purchased.  Prior to acceptance by the General Partner of an investor's subscription, the undersigned investor will have the unilateral and unqualified right to have his signed Subscription Agreement and payment returned to him at anytime.
This subscription will become effective on acceptance by the General Partner and deposit of the investor's payment in an escrow account with The Bank of New Zealand. Acceptance will be made in writing by certified mail, effective two days after mailing. No check will be cashed until accepted by the General Partner.
The subscriber will be admitted to the Partnership as a Limited Partner after acceptance by the General Partner of subscriptions for at least 2 Units.  If at least 2 Units are not sold by October 17, 1987, the undersigned's cash payment will be returned to the undersigned, with interest, if any.  No interest will be paid on the amount of any check held by the General Partner pending acceptance or return.

4. REPRESENTATIONS BY SUBSCRIBER.  The undersigned represents and warrants as follows:

(a) He and his Purchaser Representative(s), if retained, have received and read the Memorandum setting forth information relating to the Partnership and the Partnership Agreement.

(b) He and his Purchaser Representative, if any, have had the opportunity to obtain additional information to verify the accuracy of the information contained in the Memorandum and to evaluate the merits and risks of this investment.

(c) He and his Purchaser Representative have had the opportunity to ask questions of and receive satisfactory answers from the General Partner concerning the terms and conditions of the offering and the information in the Memorandum and have relied on no other information in subscribing for Units.

(d) He represents and warrants that the information furnished by him to the Partnership in the Confidential Investor Suitability Statement submitted with this Subscription Agreement is true, complete and correct in all respects.

(e) He is advised that the Units are not registered under the Securities Act of 1933, as amended, and are not qualified under the securities laws of any State but are offered under non-public offering exemptions from such registration and qualification,     and that, in this regard, the Partnership, General Partner and the other subscribers in

2

the offering are relying on his representations in this Subscription Agreement and the related Confidential Investor Suitability Statement; he is further advised, however, that the General Partner reserves the right to apply for a permit from the California Department of Corporations or for qualification in any other State to sell the Units.

(f) He understands the following provision with respect to offers and sales of Units in California:

The sale of the securities which are the subject of this Subscription Agreement has not been qualified with the Commissioner of Corporations of the State of California and the issuance of those securities or the payment or receipt of any part of the consideration for those securities prior to that qualification is unlawful, unless that sale is exempt from qualification.  The rights of all parties to this Subscription Agreement are expressly conditioned on that qualification being obtained, or on the General Partner determining that this offering is exempt from those qualification requirements.

(g) He is advised that no federal or state agency has recommended or endorsed purchase of the Units or passed on the adequacy or accuracy of the information set forth in the Memorandum.

(h) By virtue of his preexisting personal or business relationship with the General Partner, or by reason of his business or financial experience or the business or financial experience of his professional advisor who is unaffiliated with and who is not compensated by the Partnership or any affiliate or selling agent of the Partnership, directly or indirectly, it can be reasonably assumed that he had the capacity to protect his own interests in connection with the transaction.

(i) He is advised that there will be no public market for the Units, that there will be restrictions on the transferability of the Units and that it is likely that he will not be able to liquidate his investment.

(j) He is acquiring the Units solely for his own account, for investment purposes only, and not with a view to the distribution or resale of them, and he has no present or contemplated intention, agreement, understanding or arrangement to sell, assign, transfer, subdivide, hypothecate, or otherwise dispose of all or any part of the Units.

(k) In relation to his income, net worth, or both he is able to bear the economic risks of an investment in the Partnership, including, but not limited to, the risk of the loss of part or all of his investment in the Partnership, and the probable inability to sell or transfer his Units in the Partnership for an indefinite period of time.

(l) He either:  (1) has a net worth of at least $150,000 (exclusive of home, furnishings and personal automobiles), or (2) has a net worth of at least $75,000 (exclusive of home, furnishings and personal automobiles) and has a taxable income for each of the two most recent taxable years, and expects to continue to have a taxable income, of at least $75,000.

(m) He has not duplicated or distributed the Memorandum to anyone other than his Purchaser Representative or other personal advisors.

(n) It has at no time been represented, guaranteed, or warranted to me by my broker, the General Partner, his agents and employees or any other person, expressly or implicitly that:

(i) I will or will not remain as owner of the Units an exact or approximate length of time prior to sale of any property to be owned by the Partnership or sale of my Units;

(ii) A percentage of profit or any amount or type of consideration or both will be realized as a result of this investment;

(iii) Past performance or partnership experience on the part of the General Partner or any other person, including, without limitation, their salesmen, associates, brokers, bankers, investment advisers, agents, directors, writers, actors or employees, in any way indicates the predictable results of the ownership of Units or of the overall Partnership business plan; or

(iv) Any specific tax benefits will accrue as a result of investment in the Partnership.

(o) I will notify the General Partner immediately of any material change in any statement made in this Subscription Agreement occurring prior to my receipt of the General Partner's acceptance of my subscription.

3

(p) If the undersigned is a partnership, joint venture corporation or trust, it was not organized or reorganized for the specific purpose of acquiring Units.

5.  ADOPTION OF PARTNERSHIP AGREEMENT.  The undersigned hereby adopts, accepts and agrees to be bound by all the terms and provisions of the Partnership Agreement, in the form set forth in an Exhibit to the Memorandum, and to perform all obligations under that Partnership Agreement imposed on a Limited Partner for the Units being purchased.  The undersigned will become a Limited Partner following acceptance of this subscription, in whole or in part, by the General Partner, on (i) payment of the subscription amount as provided in Section 2 above, (ii) satisfaction of the offering requirements under the Memorandum for the Units purchased, and (iii) the recording of the Partnership Agreement showing the undersigned as a Limited Partner.

6.  SPECIAL POWER OF ATTORNEY.

(a) By signing this Subscription Agreement the undersigned hereby appoints the General Partner, with full power of substitution, the undersigned's true and lawful attorney-in-fact, for the undersigned and in his name, place and stead, to execute, acknowledge, file and record: (i) the Partnership Agreement and any amendments to it in accordance with the Partnership Agreement; (ii) any separate certificates of limited partnership as well as amendments to any certificate which are required to be filed, or   which the General Partner deems it advisable to file; (iii) any trade name certificate or amendment to it or other instrument or document which may be required to be filed by the Partnership under the laws of any state or by any governmental agency, or which the General Partner deems it advisable to file; (iv) any instrument or document which may be required to effect the continuation of the Partnership, the admission of additional or substituted limited partners, or the dissolution and termination of the Partnership (provided that continuation, admission or dissolution and termination are in accordance with the terms of the Partnership Agreement), or to reflect any reduction in the contributions of any partner; and (v) powers of attorney on behalf of the Partnership.

(b) This power of attorney is a special power of attorney coupled with an interest, and will not be revoked, will survive the assignment, delivery, or transfer by the undersigned of all or part of his interest in the Partnership and, being coupled with an interest, will survive the death, disability or cessation of the existence as a legal entity of the undersigned; except that where a Limited Partner's assignee has been approved by said attorneys, as General Partner of the Partnership, for admission to the Partnership as a substituted Limited Partner, this power of attorney will survive the delivery of that assignment for the sole purpose of enabling those attorneys to execute, acknowledge and file any instrument to carry out that substitution.

(c) The existence of this power of attorney will not preclude execution of any instrument by the undersigned individually on any matter.  A person dealing with the Partnership may conclusively presume and rely on the fact that any instrument executed by the attorney-in-fact is authorized, regular and binding without further inquiry.

(d) The appointment of the General Partner as attorney-in-fact under this power of attorney automatically will terminate as to that person at the time it ceases to be a General Partner and from that time will be effective only as to the substituted General Partner designated or elected under the Partnership Agreement.

7.  LIMITATIONS ON TRANSFER.  The undersigned recognizes that:  (i) the Units have not been registered under the Securities Act of 1933, as amended, or qualified under the securities laws of any State and, accordingly, he must bear the economic risk of an investment in the Units for an indefinite period of time; (ii) neither this Subscription Agreement nor the Units may be assigned, pledged, encumbered or otherwise transferred by him without registration or qualification, unless exempt and unless, in the opinion of counsel of the Partnership, that transfer would be in compliance with all applicable federal and state securities laws; (iii) he is not and will not be entitled to make any transfers of the Units under the exemption afforded by Rule 144 under the Securities Act of 1933, as amended; and (iv) any certificate or other document evidencing his Units will bear a legend stating that the Units have not been registered or qualified under applicable securities laws and referring to the restrictions on transferability and sale of the Units described in this Section and that any transfer will also be subject to the restriction on transfer of the Partnership Agreement described in the Memorandum.

8.  ACCEPTANCE OF SUBSCRIPTION.  The General Partner has full discretion to accept or reject the subscription of the undersigned for all or any part of the subscribed Units. If all or any part of the undersigned's subscription is not accepted by the General Partner, the undersigned's personal check will be returned to the undersigned and a new personal check requested from the undersigned for the part of the subscription which is accepted.

9. SUCCESSORS AND ASSIGNS. The agreements and representations set forth in this Subscription Agreement will become effective and binding on the undersigned, his heirs, legal representatives, successors and assigns on the acceptance of this subscription by the General Partner in the space provided below.

10. SUBSCRIBER'S INDEMNITY. The undersigned agrees to indemnify and hold harmless the Partnership and the General Partner from and against all loss, damage, liability or expense, including reasonable attorneys' fees and costs which they may incur, arising out of any misrepresentation, breach of warranty, or failure to perform or fulfill any covenants or agreements of the undersigned contained in this Subscription Agreement or arising out of any resale or distribution of any Units by the undersigned in violation of the Securities Act of 1933, as amended, or any other applicable federal and State securities laws.

11. MISCELLANEOUS.

(a) All notices or other communications given or made under this Subscription Agreement will be in writing and will be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the respective parties at the addresses set forth in this Subscription Agreement. Each party may change its address by notice given under this Section.

(b) This Subscription Agreement will be construed under and governed by the laws of the State of California.

(c) Whenever the context requires, the use of the singular number will be deemed to include the plural and vice versa. Each gender will be deemed to include any other gender, and each will include corporation, partnership, trust or other legal entity whenever the context so requires.

(d) This Agreement constitutes the entire agreement between the parties for the subject matter of it and may be amended only by a writing executed by all parties.

IN WITNESS OF THIS SUBSCRIPTION AGREEMENT, subject to acceptance by the General Partner, the undersigned has completed this Subscription Agreement and related power of attorney to evidence his subscription to River Why-Kiwi Partners and its execution, by this counterpart, of the Partnership Agreement.

Date:_____ , 198___

No. of Class A Units subscribed for:_____

No. of Class B Units subscribed for:_____

Cash payment  $_____ ($_____ per Unit)  OR

Irrevocable Letter of Credit (for Class A Units only)  $_____ ($_____ per Unit)  OR

Readily Realizable Assets (for Class A Units only) valued at $_____ ($_____ per Unit)

in the form of _____.

5

Units to be registered as follows:  (please print)

Name(s):_____          Co-owners to hold as:

_____          Joint Tenants _____

Residence: _____          Tenants in common_____

_____          Community Property_____

_____

Telephone: _____

Mailing address (if different from residence address):

_____

_____

_____

Social Security or Employer I.D. Number: _____

Driver's License:_____ (State and Number)

State in which Subscriber is registered to vote:_____

State of Domicile or Principal Place of Business (if different from residence address):

_____

    IN CALIFORNIA, IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFORE, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES.

Dated:_____, 19_____

(SIGNATURE LINE FOR INDIVIDUAL INVESTORS AND TRUSTEES)

_____
Signature

_____
Signature

6

(SIGNATURE LINE FOR CORPORATE INVESTORS)

_____
(Name of Corporation)

By: _____
Authorized Officer

_____
(Print Name of Authorized Officer)


(SIGNATURE LINE FOR PARTNERSHIP INVESTORS)

_____
(Name of Partnership)

By: _____
Authorized Partner

_____
(Print Name of Authorized Partner)


<u>Acceptance</u>

The foregoing subscription is hereby accepted to the extent of _____ Class A Units and/or

_____ Class B Units

(a  $_____ capital contribution).

Date:_____, 198___


RIVER WHY-KIWI PARTNERS
c/o Thomas A. Cohen
P.O. Box 5002
Mill Valley, CA 94942


By: Thomas A. Cohen, General Partner


By: _____

7

SUITABILITY STATEMENT
FOR INVESTMENT IN
RIVER WHY-KIWI PARTNERS

Purchasers of units of limited partnership interest (""Units") in River Why-Kiwi Partners (""Partnership") must meet certain requirements in order for the Partnership to comply with exemptions from registration under federal and State securities laws. Before any sale of Units is made to you, the General Partner must be reasonably satisfied that:

1. You have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of an investment in the Partnership, and

2. You are able to bear the high economic risks of the investment, which necessarily include the ability to sustain a total loss of your investment.

You are requested to submit the information requested by this Statement in connection with the Partnership's consideration of selling Units to you.

By signing this Statement, you also confirm your understanding that the General Partner will be relying on the accuracy and completeness of your responses to establish the Partnership's legal right to sell these securities to you without registration under federal and State securities laws. Your answers will at all times be kept strictly confidential; however, you agree by signing this Statement that the General Partner may present this Statement to any parties as he deems appropriate if called upon to establish the legality of your participation in the offering.

If there is any change in the information you provide in this Statement before the closing of the offering, please contact the General Partner immediately.

Please answer or initial all questions which are applicable to you. Corporate, trust and partnership investors should answer only the appropriate questions.

1. Name:_____ Age:_____

Social Security or Taxpayer Identification Number:_____ Marital Status:_____

I intend to register the investment in the following name(s): _____

2. Residence Address: _____

I have lived in the State of_____ continuously for the past _____years.

3. Business Address: _____

4. Telephone No.: Residence: (_____) _____ Business: (_____) _____

5. Current Employment and Position Held: _____ How Long? _____

6. Principal Occupation or Business for Last Five Years: _____

7. Educational Background (include any professional or busi ness education, and any degrees received): _____

_____

8. Please describe any other substantial experience you have had in business, accounting and financial matters: __

_____

_____

9. Financial Condition:

    (a) Income:

        (i) My personal income (check one space in each column; do not include your spouse's income) is:

| | Two Years Ago | Last Year | Current Year ( Expected ) |
|---|---|---|---|
| Under $50,000 | _____ | _____ | _____ |
| $50,001-$75,000 | _____ | _____ | _____ |
| $75,001-$100,000 | _____ | _____ | _____ |
| $100,001-$200,000 | _____ | _____ | _____ |
| Over $200,000 | _____ | _____ | _____ |

        (ii) My spouse's income (check one space in each column) is:

| | Two Years Ago | Last Year | Current Year ( Expected ) |
|---|---|---|---|
| Under $50,000 | _____ | _____ / | _____ |
| $50,001-$75,000 | _____ | _____ | _____ |
| $75,001-$100,000 | _____ | _____ | _____ |
| $100,001-$200,000 | _____ | _____ | _____ |
| Over $200,000 | _____ | _____ | _____ |

    (b) Net Worth:

(i) My net worth (excess of total assets over total liabilities) at fair market value (exclusive of equity in home, furnishings and personal automobiles) is (check applicable bracket):

_____ Less than $125,000

_____ $125,000 - $150,000

_____ $150,001 - $200,000

_____ $200,001 - $250,000

_____ $250,001 - $300,000

_____ $300,001 - $400,000

_____ $400,001 - $500,000

_____ $500,001 - $750,000

_____ $750,001 - $1,000,000

_____ Over $1,000,000

✓(ii) The amount of my net worth as shown above  which is in liquid assets (cash, marketable securities or assets readily convertible to cash) is (check  applicable bracket):

_____ Less than $125,000

_____ $125,000 - $150,000

_____ $150,001 - $200,000

_____ $200,001 - $250,000

_____ $250,001 - $300,000

_____ $300,001 - $400,000

_____ $400,001 - $500,000

_____ $500,001 - $750,000

_____ $750,001 - $1,000,000

_____ Over $1,000,000

(iii)  The fair market value of my home is $ _____, subject to mortgage(s) or other

encumbrance(s) of $_____. My equity in my automobile and home furnishings aggregates

approximately $ _____ .

✓10. _____(Please initial if correct). Considering the foregoing, and all other factors in my financial and personal circumstances (including, but not limited to, health problems, unusual family responsibilities and requirements for current income), I believe that I am able to bear the economic risk of an investment in the Units, including a loss of my entire investment, and I have no need in the foreseeable future for liquidity in an investment in the Partnership.

✓11. Initial either of the following which applies to you (you must check either (a) or (b)):

(a) _____I have sufficient knowledge and experence in financial, business and tax matters to be capable of evaluating the merits and risks of an investment in the Partnership.

(b) _____(Please initial  if correct)  I  intend to employ one or more Purchaser Representatives to assist me in evaluating the risks and merits of an investment in the Partnership and I, together with that Purchaser Representative(s), have sufficient knowledge and experience in financial, business and tax matters to be capable of evaluating the merits and risks of an investment in the Partnership.

Name of Purchaser Representative: _____

Address: _____

Occupation:_____

Telephone No.: ( _____ ) _____

Note: Your Purchaser Representative(s) must fill out a Purchaser Representative Disclosure Statement addressed to the General Partner, which you must also sign.

10

12.  Describe any business or personal relationship you have with Thomas A. Cohen or Hammermark Productions: please include the name of the individual(s) with whom you have such a relationship, the length of time you have known him (them), and any business or investment transactions which you have entered into with him (them).

13. In the space below, please describe your prior investment experience. The following information should be provided, if available: (a) Name of Venture.  (b) Activity of Venture (e.g., real estate, oil and gas, film etc.). c) Form of Venture (e.g., corporation, limited or general partnership or joint venture).  (d) Amount Invested. (e) Nature of Offering (e.g., private offering or public (registered) offering).  (f)  Whether or not you retained a Purchaser Representative to assist you in evaluating the investment:

_____

_____

_____

_____

_____

I certify that all of the foregoing information and answers which I have provided are true, correct and complete to the best of my knowledge as of the date of this Statement.

EXECUTION OF THIS DOCUMENT DOES NOT INDICATE ANY INTENT TO PURCHASE ANY UNITS OR NOTES OFFERED.  THANK YOU FOR YOUR HELP.

Date:_____, 198_____

(SIGNATURE LINE FOR INDIVIDUAL INVESTORS AND TRUSTEES)

_____
Signature

(SIGNATURE LINE FOR CORPORATE INVESTORS)

_____
(Name of Corporation)

By:_____
Authorized Officer

_____
(Print Name of Authorized Officer)

(SIGNATURE LINE FOR PARTNERSHIP INVESTORS)

_____
(Name of Partnership)

By:_____
Authorized Partner

_____
(Print Name of Authorized Partner)

11

PURCHASER REPRESENTATIVE DISCLOSURE STATEMENT

For: RIVER WHY-KIWI PARTNERS

Name of Purchaser Being Represented: _____

      The purchaser named above has asked me to act as a Purchaser Representative to assist the purchaser in evaluating an investment in the Partnership as described in the Confidential Offering Memorandum dated February 1, 1987 (""Memorandum"). I understand that the purchaser and I (and any other Purchaser Representatives retained by the purchaser) together must possess the knowledge and experience to be capable of evaluating the risks and merits associated with an investment in the Partnership.

      I provide the following information and make the following representations with the intent that they may be relied upon by the Partnership and its General Partner (Thomas A. Cohen) in determining my suitability to act as Purchaser Representative for the purchaser named above in evaluating an investment in the Partnership.

1.  Name, address, and occupation of Purchaser Representative:

_____

_____

2.  I have, either myself or together with my client, sufficient knowledge and experience in financial, business and tax matters to be capable of evaluating the merits and risks of an investment in the Partnership and making an informed investment decision with respect to that investment _____ . (Initial)

3. Current employment and position held: _____How long? _____

4.  Educational Background:_____

_____ Degree(s)?_____

5.  Areas and nature of experience (e.g., legal matters, tax matters, financial or business consultant, etc.): _____

_____

6.  Do you now have, have you had within the past two years or are you contemplating in the future any material relationships (including, without limitation, as a broker-dealer) between yourself (or your affiliates) and the Partnership or its General Partner? _____.

7.  Are you an affiliate, director, officer or other employee of, or beneficial owner of one percent or more of the equity interests in, the Partnership or any affiliate of the Partnership? _____
(For this purpose, an ""affiliate" of a person or entity is an individual, partnership, corporation or other entity that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such person or entity.)

8.  If the answer to Question 6 or 7 is yes, please describe the relationship, with whom it exists or existed and the amount of money received within the past two years from any of the persons or entities described in Questions 6 and 7 as a result of those relationships: _____

_____          _____

Name    (Please Print)                        Signature of Purchaser Representative

_____          _____

Street Address                           City and State   Zip Code

12

NOTE: A copy of this Disclosure Statement must be given to the purchaser whom you represent and the purchaser must execute the following Acknowledgement. This Disclosure Statement and Acknowledgement must be completed, signed and returned with the purchaser's subscription documents prior to the purchaser's purchase of any of the Partnership's securities.

## ACKNOWLEDGEMENT BY PURCHASER

I hereby represent and acknowledge that I have received and read a copy of the foregoing Purchaser Representative Disclosure Statement. Notwithstanding any of the disclosures contained in it, I designate _____ as my Purchaser Representative for purposes of evaluating the merits and risks of an investment in the Partnership referred to above. I understand and acknowledge that execution of this Acknowledgement does not indicate any intent to purchase any of the securities offered in the Memorandum.

Dated:_____ , 19_____

                  (SIGNATURE LINE FOR INDIVIDUAL
                  INVESTORS AND TRUSTEES)

                _____

                          Signature

                (SIGNATURE LINE FOR CORPORATE INVESTORS)

                _____

                     (Name of Corporation)

                By:_____

                     Authorized Officer

                _____

                (Print Name of Authorized Officer)

                (SIGNATURE LINE FOR PARTNERSHIP INVESTORS)

                _____

                     (Name of Partnership)

                By:_____

                     Authorized Partner

                _____

                (Print Name of Authorized Partner)

**PRODUCTIONS**

# HAMMERMARK

April 14, 1987

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Further to our phone conversation yesterday, this is to ask that
you invest $15,000 in RIVER WHY-KIWI PARTNERS. I arrived at this
figure based on your need to avoid risk and my need to deal in
round numbers.

Based on the current budget of $1,429,000 the total rights
payments to Sierra Club Books would be $71,450. As I understand
it, your share of that would amount to $14,290. I rounded that
figure up to $15,000 because that would make your ownership share
one percent (1%) of the total offering. This will put you at risk
for $710, however I'd be willing to personally guarantee a
donation to the Sierra Club for this amount if you haven't
recouped it in two years.

If this meets with your approval, please fill out the subscription
booklet previously delivered and mail it back to me with a check
to RIVER WHY-KIWI PARTNERS for $15,000.

Thanks for your support.

Sincerely yours,

Thomas A. Cohen

Exhibit 7



April 16, 1987

Tom Cohen
HAMMERMARK PRODUCTIONS
Post Office Box 5002
Mill Valley, CA  94942

Dear Tom:

Thanks for your letter of April 14.  I'm tempted by the investment, but because of its unusual nature, I need to check it with folks here.  I might give Allan Freeland a call, too.

In haste,

                                    Sincerely,


                                    Jon Beckmann
                                    Publisher


JB/bf

Exhibit 8



# HAMMERMARK

May 7, 1987

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

This will confirm our conversation yesterday in which you agreed to extend the option on the motion picture rights to "The River Why" under the following terms and conditions:

1. The terms and conditions of our original agreement for those rights executed by you on October 17, 1984 remain unchanged.

2. At my option, the term of the agreement may be extended for an additional twelve months beginning October 17, 1987.

3. In consideration of the extension on the option period (per 2 above), Hammermark Productions shall pay $2,000, which sum shall be credited against the final purchase price.

If this is your understanding of the agreement, kindly indicate your approval by signing and returning the enclosed duplicate original of this letter for my file.

HAMMERMARK PRODUCTIONS

By _____
    Its President


Accepted and Agreed this ___14___ day
of ___May___, 1987

_____
For Sierra Club Books


Exhibit 9

## RIVER WHY PARTNERS
### P.O. Box 5002 • Mill Valley, CA • 94942
### (415) 383-4866

August 29, 1987

Jon Beckman
730 Polk St
San Francisco, CA 94109

Dear Jon:

I am pleased to enclose the Prospectus and Investment Guide for
River Why Partners, the limited partnership being formed to
finance the motion picture, "The River Why."

I have included the entire Market Opportunities Assessment in the
Prospectus. It was prepared by the author of Off Hollywood, who
could arguably be called the country's leading expert on "American
Independent" films. His market study accurately summarizes current
trends in the film industry, and points to the numerous
opportunities available to exploit "The River Why." I highly
recommend that you read it.

The rest of the Prospectus contains a variety of information which
should be of value in evaluating River Why Partners as an
investment. But like any such document, it does contain its share
of caveats and legal boiler plate. My financial adviser once told
me that a Prospectus is like the warning label on a bottle of
medicine--it tells you everything that can go wrong, but very
little about the benefits. Consequently, I expect that you may
have some questions after reviewing it.

You will note that all investments are put into an escrow account
at Wells Fargo Bank until the 1.5 million is raised. Money cannot
be released from the escrow account without approval of the
California Department of Corporations. Consequently, I hope you
will feel comfortable investing $10,000 to $15,000 with the
knowledge that you will get it back as a rights payment shortly
after the offering closes or, failing that, your investment will
be returned with interest. As we discussed previously, your
investment in this project is important for psychological as well
as financial reasons. We feel we will be able to attract more
investors based on the fact that Sierra Club Books has money in
it.

As I told Danny Moses the other day, we are launching a $25,000
advertising and direct mail campaign to raise the funds. Bantam
Books has promised a discount coupon to allow direct mail
recipients to purchase "The River Why."

I look forward to having you join us in this venture.
Sincerely yours,

Thomas A. Cohen
Producer/director

Exhibits 10 Subscription Agreement is last page of Prospectus.
Please fill out + return with check.

RIVER WHY PARTNERS
P.O. Box 5002 • Mill Valley
(415) 383-4865

September 10, 1987

Thomas Cohen
RIVER WHY PARTNERS
P.O. Box 5002
Mill Valley, CA 94942

Dear Tom:

Thanks for your letter and the prospectus. In spirit, I am with you. Practically, because of the unusual nature of the deal, I'll have to talk to other folks here, before asking accounting to draw up a check. I'm up to my ears in 1989 calendar selections and preparation for the Frankfurt Book Fair, so I must beg for a little time to do what I need to here before committing.

Sincerely,

Jon Beckmann
Publisher

JB/bf

Exhibit 11

# Sierra Club Books ᴥ

730 Polk Street
San Francisco, California 94109
(415) 776-2211
Telex: 182652 MICROLINK LSA

September 25, 1987

Tom Cohen
HAMMERMARK PRODUCTIONS
Post Office Box 82
Mill Valley, CA  94942

Dear Tom:

I'm about to leave for Europe and the Frankfurt Book Fair, and
will be back in the office on October 19.  I've done a little
thinking about the River Why project, and am leaning toward
investing $10,000 on the terms you indicate.  Our concern, as you
know, focuses on not losing the money rather than on any profit,
and a few questions have arisen.  One is what happens in the
unlikely event that you disappear or die before the movie is
made?  It's been suggested that we make short term life insurance
coverage for our investment part of the arrangement.  Another
concern was that if the $1,500,000 was not raised, an attempt
might be made to make the movie for less, putting at risk part of
our investment, but, more importantly, leading to a film that was
insufficiently funded.  Lastly, where would the money reside
while the rest of the fund raising took place--in an escrow
account?  I'd certainly feel more comfortable making a pledge
based on the raising of some sum of money than actually turning
over cash at this early stage.

As you see, we want to be helpful, but I'm afraid we are more
than a little like the reluctant bride.

Sincerely,

Jon Beckmann
Publisher

JB/bf

*Sent to PO Box 5092*
*10-12-87*
*BY*

# Exhibit 12



Post Office Box 5002
Mill Valley, California 94942
(415) 383 4866



October 14, 1987

Mr. Jon Beckmann
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Enclosed please find my check for $2,500 to extend the option on THE RIVER WHY for an additional year as per our prior agreement.

In response to your letter of September 25, 1987 (which I received October 13), the following comments may ease your concerns in regard to investing.

In the event I die or disappear during filming, our production insurance would cover the loss. This is mentioned in the Prospectus on page 12 (Insurance and Completion) in reference to cast insurance. The standard policy, which we will carry, would insure against injury or incapacity to not only the principal cast, but also the producer and director.

Because this is a public limited partnership offering there are several conditions to meet before funds can be expended. One is that we must raise aggregate capital contributions of $1,500,000 in order to have funds released from our escrow account at Wells Fargo Bank. The funds you choose to invest must be made payable to "Wells Fargo Bank, Escrow Agent for River Why Partners." The bank will not release those funds to me until authorized to do so by the State of California, consequently there is no risk that this partnership can proceed with insufficient funds.

Finally, any investment made is placed in an interest bearing escrow account at Wells Fargo. If the $1,500,000 cannot be raised within the time limits set forth in the Prospectus, your money will be returned to you with interest. Your only risk as regards being an early investor is that you could possibly have invested your money at a higher rate of return in some alternative investment vehicle.

Exhibit 13

On the other hand, your early cash investment is of enormous importance to us--not only for its monetary value, but for its psychological importance. Just as publishers are reluctant to publish first time novelists, investors are reluctant to be the first to put money into a project. And while, at this point, you would not be the first to invest in River Why Partners, your relatively early committment will have a positive influence on the many potential investors who are standing on the sidelines.

I would be happy to discuss these or any other details with you, but urge you in the strongest possible manner to make an investment soon. Thanks for your continued support.

Sincerely yours,

Thomas A. Cohen

## RIVER WHY PARTNERS
P.O. BOX 5002 • MILL VALLEY, CA • 94942
(415) 383-4866

October 12, 1988

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Enclosed is my check number 5897 for $13,547.65 for the exercise
of the purchase of motion picture and allied rights to THE RIVER
WHY. Pursuant to our contract dated October 17, 1984, this
represents the balance of the one third of the funds due.

My calculations are based on a proposed budget for the movie,
exclusive of rights payments, of $1,234,093. Per our agreement,
five percent of that figure is $61,704.65, and one third of that
is $20,547.65. Since previous option payments totaling $7,000 are
to be credited against that amount, the enclosed check brings the
total payment to that required by the contract. The remaining two
thirds will be paid on commencement of photography, which I hope
will be next Summer.

Please note that it is still possible that I may try to mount the
film for under $500,000 in which case the total rights payment is
to be $12,500. I expressly reserve the right to receive a refund
from you of $8,047.65 in that event.

I look forward to seeing you at the movies.

Sincerely yours,

Thomas A. Cohen
General Partner

# Exhibit 14

**88 25 0700**

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549



FORM 10-Q

QUARTERLY REPORT UNDER THE SECURITIES EXCHANGE ACT OF 1934

FOR THE QUARTER ENDED                    COMMISSION FILE NUMBER

SEPTEMBER 30, 1988                       33-19204-LA

RIVER WHY PARTNERS
(Exact name of registrant as specified in its charter)

California                               68-0138532
(State or other jurisdiction             (I.R.S. Employer
of incorporation or organization)        Identification No.)

238 E. Blithedale, Mill Valley, CA       94941
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code (415) 383-4866

Indicate by check mark whether the registrant (1) has filed all
reports required to be filed under the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period
that the registrant was required to file such reports), and (2)
has been subject to such filing requirements for the past 90 days.

Yes   X                    No



NOV 4 1988

Lennel Information Services
Gaithersburg, Maryland

Exhibit 15

RIVER WHY PARTNERS

INDEX

PAGE NUMBER

Part I--Financial Information

Balance Sheets                                      3

Statement of Operations                             4

Statement of Changes in Financial Position          5

Statement of Partners' Capital                      6

Notes to Financial Statements                       7

Managements Discussion                              8

Part II--Other Information                          9

Signatures                                         10

RIVER WHY PARTNERS

BALANCE SHEETS

|  | Quarter Ended<br>September 30, 1988<br>(Unaudited) | Year Ended<br>December 31,<br>1987 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash (Note 6) | $43,406 | $3,001 |
| Prepaid Expenses | $2,800 | $4,470 |
| TOTAL CURRENT ASSETS | $46,206 | $7,471 |
| MOTION PICTURE COSTS (Notes 1 and 6) | $56,825 | $36,768 |
| ORGANIZATION COSTS (Notes 1 and 6) | $44,499 | $21,966 |
| TOTAL ASSETS | $147,530 | $66,205 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES:** | | |
| PAYABLE TO GENERAL PARTNER (Note 6) | $104,124 | $63,204 |
| COMMITMENTS (Note 6) | - - | - - |
| **PARTNERS' CAPITAL** | | |
| Limited Partners (Note 3) | $43,406 | $3,001 |
| General Partner (Note 4) | - - | - - |
| TOTAL PARTNERS' CAPITAL | $43,406 | $3,001 |
| TOTAL LIABILITIES AND PARTNERS' CAPITAL | $147,530 | $66,205 |

The Notes to Financial Statements are an integral part of these statements.

RIVER WHY PARTNERS

STATEMENTS OF OPERATIONS

|  | Three Months Ended September 30, 1988 (Unaudited) | Three Months Ended September 30, 1987 (Unaudited) |
|---|---|---|
| REVENUE: | | |
| Interest (Note 6) | $406 | 0 |
| EXPENSES (Note 6) | - - | - - |
| NET INCOME | $406 | 0 |

The Notes to Financial Statements are an integral part of these statements

4

RIVER WHY PARTNERS

STATEMENT OF CHANGES IN FINANCIAL POSITION

| | Three Months Ended September 30, 1988 (Unaudited) | Five Months Ended December 31, 1987 (Unaudited) |
|---|---|---|
| **SOURCES OF CASH:** | | |
| Operations: | | |
| Net income | $324 | $1 |
| Increase in payable to General Partner | $30,265 | $63,204 |
| Capital Contributions | $40,000 | $3,000 |
| Total sources of cash | $70,589 | $66,205 |
| **USES OF CASH:** | | |
| Motion picture costs | $19,297 | $36,768 |
| Organization costs | $12,638 | $21,966 |
| Prepaid expenses | ($1,670) | $4,470 |
| Total uses of cash | $30,265 | $63,204 |
| INCREASE IN CASH | $40,324 | $3,001 |
| CASH, BEGINNING OF PERIOD | $3,082 | $0 |
| CASH, END OF PERIOD | $43,406 | $3,001 |

The Notes to Financial Statements are an integral part of these statements

5

RIVER WHY PARTNERS

.

STATEMENTS OF PARTNERS' CAPITAL
For the Periods Ended September 30, 1988 and December 31, 1987

|  | General Partner | Limited Partners | Total Partners' Capital |
|---|---|---|---|
| Capital contributions | - - | $3,000 | $3,000 |
| Net Income | - - | $1 | $1 |
| Partners' Capital December 31, 1987 | - - | $3,001 | $3,001 |
| Capital Contributions | - - | $43,000 | $43,000 |
| Net Income | - - | $406 | $406 |
| Partners' Capital September 30, 1988 | - - | $43,406 | $43,406 |

The Notes to Financial Statements are an integral part of these statements

## RIVER WHY PARTNERS
## NOTES TO FINANCIAL STATEMENTS

### 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

Basis of accounting -

The accompanying financial statements of the Partnership are prepared on the accrual method of accounting. As a syndication, the Partnership is required to prepare its tax returns on the accrual basis.

Income taxes -

No provision is made for income taxes since a partnership is not a taxable entity; individual partners report their allocable shares of partnership taxable income or loss.

Motion picture costs -

Motion picture costs are stated at the lower of cost or net realizable value. Depreciation will be computed using the individual-film-forecast-computation method, beginning when the picture is released and revenue is recognized.

Organization Costs -

Organization costs are capitalized and will be amortized over five years beginning when the minimum of 1500 Units is subscribed.

### 2.    OPERATIONS OF THE PARTNERSHIP:

River Why Partners (the "Partnership") is a limited partnership organized under the laws of the State of California for the purpose of financing the production of the motion picture entitled "The River Why." The General Partner is Thomas A. Cohen. The Partnership's fiscal year end will be December 31.

### 3.    LIMITED PARTNERS:

The initial limited partners are three individual investors who were admitted pursuant to the California Public Offering dated July 15, 1987.

### 4.    GENERAL PARTNER:

The General Partner will contribute 1% of the total capital contributions made to the Partnership by the Limited Partners. See Note 6 for related party agreements and transactions.

### 5.    ALLOCATION OF PROFITS AND LOSSES:

Net profits and losses of the Partnership will be allocated as follows:

(a) Income/Losses

Income/Losses will be allocated one percent to the General Partner and 99% to the Limited Partners. Notwithstanding that allocation, after all Partners have received Distributions equal to their Invested Capital and after all deferments have been paid, Income/losses will be allocated 25% to the General Partner and 75% to the Limited Partners. Income/Losses and each item of income, gain, loss and deduction will be allocated among the Limited Partners in the proportion that the capital contributed by each Limited Partner bears the aggregate capital contributions.

(b) Distributions of Cash:

Distributable Cash Flow will be distributed at the following times and in the following priority: Distributable Cash Flow will first be distributed to Partners and persons entitled to first position deferments until the Partners have received distributions equal to their Invested Capital. Distributable Cash Flow next will be distributed to third parties entitled to profit participation. Thereafter, distributions will be made only to Partners and Lenders.

### 6.    COMMITMENTS AND RELATED PARTY AGREEMENTS:

In the event the Budgetary Minimum condition of availability of $1,500,000 is fulfilled, the Partnership will be liable for the following:

(a) Organizational and Offering Expenses, to be reimbursed to the General Partner at commencement and as additional Limited Partners are admitted, in connection with the initial organization of the Partnership and the offering of Units thereof, but not in an amount in excess of 5% of the total Limited Partner Capital Contributions.

(b) Commissions of up to 7.5% of the purchase price of Units sold, payable to participating broker-dealers and finders as allowed by law. The Partnership may also pay broker-dealers a portion of their due diligence costs and other expenses incurred in connection with this offering, provided the total of such reimbursements does not exceed 0.5% of Limited Partner Capital Contributions. Such reimbursements are defined as Organizational and Offering Expenses and are consequently subject to the 5% limitation set forth in (a) above.

(c) Out-of-pocket motion picture and screenplay costs, to be reimbursed to the General Partner, at his cost, on commencement of photography.

(d) Fees to the General Partner for services -

(1) The General Partner will receive a $25,000 fee for co-writing the screenplay.

(2) The General Partner will receive $100,000 in fees for his services to the motion picture as director and producer.

(e) General Partner loan commitment -

In the event that net proceeds of this offering are inadequate to complete the motion picture, the General Partner will loan or guarantee to arrange for the loan of cash and/or facilities and equipment up to the value of $150,000. Any cash loans will carry an interest rate of prime plus two percent per annum. The loan commitment will become null and void if the Partnership elects to purchase a third party completion bond.

(f) Additional General Partner Investment -

In the event that net proceeds of this offering are less than $1,429,003 due to higher than expected commissions or organizational expenses, the General Partner will purchase sufficient Units to insure that $1,429,003 is available for production financing.

The General Partner may, but is not obligated to, purchase the entire offering of Units. In the event that Budgetary Minimum condition of availability of $1,500,000 is not fulfilled , all funds received will be returned to the investors, with interest, and the General Partner will absorb all costs incurred. For the periods ended September 30, 1988 and December 31, 1987, the General Partner has incurred organizational and offering expenses amounting to $22,533 and $21,966 respectively, and motion picture costs amounting to $20,057 and $11,768, respectively, for which he may or may not receive reimbursement, depending upon whether the Budgetary Minimum condition of availability of $1,500,000 is fulfilled. These amounts and the $25,000 co-writing fee to the General Partner have been accrued on the accompanying financial statements.

MANAGEMENTS DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS

The financial condition of River Why Partners remains
substantially the same as was reported in the registration
statement filed with the SEC and made effective on July 15, 1988.
Operations are focused, almost entirely, on securing the budgetary
minimum requirements of the Offering either from new limited
partners or motion picture industry sources. The only income was
from interest on Limited Partners subscriptions held in the Wells
Fargo Bank escrow account.

The General Partner, Thomas A. Cohen, has continued to advance
funds for the organization and offering of the Partnership. These
costs consist primarily of legal, accounting, and printing
expenses. Selling agreements with two Broker/dealers, each with 11
registered representatives, will be signed in October 1988. The
expectation is that an increased sales force will result in a
successful closing of the offering before July 1989.

In July and August a production manager, Don Zavin, was hired to
begin identifying key crew members, scout locations, arrange for
equipment, and finalize a budget and shooting schedule. Lack of
anticipated financing caused his work to end in mid August, but
much of it will be applicable when the production plans to gear up
again in late Spring 1989.

A payment of $13,547.65 to Sierra Club Books and David Duncan was
accrued in anticipation of exercise, before October 17, 1988, of
the motion picture rights to the novel The River Why. When this
payment is made, Thomas A. Cohen will own outright (subject to
future fees payable on commencement of photography) the rights to
the book. These rights will be transferred to River Why Partners
on close of escrow.

There are no unfavorable events or trends which would have impact
on the sales or expenses of the company or on the profits. There
are no artificial events operating within the mix of sales and
profits which would confuse those studying financial reports.
There are no matters known to the Partnership that would have an
impact on future operations. There are no subsidiaries of the
company which would have any impact on the transference of capital
from one entity to the other, and there are no foreign entities
which are associated with this Partnership, therefore there is no
impact in either instance.

Except as otherwise noted in this report and except as noted on
the financial statements here attached, there has been no other
material changes in the financial condition of the registrant.

8

## PART II-OTHER INFORMATION

Item 1. LEGAL PROCEEDINGS
Not Applicable

Item 2. CHANGES IN SECURITIES
Not Applicable

Item 3. DEFAULTS UPON SENIOR SECURITIES
Not Applicable.

Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
Not Applicable

Item 5. OTHER INFORMATION
Not Applicable

Item 6. EXHIBITS AND REPORTS ON FORM 8-K
    (a)   Exhibits
          None

    (b)   Report on Form 8-K
          No reports on Form 8-K were filed during the quarter for
          which this report is filed.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

RIVER WHY PARTNERS, A California Limited Partnership

Thomas A. Cohen, General Partner

10/28/88

Date

PARTNERS

October 27, 1988

Mr. Thomas A. Cohen
Hammermark Productions
P.O. Box 5002
Mill Valley, CA   94942

Dear Tom:

After returning from three weeks on the road, I have found
your check and letter with respect to The River Why. You have
met the terms of the contract, and we all hope that the movie will
be an award-winner, despite the author's apprehensions. We look
forward to learning more about the shooting schedule, casting,
etc.

I have no questions about the arithmetic, but I don't see
anything in our agreement that relates to a refund.  In any case,
we wish you well with the production, and hope that it will be
a smashing success.

Sincerely,

Jon Beckmann
Publisher

JB:dgm

Thomas A. Cohen
General Partner

Exhibit 16

# HellerEhrman LLP

June 30, 2008

*Via e-mail*
*Via post*

<div align="right">

Annette L. Hurst
Annette.Hurst@hellerehrman.com
Direct +1 (415) 772-6840
Direct Fax +1 (415) 772-1790
Main +1 (415) 772-6000
Fax +1 (415) 772-6268

</div>

Lizbeth Hasse
Creative Industry Law Group, LLC
526 Columbus Avenue, 2d Floor
San Francisco, CA 94133

Thomas A. Cohen
Law Offices of Thomas A. Cohen
639 Front Street, 4th Floor
San Francisco, CA 94111

**Re:    *Duncan v. Cohen et al.*, No. 3:08-cv-02243-BZ (N.D. Cal.)**

Dear Lizbeth and Tom:

As you know, we represent David James Duncan in connection with the above-referenced matter.  As you also know, Mr. Duncan has provided Mr. Cohen with several oral and written notices that the "Letter Agreement" concerning the film rights to *The River Why* is of no further force and effect, including my initial conversation with Mr. Cohen in March 2006.

Although Mr. Duncan believes that it is likely a fruitless act (*see* Civ. Code § 1691(b)), in connection with all theories of rescission applicable in the above-captioned lawsuit, he hereby makes express his tender to Mr. Cohen of restoration of the entire purchase price paid in connection with the purported exercise of the option to the film rights in *The River Why*.

The recent revelation that the option was exercised by an entity which did not own it at the time of exercise (and never later came to own it) is a new and independent ground for rescission under Civil Code Section 1689.  That new ground has been asserted in the ongoing lawsuit as a basis for denial of Mr. Cohen's motions to dismiss and to strike, and Mr. Duncan hereby further formally asserts it pursuant to Civil Code Section 1691.

Upon Mr. Cohen's written acceptance of rescission, Mr. Duncan will immediately pay the sum of $13,547.65, the amount paid to exercise the option.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Annette L. Hurst

---

Heller Ehrman LLP    333 Bush Street    San Francisco, CA  94104-2878    www.hellerehrman.com

Beijing  Hong Kong  London  Los Angeles  Madison, WI  New York  San Diego  San Francisco  Seattle/Anchorage  Shanghai  Silicon Valley  Singapore  Washington, D.C.



Exhibit 17

*MICHAEL SNELL LITERARY AGENCY*_____

Box 655 • Truro, Massachusetts 02666
(508) 349-3718

October 1, 1993

Thomas A. Cohen
555 California Street
Suite 2950
San Francisco, CA
94104-1605

Dear Mr. Cohen:

I am writing to inform you that David James Duncan has appointed
me his sole and exclusive agent with respect to his novel
THE RIVER WHY, including all subsidiary rights.

According to the documents in my possession, you have failed to
meet your obligations under terms of the agreement pertaining
to the film rights for THE RIVER WHY and the rights should
properly revert to the author and Sierra Club Books.

Please do not move forward with the project in any direction
until this matter has been resolved.

Sincerely,

Michael Snell, President

MS/ps

Copies: David James Duncan
         Jon Beckman, Sierra Club Books

Exhibit 18



PELOTON PRODUCTIONS

## THE RIVER WHY

### WHO'S WHO


Photo Courtesy of Dan Callaghan

**David James Duncan** (author) is the author of the novel The Brothers K, which was developed by Imagine for director Ron Howard; and My Story As Told By Water, a 2001 finalist for the National Book Award.

**William Hurt** (actor) has expressed interest in playing the role of "H2O", the father of Gus. He won an Academy Award for his role in **Kiss of the Spider Woman** and has been nominated three other times (**A History of Violence**, **Broadcast News**, and **Children of a Lesser God**).

**Matthew Leutwyler** (director) has directed four features films including the romantic comedy, **This Space Between Us.** After forming the production company Ambush Entertainment with Miranda Bailey, Francey Grace, and **The River Why** producer Jun Tan, he directed the award winning comedy-horror-musical **Dead & Breakfast**. Ambush was one of the production companies on **The Squid & The Whale**, (Academy Award® nomination for best screenplay) starring Jeff Daniels and Laura LInney. Ambush also produced the comedy **The Oh In Ohio** starring Parker Posey and Danny DeVito, **Wonderful World** starring Matthew Broderick, **Against the Current** starring Joseph Fiennes and Leutwyler's latest film, **Unearthed**, which premiered at the 2007 Tribeca Film Festival.

Vertical Frontier | The River Why | Big Bill Tilden | Order

COMPANY | FILM | VIDEO | SERVICES | CONTACT | ORDER

Collaboration. Creativity. Don't take "no" for an answer. Be fair. Feed the crew™.

Exhibit 19

# HellerEhrman LLP

April 3, 2007

Annette L. Hurst
Annette.Hurst@hellerehrman.com
Direct +1.415.772.6840
Direct Fax +1.415.772.1790
Main +1.415.772.6000
Fax +1.415.772.6268

43039.0001

*Via Federal Express*

Kristi Denton-Cohen
Peloton Productions
38 Miller Avenue, #488
Mill Valley, CA 94942

Thomas Cohen, Esq.
639 Front Street, 4th Floor
San Francisco, CA 94111

**Re:**    *The River Why*

Dear Mr. and Ms. Cohen:

As you will recall, I represent David James Duncan, author of the book *The River Why* (as well as other publications). We understand that Ms. Denton-Cohen appeared recently at the Outdoor Retailers Convention in Salt Lake City where she represented to others that she was continuing to engage in efforts to produce a film based upon *The River Why*. It also appears that Peloton Productions is extensively advertising its efforts to produce this film on its website, including statements concerning actors with whom it purportedly has agreements for starring roles.

Mr. Duncan hereby demands that Peloton Productions or any other party claiming to be a successor-in-interest to Hammermark Productions, Inc. ("Hammermark") cease and desist all or any activity with respect to the preparation of derivative works of the novel *The River Why* as such conduct is in violation of the United States Copyright Act. Mr. Duncan further demands that Peloton, and any or all other persons claiming to be successors to Hammermark, confirm in writing that they no longer make any claim to any ownership, license, or other form of interest in any right associated with *The River Why*.

I am available at your convenience to discuss these matters, but Mr. Duncan expects a response in writing to this correspondence no later than April 16, 2007, or he is prepared to initiate litigation to achieve the ends described above.

The factual and legal grounds for these demands are set out below. This letter is not intended to inflame; rather, I have set forth what I believe is a fair statement of the facts and

## Exhibit 20

**HellerEhrman**LLP

have set aside those issues that may cause a great deal of controversy, emotional or otherwise. What is left in my view would be more than enough to justify a grant of summary judgment. I therefore hope that we can avoid litigation and come to a quick and amicable resolution of this matter.

As you know, Mr. Cohen executed an agreement on October 2, 1984 on behalf of Hammermark with Andrea Nachtigall, a literary agent, concerning the film and television rights to *The River Why*. Putting aside for now any issues of authorization, that agreement granted to Hammermark an option on specified terms to acquire certain rights.

In particular, the negotiated price for the rights was to be paid in two installments: one-third on exercise of the option, and two-thirds on "commencement of photography." 10/2/84 Letter ¶6. The consideration for the rights also included a promise of a future running royalty. *Id.* ¶7. The option was to expire twelve months from execution by Sierra Club—on October 16, 1986. That period could be extended for an additional six months (to April 16, 1987) if a screenplay were written during the specified period and an extension payment tendered.

In 1985, when Mr. Cohen tendered a screenplay, the relationship with Mr. Duncan began to deteriorate over artistic differences. Hammermark did not exercise the option by the deadline of April 16, 1987. Instead, on May 7, 1987, *after* the eighteen-month period of the option had expired, Hammermark (via Mr. Cohen) and Sierra Club executed a letter agreement purporting to grant a further twelve-month extension of time in exchange for a further $2000 payment.

That further option was set to expire on May 6, 1988. On October 14, 1987, Mr. Cohen sent a letter to Jon Beckman reciting that a check for $2,500 was enclosed "to extend the option on THE RIVER WHY for an additional year as per our prior agreement." 10/14/87 Ltr ¶1. Mr. Duncan has no written record of such purported "prior agreement."

"River Why Partners" then purported to exercise the option in a letter dated October 12, 1988 from Mr. Cohen to Jon Beckman at Sierra Club. We have no record of any written assignment from Hammermark to River Why Partners or any other document that would authorize that entity to exercise the option. Still, at the time that October 12, 1988 letter was written (and more than four years since the initial option grant had already passed), Mr. Cohen stated that "[t]he remaining two thirds [of the price] will be paid on commencement of photography, which I hope will be next Summer." Mr. Duncan has his doubts concerning the accuracy and veracity of other matters addressed in that letter, but we will put those aside for purposes of this correspondence.

As we all know, principal photography on the film never commenced, and a film has not been distributed. Accordingly, Mr. Duncan has never been paid the remainder of the

HellerEhrman LLP

Kristi Denton-Cohen
Thomas Cohen, Esq.
April 3, 2007
Page 3

required consideration for the rights—either based upon the October 1988 projected budget or in the form of the running royalty.  From time to time during the late 1980s and early 1990s, other potential opportunities to make a film based on *The River Why* presented themselves, but Mr. Duncan was never able to pursue anything because of the cloud on title created when Mr. Cohen continued to assert rights to third parties and refused to relinquish control of them.  Then, in 2005, Ms. Denton-Cohen informed Mr. Duncan that she was engaged anew in the preparation of a screenplay based on the book, and intended to resume production activity with respect to the film.  Mr. Duncan immediately objected.

Under California law, the 10/2/84 Letter Agreement carried with it a variety of unexpressed legal obligations and restrictions.  Those include, without limitation, the covenant of good faith and fair dealing implied in every agreement under California law, the obligation of an exclusive licensee to exercise best efforts in exploiting the licensed subject matter, the requirement for good and valid consideration to support a contract, and, perhaps most pertinent to our current discussions, the limitation of California Civil Code Section 1657, which provides as follows:  "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."

As you know, the 10/2/84 Agreement did not specify a deadline for the commencement of photography (and payment of the remaining two-thirds of the price).  Under Section 1657, without such a deadline, the time period within which performance was required is a "reasonable" one.  We have no doubt that more than twenty-two years since the initial option grant and nearly twenty years since its purported exercise is more than a "reasonable" period of time within which to commence photography—particularly, though without limitation, when measured against Mr. Cohen's stated expectation in the fall of 1987 that photography would commence by the following summer.

Indeed, under these circumstances I believe summary judgment of the question of a reasonable time is likely to be granted—particularly when one considers that Mr. Duncan has been injured in the interim by having to turn away other suitors, and that the fact he has ultimately been paid so little of even the now-ancient and agreed-upon consideration has resulted in a plainly oppressive circumstance.  To seek such a judgment, Mr. Duncan is prepared to bring a copyright infringement and declaratory relief lawsuit.  If it becomes necessary, we are confident that experts are available who will attest to the unreasonableness of the period of time that has elapsed for commencement of photography.  It is difficult to imagine anyone with any credibility and relevant experience being willing to state the contrary.  Indeed, we do not understand how you would oppose such a motion at all—and would be gratified to be educated with respect to any arguments or evidence you believe could be presented to establish that the time has in fact been "reasonable."

HellerEhrman LLP

Thus, to the extent considered necessary and not already accomplished by notice, operation of law or otherwise, Mr. Duncan hereby terminates in its entirety the October 2, 1984 Agreement and all exhibits, amendments, extensions and any and all other terms associated therewith. Mr. Duncan of course views the Agreement as having been improperly "extended," and subsequently terminated on numerous occasions. Still, as the purpose of these types of letters is to reserve all rights to one's position, Mr. Duncan is hereby doing so. Finally, in that vein, please allow me to reiterate that this letter does not encompass every argument that Mr. Duncan might choose to make concerning this matter, and there are numerous other points of contention concerning authority, expiration of the option, invalid assignments and so forth.

We understand that this venture started out of a profound respect for *The River Why*, and Mr. Duncan thanks you for your admiration of his work. We sincerely hope the time has come when you are able to let go of *The River Why*. The alternative will be a costly legal proceeding for all concerned, but one we are confident will be successful for Mr. Duncan. We hope litigation can be avoided, and look forward to your agreement for a prompt and amicable resolution of this matter.

Sincerely yours,

Annette L. Hurst

SF 1344085 v2

Lizbeth Hasse (#104517)
Creative Industry Law Group
526 Columbus Ave., 2nd floor
San Francisco, CA 94133
(415) 433-4380

Thomas A. Cohen (#154581)
Law Offices of Thomas A. Cohen
639 Front St., 4th floor
San Francisco, CA 94111
(415) 777-1997

Attorneys for Defendants
Thomas A. Cohen dba Hammermark Productions
Kristi Denton Cohen dba Peloton Productions

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID JAMES DUNCAN,

      Plaintiff,

  vs.

THOMAS A. COHEN et al,

      Defendants

Case No.:  CV 08 2243 BZ

DECLARATION OF THOMAS A. COHEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

Date: July 2, 2008-Unless Expedited by Order
Time:  10:00 a.m.
Courtroom: G

I, Thomas A. Cohen, declare:

1.  I am one of the attorneys of record for myself and Kristi Denton Cohen d/b/a Peloton Productions ("Cohen Defendants") in the above-captioned action.

Cohen Declaration re Motion to Dismiss —page 1

2.  This declaration is submitted in support of the application by Cohen Defendants for a motion to dismiss David James Duncan's complaint under FRCP 12(b)(6) and Calif. Code Civ. P. § 425.16.

The Publishing Agreement and Motion Picture Rights Agreement

3.  I am informed and believe that in November 1981, Mr. Duncan entered into a Publishing Agreement with Sierra Club Books for his novel, The River Why.   Attached as Exhibit A is the copy of the Publishing Agreement provided to me by Mike Snell, Mr. Duncan's agent.  In a cover letter transmitting the Publishing Agreement, Mr. Snell indicated that the handwritten markups and redactions were not in the original.

4.  Paragraph 1 of the Publishing Agreement states: "The Author agrees to deliver . . . [The River Why] . . . and hereby grants and assigns to Publisher the sole and exclusive right to publish the work . . ..  The Author also grants to the Publisher such further rights as are specified hereinafter."   Among the further rights are those enumerated in paragraph 5(I)(1)—including "Motion picture and/or dramatic."   Paragraph 7 states that if Duncan has not appointed an agent [which in 1984 he had not] Sierra Club Books had the right to act as his exclusive agent for disposition of subsidiary rights, which included motion picture rights. Sierra Club Books paid Duncan a $3,000 advance.

5.  I worked in production for KQED TV from 1970 to 1977, and thereafter produced and directed two independent feature films.  Shortly after publication of The River Why in 1983, I met with Sierra Club Books and Duncan to discuss acquisition of the movie rights.  Although interested, Sierra Club Books told me that they wanted to shop the novel in Hollywood before offering the rights to me.  Having no success in Hollywood, SCB and Duncan reopened discussions with me.  I initially proposed that Mr. Duncan write the screenplay.  Mr. Duncan

was interested, and began the screenwriting process, but ultimately decided not to pursue it.

6. I had not attended law school at that point in my career. I entered into negotiations with Sierra Club Books for the movie rights representing my wholly owned corporation, Hammermark Productions, Inc. Sierra Club Books was represented by an outside expert, Andrea Nachtigall. Ms. Nachtigall, the daughter of the Chairman Emeritus of The William Morris Agency, was a lawyer with motion picture experience who owned her own agency.

7. In October 1984, Sierra Club Books and Hammermark Productions, Inc. entered into a Rights Agreement consisting of a two page letter and a four page addendum entitled "Exhibit A." A true and correct copy of the Rights Agreement is attached to the Complaint as Exhibit 1. The Rights Agreement provided for a series of option payments and an exercise price based on the size of the movie's budget. Exhibit A of the Rights Agreement specifically provides that Hammermark had the right "for the purpose of advertising and exploiting the rights granted . . . the right to use . . . the Work's author's name, portrait, picture or likeness and biographical data." A typewritten addition to Exhibit A <u>requires</u> that the film credit read: "Based on the book by David James Duncan."

<u>Option Payments and Screenplay</u>

8. I paid Sierra Club Books $1,250 on execution of the Rights Agreement. On April 12, 1985, I paid an additional $1,250 and notified SCB that a screenplay had been written and that <u>The Paper Chase</u> author John Osborn would begin a rewrite "next week." Attached as Exhibit B is a true and correct copy of the contents (no letterhead; no signature) of my April 12, 1985 letter. Those events extended the first option period to April 17, 1986. Paragraph 3 of the Rights Agreement did not require that a screenplay be tendered to Duncan. It only required that it "be written before the [first 12 month] option period expires."

9. The Rights Agreement provides that either party may freely assign their rights. On or about August 15, 1985, Hammermark Productions, Inc. officially dissolved as a California corporation, and assigned all its rights to *The River Why* and five other titles to me. The assignment is recorded at the Copyright Office—Document Number V3479D245. The subsequent January 1, 2004 assignment from Cohen to Peloton Productions was also recorded at the Copyright Office—Document Number V3553 DE985 P1. True and correct copies of records of those assignments from the Copyright Office website are attached as Exhibit D.

10. In the fall of 1985, I sent a draft of the script I wrote with John Osborn to Duncan, who "detested" it. Industry professionals were not so dismissive: the script was a finalist for the highly competitive Sundance Institute's summer filmmaker's lab, and Mr. Osborn's agent at the powerful Creative Artists Agency agreed to represent it. There were no takers, and I continued to develop the project as an independent film.

11. On April 9, 1986, I wrote Sierra Club Books, extending the option for 18 months and enclosing my check number 5099 for $2,500. Attached as Exhibit C is a true and correct copy of the contents of that letter (no letterhead; no signature). The handwriting at the bottom of Exhibit C is mine, and was written on or about April 9, 1986. In the months that followed, I explored various financing options and continued to develop the script and assemble talent for the film. Realizing that more time would be needed to raise money, I contacted Sierra Club Books and negotiated a one year extension of the option upon payment of $2,000 before October 17, 1987. That payment was made on October 14, 1987.

The Prospectus and the Exercise of the Option

12. The prospectus for River Why Partners, drafted by outside counsel, shows that I went to great lengths to plan the production and develop a good faith budget for the movie. A true

and correct copy of relevant excerpts of the prospectus is attached as Exhibit E.  The entire

prospectus is more than 50 pages long and is available for inspection on request.  The budget

for the film was highly detailed.  The prospectus contains an explicit budget summary and

refers prospective investors to a 429 line item budget available on request from me (the general

partner).  In addition to identifying me as the producer/director (this would be my third feature

film in that capacity), the prospectus disclosed an experienced executive producer, production

manager, editor, Oscar nominated director of photography and several actors who had

expressed interest in participating in the film—including Timothy Bottoms and Edward

Hermann.  The prospectus for River Why Partners provides that the rights would be transferred

from me to the Limited Partnership on commencement of photography.  As a public offering,

River Why Partners was registered with the SEC and approved by the securities regulators of

several states including California.

    13.  As a public offering, any qualified member of the public was free to invest, and

many people did.  While I offered Sierra Club Books an opportunity to invest, SCB never

communicated a final decision to me about investing, and never put money into the film.

    14.  As the option deadline approached, I was optimistic that I would be able to raise the

necessary financing.  This optimism was based, in part, on meetings I had with Oregon

government officials who expressed interest in financing a substantial part of the budget.

Oregon had successfully invested in the film *Stand by Me*, and was interested in supporting a

movie which would, among other things, showcase the state's beautiful rivers.   The state sent

the offering materials to its Los Angeles investment advisor for review.  That review was still

pending in October 1988 when I, not River Why Partners, exercised the option and paid the

portion of the purchase price owed under the Rights Agreement--$13,547.65.  Attached as

Exhibit F is a true and correct copy of the October 12, 1988 transmittal letter and check.  The

exercise of the option was by personal check (#5897) drawn on my individual account.   The

letter states that I hope photography would commence in the summer of 1989.   Sierra Club

Books responded with a letter confirming that "you have met the terms of the contract."

Complaint, Ex. 13.

15.  Between 1984 and 1988, I sent five different checks to Sierra Club Books totaling

$20,547.65.  It am informed and believe that Mr. Duncan accepted his share of those payments

from Sierra Club Books on all five occasions.

16.  I married Kristi Denton (Cohen) on July 25, 1987.  The rights to <u>The River Why</u>

were purchased with separate, not community property, and were never held jointly or in my

wife's name until 2004.

<u>The 1990's</u>

17.  Sometime after I exercised the option, Oregon decided not to invest, and the public

offering was terminated.   On October 1, 1993, Mr. Duncan's agent, Mike Snell, wrote to me

stating that the rights "should properly revert to the author and Sierra Club Books."  Complaint,

Ex. 14.  On December 23, 1993, Mike Snell wrote another letter to me stating that a number of

serious filmmakers had approached him about the film rights, "but I have only been able to say

someone holds an option to the work.  Perhaps I should put these people in touch with you?"

Attached as Exhibit G is a true and correct copy of Mr. Snell's letter.  Over the years since

then, Mr. Snell has referred filmmakers to me with the understanding that I owned the rights.

In the mid-1990's, I optioned the movie rights to a third party producer on two separate

occasions.  Based on phone conversations I had with Mr. Snell, I know that both he and Mr.

Duncan were well aware of these transactions. That producer was unable to develop or finance a film, and the options lapsed.

The 2000's

18. In 2004, my wife, Kristi Denton Cohen d/b/a Peloton Productions ,decided to tackle *The River Why*. Having recently completed her acclaimed feature documentary, *Vertical Frontier,* narrated by Tom Brokaw and executive produced by Sierra Club Productions, she began her development of *The River Why* by writing to Mr. Duncan and offering to include him in the process. The effort proved fruitless, and culminated in a November 10, 2005 letter from Mr. Duncan stating: "I would much rather spend the rest of my life fighting you—no matter how ugly or endless the legal mire—than to ever have to watch your version of my novel appear on a movie screen." Attached as Exhibit H is a true and correct copy of Mr. Duncan's November 10, 2005 letter.

The Stipulated Judgment in San Francisco Superior Court

19. In April 2007, Mr. Duncan's attorney, Annette Hurst, wrote a letter to my wife and me demanding that we cease and desist efforts to make the film, and threatening legal action if we did not. When efforts at settlement proved fruitless, Peloton filed a declaratory relief action against Sierra Club seeking court validation of the Rights Agreement.

I declare under penalty of perjury of the laws of the United States that the foregoing is true except as to those matters alleged on information and belief.

Dated: May 16, 2008

_/s/  Thomas A. Cohen_____
                Thomas A. Cohen

# Exhibit A

Exhibit A



## PUBLISHING AGREEMENT

THIS AGREEMENT is made this 10 day of NOVEMBER, 1981 between DAVID JAMES DUNCAN (the "Author") a citizen of U.S.A. , whose Social Security number is REDACTED and the Sierra Club, a California non-profit corporation (hereinafter called Publisher) relating to a work tentatively titled: THE RIVER WHY

(hereinafter referred to as the "Work") in which it is mutually agreed between the Author and the Publisher as follows:

1. **GRANT OF RIGHTS.** The Author agrees to deliver two copies of the completed manuscript of the finished work and all relevant material mentioned in paragraph 9 hereunder to the Publisher by JANUARY 1, 1982 and hereby grants and assigns to the Publisher the sole and exclusive right to publish the work in volume form in the English language throughout the world.

The Author also grants to the Publisher such further rights as are specified hereinafter. The phrase "in volume form" shall be defined as meaning publication of the work as a whole, or substantially complete, as a unit or at one time.

2. **AGREEMENT TO PUBLISH.** The Publisher agrees to publish the work in volume form at its own expense, in style and price as it deems best,

but shall not be responsible for delays caused by strikes, lockouts, fires, or other circumstances beyond its control. In no event shall the Publisher be obligated to publish a work which in its opinion violates the common law or statutory copyright or the right of privacy or any other rights of any person or contains libelous or obscene matter.

3. **COPYRIGHT.** The Publisher agrees to obtain copyright in the name of DAVID JAMES DUNCAN

either under the United States Copyright Law and the Universal Copyright Convention, or under the International Copyright Union; and the Author, or the Publisher on the Author's behalf and at its option, shall take out renewals whenever they fall due. Both parties agree to execute, at any time, all such papers and documents as may be necessary in order to protect, assign, renew or otherwise effectuate the rights herein, whether granted to the Publisher or reserved by the Author.

4. ADVANCES. The Publisher shall pay to the Author or his duly authorized representative as an advance against royalties or other sums payable by Publisher to Author in accordance with this Agreement the following amounts:

    a) Upon execution of this Agreement $ 2000

    b) Upon receipt by Publisher of ____ % of an acceptable manuscript of the Work $_____

    c) Upon receipt by Publisher of an acceptable completed manuscript $ 1000

    d) Upon completion of printing and binding of the Work $_____

If the Author fails to deliver an acceptable completed manuscript on or before JAN. 1, 1982 or within an additional three (3) month grace period, Publisher shall have the right to terminate this Agreement and Author agrees to repay to Publisher all advances paid to the Author in connection with the Work. Author shall not have the right to have the Work published elsewhere until this Agreement has been terminated and all advances repaid to Publisher.

5. ROYALTIES. The Publisher will pay Author the following royalties on all copies sold less returns:



    A) Trade edition: 10% of retail price on 1st 10,000 copies sold
12½% on next 5000 copies sold
15% on all copies sold thereafter

with the following exceptions:

    B) Special discounts: On copies sold at a discount of 50% or more of our retail price, one-half (½) of the stipulated trade royalty.

    C) Export (including Canada): one-half (½) of the stipulated trade royalty.

    D) Sale of overstock: 10% of the amount received, but no royalty shall be paid on copies sold at or below cost.

    E) Other editions:

      1) Softcover edition by Publisher: 7½% on all copies sold

      2) Textbook or low cost hardcover edition by publisher: 5% of the retail price.

      3) Hardcover or softcover edition (licensed to another publisher): proceeds to be divided equally.

      4) Small quantity reprint: on copies sold from a reprinting of 3,000 or less copies made two years or more after first publication, this provision being made for the purpose of keeping the work in print and in circulation as long as possible: one half the trade edition royalties.

-2-



F) Direct sales (to individual retail customers by mail, newspaper, magazine, television, radio, or other means): one-half (½) of the stipulated trade royalty.

7 G) Book club: proceeds to be divided equally.

H) Gratis copies (review, publicity, and author's): No royalty.

I) Subsidiary rights: proceeds from the sale of subsidiary rights shall be divided as follows:

|  |  | To Author | To Publisher |
|---|---|---|---|
| (1) | Motion picture and/or dramatic | 80 % | 20 % |
| (2) | Radio and/or television | 80 % | 20 % |
| (3) | Commercial uses and adaptations for commercial uses including but not limited to exploitation for novelty items and novelty syndication | 75 % | 25 % |
| (4) | Publication of parts of the work, or of the complete work or substantially complete or condensed in two or more installments, in magazines or newspapers before publication in volume form O.K. | 80 % | 20 % |
| (5) | Publication in English by British or other foreign publishers | 75 % | 25 % |
| (6) | Publication in foreign languages by other publishers | 75 % | 25 % |
| (7) | Reproduction or storage for reproduction of the text and/or illustrations, or any part thereof in audio and/or visual form; audiovisual teaching material including film strips and motion pictures for educational purposes | 50% | 50% |
| (8) | Reprinting of the work or any part or adaptation thereof, after publication in volume form, in anthologies, magazines, newspapers or other publications | 50% | 50% |
| (9) | Publisher may at its own discretion, permit reproduction of the work, without charge, in braille or other forms for use by the physically handicapped | NONE | NONE |

J) The maximum payment to be made to Author in any one calendar year, all of the foregoing not to the contrary, shall not exceed $          and if Author shall be entitled to any amount in excess of $          in any one year, whether due under this Agreement or other agreements now or hereafter entered into between Author and Publisher.

-3-

6. PAYMENT. Publisher shall render statements to Author semi-annually on or before January 31 and July 31 of each year for the preceding six-months periods ending September 30 and March 31, and at the same time shall make payments of all sums due thereon after deducting all advances and expenses chargeable to him, all earnings as calculated herein and accrued to the account of the Author; provided, however, that annual rather than semi-annual payments may be made if semi-annual payments would amount to less than fifty dollars ($50). The Publisher may, for the first 12 months following publication, set up a reserve of fifteen percent of the earnings due the Author to provide for returns. Author or Author's representative may inspect Publisher's records relating to Author's account at the mutual convenience of the parties.

7. AGENT. All payments hereunder shall be made to Author's agent unless Publisher is advised to the contrary in writing. Any payment to the agent shall have the same effect as if paid directly to Author. The agent is hereby authorized to act in reference to all matters arising out of this Agreement. Publisher at its own discretion shall have the exclusive right to dispose of the rights to reprint the work or any part or adaptation thereof, after publication in volume form, in anthologies, magazines, newspapers or other publications. The agent shall have the exclusive right to dispose of all other subsidiary rights; however, if Publisher is entitled to any share of the proceeds, such disposition shall be subject to Publisher's approval. If Author has not appointed an agent, it is agreed as follows: Publisher shall have the right to act as Author's exclusive agent for the disposition of all other subsidiary rights in which Publisher is entitled to shares of the proceeds; and either party, subject to the approval of the other, shall have the right to dispose of first periodical rights (publication of parts of the work, or of the complete work or substantially complete or condensed in two or more installments, in magazines or newspapers before publication in volume form), it being understood that Publisher shall be entitled to 10% of the proceeds if Publisher negotiates the sale and none of the proceeds if Author negotiates the sale.

8. AUTHOR'S WARRANTY. The Author warrants that he is the sole author or proprietor of the work and that he has full power and right to enter this Agreement; that the Work is original and has not heretofore been published; that the Work is not defamatory, obscene, or violative of any statutory or common law copyright, or of any other personal or property right. The Author shall indemnify the Publisher and hold it harmless from all costs, expenses (including attorneys' fees), losses, liabilities, damages, and settlements arising out of or in connection with any claim or suit based upon allegations which if true, would constitute a breach of these warranties. These warranties and indemnifications shall be deemed to include any liability incurred by the Publisher as a result of the sale or license of any subsidiary rights, and shall survive in the event this Agreement is terminated. The Publisher shall not be obligated to publish the Work if, in its sole opinion, the Work, if published, would result in a breach of any of the foregoing warranties.

-4-

9. **MANUSCRIPT.** The Author agrees to deliver two complete and legible typewritten, double-spaced copies of the Work to the Publisher, retaining a third copy for Author's own files. If the Author does not deliver two copies or if the copies are illegible or unusable, Publisher may have copies made or retyped with the costs of duplication or typing to be charged against the Author's royalties. The Author further agrees to supply as part of the Work all maps, paintings, photographs, drawings, and charts in reproducible form necessary to its completion and publication, and at his own expense to obtain permission, if necessary, for their use in the Work and, upon request, to supply an index if needed. If not so provided by the Author, the Publisher shall supply such maps, drawings, charts and index and shall obtain such permission, charging the Author's account for the expense involved. The Work shall consist of approximately ▒▒,▒▒▒ words.

If copyrighted material from other sources is included in the Work, the Author shall, at his own expense, secure in writing from the copyright owners or their legal representatives necessary permission to reprint such material in the Work and in all subsequent editions, including reprints and bookclub editions, and shall provide written documentation thereof to the Publisher at the time of delivery of the manuscript.

The Publisher shall not be liable for any loss resulting from a destruction or other loss of the copies, including any art work, transparencies and similar material delivered to the Publisher, unless the Publisher has failed to carry appropriate insurance therefor, if the same is available and has been requested in writing by the Author and at Author's expense.

10. **EDITING.** The Publisher may have the manuscript edited to conform to a style of punctuation, spelling, capitalization and usage as it deems appropriate. In no event shall Publisher be obligated to publish a Work which in its sole opinion, may subject it to any claims from any third party.

Author agrees to read, revise if necessary, correct and return promptly all proofs of the Work. If revisions in the proofs are made at Author's request, other than to correct printer's or editor's errors or additions, after type has been set in conformity with the copy edited manuscript, the cost of such revisions in excess of 10% of the original cost of composition shall be charged to Author and deducted from the income payable to him hereunder. Upon request of Author, an itemized statement of the charges and costs of such revisions shall be submitted by Publisher. Author or his representative may, during normal business hours and upon prior arrangement, inspect Publisher's books and records relating to such charges.

11. **REVISION.** The Author agrees to revise the Work if the Publisher considers that a revision is necessary. The manuscript of the revised Work shall be delivered in final form by the Author to the Publisher within a reasonable time after the request by the Publisher. Should the Author be unable or unwilling to decide upon revisions or to make them, then the Publisher may arrange for the revision and charge the cost thereof against payments due then or thereafter to the Author and may display in the revised Work, and in the advertising, the name of the person, or persons, who revised the Work. If revisions require resetting of more than 50% of the Work, and if the royalty rate provided in Paragraph 5(A) is on a rising scale, the rate on the new edition shall begin at the original rate provided for the first edition.

-5-

12. PROMOTION. The Publisher shall have the sole and exclusive right to use parts of the Work, including but not limited to photographic prints and quotations, for promotional purposes and to sell the same in the form of posters, film shorts, slides, or other similar form. To the extent that the Publisher uses the monies derived from the exercise of its rights under this paragraph for promotion of the Work, the money shall be received by the Publisher without accounting to the Author; otherwise the receipts will be divided as with subsidiary rights in Paragraph 5(I).

13. AUTHOR'S COPIES. The Publisher shall give the Author ten (10) copies of the Work free and shall supply the Author with a reasonable number of further copies for personal use, but not for sale or resale, at a discount of forty percent (40%) from the retail price of the trade edition.

14. OUT-OF-PRINT PROVISION. (a) If the Work should be out of print for six months or more in all editions, the Publisher may offer its plates, if any, to the Author at fifty percent (50%) of their cost of manufacturing and composition, and any remaining bound copies or sheets at their manufacturing cost. The Work will be considered in print if it is on sale under the Publisher's imprint or under the licensed imprint of another publisher, or if it is under option or contract for publication in another edition.

(b) If at any time after two years from the original date of publication hereunder the Work is out of print as above defined and the Author makes written demand on the Publisher to reissue the Work, the Publisher will have six months after such written demand to reprint the Work or to contract for its reissue within a reasonable time. Upon the Publisher's failure to cause reissue of the Work, and upon payment to the Publisher of any sums owing from the Author, excluding any unearned advance paid hereunder, this Agreement will terminate and all rights herein granted will revert to the Author, subject, however, to any licenses or options previously granted by either party, and to the continuing payment to the Publisher of its share of the proceeds from any such licenses or options.

15. BANKRUPTCY AND INSOLVENCY. If a petition in bankruptcy is filed by or against the Publisher, or if it is adjudged insolvent by any court, or if a Trustee or a Receiver of any property of the Publisher is appointed in any suit or proceeding by or against the Publisher, or if the Publisher makes an assignment for the benefit of creditors or takes the benefit of any Bankruptcy or Insolvency Act, or if the Publisher liquidates its business for any cause whatsoever, this Agreement shall terminate automatically without notice, and the termination shall be effective as of the date of the filing of such petition, adjudication, appointment, assignment or declaration or commencement or reorganization or liquidation proceedings. All rights granted hereunder shall thereupon revert to the Author. As a condition of the making of this Agreement the Author hereby acquires the right, upon termination, to purchase the plates, remaining copies and sheets as provided in Paragraph 16 hereof. In the event that the Author does not give notice of his intention to purchase such properties within thirty (30) days after the Author has had notice of the happening of the event herein referred to, the Publisher, Trustee, Receiver, Assignee or other such official, may melt the plates and sell the copies or sheets remaining on hand subject only to payment to the

—6—

Author of the royalties herein provided.  In the event the Author
desires to purchase the books and sheets aforesaid, and the
Trustee, Receiver or other said named official deems the price
fixed at fifty (50%) percent of the manufacturing costs or the
metal value to be below the fair market value thereof, then such
value shall be determined by arbitration conducted pursuant to
commercial arbitration rules of the American Arbitration Association
then applicable.

16.  DISPOSAL OF REMAINDERS AND PLATES.  If the Publisher
has remainders or other finished stock on hand which, in its
judgment, cannot be sold on the usual terms and within a reasonable
time, the Publisher shall sell such copies at the best price it
can secure and the royalty to be paid shall be calculated as in
Paragraph 5(D).  When in the judgment of the Publisher, public
demand for the Work is no longer sufficient to warrant its
continued manufacture or sale, the Publisher may discontinue
further manufacture and shall offer the Author the plates and
sheets, if any, on the following terms f.o.b. point of shipment:
the plates at their value for old metal, the engravings at one-
half their original cost, the sheet stock at the cost of gathering
and folding.  Unless the Author shall within thirty (30) days
accept such offer and pay the full amount due calculated as
above, the Publisher may dispose of the plates, sheets and other
property, without further liability for royalties or otherwise.

17.  COMPETITIVE MATERIAL.  The Author agrees that,
while this agreement is in force, he will not, without the
written permission of the Publisher, publish or permit to be
published in book or pamphlet form, or dispose of any subsidiary
rights in, any material controlled by the Author that is based on
the work or is of such a nature as to impede or reduce its sale.

18.  PRIOR PUBLICATION ELSEWHERE.  If the Author
retains the right to first serialization of the work, he shall
notify the Publisher promptly of any such arrangement for publication,
in order that the Publisher, when it publishes the work, may be
in a position to comply fully with all requirements under the
United States Copyright Law, and if any registered copyright
therein shall be in the name of any person or party other than
that stipulated in Paragraph 3 he shall deliver to the Publisher
promptly legally recordable assignment or assignments of such
copyright; he shall not permit serialization of the work as a
whole, substantially complete, or condensed, or publication in a
single installment without the Publisher's written consent; he
shall not require the Publisher to postpone publication, in order
to permit serialization beyond the season for which the book has
been catalogued, without compensation satisfactory to the Publisher.
If the Author should arrange for publication of the work elsewhere
than in the United States (provided Paragraph 1 permits him to do
so), he agrees that it shall not precede publication in the
United States without the Publisher's consent in writing; and
that, if publication elsewhere has taken or will take place with
the Publisher's consent, it shall not be responsible for securing
American copyright if it should be impracticable to do so.

-7-

19.  INTERPRETATION.  This Agreement and any further agreements to which it gives rise shall be interpreted under the laws of the State of California, and shall be binding upon and inure to the benefit of the parties hereto, the heirs, executors, administrators and assigns of the Authors, and the successors and assigns of the Publisher.  The Author may assign any net sums due or to become due hereunder.

20.  LIMITATION.  This Agreement shall not be binding upon either of the parties unless it is signed by both and delivered to the Publisher not later than sixty (60) days after the date of signing by the Author.

21.  ASSIGNMENT OF COPYRIGHT.  The Publisher agrees to assign the copyright of the Work to the Author upon termination of the Agreement and upon written request by the Author to do so. Thereupon, all then existing rights granted to the Publisher under this Agreement shall revert to the Author.

22.  MULTIPLE AUTHORSHIP.  If the Work has been written or is owned by more than one person, the word Author shall include all collaborators, authors, or owners, jointly and severally, and all sums payable to the Author shall be divided equally between or among them.  Publisher shall render separate accounts and make seperate payments to each of them unless otherwise provided herein.

23.  WHOLE AGREEMENT.  This Agreement contains the whole understanding of the parties, supersedes all previous oral or written representations or agreements, and may be changed, modified, or terminated only by a written document signed by both parties.

Additional Paragraphs numbered_____. are an integral part of this Agreement.

The changes, alterations, and interlineations made in Paragraphs                of this Agreement were made and added before execution.

Signed and delivered the day and year first above written.

AUTHOR                              SIERRA CLUB

_____            _____

_____            _____

-8-

April 12, 1985

Mr. Jon Beckman
Sierra Club Books
2034 Fillmore St.
San Francisco, CA, 94115

Dear Mr. Beckman:

Enclosed is my check for $1,250 as the second installment for the
rights to "The River Why" by David James Duncan.

Because I have already written a first draft screenplay, under
the terms of our agreement the option period will extend to April
17, 1986. You may be interested to know that the rewrite of the
script will begin next week, and is being undertaken by John Jay
Osborn, Jr. who is noted for "The Paper Chase" (among other
things). We are excited about the prospects and will, of course,
keep you informed as things develop.

Please let me know if I can be of service.

Sincerely yours,


Thomas A. Cohen

Exhibit C

Exhibit C

April 9, 1986

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA. 94109

re: THE RIVER WHY

Dear Jon:

Per our contract, the enclosed check for $2,500 will extend my option on
the motion picture rights to "The River Why" by David James Duncan for
another eighteen (18) months.

I am very hopeful of mounting a production within the next year. Please
call me if I can provide you with any information on the project.

Sincerely yours,


Thomas A. Cohen


Check # 5099          #2,500

# Exhibit D

Exhibit D

```
Type of Work:        Recorded Document

Document Number:  V3550D971

Date of Recordation:
                     2007-05-10

Entire Copyright Document:
                     V3550 D971 P1-6

Date of Execution: 02Oct84; 17Oct84; date of cert.: 11Apr07

Title:               The river why : book / by David James Duncan.

Notes:               Letter.

Party 1:             Sierra Club Books.

Party 2:             Hammermark Productions, Inc.

Names:               Sierra Club Books.
                     Hammermark Productions, Inc.
```

================================================================================

```
Type of Work:        Recorded Document

Document Number:  V3479D245

Date of Recordation:
                     2002-01-10

Entire Copyright Document:
                     V3479 D245 P1

Date of Execution: as of 15Aug85

Title:               The River Why & 5 other titles.

Notes:               Assignment of copyright interests from Hammermark
                     Productions, Inc. to Thomas A. Cohen.

Party 1:             Hammermark Productions, Inc.

Party 2:             Thomas A. Cohen.

Names:               Cohen, Thomas A.
                     Hammermark Productions, Inc.
```

================================================================================

```
Type of Work:      Recorded Document

Document Number:   V3553D985

Date of Recordation:
                   2007-06-19

Entire Copyright Document:
                   V3553 D985 P1

Date of Execution: as of 01Jan04

Title:             The river why : novel & screenplay.  Novel by David James
                   Duncan / screenplay by Thomas A. Cohen & John Jay
                   Osborn, Jr.

Notes:             Assignment of copyright interests.

Party 1:           Thomas A. Cohen, successor in interest to Hammermark
                   Productions, Inc.

Party 2:           Peloton Productions.

Names:             Cohen, Thomas A.
                   Hammermark Productions, Inc.
                   Peloton Productions
```

===========================================================================

# Exhibit E

Exhibit E

# RIVER WHY PARTNERS
## A California Limited Partnership

## 2,500 Limited Partnership Units

**$1,000 Per Unit**                                    **Minimum Purchase-1 Unit ($1,000)**

River Why Partners (the "Partnership") is a newly organized limited partnership which intends to fund the final development, production, and distribution of a motion picture tentatively entitled "The River Why" ("Motion Picture").

The Partnership's business objectives are to generate sufficient cash receipts from the distribution and exploitation of the Motion Picture in theaters and other media to provide cash distributions to the Limited Partners sufficient to return their Original Capital and to provide them with cash distributions over and above such Original Capital. THERE IS NO ASSURANCE THAT THESE INVESTMENT OBJECTIVES CAN BE ATTAINED. THIS INVESTMENT INVOLVES A NUMBER OF SIGNIFICANT RISKS. SEE "RISK FACTORS."

Investors are advised to read this Prospectus carefully and to retain it for future reference.

**THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES HAVE BEEN QUALIFIED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS.**

**THIS OFFERING IS BEING SOLD ON A BEST EFFORTS BASIS WITH NO MINIMUM SALES REQUIREMENT; HOWEVER THE GENERAL PARTNER HAS ESTABLISHED AS A CONDITION OF THIS OFFERING THAT THE PROCEEDS BE PLACED IN ESCROW AND NOT UTILIZED UNTIL THE AGGREGATE CAPITAL AVAILABLE FOR PRODUCTION, INCLUDING NON-CASH AND THIRD PARTY SOURCES, EQUALS $1,500,000.**

|                            | Price to Investors (1) | Selling Commissions(2) | Proceeds to Partnership(3) |
| -------------------------- | ---------------------- | ---------------------- | -------------------------- |
| Per Unit                   | $1,000                 | $75                    | $925                       |
| Budgetary Minimum(4)       | $1,500,000             | $112,500               | $1,387,500                 |
| Total Maximum Offering (5) | $2,500,000             | $187,500               | $2,312,500                 |

(1) As provided in the Limited Partnership Agreement 1.08 (b), the Budgetary Minimum condition shall consist of subscription funds, distribution commitments, other secured financing, cash advances, and deferred compensation. All funds received will be held in an interest bearing escrow account at Wells Fargo Bank, San Francisco until the first of the following events occurs: the Budgetary Minimum condition of $1,500,000 has been met; the termination of this offering at the sole discretion of the General Partner; or July 1, 1989.

(2) The General Partner may use the services of selected broker dealers that are members of the National Association of Securities Dealers, Inc. ("NASD") to sell the securities offered under this Prospectus. Compensation for those services will be commissions of 7.5% of the sale price of each security sold.

(3) Before deducting organizational and offering expenses other than selling commissions, payable by the Partnership, estimated at $75,000, assuming the sale of 1500 Units (but not to exceed five percent of the gross offering proceeds). It is anticipated that commissions will not be owed for all sales (such as those made by the General Partner) and therefore the actual proceeds to the Partnership will be higher.

(4) This amount represents the minimum budget determined by the General Partner as necessary to produce the Motion Picture. The actual amount of securities sold may be substantially less than this amount, and the General Partner may purchase a substantial amount, or the entire amount, of this offering (see Business Plan: I. Budget).

(5) Maximum proceeds are estimated to be sufficient to pay for production and distribution costs of the Motion Picture, thereby minimizing reliance on distributors.

<div align="center">

**Thomas A. Cohen (General Partner)**
**238 E. Blithedale Ave.**
**Mill Valley, CA 94941**
**(415) 383-4866**

</div>

<div align="center">

**The date of this Prospectus is July 15, 1988**

</div>

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | SUMMARY | 3 |
| II. | RISK FACTORS | 5 |
| III. | INVESTOR SUITABILITY STANDARDS | 7 |
| IV. | USE OF PROCEEDS | 8 |
| V. | PLAN OF DISTRIBUTION | 9 |
| VI. | TERMS OF OFFERING | 9 |
| VII. | GENERAL PARTNER | 10 |
| VIII. | FIDUCIARY RESPONSIBILITY OF GENERAL PARTNER | 11 |
| IX. | BUSINESS PLAN | 11 |
| X. | CONFLICTS OF INTEREST | 18 |
| XI. | SUMMARY OF PARTNERSHIP AGREEMENT | 19 |
| XII. | INCOME TAX CONSEQUENCES | 22 |
| XIII. | PRIOR PERFORMANCE | 32 |
| XIV. | SELLING MATERIALS | 32 |
| XV. | LEGAL MATTERS | 32 |
| XVI. | BALANCE SHEET OF RIVER WHY PARTNERS | 33 |
| EXHIBITS | | |

---

THIS PROSPECTUS AND THE EXHIBITS TO IT ARE SUBMITTED IN CONNECTION WITH THIS OFFERING OF SECURITIES WHICH ARE UNITS OF LIMITED PARTNERSHIP INTEREST ("UNITS") AND MAY NOT BE USED OR REPRODUCED FOR ANY OTHER PURPOSE. DISTRIBUTION OF THIS MATERIAL IS LIMITED TO PERSONS INTERESTED IN PURCHASING UNITS, AND WHO ARE DEEMED TO BE SUITABLE PROSPECTIVE INVESTORS. THIS MATERIAL MUST BE RETURNED TO THE GENERAL PARTNER ON REQUEST.

NO BROKER/DEALER, SALESMAN OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS PROSPECTUS OR PROVIDED, ON REQUEST, BY THE GENERAL PARTNER AND, IF GIVEN OR MADE, THAT INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.

THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY UNITS IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THERE IS CURRENTLY NO MARKET FOR THE UNITS AND NONE IS ANTICIPATED TO DEVELOP. IN ADDITION, TRANSFERABILITY OF THE UNITS IS RESTRICTED BY LAW AND BY THE PARTNERSHIP AGREEMENT. INVESTORS MAY FIND IT DIFFICULT OR IMPOSSIBLE TO LIQUIDATE THEIR INVESTMENT AT A TIME WHEN THEY MAY DESIRE TO DO SO, AND THEREFORE MAY BE REQUIRED TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ANY SALE OR TRANSFER OF THESE UNITS MAY RESULT IN ADVERSE TAX CONSEQUENCES. (See RISK FACTORS,    INCOME TAX CONSEQUENCES   AND SUMMARY OF PARTNERSHIP AGREEMENT)

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS PROSPECTUS, OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE PARTNERSHIP, THE GENERAL PARTNER OR ANY OF THEIR REPRESENTATIVES, AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OWN ATTORNEY, ACCOUNTANT OR OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT AND ITS SUITABILITY FOR THE INVESTOR.

THE PARTNERSHIP INTENDS TO FURNISH ITS UNITHOLDERS WITH ANNUAL REPORTS CONTAINING FINANCIAL STATEMENTS AUDITED BY AN INDEPENDENT PUBLIC ACCOUNTING FIRM.

THIS IS NOT INTENDED TO BE A TAX SHELTER OFFERING AND PROSPECTIVE INVESTORS SHOULD ANALYZE AN INVESTMENT IN THESE UNITS ON THE BASIS OF ITS ECONOMIC POTENTIAL AND NOT ON ITS TAX BENEFITS, IF ANY.

Prior to acceptance by the General Partner of an investor's subscription, the investor has the unilateral and unqualified right to have his Subscription Agreement and Power of Attorney returned, and his subscription amount, plus interest, refunded. All Units are offered subject to (i) prior sale, (ii) the right of the General Partner to reject any subscription or a portion of any subscription for any reason, and (iii) certain other conditions stated in this Prospectus. In addition, the General Partner reserves the right (but assumes no obligation) to allow rescission of any sale of Units if, in his sole discretion, he believes that rescission is necessary or desirable.

### C.    Expenditure Arrangements.

The General Partner will deposit the investors' checks, distribution guarantees, and agreements for deferred compensation in River Why Partners Escrow Account at Wells Fargo Bank, 1 Montgomery St., San Francisco, CA 94104. Funds held in the escrow account will earn interest at market rates (5.00% as of June 21, 1988), and each limited partner will earn a proportionate share of interest earned based on the period his or her funds are held in escrow, after deduction of a proportionate share of the fees of the escrow agent. Only when the Budgetary Minimum conditions of $1,500,000 are fulfilled will funds be expended to produce the Motion Picture. (see SUMMARY OF PARTNERSHIP AGREEMENT.)

### D.    Closing or Termination of Offering.

As used in this Prospectus, the term "closing" or "closure" means ceasing to offer Units for the reason that sufficient Units have been sold in order to finance the Motion Picture, and production has commenced. The term "termination" means ceasing to offer Units for the reason that it appears either that (1) it is unlikely that sufficient Units will be sold to adequately finance the Motion Picture, or (2) the production of the Motion Picture appears disadvantageous to the Partnership for some other reason, as provided herein.

This offering will close when the General Partner, in his sole discretion, determines that sufficient Units have been sold to produce and distribute the Motion Picture, but not later than July 1, 1989. Production of the Motion Picture will commence upon receipt and availability of funds or deferments aggregating $1,500,000.

The General Partner may terminate this offering at any time before closure, for any reason, but shall terminate this offering upon either of the following occurrences: (a) the film rights option to "The River Why" is not exercised by October 17, 1988, the expiration date of the option contract; (b) the Budgetary Minimum of $1,500,000 is not fulfilled by July 1, 1989. In this case, termination will be effectuated within five business days of this date, to permit clearing of funds received prior to, or on, July 1, 1989. Upon termination, all Subscription Agreements and Powers of Attorney will be returned promptly, and all funds held will be returned to investors with any interest earned and received thereon and without deduction therefrom. If, and only if, the Budgetary Minimum condition of availability of $1,500,000 is fulfilled will funds be released to the Partnership. (See TERMS OF OFFERING).

### E.    Formation of Partnership.

The General Partner filed a Certificate of Limited Partnership with the Secretary of State of California on August 13, 1987, thereby causing the formation of the Partnership. Each Subscription Agreement and Power of Attorney contains a Power of Attorney under which, among other things, each investor appoints the General Partner as his attorney-in-fact to execute the Partnership Agreement, and to execute, acknowledge and record a Certificate of Limited Partnership as required by the California Revised Limited Partnership Act. ALTHOUGH A SUMMARY OF THE PARTNERSHIP AGREEMENT IS INCLUDED IN THIS PROSPECTUS (SEE SUMMARY OF PARTNERSHIP AGREEMENT), SPECIFIC REFERENCE SHOULD BE MADE TO THE PARTNERSHIP AGREEMENT ITSELF, ATTACHED AS EXHIBIT A TO THIS PROSPECTUS.

## VII.  GENERAL PARTNER

Thomas A. Cohen, 41, is the Partnership's General Partner. Hammermark Productions, a sole proprietorship, is his production company. Mr. Cohen will be the producer and director of the Motion Picture.

Mr. Cohen was awarded a Master of Arts in Visual Design from U.C. Berkeley in 1974, with an emphasis on video, photography and graphics. Previously, he attended New York University School of the Arts for one year where he studied filmmaking under Martin Scorsese, among others, and was awarded the student prize for best production. Mr. Cohen received his B.A. from Colorado College.

From 1970 to 1977, Mr. Cohen worked for KQED-TV in San Francisco, where he directed over 100 hours of PBS network programming, including "World Press" and "Grand Prix Tennis." He produced and directed a variety of additional programs for local broadcast and was awarded the Harrah Prize for "The Final Arbiter," and a Northern California Emmy nomination for "Newsroom of the Streets." While at KQED-TV, he also stage managed thousands of programs in almost every genre.

With his own company, Hammermark Productions, he produced and directed the feature documentary, "hungry i reunion," which he completed in 1981. This motion picture was made in partnership with One Pass Productions, a division of One Pass, Inc., and was financed in part through a limited partnership, Brickwall Associates, whose General Partner was Mr. Cohen. Starring Jonathan Winters, Bill Cosby, Mort Sahl and The Kingston Trio, among others, the motion picture has played theatrically in many major United States cities to critical acclaim and can currently be seen on video cassette, pay cable and public television in some areas.

In 1984 Mr. Cohen produced and directed the feature length dramatic motion picture, "Massive Retaliation." Made in partnership with One Pass Productions, the movie was financed through a limited partnership, Massive Productions, whose co-General Partner is Mr. Cohen. Massive Retaliation is a film about survivalists coping with the threat of nuclear war starring Peter Donat, Marilyn Hassett, Michael Pritchard, Jason Gedrick, and Bob Goldthwait, among others. Currently available on video cassette from Vestron Video, it has been released in North America, South America, Europe, Asia, Africa, and Australia. In 1986 it was broadcast on Home Box Office and Home Theater Network. It is currently being offered to domestic television syndicators by The Movie Store and to foreign broadcasters by Film Sales International.

Mr. Cohen's net worth based on the estimated fair market value of assets and liabilities, with provisions for estimated income taxes on unrealized gains, is approximately $1,750,000. Mr. Cohen owns the rights to Tilden, a motion picture project based on Frank Deford's definitive biography of tennis player "Big Bill" Tilden. Additionally, he has been published as a freelance journalist and has had training as an actor, camera operator and video tape editor.

## VIII. FIDUCIARY RESPONSIBILITY OF GENERAL PARTNER

The General Partner is accountable to the Partnership as fiduciary and consequently must exercise good faith and integrity in handling Partnership affairs. The law defining the scope of a general partner's fiduciary duties is changing. Limited Partners who have questions concerning the duties of the General Partner should consult with their counsel. Where a general partner has breached his fiduciary duties or failed to account to a limited partnership, courts have held that a limited partner may bring legal action to recover damages from the general partner or from third parties on behalf of the partnership.

Under the Partnership Agreement, the General Partner is liable to the Partnership and the Limited Partners only for acts or failures to act which amount to gross negligence or willful misconduct. This restriction on liability limits the rights of action the Limited Partners would have without that restriction. The Partnership Agreement does provide for indemnification of the General Partner by the Partnership for liabilities incurred by or claims made against the General Partner in connection with the business of the Partnership. The General Partner intends to purchase errors and omissions insurance for the Motion Picture, as indicated in the production budget (see INSURANCE AND COMPLETION).

Notwithstanding the fiduciary relationship of the General Partner to the Partnership, the General Partner has broad discretionary powers to manage the Partnership under the Partnership Agreement and under California law. Generally, actions of the General Partner are not subject to a vote or review of the Limited Partners except to the limited extent provided in the Partnership Agreement and under the California Revised Limited Partnership Act.

## IX. BUSINESS PLAN

### A.  Introduction and Objectives

The primary business activity of the Partnership is to develop, produce and own a feature-length motion picture entitled The River Why ("Motion Picture"). The Partnership does not have the primary intention of self-distributing or exhibiting the completed Motion Picture, but intends to arrange for its distribution and marketing by one or more distribution companies. However, if substantially more than the Budgetary Minimum $1,500,000 is raised, the Partnership may make substantial contributions to the cost of distribution, or may undertake to "self-distribute." Although outright sale of the Motion Picture is not foreseen, an opportunity may arise in which the financial benefits of a sale outweigh the possible negative tax consequences of depreciation "recapture." The Partnership's share of income from Motion Picture distribution, marketing, or sale, if any, will be distributed to the Partners.

### B.  The Novel and Screenplay

The River Why is a screenplay ("Screenplay") based on the novel of the same title by David James Duncan. It was the first novel published by Sierra Club Books, was a Book of the Month Club selection, and is currently available in a Bantam paperback. The River Why is a celebration of the wilderness and an eloquent plea for its protection that teaches by example and is never preachy. The story line is simple and episodic. We follow a young man, Gus Orviston, as he leaves home, finds a career, starts a family and finally makes peace with his parents.

At twenty, Gus Orviston graduates, two years late, from an urban high school. Gus's father is the Dean of American trout fisherman--the ultimate heavyweight sportsman, a perfectionist in the classic Abercrombie and Fitch

11

tradition. Tweedy, knowledgeable and confident, he represents all that Gus is not. But buried under their bickering is a shared love of rivers and fishing.

Soon after Gus graduates, he picks a fight with his father, and leaves for the Tamanawis River in the Northern wilderness to find himself. Gus rents an isolated cabin on the beautiful river. For the first few weeks he fishes alone. But his solitary angling does not make him happy. One night when he is unable to sleep, he sets out up river, trying to find its source. He travels for a day and a half--and reaches a beautiful Spruce grove where the river is born. On his way back to the cabin, he's overtaken by a monstrous storm. He's pushed to his physical limits and drops exhausted on the river road. There he is rescued by a misfit philosopher named Titus, who takes him back to the cabin.

On a swimming expedition to a nearby river, he comes upon a beautiful young woman who is fishing. Gus sneaks up on Eddy and watches her land a huge trout and then sunbathe naked on a rock eight feet from where he is hiding. When Eddy discovers Gus, he's embarrassed, flustered, can barely speak and has fallen hopelessly in love. Gus looses Eddy in the woods.

Though Titus offers consolation to him through a combination of drinking, eclectic philosophy, and the companionship of his talking dog, Gus is desolate. He goes home, but there is no salvation there either: his father is full of criticism, not solace. His mother and little brother are preoccupied. Gus explores the suburban stream he fished on as a child, and rescues the last trout in it, discovering that the stream of his childhood dreams has become a garbage infested sewer.

Gus returns to his cabin and throws himself into rod making. His craftsmanship and skill begin to pay off. The rods are selling, he has become friends with his neighbors, and despite himself Gus is beginning to make a success of his life. But his heart still aches for Eddy. One day on a fishing trip, he meets an idiotic fishing reporter who wants to get a line on Gus's incredible angling skills. After spinning an absurd tale for the reporter, Gus convinces him to publish a message to Eddy, begging her to make contact.

Hearing nothing from her, Gus deals with his loneliness in typical fashion by heading down stream on a fishing trip. While canoeing in a dense fog, he hooks the sleeve of a drowned fisherman, and nearly drowns himself taking the corpse to the nearest town. Dried out and nearly recovered, he sets out for a Halloween party at his neighbor's farm. Returning to his cabin from the party, Gus finds Eddy waiting for him. They talk all night. The next days are filled with talk and fishing, walking in the woods and blossoming love.

When Eddy finally has to leave, she hooks a huge salmon on the most fragile of fishing leaders, and hands her rod to Gus with the request to "play the fish." Any misstep and the line will break, the fish will be lost. Gus follows the fish all night. Finally, at dawn, he lands and gently releases it. Eddy greets him at the cabin with a declaration of her love. Months later their romance leads to a wedding by the river with friends and family in attendance. Having established an identity and family of his own, Gus is able to make peace with his father.

## C.  Critical Acclaim

The novel received critical acclaim from a variety of publications. A sampling follows:

> "...a sort of 'Catcher in the Trout Stream,' an irreverent, offbeat and thoroughly likable tale...Funny and poignant, vulgar and sensitive...and, strangely enough, it should even lure the attention of those who think a reel belongs on a projector and a bass on a rock musician."
>
> *The Los Angeles Times*

> "In the company of Catch 22 and Zen and the Art of Motorcycle Maintenance."
> *The Houston Post*

> "Entertaining...Humorous...Well worth reading. The range and vivid depiction of characters mark Duncan as a major new novelist."
> *The Chicago Tribune*

> "Wonderfully funny...Imbued with a wisdom and a rather joyous ecology-minded spirit."
>
> *Esquire (4/83)*

> "A veritable epic...moving, rhapsodic in its intensity."
> *Publishers Weekly*

## D.  Book Sales

A best seller on more than one list, Sierra Club Book's publisher, Jon Beckman, called The River Why, "extraordinarily successful for a serious novel by a first time author." Bantam Books editor, Tobi Sanders" called it an

"underground classic." The most recent figures available show hard back sales of 15,268, book club sales of 7,800, and trade paperbacks in print of 75,000. It continues to sell well.

### E.   Rights and Writing

The business of the Partnership is based on the General Partner's Purchase Option Agreement for the motion picture and allied rights in the novel The River Why, the exercise of which will be paid for from the proceeds of the Partnership. The General Partner owns an option to acquire the rights to the Screenplay (which on exercise will comprise the motion picture, television, and allied rights to The River Why) having paid a total of approximately $12,500 for the Option Agreement, polish and final writing of the Screenplay. Hammermark Productions, Inc. (now Hammermark Productions, a sole proprietorship owned by Thomas A. Cohen) acquired rights to the novel under a Purchase Option Agreement signed October 17, 1984 by Sierra Club Books. Under that Agreement, Hammermark Productions, Inc. acquired an eighteen month option to buy broad rights to the Screenplay for $2,500 against 5% of the motion picture budget. That option was renewed for an additional eighteen months on April 9, 1986. An agreement was reached on May 6, 1987 to extend the option period for an additional twelve months to October 17, 1988. Payment of $2,500 was made in October 1987 pursuant to that agreement. The agreement calls for a payment of one third of the full amount (estimated at $71,000) to be paid on exercise of the option, with the balance to be paid on commencement of photography. As further consideration, Sierra Club Books and David James Duncan are to receive 2.5% of 100% of the net profits (defined as cash available to distribute to the Partnership after all Partners have recouped their capital contributions) of the motion picture. Provided sufficient funds are available, it is the intention of the General Partner to exercise the option before the date of expiration. (The complete purchase option agreement is available for inspection at the offices of the General Partner, and was filed with the SEC as an exhibit to the registration statement and is available to the public through the Commission's public reference section). Mr. Cohen will transfer his rights to the novel and screenplay upon commencement of photography of the Motion Picture.

The first draft of the Screenplay was written by Thomas A. Cohen and completed in January 1985. On April 12, 1985 Hammermark Productions entered into a Writer's Flat Deal Contract with John Jay Osborn, Jr. to provide a polish of the screenplay for $4,276 plus contingent compensation of 2.5% of the Motion Picture budget (estimated at $35,000) and 2.5% of 100% of producer's net profits (in this context, the same as net profits). Between April 1985 and March 24, 1986, Mr. Osborn and Mr. Cohen, both separately and together, wrote three drafts of the motion picture. Although the General Partner expects small changes to be made to the script before commencement of photography, the fourth draft is considered the final script.

John Osborn, 42, attended Harvard College and Harvard Law School where he gathered material for his first novel, The Paper Chase. Since its publication in 1971, he has written for the motion picture and tv series of the same name as well as three other novels: The Only Thing I've Done Wrong, The Man Who Owned New York, and The Associates, which became an ABC television series. Mr. Osborn, a resident of San Francisco, has written television scripts for Embassy TV, Fred Silverman, New World Television (for ABC), and others. Three times nominated for cable tv's ACE awards for scripts he wrote for Showtime and 20th Century Fox's "Paper Chase," his most recently produced teleplay was for NBC's "L.A. Law."

Upon commencement of principal photography, the General Partner will assign to the Partnership all of his rights to the Screenplay and the Partnership will reimburse the General Partner for the amounts expended by him for the option rights and writing of the Screenplay in addition to the fees owed for rights and writing once the Motion Picture is in production. As of the date of this offering the General Partner is owed reimbursements for rights and writing of $11,768. Additionally, he is entitled to receive $25,000 as his fee for co-writing the screenplay. (See summary of the budget for the Motion Picture).

### F.   Stages of Production.

The following is a summary of the typical stages of production of a motion picture. Although it is likely that "The River Why" will follow this pattern, there can be no guarantee that it will do so exactly.

1. Development. The production of a motion picture begins with the selection of a subject in the form of a literary work which is conceived or acquired by a producer or production company. In this phase the literary material is worked and reworked until complete. Once complete, a director is selected, a budget prepared and principal cast are approached. When development is complete, the motion picture is presented for financing. Once financing is secured a "start date" is fixed and the next phase begins.

2. Pre-production. Pre-production involves preparations prior to "principal photography" (the actual shooting of the Motion Picture). During this period, all crew will be hired, and the producer will work with the casting director to interview and hire the actors. After they are hired, the actors will be fitted for wardrobe and tested for makeup, and rehearsal with key cast members will commence. Location for shooting will be secured and prepared during this period, and lighting, film stock, equipment and technical crew will be selected and contracted for.

3. Principal Photography. Principal photography is the phase in which the actual filming takes place, which for "The River Why" is scheduled to be last for seven weeks. The choice of location will depend on a number of factors including economics. It is anticipated, but not guaranteed, that the Motion Picture will be shot in Oregon in order to

take advantage of spectacular locations and fishing, and experienced low cost film crews. The General Partner has traveled to Oregon and met with State officials and production managers there. He has been assured of cooperation from them as well as other government, financial, and technical organizations. During principal photography, each Limited Partner is invited to visit the location (at his own expense) to observe and enjoy the making of a motion picture.

All of the recording of picture and sound requiring the presence of principal actors and technical personnel will take place during the principal photography stage. The picture will be shot in 35mm color with sync sound, and the negative will be transferred to videotape for editing.

4.  Post-production.  Post-production will begin immediately following principal photography, and is estimated to last 24 weeks.  During post-production, picture and sound cutting will occur, some scenes may be shot without key personnel in order to improve continuity, music will be composed and recorded and the combination of picture, dialogue, sound effects and music will be mixed into a final form.  The original negative will be cut to conform to the videotape master and an answer print will be struck.

### G.    Distribution.

Distribution of a motion picture consists of licensing the film for its various uses. Although there is no standard deal for distributors, it is likely that any arrangement between the Partnership and a distributor will be either a "Gross " or a "Net" deal. The General Partner has no specific preference as to which kind of deal to negotiate. A "Gross deal" provides for the filmmaker and distributor to split all rentals on the basis of agreed-upon percentages and is guaranteed before expenses are deducted. A "Net deal" provides for the filmmaker and distributor to split all rentals against a specified percentage split after deducting agreed-upon expenses. The initial use of a film is usually exhibition in theaters throughout the world. This consists of "booking" the picture into specific theaters, negotiating the terms for each theater (the duration of the "release", the guarantee or agreed minimum payment if any from the theater to the distributor, and the division of revenue received at the box office-the "box office gross"). The distributor also prepares and pays for the advertising material, the trailers, the television and radio spots, if any, the print ads, billboards, one sheets, etc. The distributor also selects and pays for the advertising media; television film, magazine and newspaper ads, and secures and pays for the release prints. The distributor also collects its share of the box-office receipts (the "distributor's gross" or "film rental").

Following the theatrical release of the motion picture the distributor will itself, or through licensees, exploit all the other ways in which revenue may be derived from a film. Ancillary markets include home video, pay and cable tv, free tv, educational institutions, airlines, prisons, merchandising rights, soundtrack recordings and posters. There is no assurance that attempts to distribute or otherwise market the Motion Picture will be successful (see RISK FACTORS).

The General Partner has consulted with Mark Shaw as a producer's representative for the Motion Picture. Mr. Shaw is an entertainment attorney headquartered in Beverly Hills, California. Both the General Partner and Mr. Shaw have had discussions with a number of theatrical and home video distributors in regard to "The River Why". As of May 1, 1988 no agreements have been entered into with any distributors, and there is no assurance that any will be negotiated in the future. While not necessary to fund the Partnership, it is the intention of the General Partner and Mr. Shaw to arrange partial financing from a distributor in return for distribution rights and an equity position similar to that of a Limited Partner. There can be no assurance that these arrangements will be made prior to production of the Motion Picture.

As of  the effective  date of this offering, no arrangements have been made for distribution of the Motion Picture in the United States or elsewhere (see RISK FACTORS). The General Partner will, in his sole discretion, select the distributor based on a number of factors, including the ability of the distributor, the distributor's proposed schedule for releasing the Motion Picture, the advertising commitments of the distributor, and the distributor's experience in releasing motion pictures similar to the Motion Picture and in the geographic area in which the Motion Picture is to be released.  If favorable terms can be negotiated, the General Partner may enter into an exclusive arrangement with one major distributor or may enter into separate arrangements for domestic and foreign distribution. The General Partner may also determine that it is in the best interest of the Partnership to sell the Motion Picture before or after it is completed.  If the Motion Picture is sold prior to marketing, the Partnership would be unable to recover its investment through the Income Forecast Method of Depreciation, and therefore the sale proceeds would be taxed at ordinary income rates. If it is sold after the marketing efforts have begun, any depreciation deductions would be subject to recapture and taxed at ordinary income rates.(see INCOME TAX CONSEQUENCES).

The General Partner may also seek out other opportunities for marketing the Motion Picture, including pre-release sales or licenses to network television, cable television, exhibitors or foreign distributors.  These arrangements may not generate immediate revenues and, if the Motion Picture is successful, those pre-release commitments may have the unintended disadvantage of limiting revenues.  However, the General Partner will enter into pre-release arrangements if he believes that these arrangements will assure an adequate and certain level of revenue for the Partnership.

If substantially more than the Budgetary Minimum of $1,500,000 is raised by this offering, the Partnership will have the option of self distributing the picture in some or all markets. Alternatively it may offer to pay some or all of the print, advertising, and publicity costs of an established distributor in return for a lower distribution fee, and

14

first position recoupment of expenses. Funds expended for these purposes would only be released if, in the judgement of the General Partner, such expenditures would improve the overall financial benefit to the Partners. If funds raised in excess of $1,500,000 (but not to exceed $2,500,000) are not expended, they will be distributed to the Partners along with any accrued interest.

### H. Deferments, Loans, Advances and Recoupment

In certain instances funds in excess of the production budget may be advanced for the benefit of the Partnership which may entitle those advancing funds to a right of first recoupment. The General Partner will consider such advances only if, in his estimation, doing so will ultimately provide financial benefit to the Partners.

Although no arrangements for deferments by cast, crew, or vendors have yet been made, it is likely that some will be made before completion of the film. Those entitled to deferments will receive payments pro-rata, based on the ratio of the amount of such deferments to the amount of subscription funds, with the limited partners, but they will not be entitled to any profits (unless separately negotiated as an inducement for them to participate in the production) nor will they have any of the rights of limited partners.

The General Partner has agreed to provide standby financing in the form of loans, deferments and facility contributions should budgeted funds be insufficient to complete the film. Amounts advanced by the General Partner will be recoupable with interest from first receipts payable to the Partnership and prior to recoupment of capital contributions by the limited partners.

A distributor may be entitled to a right of first recoupment in several different ways. If the Partnership were to negotiate a "net deal" with a distributor, the distributor would typically be allowed to recoup their print and ad costs before monies were paid to the Partnership. If a distributor were to advance production costs or in some other fashion become an equity partner in the Motion Picture, they might be entitled to recoup their investment prior to the limited partners. It is the intention of the General Partner to negotiate such right of first position recoupment only if, in his estimation, doing so would be advantageous to the Partnership. Although no such agreements have yet been reached, it is possible that a distributor would insist on higher priced talent or production values than are contemplated in this offering. In such instance, it is likely that the distributor would advance the additional amounts necessary to secure such talent or production value, and that the advance would be recoupable before monies were paid to the Partnership.

### I. Budget

(1) Motion Picture Production. A complete (429 line items) budget ("Budget") prepared by the General Partner is available on request at the offices of the General Partner. A top sheet summary of that budget appears on the following page. The General Partner believes that the Budget is a reasonable estimate of the cost of producing the Motion Picture. In order to allow for production costs in excess of the Budget, and to afford additional incentive to certain key personnel, the General Partner, in his discretion, will have the right to offer certain key personnel profit participation in addition to their regular fees. Additionally, the General Partner may, in his sole and absolute discretion, defer some or all of the compensation payable to the General Partner for his services, equipment and personnel.

Prior to the Closing Date, the General Partner may negotiate agreements with third parties which could substantially reduce the need for Capital Contributions to the Partnership. These agreements could be negotiated with: (i) Distributors of motion pictures for exploitation of various rights in the Motion Picture in which case The Partnership would be likely to receive cash advances or bankable guarantees for these rights. (ii) Cast, crew, associated professionals, motion picture facilities, and suppliers for deferred compensation and/or profit participation in the Motion Picture. The Partnership could reduce the cash requirements of the production by the amount of these deferments. Parties receiving deferred compensation will recoup pari passu with the limited partners.

Profit participations will be paid from Partnership cash which is available for distribution after cash distributions are made to the Limited Partners and those entitled to deferments in an amount equal to their initial capital contributions to the Partnership. (See SUMMARY OF PARTNERSHIP AGREEMENT).

## TOP SHEET BUDGET--THE RIVER WHY

| Description | Amount | Total |
|---|---|---|
| Story & Rights | $65,000 | |
| Writing | $61,500* | |
| Producer's unit | $108,490 | |
| Director's unit | $97,900 | |
| Talent | $321,585 | |
| Subtotal above the line | | $654,475 |
| | | |
| Production staff | $56,500 | |
| Camera | $54,468 | |
| Electrical | $25,008 | |
| Sound | $15,662 | |
| Set operations | $13,012 | |
| Art department | $16,362 | |
| Set construction | $16,125 | |
| Set dressing | $5,575 | |
| Action props | $8,575 | |
| Wardrobe | $13,300 | |
| Makeup/hair | $6,388 | |
| Location | $99,277 | |
| Transportation | $18,019 | |
| Film production period | $62,508 | |
| Tests and sundry | $2,580 | |
| Special photography | $5,000 | |
| Subtotal production period | | $418,359 |
| | | |
| Editorial | $50,486 | |
| Music | $40,000 | |
| Sound (post) | $50,352 | |
| Film & lab (post) | $20,810 | |
| Titles & opticals | $3,060 | |
| Insurance | $24,500 | |
| Publicity & stills | $5,750 | |
| General expense | $31,300 | |
| Subtotal post production | | $226,258 |
| | | |
| TOTAL BUDGET | | $1,299,092 |
| CONTINGENCY | | $129,909 |
| COMPLETION BOND | $0 | |
| GRAND TOTAL | | $1,429,001 |

*The General Partner will be compensated for services rendered from three areas of the budget: writing $25,000; producing $25,000; and directing $75,000.

(2) Distribution Budget. If funds are raised in excess of $1,500,000 (not to exceed $2,500,000) from this offering, they may be used to market the picture. The General Partner believes that the Budget is a reasonable estimate of the cost of distributing the Motion Picture. In addition to these hard costs, the distributor will take a percentage (normally from 15% to 40%) of the theatrical rentals as a fee for managing the distribution.

## DISTRIBUTION BUDGET-THE RIVER WHY

| | | |
|---|---|---|
| Prints | $200,000 | |
| Creative | $100,000 | |
| Publicity | $200,000 | |
| Promotion | $100,000 | |
| Screenings | $ 75,000 | |
| Co-op Ads | $250,000 | |
| | | |
| TOTAL | | $925,000 |

16

### I.    Insurance and Completion.

The Partnership will obtain liability insurance for injury to persons or property, workers' compensation insurance, automobile and equipment insurance, errors and omissions insurance for copyright infringements and the like, and cast insurance to cover costs incurred by the Partnership on injury or incapacity of a cast member. Unless required by a distribution agreement, the Partnership will not obtain completion insurance or a completion bond to assure funds necessary to complete the Motion Picture, in light of the prohibitive cost of that insurance. If, once started, the Motion Picture cannot be completed due to causes that would normally be insured against by a standard motion picture industry completion guarantee, the General Partner will provide standby financing of up to $150,000 to be paid back with interest from first proceeds of the Motion Picture. (The standby financing commitment is available for inspection at the offices of the General Partner, and was filed with the SEC as an exhibit to the registration statement and is available to the public through the Commission's public reference section).

### J.    Management.

The General Partner will have approval over all aspects of the management of the Partnership and production of the Motion Picture. Thomas A. Cohen (Producer, Thomas A. Cohen) will have the primary responsibility of directing all creative aspects of the project, including the securing of talent, and other creative personnel; controlling all technical aspects of the project, including all matters relating to the use of equipment and materials and the means by which the desired results are to be achieved; and arranging the distribution of the Motion Picture by third parties.

### K.    Other Key Personnel

Interest in participating in the production of the Motion Picture has been expressed by the individuals described below; while these individuals have not entered into formal written contracts, nor negotiated items of material compensation or profit participation, and their participation is subject to change, some have orally expressed intent to enter into agreements to perform specified services.

1. Casting Director. An agreement for casting director services has been entered into with **Kimba Hills**. Ms. Hills is based in Los Angeles and has been associated with the production or casting of a number of movies and television shows including "Gaby Brimmer," "Slow Burn," "St. James Elk," and "Nomads."

2. Director. **Thomas A. Cohen**, sole proprietor of Hammermark Productions, the General Partner will act as director as well as producer. (See General Partner.)

3. Producer's representative/executive producer. **Mark Shaw** has agreed to act as producer's representative, and may take the title of executive producer if he is successful in obtaining financing and distribution for the Motion Picture. Mr. Shaw is an entertainment attorney and the General Partner of Aspen Leaf Entertainment. He has worked both in private practice and with The Larry Thompson Organization in the entertainment field. He served as co-host or correspondent for a number of national and local television programs including Good Morning America for ABC. He was producer of "A Beverly Hills Christmas with James Stewart" for Fox Broadcasting and is co-producer of "Neighborhood Warriors" for CBS. Currently he is president of Film Indiana, and maintains offices in Los Angeles and Indianapolis.

5. Production Manager. **Don Zavin** has agreed to serve as production manager, although no formal written agreement has been made. Mr. Zavin lives in Portland, Oregon and has been either production manager or associate producer of a number of feature films shot there including: "Shadow Play" starring Cloris Leachman, "St. Helen's" starring Art Carney, and "O' Hara's Wife" starring Ed Asner and Jodie Foster. Additionally, he has produced, written, or directed a number of films ranging from industrials to commercials to feature documentaries.

6. Editor. **B.J. Sears** has agreed to serve as editor, although no formal written agreement has been made. Mr. Sears was the editor for "hungry i reunion" and "Massive Retaliation." He has worked as an assistant editor for director's Michael Ritchie and John Korty, served as sound editor for Milos Forman on "Amadeus," and as film editor for Philip Kaufman's "The Unbearable Lightness of Being."

7. Technical Advisor. **Mel Krieger** has agreed to act as the expert advisor on aspects of fly fishing and fly casting. He is a nationally recognized teacher and writer on the subject.

8. Writer. **John Jay Osborn, Jr.**, the author of "The Paper Chase" has co-written the screenplay. (See rights and writing).

9. Director of Photography. **Jack Couffer** has agreed to serve as the director of photography, although no formal written agreement has been made. Known for nature photography, he was 2nd unit DP on "Milagro Beanfield War" and "Out of Africa"; Oscar nominated for "Jonathan Livingston Seagull"; and co-producer of "Never Cry Wolf."

10. Talent. No contracts have been entered into for acting services and it is probable that none will be entered into until the closing of this offering. However, casting efforts have begun, and expressions of interest have come from the following actors and actresses, although in order to balance the cast for an ensemble performance, not all of the actors and actresses listed will be included in the cast for the Motion Picture. Each of the following actors has represented through a letter of intent to the General Partner that they have read the script, are aware of the budget considerations, and, subject to their availability, wish to participate in the Motion Picture.

17

(a) **Christopher Collet** starred in "The Manhattan Project" and "First Born."

(b) **Edward Herrmann** is best known for his portrayal of FDR in "Eleanor and Franklin," but has starred in a number of feature films and telemovies including "Compromising Positions" and "Big Business."

(c) **Susan Anspach** is noted for her roles in "Montenegro" and "Five Easy Pieces."

(d) **Bob Keeshan** is known to more than a generation of Americans as "Captain Kangaroo."

(e) **Timothy Bottoms** is noted for his starring roles in "The Paper Chase," "The Last Picture Show," and "The Other Side of the Mountain, II." In January 1988 he won the ACE (Award for Cable Excellence) Award for Best Actor in a Dramatic Series for his role in HBO's "The Hitchhiker."

(f) **Alan Boyce** starred in "Permanent Record" and "7 Minutes in Heaven."

## L. Compensation and Fees to General Partner.

1. Compensation for Services. The General Partner will be paid compensation for his services to the Partnership. This compensation will be paid regardless of the success or profitability of the Partnership, except that the General Partner may, in his sole discretion, defer some or all of this compensation. The compensation was established by the General Partner, and was not determined by arms'-length negotiations (see CONFLICTS OF INTEREST). Thomas A. Cohen will receive up to $125,000 for his services as writer, producer and director, plus up to $75,000 for reimbursable expenses incurred in connection with developing the Motion Picture and organizing the Partnership. He will not receive fees for organizing or administering the Partnership.

2. Interest in Partnership. The General Partner will contribute $25,000 in cash and services to the capital of the Partnership on the closing of this offering. The General Partner will have a 1% interest in the net income, net losses and cash distributions of the Partnership until the total distributions of cash to the Partners equal the total initial capital contributions of the Partners and the total amount of compensation owed is paid to all those persons entitled to deferred compensation; thereafter the General Partner will have a 25% interest in the net income, net losses and cash distributions of the Partnership. (See SUMMARY OF PARTNERSHIP AGREEMENT and CONFLICTS OF INTEREST)

## X.   CONFLICTS OF INTEREST

The Partnership is subject to various conflicts of interest arising out of its relationship with the General Partner and his affiliates. These conflicts include, but are not limited to, the following:

### A.   Compensation to General Partner.

The agreements and arrangements, including compensation and Partnership interest, between the Partnership and the General Partner and his affiliates were determined by the General Partner and are not the result of arms'-length negotiations.

### B.   Competition for Management Services.

The Partnership will not have an independent manager and will rely on the General Partner for the operation of the Partnership. The General Partner will devote as much of his time to the business of the Partnership as, in his judgment, is reasonably required, but the Partnership may at times compete with other business activities of the General Partner for his management services .

### C.   Other Business Ventures.

The General Partner may engage for his own account, or for the account of others, including other limited partnerships in other business ventures, motion picture or otherwise, and neither the Partnership nor any Limited Partner will be entitled to any interest in that other business venture.

### D.   Lack of Separate Representation.

The Partnership and the General Partner are not represented by separate legal counsel. Counsel for the General Partner and the Partnership do not represent the interests of the Limited Partners. Attorneys, accountants and other professionals who may perform services for the Partnership might also be expected to perform services for the General Partner and his affiliates. If a conflict of interest arises and cannot be resolved or the consent of the respective parties cannot be obtained for the continuance of that dual representation after full disclosure of that conflict of interest, then those professionals may withdraw from the representation of one or both of the conflicting interests with respect to the matter involved.

18

# Exhibit F

Exhibit F

# RIVER WHY PARTNERS
### P.O. BOX 5002 · MILL VALLEY, CA · 94942
### (415) 383-4866

October 12, 1988

Mr. Jon Beckman
Sierra Club Books
730 Polk St.
San Francisco, CA 94109

Dear Jon:

Enclosed is my check number 5897 for $13,547.65 for the exercise of the purchase of motion picture and allied rights to THE RIVER WHY. Pursuant to our contract dated October 17, 1984, this represents the balance of the one third of the funds due.

My calculations are based on a proposed budget for the movie, exclusive of rights payments, of $1,234,093. Per our agreement, five percent of that figure is $61,704.65, and one third of that is $20,547.65. Since previous option payments totaling $7,000 are to be credited against that amount, the enclosed check brings the total payment to that required by the contract. The remaining two thirds will be paid on commencement of photography, which I hope will be next Summer.

Please note that it is still possible that I may try to mount the film for under $500,000 in which case the total rights payment is to be $12,500. I expressly reserve the right to receive a refund from you of $8,047.65 in that event.

I look forward to seeing you at the movies.

Sincerely yours,

Thomas A. Cohen
General Partner

# Exhibit G

Exhibit G

# MICHAEL SNELL LITERARY AGENCY

December 23, 1993

Thomas A. Cohen
555 California Street
Suite 2950
San Francisco, CA
94104-1605

Dear Mr. Cohen:

I have continued reviewing the history of the film rights to
David Duncan's THE RIVER WHY, and I come away confused and
saddened by the situation.  In your letter of October 12, 1988,
you expressed hope that photography would commence the next
summer, then in your letter of January 27, 1993 you offered
that "the only hope for mounting this film rests on bringing
aboard new blood. . . ."

As David's agent, I would like to offer my help in moving this
project forward.  From both an artistic and business point-of-view,
the situation strikes me as a "no win' predicament.  What can
we do to lay the sad history to rest and create a situation
in which everyone--you, David, the market for his work--can win?

Quite a number of serious, competent filmmakers have approached
me about the film rights to THE RIVER WHY (Tom Mangan, who
produced WATCH IT and Maria Campbell at Amblin' among them), but
I have only been able to say someone holds an option to the
work.  Perhaps I should put these people in touch with you?

I would love to hear your thoughts on the matter.


Sincerely,

Michael Snell, President


MS/ps


P. O. Box 1206, Truro, Massachusetts 02666-1206   •   (508) 349-3718

# Exhibit H

Exhibit H

Tom and Kristi Denton Cohen
38 Miller Ave. #488
Mill Valley, CA 94941

David James Duncan
9495 Lolo Creek Rd.
Lolo, MT 59847


November 10, 2005

Dear Tom and Kristi,

As we near the 20th anniversary of inaction following your alleged purchase of *The River Why* film rights, the time has come for decisive action on my part. The novel of my youth has awaited me with the faithfulness of a Penelope awaiting her Odysseus. To my mind, this metaphor makes you "the suitors." I am turning, with all the energy and resources I have, to the task of convincing the world, or a judge, that this metaphor is apt.

Since our points of view differ enormously, I'll begin with a summary of my perspective on what has transpired over the last two decades. I don't do this to offend you. I do it to give Kristi – who seems baffled by my ire – the clearest possible understanding of where I am coming from and what I intend to do about it.

In the mid-1980s, relying on your purported purchase of the film rights from SCB, Tom informed me that he hired John Jay Osbourne to do a screenplay. What I later learned directly from Osbourne, however, was that Tom wrote the screenplay and asked Osbourne to edit it and co-sign his more marketable name to it. Reading this screenplay was nightmarish. Almost everything I love about my novel had been stripped away. Caricatures instead of characters. Ma, H20, Bill Bob reduced to mere sight-gags. The fishing scenes unfilmable. The mystery of rivers, gone. The story of Gus's spiritual quest replaced with a "Wacky Boy Meets Strange Girl" yarn that chugged along to a soft-porn climax.

I wrote a letter expressing my disgust over the screenplay. When Tom showed my angry letter to Osbourne, John was indignant in his first letter to me and asked for more detail. When I wrote back and explained my reasons for dismay, though, John agreed with me in a second letter I doubt you've seen. The screenplay was enormously inferior to my novel, he said, and apologized for this. He added that there wasn't much he could do about it.

The knowledge that Tom's "The River Why" was making the rounds in Hollywood with my name and reputation attached to it was humiliating and unfair from the start. But greater embarrassments ensued. At home in Oregon I began to run into artists, carpenters, school teachers, fishing guides and such who'd sent a few hundred hard-earned bucks, in solidarity with me (they thought), to Tom's fund-raising scheme called "River Why Partners." Ads for the "Partners" appeared in fly fishing mags, with space donated gratis out of affection for my novel. All of this misrepresented me and felt like a betrayal to me. Tom's later desire to film my quintessentially Pacific Northwest tale in Tasmania; the embarrassing "gimme" booths at the SLC Outdoor trade shows; the lame-looking nude on your "River Why" website as an attempt to allude to Eddy---are characteristic of your twenty year effort: shoddy and *sad*. Though you've billed yourselves as the champion of

my literary progeny, you've done nothing but humiliate and misrepresent me for two decades. And spin it any way you like, the list of legitimate folk willing to invest in Tom's script has, despite tremendous ongoing enthusiasm for my novel, remained at zero.

I can serve my story better. Surely you can see that. I birthed a novel that has become a classic and I continue to live and write of the river life. You birthed a screenplay nobody wants and live in Mill Valley. I'll keep mine and you keep yours. Just start calling yours something different. Based on a fresh legal understanding of my violated rights, I will be telling the world from now on that your screenplay is a disaster, that your contract was a cheat from the start, that I do not support your stagnating project, that you are wasting your lives but have no right to waste mine, and that I consider your claim on my novel to be void.

Through my agent, Mike Snell, I disputed your claim to the movie rights some time ago. More recently I have consulted at length with industry insiders and some of the best-known intellectual property rights lawyers in the country. They unanimously agree that I have a very strong case in establishing through a declaratory action the retention of my ownership of the movie rights. I have been counseled that the original "agreement" (the two-page letter from Tom to Andrea Nachtigall dated October 2, 1984) was not a valid agreement and was void as a matter of law. The primary reason for this was that in that letter – *which Tom drafted, and which I was not a signator or party to* – Sierra Club Books "warranted" to Hammermark that it had the "sole, exclusive, and unencumbered ownership of" the movie rights when in fact *it did not*. My publishing agreement with SCB granted no such ownership rights to SCB. My agreement with SCB granted it the sole and exclusive right to publish the written work, and to act as my agent with respect to subsidiary rights; however, it did not transfer any of my ownership rights (including the film rights) to SCB. *Any contract that SCB attempted to make with you with respect to an ownership interest it never possessed, is void.* If you do not have a copy of my publishing agreement with SCB, you have my authorization to obtain a copy of the agreement from SCB so that you can see for yourself the truth of which I speak.

Further, even in the unlikely event that you were able to convince a judge that SCB did have an ownership of the film rights, and that the contract was legitimate, I am confident that the return of the film rights to me will be established through your ongoing breach of the agreement. In 1987, in order to allegedly exercise his option to purchase the film rights, Tom concocted a fictitious film budget of $1,234,093. Though no one at SCB has ever seen Tom's calculations, the first one-third of 5% of the total fictitious budget was sent to SCB representing some sort of "purchase" in Tom's mind, and the other two-thirds payment (as well as a percentage of the profits) was to be paid "on commencement of photography." Since then, nineteen years have passed without any semblance of performance of your obligations under this (void) agreement. No actors have been hired, not one frame of film has been shot, and so on and so forth, as everyone knows. I have been told by every attorney I've consulted that, even if you could establish that SCB had the ownership rights to transfer, the steps you took prior to and subsequent to the date of the agreement constitute, at best, a breach of the duty of good faith and fair dealing and,

at worst, fraudulent inducement. Under either California or Oregon law, my ownership of the film rights would be established.

Tom and Kristi, *The River Why* is the coming of age tale of a twenty-year-old in his fifties now and your long and awkward efforts have come to nothing. If you do not acknowledge my ownership of my own film rights, I will sue you to establish those rights. As you know, the film industry is a gossip industry, averse to troubled properties, and I warn you: I will make my side of this story as high profile as I can, and use all of the skills and resources I have, including my reputation in the literary, fly fishing and film communities, in my effort to terminate your claim.

While I have no wish to publically humiliate you, I am determined to reclaim, work with, and share with the world what is rightfully mine. If you choose to bow out gracefully I would be happy to negotiate how that might be most gracefully and fairly done. I am *not* willing to consider any sort of creative collaboration with you. I am well aware that Tom is a lawyer, and that you have considerable legal resources at your disposal, but the truth is: I would much rather spend the rest of my life fighting you – no matter how ugly or endless the legal mire – than ever have to watch your version of my novel appear on a movie screen.

I am dead serious about settling this issue, either through some kind of face-saving agreement, or through litigation. If you wish to avoid the latter I request your response within ten days. I will participate in a conference call with you and my attorneys if you desire.

Sincerely,

David James Duncan

cc: H. M. Snell
Sierra Club: Lou Barnes; CFO, Carl Pope, President; Sweetland & Moses, SCBooks
Counsel: Simmons/Zawdzkas/SF Firm/PDX Firm/LA Firm/NY:Salinger/Doubleday